1                    UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF DELAWARE

3

4     RAINDANCE TECHNOLOGIES,      :    CA NO. 15-152-RGA

5     INC., et al.,                :

6                                  :

7                 Plaintiff,       :

8                                  :

9            v.                    :    April 27, 2017

10                                 :

11    10X GENOMICS, INC.,          :

12                                 :

13                Defendant,       :    3:04 o'clock p.m.

14    ...........................:

15

16

17                 TRANSCRIPT OF DISCOVERY DISPUTE

18            BEFORE THE HONORABLE RICHARD G. ANDREWS

19                 UNITED STATES DISTRICT JUDGE

20

21

22    APPEARANCES:

23

24    For Plaintiffs:     FARNAN LLP

25                        BY:  MICHAEL J. FARNAN, ESQ

```
 1                            -and-

 2                 WEIL GOTSHAL & MANGES LLP

 3                 BY:  DEREK C. WALTER, ESQ

 4

 5

 6   For Defendant:    RICHARDS, LAYTON & FINGER

 7                 BY:  FREDERICK L. COTTRELL, III, ESQ

 8                            -and-

 9                 IRELL & MANELLA LLP

10                 BY:  MICHAEL H. STRUB, JR., ESQ

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Court Reporter:        LEONARD A. DIBBS

25                          Official Court Reporter
```

P R O C E E D I N G S

(The proceedings occurred at 3:04 o'clock p.m. as follows:)

THE COURT:  All right.

So this is a discovery conference in <u>RainDance Technologies v. 10X Genomics</u>, Civil Action No. 15-152.

Mr. Farnan?

MR. FARNAN:  Good afternoon, your Honor.

Michael Farnan on behalf of plaintiff, RainDance.

With me today is Derek Walter from Weil Gotshal.

THE COURT:  Good afternoon.

Mr. Cottrell?

MR. COTTRELL:  Good afternoon, your Honor.  Fred Cottrell from Richards Layton.

With me is Michael Strub from Irell & Manella.

THE COURT:  Thank you, Mr. Cottrell.

I read the letters that went back and forth that defendant says was the comprise that you all agreed to, right?

The e-mail chain with, I think, not with you, but with somebody else from your side.  And I looked at the e-mail chain and I think that's a reasonable interpretation of what it was.

MR. WALTER:  Yes.  That's not the way I remember things.  I think there is a long history here that goes way back.  This is a dispute that has been going on for a long time.

1    I some other e-mails.  I have one that I'd like to show.  This

2    is an e-mail from October.

3             THE COURT:  Okay.

4             And this is prior to the November e-mail that they

:08:11    5    submitted in this case, but the point is that we've been asking

6    for these documents for quite some time.

7             And the agreement that they identified -- the alleged

8    agreement that they identified in their November 11th letter was

9    to provide pleadings, deposition transcripts, and discovery

:08:24    10    responses, and that we would go away.  That was what they were

11    saying they were going to do.

12             That's a thing that they had been proposing for a long

13    time, okay?

14             And here's what we stated, and this was proposed much

:08:36    15    earlier, beginning way back when.  Our position always was

16    that's not the end point, that's the starting point.

17             And here's an example of this.

18             This an e-mail from us.

19             "Third, we have not seen Bio-Rad documents in 10X's

:08:51    20    production.  Your September 20th, 2016, letter agreed to produce

21    documents responsive to Request No. 41 that are also responsive

22    to one or more of plaintiff's other requests.

23             "In your September 28th, 2016 letter" --

24             THE COURT:  I'm sorry.  Do you have an extra one of

:09:05    25    these e-mails?

1      MR. WALTER:  I do.  I have an extra one that I gave to

2  opposing counsel.

3      THE COURT:  Okay.  I was just --

4      MR. WALTER:  I mean, I can hand this to your clerk, as

:09:15    5  soon as I complete reading of this.

6      MR. STRUB:  You can share this with me.

7      MR. WALTER:  "You further agreed to produce all

8  depositing transcripts and discovery responses from the Bio-Rad

9  litigation relating to the design and development of the GemCode

:09:28   10  Platform.  Well reiterate that the Bio-Rad pleadings and

11  proceedings are under seal, essentially rendering the Bio-Rad

12  litigation a black box.

13      "While plaintiff's do not agree to this unilateral

14  reduction of scope of Request No. 41, plaintiff's will reserve

:09:40   15  their rights and review 10X's production before insisting on

16  further production."

17      That was always our position, okay?  I think they were

18  always aware of that.  And they don't have any correspondence

19  from us, and if they do, and if they have it, I'd like to see

:09:52   20  it.

21      But they haven't provided to us where they say, yes, we

22  agree.  You give us whatever deposition transcripts you think

23  are relevant in your own judgment and then we'll go away and

24  agree never to -- never to pursue any further documents from

:10:08   25  that litigation.

1          They always knew what our position was on this and this

2     is what we told them on the phone, but this was the starting

3     point, not the ending point.

4               THE COURT:  So, Mr. Strub?

:10:19     5     MR. STRUB:  Yes.

6               THE COURT:  What do you have to say in response?

7               MR. STRUB:  So, as counsel points out, this October

8     e-mail, which I haven't seen before, is about a month before the

9     important e-mails, which are the ones that your Honor alluded

:10:33    10     to, which are attached as Exhibit 2 to our letter.

11          And there's no dispute here.  In fact, RainDance's

12     letters point out that the agreement was reached -- that was

13     reached was following, in their words, a lengthy meet-and-confer

14     process.  This was a process that happened over months.

:10:57    15          And in the -- on Page 3 of Exhibit 2, Lauren Drake from

16     our office writes directly to Mr. Walter, who's sitting across

17     the table from me, "Regarding 10X's" -- this is the second --

18     the third to last paragraph.

19               THE COURT:  No, no, I'm just checking.

:11:15    20          I recognize Ms. Drake's name.  I've seen her at the

21     Markman, or somewhere along the line, but I hadn't realized that

22     she was writing to Mr. Walter.  I thought she was writing to

23     somebody else.

24               MR. STRUB:  No.  This was a meet-and-confer between Ms.

:11:30    25     Drake and Mr. Walter.

1    And she clearly says what the agreement is.

2    "Regarding 10X's production of Bio-Rad litigation

3    documents, again, to fully resolve this dispute, 10X will agree

4    to produce deposition transcripts, discovery responses, and

:11:48    5    pleadings from the Bio-Rad litigation that relate to the design

6    and development of the GemCode Platform.

7    Then Mr. Walter comes back in the preceding e-mail --

8    this is November 9th.

9    THE COURT:  The following e-mail, not preceding.

:12:10    10    MR. STRUB:  Yes.  The subsequent e-mail preceding the

11    chain.

12    THE COURT:  Right.

13    MR. STRUB:  I have that problem in depositions all the

14    time, too.

:12:17    15    In the very last paragraph the only comment that Mr.

16    Walter makes is, "As to the Bio-Rad documents, please confirm

17    that the documents that are not subject to any confidentiality

18    concerns will start being produced no later than November 14th."

19    So then if we go to Ms. Drake's subsequent e-mail,

:12:39    20    which is the very first page of the exhibit -- kind of

21    penultimate paragraph there -- she reiterates the agreement.

22    She says, "Regarding the Bio-Rad litigation documents,

23    we plan to begin producing deposition transcripts, discovery

24    responses, and pleadings for the Bio-Rad litigation that relate

:13:00    25    to the design and development of the GemCode Platform, and that

1    are not subject to any confidentiality concerns next week.

2          THE COURT:  Yeah.  That's not -- I mean, that's not as

3    -- she doesn't really state the agreement so much as she stated

4    in the first one.

5          MR. STRUB:  That's true, your Honor.

6          The first one is -- is the memorialization that this

7    is, quote, "to fully resolved this dispute."

8          And this is why this is so important.

9          The negotiations that we had with RainDance about these

10   30,000 plus documents took place last year.  And the reason they

11   took place last year is because it was before the parties had

12   gotten into discovery.

13         And the issues that are being raised right now are the

14   same ones that we were -- that -- there's nothing new.  There's

15   no new issues.  And we wanted to know before getting into

16   discovery what is the world of documents that we're going to be

17   dealing with.

18         And now we're 17 depositions into the case.  There's

19   been substantial discovery.  And there was a decision made --

20   Bio-Rad acquires RainDance -- and a decision was made for some

21   reason.

22         You know what?

23         That agreement that we reached back in November, we

24   don't really like that agreement any more, and we want to get

25   out of it.

1       But from our position, if they had said that to us back

2   in November, we would have been in front of your Honor six

3   months ago, because this -- the documents that were produced in

4   the Bio-Rad litigation are, if they were relevant, they would

:14:42    5   have been produced in this litigation, pursuant to the parties'

6   agreements following the standard procedure to search for

7   documents with search terms.

8       That is why we fought about it so long ago.  We didn't

9   just want to say, here's 30,000 documents you have to review

:15:02   10   that are outside the scope of what we agreed on behalf of 10X

11   they were going to be produced.

12       So our position here is, look, we had this discussion.

13   We had a meet and confer.  We had a resolution.  We're just

14   asking the Court hold RainDance to its agreement.

:15:20   15       MR. WALTER:  All right.

16       So I think I laid out our position.  Our position on

17   this has always been that the depositions, and transcripts, and

18   pleadings were going to be a starting point.

19       Because what they were telling us in the

:15:33   20   meet-and-confer is that so much of that case is about irrelevant

21   issues.

22       And we said, well, we're skeptical about that, because

23   this is a trade secrets case, it's about the technology that's

24   involved, but let us see the depositions, transcripts, and

:15:45   25   pleading, and we're going to reserve our rights to seek more

1    based on what we learn.

2              Now, let's find out about what we learned.

3              I think this Declaration they submitted from Michael

4    Weil today, who was the attorney who represented --

:15:56    5              THE COURT:  When you say "today," you mean yesterday?

6              MR. WALTER:  Yesterday.  Who represented 10X Genomics

7    in that dispute.

8              Here's what the documents are allegedly about.

9              He says in Paragraph 7 of his Declaration.

:16:11    10              "Bio-Rad proceedings involve the exchange of hundreds

11    of thousands of documents.  Those documents relate to the issues

12    in dispute in those proceedings, including the founder's

13    contractual obligations, surfactant formulation and synthesis,

14    the geometry of 10X's microfluidic chips, vendors,

:16:33    15    manufacturing, quality control methods, next generation

16    sequencing applications, and software routines."

17              So all of those issues are technical issues related to

18    the design and operation of their product, outside of this first

19    issue, which is the founder's contractual obligations.

:16:49    20              Now, I want to be clear about what we're seeking in

21    this case, because there's a little bit of a discrepancy.

22    They're talking about how there's hundreds of thousands of

23    documents that have been produced in that litigation, but

24    there's only 30,000 at issue here.

:17:02    25              THE COURT:  Right.

1    MR. WALTER:  I want to explain that discrepancy so you

2  know what it is we're seeking and what we're not seeking.

3    The reason they're talking about hundreds of thousands

4  of documents is because in that trade secret dispute, the

:17:14    5  founders of Bio-Rad produced roughly a hundred thousand

6  documents.

7    THE COURT:  The founders of?

8    MR. WALTER:  Excuse me.  The founders of 10X.

9    They produced roughly a hundred thousand documents in

:17:23    10  their personal capability, okay?

11    And we know by conferring with counsel for Bio-Rad in

12  the trade secret dispute that the bulk of those documents relate

13  to their activity before they were at 10X.

14    And we're not seeking those 80,000 documents, because

:17:40    15  those are the documents that relate to the founders contractual

16  obligation.

17    The 30,000 documents that we're seeking are the

18  documents that 10X produced in the arbitration and the trade

19  secret proceeding that are 10X documents that came after 10X was

:17:55    20  formed.

21    And how do we know what those documents relate to?

22    Well, number one, we know because we've been able to

23  speak with Bio-Rad's counsel.  They haven't shown us the

24  documents, but they've told us at a high level what those

:18:09    25  documents are about.  And they told us they related to the

1   design and operation of 10X's products.  It's precisely the

2   stuff that's out --

3   　　　　THE COURT:  Well, haven't you already gotten the

4   documents through other discovery that are about the design and

5   operation of 10X products?

6   　　　　MR. WALTER:  Well, I think that's an interesting point,

7   isn't this cumulative?

8   　　　　Up until now, they've never taken the position that

9   it's cumulative and it's the same stuff we've received, okay?

10  　　　　Now, I think -- I mean, it is a little bit unclear what

11  position they're taking.

12  　　　　THE COURT:  Well, I mean, I think -- my impression is,

13  the position they're taking is, we haven't reviewed the 30,000

14  documents, so we don't know exactly what's in there, am I right?

15  　　　　MR. STRUB:  That's right, your Honor.

16  　　　　MR. WALTER:  I think they do know exactly what's in

17  there.  Those documents --

18  　　　　THE COURT:  Wait, wait.

19  　　　　So, Mr. Strub says they have not reviewed them.

20  　　　　Are you challenging his honesty here?

21  　　　　MR. WALTER:  Well, what I'm saying is that those

22  documents, they have been reviewed and produced to Bio-Rad, so

23  someone on their side knows exactly what's in them.

24  　　　　THE COURT:  Well, when you say "on their side," what he

25  said was, some other law firm represented --

:18:21

:18:33

:18:47

:18:56

:19:08

1        MR. WALTER:  That's right.  It might have been some

2   other law firm, but 10X's attorneys, whether it's at Irell or

3   the attorneys that represented 10X in the trade secrets dispute,

4   they know exactly what's in those documents.

5        THE COURT:  But the problem is that saying this group

6   of people know what's in it, when it's that group of people that

7   is representing them now.

8        I mean, you know, any documents, somebody in the world

9   knows what's in it, but that doesn't mean that it's -- that the

10   knowledge is just transferred with no effort.

11        MR. WALTER:  But there might be some effort involved,

12   there might need to be a phone conversation, and there might

13   need to be a little bit of work.  The point is they have access.

14        THE COURT:  But I think their point is, we had an

15   agreement as to how we were going to do all of this, you know,

16   designate a custodian, blah, blah, blah, whatever.

17        And, so, why should we be, you know, looking at this

18   pot of 30,000 documents that's fallen out of the sky, to see how

19   many duplication there is with what we've already given you, and

20   how much of the 30,000, notwithstanding that it post-dates the

21   formation of the company are, nevertheless, irrelevant?

22        MR. WALTER:  Well, my position on that --

23        THE COURT:  And, I mean, so I guess -- so you all set

24   up discovery, so that you were supposed to get whatever it is

25   you needed to make your case, right?

1          MR. WALTER:  And part of that process was, we served

2    Requests for Production.  One of those Requests for Production

3    we served was for documents related to this case.

4          And one thing I don't know, have they taken those

:21:06    5    30,000 documents, and have they even applied the search terms

6    that we've submitted?

7          THE COURT:  But aren't the search terms supposed to be

8    supplied to -- applied to seven custodians who were presumably

9    not the lawyers for this other firm?

:21:18    10          MR. WALTER:  It's not just -- I don't think it's just

11    limited to custodians.  I think they also have to search

12    repositories or other documents they might have.  I don't think

13    it's just limited to people.

14          MR. STRUB:  Now, your Honor, we complied with the

:21:31    15    default standard that we agreed to.  We applied it to the search

16    terms that were agreed to.  We applied it to custodians that

17    were agreed to.

18          And, I mean, your Honor is absolutely right.  We have

19    no idea what's in those documents, but to the extent that they

:21:47    20    are within the category of what the parties agreed to in the

21    default standard, they have them.  There's no documents that

22    are, you know, wild documents out there that would have been

23    responsive, that wouldn't have been captured.

24          THE COURT:  And I'm sorry, you're saying "wild"?

:22:02    25          MR. STRUB:  Well, no, no, I mean -- that was an

1    inappropriate or inaccurate term.

2            What I'm saying is that --

3            THE COURT:  You're talking about the law firm?

4            MR. STRUB:  Well, the documents that we searched for

:22:15    5    were 10X documents.  And to the extent they were responsive to

6    the protocol that the parties agreed to, they would have been

7    produced.

8            That's what I'm saying, right?

9            THE COURT:  Right.

:22:25    10           MR. WALTER:  Your Honor, I'm having a hard time with

11   that.  We don't even have all the deposition transcripts from

12   that case.

13           I took the 30(b)(6) of their finance person just a few

14   weeks ago.  And when I walked in I was surprised to learn that

:22:36    15   she's been deposed once in the arbitration and once in the trade

16   secrets case.  And we didn't have the trade secret.  We didn't

17   have the deposition transcript.

18           Why?

19           Because they decided to withhold it, okay?

:22:48    20           And, so, I'm a little bit skeptical that we --

21           THE COURT:  Well, so, that's a slightly different

22   thing.

23           How much of the transcripts, whatever, that are the

24   things that you agreed to -- and I forget exactly what the

:23:06    25   terminology was to produce whatever you thought was relevant --

1   are you done doing that?

2        MR. STRUB:  Yes, your Honor.  The agreement was, as in

3   Ms. Drake's letter, we were going to produce anything --

4   transcripts that relate to the design and development of the

:23:27    5   GemCode Platform.

6        Ms. Osborne was the financial person.

7        THE COURT:  Right, I get it.

8        MS. STRUB:  She wouldn't have testified about the

9   design and development of the GemCode Platform -- and she didn't

:23:36   10   -- and that's why the transcript wasn't produced.

11        MR. WALTER:  She might not have testified about the

12   design of it, but the fact that -- the notion finance person

13   wouldn't have been testifying about the development and the cost

14   of goods they were putting into things, and the forecast

:23:47   15   revenues, and the market for this, she would have testified

16   about that.  She was deposed for two days.

17        The point is, at a minimum, they're taking a very

18   narrow interpretation of what their obligation was under what

19   they agreed to.

:24:02   20        THE COURT:  Right.  But that's a different dispute than

21   the one you're here about today, right?

22        MR. WALTER:  I think it is a little bit of a different

23   dispute.  If you take their version of the events that there's

24   an agreement here -- and I'm not sure they supplied it -- they

:24:17   25   fulfilled the agreement, okay?

1        But the point is that there is information related to

2   that trade secret dispute that's not duplicative of what we've

3   already received in this case.  We know that.

4        THE COURT:  And you say that because?

5        MR. WALTER:  Because there's at least one deposition

6   transcript within the narrow patch of materials that they

7   haven't produced.  There is going to be more information as

8   well.

9        Now, I can't emphasize the -- I wanted to do something

10  to try the emphasize and make clear the relevance of the

11  material from this case.

12       I brought two other deposition transcripts along, okay?

13       And I can make them available to the Court.  I don't

14  know if you want to read these deposition transcripts.

15       The exercise I went through was to try to highlight the

16  material that was going to be relevant to the case, okay?

17       And here's the deposition transcripts from their

18  surfactant person, okay?

19       And there's 60 pages of transcript that I highlighted.

20  I saw it.  It's all relevant.  It's all about the operation and

21  design of their product.

22       There's a chunk here that deals with his time at

23  Bio-Rad -- and I admit that's not relevant -- but then the chunk

24  at the beginning is all about the design and operation of the

25  product.

:24:30

:24:41

:24:54

:25:10

:25:19

1    THE COURT:  Wait, wait.

2    Let me just make sure what you're saying, Mr. Walter.

3    One of the depositions that you got pursuant to Ms.

4 Drake's e-mail, you've gone through and it has at least 60

:25:32  5 relevant transcript pages?

6    MR. WALTER:  More, more.

7    And then here's another one.  This is another

8 deposition transcript.  And I tried to go through the exercise

9 and find --

:25:40  10    THE COURT:  And, so, what I'm having trouble with is,

11 they said they would produce relevant documents.  Earlier you

12 were complaining that they had a chintzy view of what's a

13 relevant document.

14    MR. WALTER:  Mm-hmm.

:25:51  15    THE COURT:  Now you're saying, well, here's a document

16 that they produced and it has lots of relevant information.

17    How does that -- what's the impact on the -- how does

18 that help you?

19    MR. WALTER:  The way it helps us is, it shows that what

:26:04  20 was going on in that case was information that got down to the

21 gory details of how that product works, and how it's designed,

22 and how it was developed, and what they were going to do in the

23 process of trying to develop that product.

24    It's very detailed, highly relevant information.

:26:19  25    As I was saying for this one transcripts, I tried to

1    highlight it to identify the stuff that was relevant.  The whole

2    thing is highly relevant material regarding the design and

3    operation of the product.

4         And we don't have all the documents they even agreed to

:26:32    5    produce.

6         THE COURT:  Remind me, how many pages of documents has

7    10X produced pursuant to the -- not counting these transcripts

8    and things, you know, just pursuant to your normal -- I remember

9    seeing numbers, and I forget whose numbers were big and whose

:26:49    10   numbers were small.

11        MR. WALTER:  They contend that they produced 30,000

12   documents, roughly.

13        THE COURT:  And the document is not a page.  The

14   document is however many pages the document -- or it's 30,000

:27:00    15   discrete things, some of which might be multiple pages.

16        MR. WALTER:  Right, and I don't have a page count for

17   you.

18        THE COURT:  No, I don't care about a page count.

19        And how many pages -- how many documents have you

:27:19    20   produced to them?

21        MR. WALTER:  That I don't know.  That I don't know.

22        THE COURT:  All right.

23        What else would you like to tell me?

24        MR. WALTER:  So, you know, there were -- there are some

:27:33    25   things I would like to add.

1      First, this notion about the ESI Order, and the ESI

2  Order saying that it's seven custodians, and a certain number of

3  key words.

4      The purpose of that ESI Order was not so that there

:27:45    5  would be a fixed number of custodians on one side, and a fixed

6  number of custodians on the other side, so there would be a

7  level playing field.

8      That hasn't happened here.

9      They are one party, so there have been seven custodians

:27:55   10  from them.  We have the University of Chicago and RainDance.  We

11  actually had to collect documents from 14 custodians, and

12  through seven through third-party subpoenas, so there is a lot

13  of documents they're filtering through.  And we probably

14  filtered through a lot more documents than they, if you take

:28:13   15  into account the 14 custodians that we've had to look at.

16      The key point, though, is that ESI Order that we agreed

17  to, the purpose of that order was not so that we would have a

18  level playing field, or that each decide would have the same

19  number of documents.

:28:25   20      The purpose of the order was to control the burden on

21  discovery on both sides.

22      THE COURT:  Yes, that seems like a reasonable thing to

23  say.

24      MR. WALTER:  That's the purpose of that.  That's why we

:28:33   25  were talking about key words and the number of custodians.

1                    It didn't put hard limits on things and it certainly

2     didn't say that you can't go beyond the key words and the

3     custodians, if what you have is a repository of documents that's

4     been reviewed for privilege, that's been reviewed for privilege,

:28:51   5     and it's sitting there and there's no further burden to produce

6     it.

7                    There's nothing about that ESI Order that contemplates

8     that --

9                    THE COURT:  So when you say there is no further burden

:28:57   10    to produce it, Mr. Strub, or whoever wrote the letter said,

11    which seems fairly reasonable to me is, of course there is a

12    burden to produce it, because the lawyers have to go through it,

13    and figure out what it is, and see what is actually, you know,

14    responsive?

:29:17   15                   MR. WALTER:  My point here is -- first of all, why

16    would you be reviewing those?

17                    The primary reason you do a review of documents is to

18    avoid a production of privileged documents.  Those documents

19    have already been reviewed for privilege, okay?

:29:29   20                   That's happened.

21                    Attorneys and/or consultants have gone through them in

22    great detail.  They removed the privileged documents, okay?

23                    And, so, what is left are documents that we understand

24    relate to the design and operation of the product.

:29:42   25                   What kind of documents could -- I mean, it's hard for

1    us to understand what kind of irrelevant documents are going to

2    be in there.

3          What's the harm if we do get a few irrelevant

4    documents?

:29:52    5          As I said earlier, we're trying to sift out the

6    irrelevant documents from what we understand to be relevant.  We

7    understand there's 80,000 documents that the inventors collected

8    and produced in their personal capacity that relates to their

9    time when they were at Bio-Rad, not their time at 10X.  These

:30:09    10   are 10X documents.

11          And everything we know, everything we know from counsel

12   at Sidley Austin, who's looked at the documents, everything we

13   know from looking at the deposition transcripts that we have

14   seen, is that those documents are going to be detailed

:30:21    15   documents, highly relevant documents about the design and

16   development of their product.

17          THE COURT:  And, so, let me just make sure that I have

18   this straight.

19          So there's these 30,000 documents that are in the law

:30:36    20   firm that you think are relevant.  Meanwhile, through your

21   discovery procedure, they have produced 30,000 documents, right?

22          MR. WALTER:  That's right.

23          MR. STRUB:  And your Honor, the actual numbers -- you

24   asked the question before -- is in Footnote 3.

:30:49    25          THE COURT:  What are the actual documents?

1          MR. STRUB:  So 10X has produced 33,000 documents in the

2     litigation.  Each of the plaintiffs, the University of Chicago

3     and RainDance, has produced 3,000 documents.

4          THE COURT:  Yeah, even though in these cases, isn't it

:31:04    5     usually the defendants that produce more documents?

6          MR. STRUB:  Well, right.  And the third parties have,

7     including -- including the inventors, have produced about 13,000

8     documents.

9          So 10X has produced 33,000 and collectively 10X has

:31:19    10     received from multiple sources about --

11          THE COURT:  No.  The point that I was just asking is,

12     you get a treasure trove of documents that we said is 30,000.

13     They've already produced 33,000.

14          Presumably, the two things are not at all inconsistent,

:31:43    15     that they have produced a bigger pile than what you're now

16     saying they produced in some other case where the same issues

17     were at stake, right?  Isn't it your theory that somehow or

18     other the trade secrets case involved the same issues as this

19     case, so they produced 30,000 documents?

:32:05    20          Now, later in time, they're litigating with you on

21     these same issues, and they produced 33,000 documents.

22          Doesn't it seem actually likely there's going to be a

23     fairly heavy overlap between what they produced before and what

24     they produced now?

:32:20    25          MR. WALTER:  Well, if that's the case, there's a heavy

```
        1    overlap between what they produced now, and what they produced

        2    earlier, and there is no burden to providing them, why wouldn't

        3    they make them available to us?

        4         That's what I don't know understand.

:32:30  5         THE COURT:  All right.

        6         MR. WALTER:  I mean, the cumulativeness argument

        7    doesn't seem to advance the ball here.

        8         If it really is the same stuff --

        9         THE COURT:  All right.

:32:37 10         Hold on a for minute.

       11         Mr. Strub, I let Mr. Walter talk for a while.  What do

       12    you have to say?

       13         MR. STRUB:  Your Honor, I think you identified the

       14    points.  I don't have much to add, unless your Honor has

:32:48 15    concerns about this.

       16         I wouldn't be here -- my clients wouldn't pay for me to

       17    come out here if we weren't concerned about the substantial cost

       18    and burden of having to go through these 30,000 documents.

       19         And contrary to what Mr. Walter had said, we're not

:33:06 20    reviewing the -- we don't review documents just for privilege.

       21    We review documents so that we know what evidence is at issue in

       22    the case, what evidence we're going to expect to be shown to our

       23    witnesses, what evidence might be used with other witnesses -- I

       24    mean, this -- the facts in the case.

:33:22 25         THE COURT:  So tell me -- you're obviously an
```

1    experienced lawyer at this -- based on what you know about the

2    30,000 documents that are in the law firm's files, or, you know,

3    however they're stored, given that they've been produced before,

4    how many lawyer hours, or paralegals hours, or whoever you put

:33:46    5    on this job, would it to take review them before you would

6    produce them?

7            MR. STRUB:  Well, we wouldn't -- it wouldn't be a

8    matter of reviewing them before production I don't think.

9    That's not the issue.

:33:59    10    The burden is in production.  The burden is in taking

11    this vast amount of information, double the size that's already

12    been produced, and figuring out whether there are any new

13    documents in here that didn't hit on the parties agreed-upon

14    protocol, that might be used in the case, that we have to

:34:21    15    integrate into our outlines of evidence, we have to integrate

16    into our examination outlines, and every single document would

17    have to be reviewed in order to do that.  We've never see them.

18    We don't know what's in them.

19           And, in terms of how many lawyers hours, it's -- so I

:34:37    20    was looking at this, and I'm sort of old school, I think of it

21    in terms of banker's boxes.

22           I looked at this and said, this is a probably about 50

23    banker's boxes worth of documents.

24           And, you know, from the way I used to calculate these

:34:51    25    things.

1          THE COURT:  Yes, I'm familiar with the concept.

2          MR. STRUB:  And, so, depending on how -- we don't have

3    a huge team.  We have a couple of associates who are working on

4    this primarily.

:35:05  5          And, you know, based on my experience, it's really

6    difficult to get through that amount of material in a short

7    period of time.  I mean, I'm thinking this is maybe a month's

8    worth of work reviewing these documents.

9          THE COURT:  So I'm just curious, but I understand there

:35:26  10   are software programs or something.

11         Wouldn't you first take the 30,000 documents and run

12   some program that would tell you which ones are duplicates?

13         MR. STRUB:  The problem with that software is that it

14   only picks up absolutely identical duplicates.  And many of the

:35:44  15   documents -- and this is why there are duplicates in production

16   -- many of the documents, for example --

17         THE COURT:  If they have somebody else's initials on

18   them?

19         MR. STRUB:  Or it's an e-mail chain and you have one

:35:56  20   e-mail in the production, but it's part of a chain, and the

21   other production has just the one e-mail.  That won't hit as a

22   duplicate.

23         And believe me, I've asked the same question that your

24   Honor has.

:36:10  25         Why can't we just run some software program and knock

1    out the duplicates?  Why am I seeing, you know, four boxes of

2    documents here all which seem to be duplicative?

3            And that's the answer is, the software is not yet at

4    the point robust enough to where it can -- it can perform that

:36:27    5    function.

6            Like I said, your Honor, I have other things to do.  I

7    wouldn't be here if we weren't concerned about the burden.  And

8    that's why we negotiated this way back in November, because we

9    were concerned about exactly this issue.

:36:43    10           And that's why we reached the agreement, and we would

11   not have reached that agreement if we did not believe, as Ms.

12   Drake said, that fully and finally resolved the dispute.

13           If we knew we were going to have this dispute again, we

14   would have said, okay, let's have this dispute in November

:36:59    15   before the depositions had begun so we know what's in play.

16           And, you know, what happened is, Bio-Rad acquires

17   RainDance.  There's a new boss in town.  Counsel for Bio-Rad --

18           THE COURT:  Yes, I heard that the first time.

19           MR. STRUB:  Yes.

:37:11    20           THE COURT:  And remind me, 10X, is that a privately-

21   held company?

22           MR. STRUB:  Yes, your Honor.

23           THE COURT:  And, so, there is no public information

24   about the state of its finances?

:37:37    25           MR. STRUB:  No, your Honor.  We've disclosed that

1    information under the Protective Order, but --

2           THE COURT:  All right.

3           So you don't have any more to say.

4           Do you have any more to say?

:37:52    5    MR. WALTER:  Well, I think -- you know, you asked the

6    question, what do we -- what do we know about these documents?

7           And here's the evidence they submitted about what's in

8    those documents.

9           Founders contractual obligations, surfactant

:38:03    10   formulation and synthesis, the geometry of 10X's microfluidic

11   chips, vendors, manufacturing, quality and control methods, next

12   general sequencing applications and software routines.

13          It's almost all technical information about their

14   product.

:38:15    15   Now, the -- the argument they're pushing on most

16   heavily now is burden.  And the burden they're identifying is

17   not that it would be hard for them to produce the documents.

18   The primary burden they're identifying is that these documents

19   would now be part of the case.

:38:31    20   THE COURT:  And they at least would have to be reviewed

21   to see whether they're part of the case.

22          MR. WALTER:  Well, I don't know that they do need to be

23   reviewed to see if they're part of the case.

24          Our position is that based on what we know, what

:38:42    25   Michael Weil has told us about those documents, they should be

1    part of the case.

2         And based on what we see in the deposition transcripts,

3    they should be part of the case.  Everything we've seen so far

4    tells us that those documents should be part of the case, maybe

:38:53    5    not the 80,000 documents that predate the founders time at 10X,

6    but the 30,000 documents that come after.  Everything we know

7    tells us that they should be part of the case.  They haven't

8    really identified anything to suggest otherwise.

9         Like I said, they're shifting now off this argument

:39:08    10    about burden, of not having them to be produced.  Really,

11    they're primary argument is that they're going to be part of the

12    case, and we're going to have to look at them and find out

13    what's in them, in case there is something extra.

14         So, you know, they kind of want to have it both ways.

:39:20    15         On the one hand they want to say, it's all duplicative,

16    we shouldn't have to produce it, because they already got it,

17    but on the other hand, they're saying they're going to face an

18    ordinary burden of a month's worth of work to figure out if

19    there's anything new in there.

:39:33    20         There might be something.  The truth is probably in

21    between, okay?

22         There is probably going to be some new documents, and

23    whatever those new documents are, I don't see any reason why we

24    shouldn't have them.  There's no burden for them to produce it.

:39:45    25         And this notion that they're not going to be able to

1    use any software to figure out what's new and what isn't new,

2    that's probably not true.  They're going to be able to narrow it

3    down using the software, and that's going to reduce the burden,

4    which I think is going to be pretty minimal.

:39:58    5        30,000 documents is not a lot of documents.  It's not

6    going to take them a month of time to get through.  That's for

7    sure.

8        Now, I want to -- I want to note one other thing real

9    quick.

:40:07   10        These documents that they're withholding from us, and

11   not release them for the case, they've subpoenaed us for those

12   documents.

13        THE COURT:  Well, I gather they had subpoenaed Bio-Rad.

14        MR. WALTER:  They subpoenaed Bio-Rad, that's right.

:40:19   15        THE COURT:  Right.  Who's not you, right?

16        MR. WALTER:  Well, we are representing Bio-Rad in

17   connection with the subpoena.  Bio-Rad is not the owner of --

18        THE COURT:  No, I understand Bio-Rad's bought or

19   they're in the process of buying RainDance.

:40:31   20        MR. WALTER:  The acquisition is complete.

21        THE COURT:  Okay.

22        MR. WALTER:  Yes.

23        THE COURT:  All right.

24        Yeah, yeah, I guess they continued things, so you could

:40:37   25   actually substitute Bio-Rad in?

1      MR. WALTER:  Yeah, and that's in process.

2      THE COURT:  Okay.

3      MR. WALTER:  And, so, they subpoenaed -- days after

4  that acquisition happened -- they subpoenaed Bio-Rad for those

:40:46    5  very documents, okay?

6      You know, it can't be that they can go to Bio-Rad and

7  say, we want every document you have related to 10X, and we want

8  every document your attorneys have related to 10X.

9      And, oh, by the way, don't give us any of the

:40:59   10  documents.

11     THE COURT:  I thought they were trying to get from

12  Bio-Rad the documents related to RainDance.

13     MR. WALTER:  No, they're request was all documents

14  related to 10X.  That's what they wanted to do.

:41:11   15     They went to Bio-Rad and they said, give us all

16  documents related to 10X.

17     And, in that subpoena, they just didn't say, give us

18  all documents that you, Bio-Rad, have related to 10X.

19     They said, give us all documents all your attorneys

:41:21   20  might have related to 10X.

21     They subpoenaed us for those documents.

22     And now they're telling us, no, all those documents

23  from the 10X/Bio-Rad litigation, that 10X has in those cases

24  that are now in the possession of your attorneys, those are off

:41:38   25  limits.  Those are off limits, because there's a Protective

1    Order.

2            THE COURT:  Okay.

3            MR. STRUB:  Your Honor, that's a complete red herring.

4            Obviously, 10X was not subpoenaing BioRad for 10X

:41:50    5    documents, and we offered to withdraw the subpoena, and clarify,

6    and make that clear.

7            The reason we were seeking documents from Bio-Rad

8    relating to 10X products related to the valuation that Bio-Rad

9    put on RainDance's part of the accusation.  That was what --

:42:07   10            THE COURT:  Well, that's -- you must have put that in a

11    footnote or something, because that's what I thought you were

12    doing, because that -- that's logical why you would subpoena

13    from Bio-Rad, the documents that presumably were exchanged in

14    litigation, when presumably the law firm that has the 30,000

:42:31   15    also has whatever Bio-Rad produced.

16            Yeah, that's a lot harder to figure out.

17            MR. STRUB:  Right, this is kind of a gotcha argument.

18            Your subpoena is overbroad, therefore, we got you.

19            And told them that we will withdraw the subpoena and

:42:41   20    reissue it.

21            That's really the genuine issue here.

22            THE COURT:  Well, so are you actually withdrawing the

23    subpoena?

24            MR. STRUB:  Well, no.

:42:48   25            What the position that -- that RainDance has taken

1    here, oh, no, no, no, we don't -- we don't want you to do that.

2        We want you to stick with the subpoena you originally

3    served, because we like -- because we like the language that you

4    used in that subpoena, because we think it includes these 10X

5    documents.

6        THE COURT:  Is there anything else either of you want

7    to say?

8        MR. STRUB:  No, your Honor, not from me.

9        MR. WALTER:  I don't think I have anything further to

10   add.

11       THE COURT:  Why don't you all just hold on here for a

12   minute.  I'll be back in a few minutes.

13       (A recess was taken at this time.)

14       (The proceedings reconvened as follows:)

15       THE COURT:  So I've considered what the parties wrote

16   in their letters and what they said today, and I think that --

17   what I'm convinced of is that the parties agreed upon a way to

18   conduct discovery in this case, which the parties thought would

19   be sufficient to provide both sides with what they needed to

20   litigate this case pursuant to these procedures.

21       Plaintiff has gotten 33,000 documents, which are

22   presumably relevant.

23       Now, they want more.  They want to search through a

24   database of 30,000 documents.  I think they just want the whole

25   database, which logic would suggest, since we don't have any

1    actual facts, that this database, to a large extent, duplicate

2    items that are elsewhere in the RainDance's database -- I'm

3    sorry -- not the RainDance, the 10X database.  And, thus,

4    presumably for the most part have already been produced.

:02:40    5        Therefore, it seems to me that plaintiff's request is

6    inconsistent with the now familiar proposition that discovery

7    should be proportional to the needs of the case.

8        And, therefore, I'm going to deny plaintiff's request.

9        All right.

:03:01    10        MR. STRUB:  Thank you, your Honor.

11        THE COURT:  We're in recess.

12        (The proceedings adjourned at 4:03 o'clock p.m.)

13        * * * * *