# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THE UNIVERSITY OF CHICAGO  :
                           :

      and                     :
                           :

BIO-RAD LABORATORIES, INC.  :
                           :

          Plaintiffs,     :       Civ. A. No. 15-152-RGA
                           :

         v.                  :
                           :

10X GENOMICS, INC.        :
                           :

         Defendant     :
                           :

---

## PLAINTIFFS' MOTION *IN LIMINE* NO. 1 TO PRECLUDE REFERENCE TO LITIGATIONS AND *INTER PARTES* REVIEWS BETWEEN THE PARTIES UNRELATED TO THE PATENTS IN-SUIT

Pursuant to Federal Rules of Evidence 401, 402, and 403, plaintiffs The University of Chicago and Bio-Rad Laboratories, Inc. ("Bio-Rad") (collectively, "Plaintiffs") move the Court for an order precluding defendant 10X Genomics, Inc. ("10X") from offering evidence or eliciting testimony on six different litigations and numerous *inter partes* reviews between the parties involving patents **_unrelated_** to the patents in-suit, including: (1) *Bio-Rad Labs., Inc. and Bio-Rad QL, Inc. v. 10X Tech., Inc., Serge Saxonov, Kevin Ness, and Ben Hindson*, Civ. A. No. MSC14-01751 (Super. Ct., Contra Costa Cnty.); (2) *Bio Rad Labs., Inc. v. Hindson, Ness, and Saxonov* (Am. Arb. Assoc.); (3) *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, Civ. A. No. 3:17-cv-04339-VC (N.D. Cal.); (4) *10X Genomics, Inc. v. Bio-Rad Labs., Inc.*, Civ. A. No. 3:18-cv-00209-JST (N.D. Cal.); (5) *Certain Microfluidic Devices*, Inv. No. 337-TA-1068 (ITC); (6) *Certain Microfluidic Systems and Components Thereof and Products Containing Same*, Inv. No 337-TA-1100 (ITC); and (7) *inter partes* reviews ("IPRs") pertaining to non-asserted patents (collectively, the "Unrelated Matters").

By way of background, in the 2010 timeframe, 10X's principals were part of a company called QuantaLife, which was engaged in the development of microfluidic droplet technology. Bio-Rad purchased QuantaLife in 2011, and the individuals who would later become 10X's principals joined Bio-Rad in the acquisition. These individuals, however, soon left Bio-Rad to start 10X. In late 2014, shortly before 10X commercialized its product, Bio-Rad filed suit against 10X in California state court alleging trade secret misappropriation. In 2017, the parties settled the trade secret dispute. Some Unrelated Matters pertain to this dispute.

Come 2017, Bio-Rad purchased the original plaintiff in this case, RainDance Technologies, Inc., for $87 million, and continued to prosecute this case. Since then, Bio-Rad and 10X have filed numerous back-and-forth actions—including two ITC actions, two district

court actions, and multiple IPRs—involving different factual allegations, causes of action, and patents.   None of these disputes involve plaintiff University of Chicago or the University of Chicago patents that are the only patents-in-suit in this case.   During meet and confer, 10X stated it wants to offer evidence of these Unrelated Matters, supposedly to show that Bio-Rad acquired RainDance not because RainDance held valuable IP, but so it could pursue this case and give 10X its comeuppance.  Allowing evidence or argument about the Unrelated Matters would create side-shows that would distract from the merits of this action needlessly.

### A.    The Unrelated Matters Are Not Relevant

The Unrelated Matters are irrelevant.  They have no bearing on Plaintiffs' infringement or damages cases, 10X's defenses, or any other matter of consequence.  *See* Fed. R. Evid. 402; *ICU Med., Inc. v. RyMed Tech., Inc.*, 752 F. Supp.2d 486, 489-90 (D. Del. 2010) (granting patentee's motion *in limine* to the extent the accused infringer sought to offer evidence of prior litigation regarding non-asserted patents and accused products).   Indeed, they have nothing to do with plaintiff University of Chicago at all.

 10X has admitted that at least some of the Unrelated Matters are irrelevant, stating in this case that the previous trade secret dispute involved "issues unrelated to this litigation."  D.I. 167 at 1.

### B.    The Unrelated Matters Are Prejudicial, Confusing, Misleading, And A Waste Of Time

Even if the Unrelated Matters were probative of some issue in this case, they should be precluded as collateral and prejudicial.  *See* Fed. R. Evid. 403; *AVM Tech. LLC v. Intel Corp.*, Civ. A. No. 15-cv-00033-RGA, 2017 WL 2938191, at *1 (D. Del. Apr. 19, 2017) (Andrews, J.) (granting patentee's motion *in limine* to exclude references to decisions or orders from prior lawsuits under Rule 403).  10X's introduction of the Unrelated Matters as evidence of Bio-Rad's

2

purported sourness against 10X is simply an attempt to poison the jury against Plaintiffs.  *See Helios Software, LLC v. Spectorsoft Corp.*, Civ. A. No. 12-81-LPS, 2015 WL 3653098, at *1 (D. Del. May 22, 2015) (precluding admission of related litigation finding it "not probative of the issues that will be the subject of the Jury Trial and, even if such evidence was relevant, any minimal probative value is substantially outweighed by the risk of unfair prejudice.").  Permitting 10X to suggest that Bio-Rad is pursuing this action out of spite is particularly inappropriate when one considers that Bio-Rad paid $87 million to acquire RainDance and the rights to the intellectual property estate that includes the patents-in-suit.  It strains credulity to think that Bio-Rad paid this sum simply so it could gain the right to harass 10X with a lawsuit.

The Unrelated Matters are apt to be confusing, misleading, and a waste of time.  *See* Fed. R. Evid. 403.  Trial is fixed at five days.  Plaintiffs intend to assert five patents encompassing multiple claims with several subparts.   10X has asserted non-infringement and invalidity defenses—including anticipation, obviousness, written description, enablement, and indefiniteness.  The parties have disclosed fifteen "will call" witnesses between them, including seven experts.  Proceeding down the "rabbit hole" and re-litigating the Unrelated Matters would be foolhardy.  *See World Wide Stationery Mfg., Co. v. Bensons Int'l Sys., Inc*., Civ. A. No. 3:11-523, 2012 WL 12894226, at *2 (N.D. Ohio Sept. 12, 2012) (excluding reference to prior patent litigation since it would risk confusing the jury and require mini-trials to explain); *Helios*, 2015 WL 3653098, at *1.

For the foregoing reasons, Plaintiffs respectfully request the Court order that 10X is precluded from offering evidence or eliciting testimony at trial on the Unrelated Matters.

Dated:  March 16, 2018

OF COUNSEL:

Edward R. Reines
Derek C. Walter
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000
ed.reines@weil.com
derek.walter@weil.com

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: 302-777-0300
Facsimile: 302-777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiffs*

4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BIO-RAD LABORATORIES, INC. and THE
UNIVERSITY OF CHICAGO,

               Plaintiffs,

      v.

10X GENOMICS, INC.,

               Defendant.

C.A. No. 15-152-RGA

---

**DEFENDANT 10X GENOMICS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 1 TO PRECLUDE REFERENCE TO LITIGATIONS AND *INTER PARTES* REVIEWS BETWEEN THE PARTIES UNRELATED TO THE PATENTS IN-SUIT**

*Of Counsel*:

David I. Gindler (dgindler@irell.com)
Alan J. Heinrich (aheinrich@irell.com)
Lauren N. Drake (ldrake@irell.com)
Elizabeth C. Tuan (etuan@irell.com)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276
Tel: (310) 277-1010

Michael H. Strub, Jr. (mstrub@irell.com)
Dennis J. Courtney (dcourtney@irell.com)
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Tel: (949) 760-0991

D: March 23, 2018

Frederick L. Cottrell, III  (#2555)
Jason J. Rawnsley  (#5379)
RICHARDS, LAYTON & FINGER P.A.
920 North King Street
Wilmington, DE 19801
Tel: (302) 651-7700
cottrell@rlf.com
rawnsley@rlf.com

*Attorneys for Defendant 10X Genomics, Inc.*

Plaintiffs improperly seek to exclude all evidence of Bio-Rad's litigation with 10X in related proceedings involving the same technology, parties, and products.[1] Bio-Rad's motion is an attempt to whitewash the facts and keep from the jury compelling evidence that Bio-Rad acquired RainDance as part of a campaign against 10X's business after previous efforts in other lawsuits failed. The existence of the other cases—and the contradictory and inconsistent positions taken in those cases—is directly relevant and will allow the jury to consider and decide in context important issues of willfulness, damages, and witness credibility.[2]

## I.   THE DISPUTES BETWEEN THE PARTIES ARE RELEVANT

Evidence regarding the other litigations is relevant to a number of issues, including willfulness, damages, and witness credibility. Bio-Rad acquired RainDance only after Bio-Rad was unsuccessful in the California Superior Court and arbitration proceedings. The purpose of the acquisition was not—as Bio-Rad has suggested—to acquire "foundational" patents, but to acquire a litigation against 10X. These facts rebut Plaintiffs' allegations of willfulness, as Bio-Rad's motivations in acquiring RainDance—and thus a license to the Ismagilov patents—put 10X's alleged conduct in its proper context. Bio-Rad too had previously released its own product without a license to the Ismagilov patents, and only acquired a license to the Ismagilov patents when that license could be used as a weapon against 10X. Bio-Rad's past conduct—i.e., its apparent belief that a license was not necessary—confirms the reasonableness of 10X's current position.

---

[1] Plaintiffs argue that "10X has admitted" that the trade secret dispute is irrelevant. *See* MIL 1 at 2. Plaintiffs omit that 10X made this statement in the context of a discovery dispute between 10X and ***RainDance***, before Bio-Rad was substituted as a party. Once Bio-Rad became a party, the trade secret dispute with 10X is undoubtedly relevant.

[2] Plaintiffs also seek to exclude evidence of *inter partes* reviews for non-asserted patents. 10X has likewise moved *in limine* to exclude IPRs involving the patents at issue in the case and does not intend to offer evidence of the IPRs regarding non-asserted patents.

This evidence also rebuts Bio-Rad's claims that it purchased RainDance in order to acquire the Ismagilov patents, and not simply as another mechanism to challenge 10X's business. This and similar evidence is directly relevant to Plaintiffs' valuation of the Ismagilov patents. *See Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-CV-03999-BLF, 2015 WL 4129193, at *1 (N.D. Cal. July 8, 2015) (allowing evidence of plaintiff's litigation practices as relevant to the reasonable royalty determination). Plaintiffs' citation to *ICU Medical, Inc. v. RyMed Technologies, Inc.*, 752 F. Supp. 2d 486, 489-90, 489 n.3 (D. Del. 2010), is inapposite, as it concerned non-asserted patents plus different accused products.

The District Court and ITC actions between the parties, in which 10X asserted its own patents, also are relevant to apportionment. In determining damages, one factor in a hypothetical negotiation is the contribution that 10X's own innovation would bring to the accused products. *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) ("improvements added by the infringer" factor). 10X has its own patented technology. Evidence from 10X's ITC action explains how that patented technology relates to both 10X's products and Bio-Rad's products. Although the parties dispute whether Bio-Rad practices 10X's technology, these facts are relevant to damages and the hypothetical negotiation. *See Finjan*, 2015 WL 4129193, at *2 (allowing "generalized background information about [defendant']s business and patented technology").

The evidence of the other proceedings is also highly relevant to witness credibility. For example, Bio-Rad has asserted fundamentally inconsistent theories in different cases. *See World Wide Stationery Mfg., Co. v. Bensons Int'l Sys., Inc.*, No. 3:11CV523, 2012 WL 12894226, at *2 (N.D. Ohio Sept. 12, 2012). In this case, Bio-Rad has taken the position that 10X and Bio-Rad compete in a two-player market for single-cell analysis. Yet in Bio-Rad's ITC action, Bio-Rad

has taken the position that 10X and Bio-Rad compete in a multi-party market where many other companies sell acceptable substitutes for 10X's single-cell products. Further, 10X expects Bio-Rad will contend that the Ismagilov patents are foundational and that this is the reason why Bio-Rad acquired RainDance. Yet only after Bio-Rad lost its arbitration against 10X's founders (Kevin Ness, Serge Saxonov, and Ben Hindson) did it pursue an acquisition of RainDance, which already had a lawsuit against 10X. The jury should have the opportunity to hear this evidence and draw all appropriate inferences, including that Bio-Rad acquired RainDance to acquire this lawsuit and continue its efforts against 10X.[3]

## II.   PLAINTIFFS' RULE 403 OBJECTION IS NOT WELL TAKEN

It is not a sideshow or a time-wasting detour for 10X to explain that Bio-Rad is pursuing this action as part of its ongoing campaign against 10X because Bio-Rad has been unable to compete with 10X's technology. While Plaintiffs may disagree, a motion *in limine* is not a vehicle to resolve factual disputes. *Bowers v. Nat'l Collegiate Athletic Ass'n*, 563 F. Supp. 2d 508, 532 (D.N.J. 2008). Further, explaining the existence, timing and outcome of the litigations and the acquisition will not consume undue time or require a mini-trial. 10X is mindful of the limited trial time available.

---

[3] Plaintiffs' citations are inapposite. *AVM Techs. LLC v. Intel Corp.*, No. CV 15-33-RGA, 2017 WL 2938191, at *1 (D. Del. Apr. 19, 2017), involved a motion to preclude a "summary judgment of no damages," which is not at issue. In *Helios Software, LLC v. Spectorsoft Corp.*, No. CV 12-81-LPS, 2015 WL 3653098, at *1 (D. Del. May 22, 2015), the related litigation involved different accused products. *World Wide*, 2012 WL 12894226, at *1, involved litigation between different parties. *World Wide* also stated that it "will not grant [plaintiff]'s [m]otion so far as it requests a blanket ruling precluding *all* evidence pertaining to prior litigation." *Id.*

*Of Counsel*:

David I. Gindler (dgindler@irell.com)
Alan J. Heinrich (aheinrich@irell.com)
Lauren N. Drake (ldrake@irell.com)
Elizabeth C. Tuan (etuan@irell.com)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010

Michael H. Strub, Jr. (mstrub@irell.com)
Dennis J. Courtney (dcourtney@irell.com)
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
(949) 760-0991

Dated: March 23, 2018

*/s/ Jason J. Rawnsley*
Frederick L. Cottrell, III (#2555)
Jason J. Rawnsley (#5379)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
rawnsley@rlf.com

*Attorneys for 10X Genomics, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 23, 2018, I caused true and correct copies of the foregoing document to be served on the following counsel in the manner indicated:

<u>VIA EMAIL</u>
Brian E. Farnan
Michael Farnan
FARNAN LLP
919 N. Market St., 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

<u>VIA EMAIL</u>
Edward R. Reines
Derek C. Walter
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
raindance10xservice@weil.com

*/s/ Jason J. Rawnsley*
Jason J. Rawnsley (#5379)
rawnsley@rlf.com

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THE UNIVERSITY OF CHICAGO | : | |
| | : | |
| and | : | |
| | : | |
| BIO-RAD LABORATORIES, INC. | : | |
| | : | |
| Plaintiffs, | : | Civ. A. No. 15-152-RGA |
| | : | |
| v. | : | |
| | : | |
| 10X GENOMICS, INC. | : | |
| | : | |
| Defendant | : | |
| | : | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION *IN LIMINE* NO. 1 TO PRECLUDE REFERENCE TO LITIGATIONS AND *INTER PARTES* REVIEWS BETWEEN THE PARTIES UNRELATED TO THE PATENTS IN-SUIT**

10X's reply confirms that it wants to argue about the parties' other litigations so it can try to smear Bio-Rad by suggesting Bio-Rad is pursuing this suit for an improper purpose. This attack is untrue, but if permitted, would provoke a satellite dispute about Bio-Rad's true intent. Bio-Rad's intent is irrelevant. *See, e.g.*, *Samsung Elecs. Co. v. NVIDIA Corp.*, 2016 WL 754547, at *2 (E.D. Va. 2016) ("a plaintiff's motive for bringing suit is irrelevant"). 10X has no claim or defense to which subjective intent is relevant (*e.g.*, antitrust, patent misuse) and thus Bio-Rad's "motives are irrelevant" altogether. *Id.* at *3.

As a fallback, 10X weakly argues that it should be able to argue about the parties' ITC actions because "[e]vidence from 10X's ITC action [that] explains how that patented technology relates to" the parties' products is "relevant to damages." Opp. at 2. 10X does not even identify the evidence that supposedly justifies introducing the ITC action. Regardless, evidence properly disclosed and otherwise admissible in this case can be used without mentioning the ITC.

Dogged in its effort to inject the ITC investigation into this case, 10X next contends that Bio-Rad supposedly took an inconsistent position there. This third-tier relevance theory fails also. 10X's attempt to rely on its characterization of a contention in the ITC to prove ***facts*** about the nature of the market before the jury in this case creates far too much confusion to prove far too little. The nature of the market should be resolved by the witnesses, expert reports, and evidence in this case, not an argument about the meaning of an initial pleading in another matter.

Finally, after keeping out the discovery from the parties' trade secret action because it was supposedly irrelevant, 10X now argues that it only became relevant when Bio-Rad became the party in this case. Bio-Rad, however, had already purchased Raindance at that time and 10X never volunteered to produce the trade secret case discovery after the party-substitution. It has not identified any evidence from that case that is missing from this case.

1

Dated:  March 26, 2018

OF COUNSEL:

Edward R. Reines
Derek C. Walter
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000
ed.reines@weil.com
derek.walter@weil.com

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: 302-777-0300
Facsimile: 302-777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiffs*

2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THE UNIVERSITY OF CHICAGO   :
                                  :
      and                      :
                                  :
BIO-RAD LABORATORIES, INC. :
                                  :
           Plaintiffs,      :          Civ. A. No. 15-152-RGA
                                  :
        v.                       :
                                  :
10X GENOMICS, INC.         :
                                  :
          Defendant       :
                                  :

**PLAINTIFFS' MOTION *IN LIMINE* NO. 2 TO PRECLUDE DEFENDANT 10X GENOMICS, INC. FROM OFFERING ARGUMENT OR EVIDENCE REGARDING PLAINTIFF BIO-RAD LABORATORIES, INC.'S STATE OF MIND CONCERNING WHETHER IT INFRINGED THE PATENTS IN-SUIT BEFORE ACQUIRING RIGHTS TO THOSE PATENTS**

At trial, defendant 10X Genomics, Inc. ("10X") intends to pursue a logically tenuous—and highly unusual—theory in an attempt to avoid liability for its infringement.  10X's theory is not based on any technical aspect of its products, but rather on plaintiff Bio-Rad Laboratories, Inc.'s ("Bio-Rad") alleged pre-suit state-of-mind.

10X's theory goes as follows.  First, 10X argues that before acquiring rights to the patents-in-suit, Bio-Rad began selling a product (the Bio-Rad ddPCR product) that embodies some of the patents-in-suit.  10X next argues that because Bio-Rad did not yet have a license to the patents-in-suit when it first began selling this product, Bio-Rad must have originally believed that this product did not infringe the patents-in-suit.  10X then reasons that, if Bio-Rad originally believed it did not infringe, it must be that 10X does not infringe now.

Thus, in a nutshell, 10X's theory is that it should not be liable for infringement because Bio-Rad allegedly once believed its own products did not infringe.  According to 10X, Bio-Rad is the "pot calling the kettle black." *See, e.g.*, D.I. 199 at 3 (10X argues "Why did Bio-Rad initially conclude that its ddPCR products did not infringe the Ismagilov Patents, and why does it now claim that they do infringe the very same patents?").

Pursuant to Federal Rules of Evidence 401, 402 and 403, 10X should be precluded from presenting such logically flawed theories that are based solely on speculation about Bio-Rad's pre-suit state-of-mind and that are being presented only to impugn Bio-Rad's character by portraying Bio-Rad as hypocritical.

## A.     10X's Theory Will Waste Time, Confuse The Issues, And Prejudice Bio-Rad

The infringement issue at trial is whether ***10X's products*** infringe the patents-in-suit, as construed by the Court.  Expert witnesses will present detailed technical opinions comparing 10X's products to the claims as construed, and the jury should base its infringement decision on this direct evidence.   10X, however, wishes to put ***Bio-Rad*** on trial for allegedly taking

1

inconsistent views about its own products, an issue that sheds no light on whether 10X's products infringe.  Indeed, 10X's theory is plagued by logical gaps and, if permitted, would foment numerous irrelevant sideshows that would only confuse the jury and raise knotty privilege issues.

For 10X's theory to have any semblance of coherence, 10X needs to show at least the following: (1) that Bio-Rad originally believed its ddPCR products did not infringe the patents-in-suit, (2) the reason Bio-Rad believed this, (3) that this reason also applies to 10X's products, and (4) that Bio-Rad changed its mind about its original reasoning after acquiring rights to the patents-in-suit.  None of these issues are subject to proof, and none of them should be in the trial.

As to Bio-Rad's pre-suit state-of-mind about whether its product infringes, 10X has never presented any evidence.  Such information implicates the attorney-client privilege, and 10X should not be permitted to probe privileged information at trial for the first time or, even worse, insinuate to the jury—without evidence—that Bio-Rad held certain beliefs.  The same is true with regard to any analysis Bio-Rad may have done after acquiring rights to the patents-in-suit.  As to the specific reason why Bio-Rad allegedly believed its products did not infringe, the record is empty, and 10X has never informed Bio-Rad what this alleged reason might be.  Whatever it supposedly is, 10X has not presented any evidence to establish that it also applies to 10X's products.  Further, even if 10X had proposed such a reason, there would need to be mini-trial to compare the technical details of 10X's product to Bio-Rad's product.  And the jury would need to be specially instructed as to why such a comparison is supposedly relevant.

Given the speculative nature of 10X's theory and the complete lack of underlying evidence, its presentation at trial would only serve to raise questions, create sideshows, distract the jury, waste time, and demand extra court intervention during trial.  While 10X may contend

2

that such diversions are necessary because its theory about Bio-Rad's state-of-mind sheds light on credibility, any such relevance is speculative at best. In fact, 10X's theory is intended solely to sour Bio-Rad with the jury and confuse the jury into believing that infringement cannot be found unless Bio-Rad is of pure enough heart and mind. This epitomizes the type of prejudicial theory that should be excluded under Rule 403.

**B.     10X Has Not Preserved Its Theory Based On Bio-Rad's State-Of-Mind**

During discovery, Plaintiffs sought the bases for 10X's affirmative defenses. *See* Ex. 1 [RainDance Tech., Inc. and The Univ. of Chicago's First Set of Interrogatories to 10X Genomics, Inc. (Nos. 1-6) (dated Apr. 22, 2016)] at 7. 10X's tenth affirmative defense was "unclean hands," (*see* D.I. 39 at 28) which presumably Bio-Rad's "bad state-of-mind" would have fallen under. In its interrogatories responses, 10X did not disclose ***any*** theory for its unclean hands defense. *See* Ex. 2 [10X Genomics, Inc.'s First Supp. Resp. to Interrogatories Nos. 6, *et al.* (dated July 21, 2017)] at 46-50. Nor did 10X disclose anywhere in this interrogatory response any theory regarding Bio-Rad's "bad state-of-mind." Accordingly, 10X has not preserved this theory and it would be improper for 10X to offer it at trial.

For the foregoing reasons, Plaintiffs respectfully request the Court order that 10X is precluded from offering argument or evidence at trial regarding Bio-Rad's state-of-mind concerning whether it infringed the patents-in-suit before acquiring rights to those patents.

Dated:  March 16, 2018

OF COUNSEL:

Edward R. Reines
Derek C. Walter
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000
ed.reines@weil.com
derek.walter@weil.com

Respectfully submitted,

FARNAN LLP

*/s/* Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: 302-777-0300
Facsimile: 302-777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiffs*

4

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RAINDANCE TECHNOLOGIES, INC. and THE UNIVERSITY OF CHICAGO, | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | C.A. No. 15-152 (RGA) |
| v. | ) ) | |
| 10X GENOMICS, INC., | ) ) | |
| Defendant. | ) | |

**RAINDANCE TECHNOLOGIES, INC. AND THE UNIVERSITY OF
CHICAGO'S FIRST SET OF INTERROGATORIES TO 10X GENOMICS, INC.**

Pursuant to Federal Rules of Civil Procedure 26 and 34, Plaintiffs RainDance Technologies, Inc. ("RainDance") and the University of Chicago, by their attorneys, hereby request that Defendant 10X Genomics, Inc. ("10X") serve RainDance and the University of Chicago with their written responses to these requests for production and produce copies of the documents and things requested below at the law offices of Weil, Gotshal & Manges LLP, 201 Redwood Shores Parkway, Redwood Shores CA 94065 within thirty (30) days after service hereof.

## DEFINITIONS AND INSTRUCTIONS

1.      "RainDance" means Plaintiff RainDance Technologies, Inc. and its predecessors, successors, affiliates, subsidiaries, parents, assignees, joint venturers, partners, principals, employees, representatives, agents, officers, directors, attorneys, and all other persons or entities acting or purporting to act on their behalf.

2.      "The University of Chicago" means Plaintiff the University of Chicago and its predecessors, successors, affiliates, subsidiaries, parents, assignees, joint venturers,

partners, principals, employees, representatives, agents, officers, directors, attorneys, and all other persons or entities acting or purporting to act on their behalf.

3.     "10X" means Defendant 10X Genomics, Inc. and their predecessors, successors, affiliates, subsidiaries, parents, assignees, joint venturers, partners, principals, employees, representatives, agents, officers, directors, attorneys, and all other persons or entities acting or purporting to act on their behalf.

4.     "You" and "your" means each individual Defendant responding to these requests for documents and things.

5.     "The '430 Patent," "the '193 Patent," "the '407 Patent," "the '148 Patent," "the '083 Patent," and "the '091 Patent" means U.S. Patent No. 8,658,430, U.S. Patent No. 8,304,193, U.S. Patent No. 8,329,407, U.S. Patent No. 8,822,148, U.S. Patent No. 8,889,083 and U.S. Patent No. 7,129,091 respectively.

6.     The "Patents-in-Suit" shall refer to all patents asserted or to be asserted in the future by RainDance and/or the University of Chicago in this action, including, without limitation, U.S. Patent Nos. 8,658,430, 8,304,193, 8,329,407, 8,822,148, 8,889,083, and 7,129,091 individually and collectively.

7.     "Related Patents" and "Related Patent" mean all patents and patent applications relating to the patent in question, including any patents or patent applications (including all published and unpublished pending and abandoned applications) from or through which the patent in question claims priority, any patents or patent applications (including all published and unpublished pending and abandoned applications) that claim priority from or through the patent in question, and any foreign counterpart patents or patent applications

(including all published and unpublished pending and abandoned applications) of any of the foregoing.

8.      "Named Inventors" means Benjamin J. Miller, Qun Zhong, Darren Roy Link, Rustem F. Ismagilov, Joshua David Tice, Cory John Gerdts, Bo Zheng, Helen Song, and/or Lewis Spencer Roach, Jr. individually and collectively.

9.      The term "GemCode platform" means the combination of either 10X's original GemCode Instrument or the Chromium Controller with any of 10X's reagent kits, including without limitation the Chromium Single Cell 3' kit, the Chromium Genome kit, the Chromium Exome kit, and/or the GemCode reagent kit.

10.      "Accused Products" means the GemCode platform, including without limitation all past and future versions of the GemCode platform and any variant of the GemCode platform.

11.      "Prior Art" is used herein in the same sense that it is used in 35 U.S.C. § 102 or 103 that includes any patent, printed publication, prior knowledge, prior use, prior sale or offer for sale, or other act or event defined in 35 U.S.C. § 102, taken singly or in combination.

12.      "Communication" means any form of oral or written interchange, whether in person, by telephone, by facsimile, by telex, by electronic email, or by any other medium.

13.      "Document" shall be interpreted to the full extent permitted by the Federal Rules of Civil Procedure and includes, without limitation, e-mail, files stored on electronic media, copies of letters, notes and records of telephone conversations, intra-corporate communications, minutes, bulletins, specifications, instructions, advertisements, literature, patents, patent applications, specification sheets and diagrams, work assignments, reports, memoranda, memoranda of conversations, notes, notebooks, drafts, data sheets, work sheets,

contracts and agreements, memoranda of agreements, assignments, licenses, sublicenses, opinions and reports of experts and consultants, books of account, orders, invoices, statements, bills, checks and vouches, brochures, photographs, drawings, charts, catalogs, pamphlets, magazines, copies of magazines, decals, world-wide web and/or internet postings, trade letters, notices and announcements, and press releases, and all other printed, written, recorded, taped, electronic, graphic, computerized printout or other tangible materials of whatever kind known to, or in the possession, custody, or control of 10X.  A draft or nonidentical copy is a separate document within the meaning of this term.

14.     "Concerning" means relating or referring to, discussing, describing, summarizing, evidencing, or constituting.

15.     The words "identify," "identity," and "identification" mean:

a.     as applied to an individual, state the individual's first name; present or last known address and telephone number; present or last known employer; and present or last known business address and telephone number.

b.     as applied to a document, state the type of document; date of the document; names of the individuals who drafted, authored, or signed the document; names of the individuals to whom the document or a copy thereof was addressed or sent; a summary of the subject matter of the document; the number of pages of the document; the present whereabouts of the document; the name and address of the current custodian; and the Bates number(s), if the document has been produced.

c.     as applied to a patent or patent application, state the country where it was filed or granted; the patent or patent application number; the filing date; the dates of publication and issue, if any; the identity of all inventors; the title; and the identity of all related applications and patents.

d.     as applied to oral communications, state the name of the person making the communication and the name(s) of the person(s) present while the communication was made, and, where not apparent, the relationship of the person(s) present to the person making the

communication; the date and place of the communication; and a summary of the subject matter of the communication.

e.     as applied to an event or chain of events, state the date(s) of each occurrence relevant to the event, including but not limited to those involved in witnessing, supervising, controlling, supporting, requesting, or otherwise participating in the event and/or those who can corroborate or refute the described circumstances of the event; and describe the role and/or contribution of each person so identified.

16.     The words "any," "all," and "each" shall mean any, all, each, and every.

17.     The terms "and" and "or" should be understood as either conjunctive or disjunctive, whichever is necessary to bring within the scope of the interrogatory any responses that might otherwise have been understood to be outside its scope.

18.     Use of the singular includes the plural and vice versa.

19.     The term "person" refers to both natural persons and to corporate or other business entities (including 10X), whether or not in the employ of 10X, and the "acts" of a person (including 10X) are defined to include the acts of directors, officers, owners, members, employees, agents or attorneys acting on the person's behalf.

20.     Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these requests for documents and things are continuing in nature.  If, after producing the requested documents and things, 10X obtains or becomes aware of any further responsive documents or things, 10X must produce to RainDance and the University of Chicago such additional documents and things.  These requests are being propounded in light of the discovery served thus far in this case.  RainDance and the University of Chicago stand ready to meet and confer to discuss the best and most efficient way to conduct discovery bilaterally.

21.     If you withhold any document based upon a claim of privilege or any other claim of immunity from discovery, then state so in writing in response to the claim being

asserted and describe the facts and circumstances giving rise to it in sufficient detail so as to permit RainDance and the University of Chicago to evaluate, and the Court to adjudicate, the merits of the claim.

22.      If you contend that a portion of a document contains information that is immune from discovery, then produce the document with the immune portion redacted therefrom and describe the redacted portion in a privilege log.

23.      If a document that is responsive to these requests has been destroyed, the response hereto shall identify (i) the preparer of the document; (ii) its addresser (if different), addressee, and each recipient thereof; (iii) each person to whom it was distributed or shown; (iv) the date it was prepared; (v) the date it was transmitted (if different); (vi) the date it was received; (vii) a description of its contents and subject matter; (viii) the date of its destruction; (ix) the manner of its destruction; (x) the name, title and address of the person authorizing its destruction; (xi) the reason(s) for its destruction; (xii) the name, title and address of the person destroying the document; and (xiii) a description of the efforts to locate the document and copies of it.

## INTERROGATORIES

### INTERROGATORY NO. 1.:

Separately for each of the Patents-in-Suit, describe in detail the circumstances, including identification of the date and all individuals involved, under which you first became aware of that patent.

### INTERROGATORY NO. 2.:

Separately for each of the Patents-in-Suit, for each of the Accused Products which you contend does not infringe one or more claims of that patent, identify the claims that you

assert would not be infringed, state all bases under which you contend such claims would not be infringed either literally or under the doctrine of equivalents.

**INTERROGATORY NO. 3.:**

Separately for each Patent-in-Suit, describe in detail all time, labor, costs and expenses associated with any potential workarounds or design-arounds 10X contends it could have or has implemented to avoid infringing the Patents-in-Suit, and identify all documents and/or testimony on which 10X intends to rely to support its contention.

**INTERROGATORY NO. 4.:**

Describe in detail all licenses and prospective licenses negotiated, even if not yet executed, relating to the Accused Products, and identify all such licenses that you contend would be comparable to a license between the parties.

**INTERROGATORY NO. 5.:**

Identify all companies 10X contemplated partnering with to sell or market the Accused Products and describe in detail the facts and circumstances of said partnership, including at least the terms of the partnership, the individuals involved in negotiating the partnership, the basis for determining to proceed or not to proceed with said partnership, and any documents related to said partnership.

**INTERROGATORY NO. 6.:**

Separately, for each of 10X's first and fourth through eleventh affirmative defenses, state all legal and factual bases for each defense and identify all documents and/or testimony upon which 10X intends to rely to support each affirmative defense.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)
Karen Jacobs (#2881)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
kjacobs@mnat.com

OF COUNSEL:                                        *Attorneys for Plaintiffs*

Edward R. Reines
Derek C. Walter
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000

April 22, 2016

## <u>CERTIFICATE OF SERVICE</u>

I, hereby certify that on April 22, 2016, copies of the foregoing were caused to be

served upon the following in the manner indicated:

Steven J. Balick, Esquire                                                          *VIA HAND DELIVERY*
Tiffany Geyer Lydon, Esquire                            *with courtesy copy via ELECTRONIC MAIL*
Andrew C. Mayo, Esquire
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
Wilmington, DE  19801
*Attorneys for Defendant*

David Isaac Gindler, Esquire                                                  *VIA ELECTRONIC MAIL*
Andrei Iancu, Esquire
Lauren Nicole Drake, Esquire
Elizabeth Chenyi Tuan, Esquire
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067
*Attorneys for Defendant*

*/s/ Jack B. Blumenfeld*
_____

Jack B. Blumenfeld (#1014)

# EXHIBIT 2 TO PLAINTIFFS' MIL NO. 2 REDACTED IN ITS ENTIRETY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BIO-RAD LABORATORIES, INC. and THE
UNIVERSITY OF CHICAGO,

                    Plaintiffs,

          v.

10X GENOMICS, INC.,

                    Defendant.

C.A. No. 15-152-RGA

**CONTAINS OUTSIDE ATTORNEYS'
EYES ONLY INFORMATION**

## DEFENDANT 10X GENOMICS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 2 TO PRECLUDE DEFENDANT 10X GENOMICS, INC. FROM OFFERING ARGUMENT OR EVIDENCE REGARDING PLAINTIFF BIO-RAD LABORATORIES, INC.'S STATE OF MIND CONCERNING WHETHER IT INFRINGED THE PATENTS IN-SUIT BEFORE ACQUIRING RIGHTS TO THOSE PATENTS

*Of Counsel*:

David I. Gindler (dgindler@irell.com)
Alan J. Heinrich (aheinrich@irell.com)
Lauren N. Drake (ldrake@irell.com)
Elizabeth C. Tuan (etuan@irell.com)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276
Tel: (310) 277-1010

Michael H. Strub, Jr. (mstrub@irell.com)
Dennis J. Courtney (dcourtney@irell.com)
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Tel: (949) 760-0991

D: March 23, 2018

Frederick L. Cottrell, III (#2555)
Jason J. Rawnsley (#5379)
RICHARDS, LAYTON & FINGER,
P.A.920 North King Street
Wilmington, DE 19801
Tel: (302) 651-7700
cottrell@rlf.com
rawnsley@rlf.com

*Attorneys for Defendant 10X Genomics, Inc.*

10471260

10X is entitled to present evidence that Bio-Rad did not take a license to the Ismagilov patents when it launched its droplet digital PCR product—and for five years thereafter, until Bio-Rad acquired RainDance along with this lawsuit. This evidence is highly relevant **to rebut Bio-Rad's allegations** that the Ismagilov patents are somehow "foundational" and that 10X willfully infringed.

In its motion, Bio-Rad completely ignores these issues, instead presenting a red herring that 10X should not be allowed to point to Bio-Rad's activities as evidence of "non-infringement" or "unclean hands." These are not the issues for which 10X intends to offer this evidence. Bio-Rad cannot rely upon Rule 403 to preclude evidence that rebuts a theory which Bio-Rad itself has advanced. *Personalized User Model, L.L.P. v. Google, Inc.*, No. 09–525–LPS, 2014 WL 807736, at *3 (D. Del. Feb. 27, 2014) (denying request to exclude evidence under Rule 403 that was necessary to rebut argument other party raised); *Enova Tech. Corp. v. Initio Corp.*, No. 10–04–LPS, 2013 WL 12156023, at *1 (D. Del. Jan. 31, 2013) (recognizing that it is improper to exclude rebuttal evidence "should [Plaintiff] open the door to such evidence").

Bio-Rad hopes to convince the jury that the Ismagilov patents are foundational to droplet-based microfluidics. For example, Bio-Rad intends to tell the jury that a key reason that it acquired RainDance—and thus RainDance's exclusive license to the Ismagilov patents—is because the Ismagilov patents are foundational and Bio-Rad needed to license those patents for its droplet digital PCR and single-cell instruments. Ex. A (Tumolo Dep.) at 133: 4-7; D.I. 256 at p. 1 ("This is a patent infringement case involving foundational technology in the field of microfluidics.").

Yet the record confirms that Bio-Rad had a very different view of those patents prior to acquiring RainDance in January 2017. After learning of the Ismagilov patents in 2010, Bio-Rad

did not take a license and continued to sell its digital PCR product for over five years with knowledge of the patents and without licensing any of them. Ex. A (Tumolo Dep.) at 122:24-123:11. Bio-Rad wants to tell the jury that the Ismagilov patents are foundational in the field of droplet microfluidics, even though Bio-Rad itself saw no need to license these patents until it acquired RainDance (and this litigation against 10X). The jury is entitled to know these facts.

In addition, 10X anticipates that Bio-Rad may argue that 10X willfully infringes because Drs. Hindson and Ness gained knowledge of the Ismagilov patents while they were employees of QuantaLife (and then employees of Bio-Rad after it acquired QuantaLife). In that event, 10X must be allowed to rebut this assertion with evidence of Bio-Rad's actions. For instance, after acquiring QuantaLife, Bio-Rad conducted a freedom to operate analysis to "make determinations whether we have infringing positions or not." *Id.* at 15:25-16:12; 20:22-21:3; 21:12-22. QuantaLife's product—like 10X's products—generally involved conducting reactions in microfluidic droplets that, once formed, are collected and transferred to a thermal cycler where the reactions occur. Ex. B ¶¶ 4-5. Evidence showing that QuantaLife's technology cleared Bio-Rad's freedom to operate analysis establishes that Dr. Hindson and Ness's knowledge of the Ismagilov patents does not equate to knowledge of infringement—they knew of the Ismagilov patents and were told the QuantaLife (and later Bio-Rad) products did not infringe.[1] Bio-Rad cannot have it both ways: It cannot simultaneously issue itself a clean bill of health with respect to the QuantaLife technology based on the freedom to operate analysis while at the same time arguing that the freedom to operate analysis provided Drs. Hindson and Ness with the knowledge necessary to support a claim of willful infringement.

---

[1] This is evidence of facts in the discovery record, and its presentation at trial does not require "prob[ing] privileged information" or "speculation about Bio-Rad's pre-suit state-of-mind," as Bio-Rad alleges.

In short, Bio-Rad seeks to prevent the jury from hearing the evidence that is necessary for it to decide willfulness in its full context.  Bio-Rad cannot use Rule 403 to preclude evidence that rebuts arguments that Bio-Rad intends to make: that the patents are foundational and that 10X willfully infringes. The jury is entitled to hear this evidence. Plaintiffs' motion should be denied.

|  |  |
|---|---|
| | /s/ Jason J. Rawnsley |
| *Of Counsel*: | Frederick L. Cottrell, III (#2555) |
| | Jason J. Rawnsley (#5379) |
| David I. Gindler (dgindler@irell.com) | RICHARDS, LAYTON & FINGER, P.A. |
| Alan J. Heinrich (aheinrich@irell.com) | 920 North King Street |
| Lauren N. Drake (ldrake@irell.com) | Wilmington, DE 19801 |
| Elizabeth C. Tuan (etuan@irell.com) | (302) 651-7700 |
| IRELL & MANELLA LLP | cottrell@rlf.com |
| 1800 Avenue of the Stars, Suite 900 | rawnsley@rlf.com |
| Los Angeles, CA 90067 | |
| (310) 277-1010 | *Attorneys for 10X Genomics, Inc.* |

Michael H. Strub, Jr. (mstrub@irell.com)
Dennis J. Courtney (dcourtney@irell.com)
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
(949) 760-0991

Dated: March 23, 2018

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 23, 2018, I caused true and correct copies of the foregoing

document to be served on the following counsel in the manner indicated:


<u>VIA EMAIL</u>
Brian E. Farnan
Michael Farnan
FARNAN LLP
919 N. Market St., 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

<u>VIA EMAIL</u>
Edward R. Reines
Derek C. Walter
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
raindance10xservice@weil.com


*/s/ Jason J. Rawnsley*
Jason J. Rawnsley (#5379)
rawnsley@rlf.com

# EXHIBIT A

CONFIDENTIAL - ATTORNEYS' EYES ONLY
ANNETTE TUMOLO - 08/29/2017

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


BIO-RAD LABORATORIES
and THE UNIVERSITY OF CHICAGO,

                    Plaintiffs,
     vs.                              C.A. No. 15-152(RGA)

10X GENOMICS, INC.,

                    Defendant.
_____/



     *** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***




          DEPOSITION OF ANNETTE TUMOLO

               August 29, 2017




Reported by:
Natalie Y. Botelho

CSR No. 9897

CONFIDENTIAL - ATTORNEYS' EYES ONLY
ANNETTE TUMOLO - 08/29/2017                    Page 15

```
1             MR. REINES:  -- Ms. Tumolo was correct.    09:13:18
2    So hopefully that clarifies it.  I think the content 09:13:20
3    is overlapping, and she's ready on the content.      09:13:23
4    That --                                              09:13:24
5             MR. STRUB:  That's fine.                    09:13:25
6             MR. REINES:  -- I'm pretty confident        09:13:25
7    about.  All right.                                   09:13:27
                                                          09:13:31
                                                          09:13:33
                                                          09:13:35
                                                          09:13:36
                                                          09:13:38
                                                          09:13:42
                                                          09:13:43
                                                          09:13:46
                                                          09:13:51
                                                          09:13:57
                                                          09:14:02
                                                          09:14:05
                                                          09:14:12
                                                          09:14:17
                                                          09:14:20
                                                          09:14:23
                                                          09:14:26
                                                          09:14:28
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY
ANNETTE TUMOLO - 08/29/2017          Page 16

| | |
|---|---|
| | 09:14:30 |
| | 09:14:34 |
| | 09:14:34 |
| | 09:14:36 |
| | 09:14:38 |
| | 09:14:41 |
| | 09:14:44 |
| | 09:14:47 |
| | 09:14:52 |
| | 09:14:58 |
| | 09:15:04 |
| | 09:15:11 |

```
13            MR. STRUB:  Q.  Who is John Cassingham?      09:15:16

14  A.        He's the head of our intellectual property  09:15:18

15  team.  He's a lawyer.                                 09:15:22

16  Q.        Is he the head of the intellectual          09:15:25

17  property team for Bio-Rad as a whole or just for the  09:15:26

18  digital biology group?                                09:15:28

19  A.        For Bio-Rad as a whole.                      09:15:31

20  Q.        Does Bio-Rad typically work with outside     09:15:32

21  counsel in doing freedom to operate opinions?          09:15:34

22  A.        Sometimes we do and sometimes we don't.      09:15:37

23  Q.        What are the circumstances in which you      09:15:40

24  do?                                                    09:15:41

25  A.        I think that's situational.                  09:15:44
```

| | | |
|---|---|---|
| 1 | on the assumption she is.  34, 55, 56, 61, and 62, | 09:19:00 |
| 2 | which you did correctly identify, are topics.  So | 09:19:07 |
| 3 | now I'll leave you go on this line of questioning, | 09:19:10 |
| 4 | but I didn't want it to go too long with that | 09:19:12 |
| 5 | inaccuracy. | 09:19:15 |
| 6 | MR. STRUB:  Q.  Since 2 -- starting in | 09:19:17 |
| 7 | 2011, okay, so over the last six years or so -- | 09:19:18 |
| 8 | A.        Mm-hmm. | 09:19:22 |
| 9 | Q.        -- has Bio-Rad typically worked with one | 09:19:22 |
| 10 | outside counsel for freedom to operate opinions or | 09:19:27 |
| 11 | has it been multiple outside counsel, based on your | 09:19:29 |
| 12 | experience? | 09:19:32 |
| 13 | A.        I can only speak for my business, and over | 09:19:34 |
| 14 | that time period, best I can recall, we've engaged | 09:19:39 |
| 15 | more than one outside counsel firm on various | 09:19:46 |
| 16 | topics. | 09:19:49 |
| 17 | Q.        Which outside counsel firms has Bio-Rad | 09:19:50 |
| 18 | engaged since 2011? | 09:19:54 |
| 19 | A.        Again, best I can recall, we engaged | 09:19:57 |
| 20 | Wilson Sonsini and Morgan Lewis.  Those two come to | 09:20:01 |
| 21 | mind. | 09:20:11 |
| | | 09:20:17 |
| | | 09:20:20 |
| | | 09:20:24 |
| | | 09:20:31 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
ANNETTE TUMOLO - 08/29/2017                Page 21

```
                                                      09:20:36

                                                      09:20:42

                                                      09:20:50

 4   Q.      Who was the attorney at Wilson who did   09:20:54

 5   that opinion?                                    09:20:57

 6   A.      I did not request that.  It was our legal 09:21:04

 7   counsel.  I believe it was Vern, whatever his last 09:21:06

 8   name is.                                         09:21:11

 9   Q.      Norviel?                                 09:21:12

10   A.      Yeah.  But John Cassingham was the one who 09:21:13

11   solicited the work, so he would be the best person. 09:21:17

                                                      09:21:20

                                                      09:21:22

                                                      09:21:25

                                                      09:21:28

                                                      09:21:31

                                                      09:21:34

                                                      09:21:44

                                                      09:21:51

                                                      09:22:01

                                                      09:22:05

                                                      09:22:08

23   Q.      Was it in the form of a PowerPoint deck? 09:22:09

24   A.      I believe it was.                        09:22:12

25   Q.      Then was that PowerPoint deck presented by 09:22:14
```

| | | |
|---|---|---|
| 1 | deposition of Annette Tumolo.  The time is 12:53. | 12:53:49 |
| 2 | MR. REINES:  Before we resume, there was a | 12:53:56 |
| 3 | question in the first half or pre-lunch, I should | 12:53:57 |
| 4 | say, that you expressed exception to the answer as | 12:54:03 |
| 5 | not being as fulsome as you wanted, and it was | 12:54:08 |
| 6 | related to some privilege stuff, and I think that's | 12:54:10 |
| 7 | concern to your question as to whether the witness | 12:54:14 |
| 8 | believed that she was wrongful or Bio-Rad was | 12:54:18 |
| 9 | wrongful, or something along those lines, during the | 12:54:21 |
| 10 | interim period between first awareness of the | 12:54:24 |
| 11 | Chicago patents and purchase of RainDance or some -- | 12:54:26 |
| 12 | it's not exact, but something like that.  And if you | 12:54:35 |
| 13 | want to ask that question again to try to avoid | 12:54:38 |
| 14 | dispute, I'm happy to have you do that. | 12:54:42 |
| 15 | MR. STRUB:  Q.  Okay.  Let me ask you this | 12:54:45 |
| 16 | question:  Just this is a "yes" or "no" answer. | 12:54:46 |
| 17 | Don't disclose the substance.  Over the break, over | 12:54:50 |
| 18 | our lunch break, did you discuss your testimony with | 12:54:52 |
| 19 | your counsel? | 12:54:54 |
| 20 | A.       No.  Just kind of rules of engagement. | 12:54:55 |
| 21 | Q.       Okay.  Don't disclose substance. | 12:54:59 |
| 22 | So let me then go back to a question that | 12:55:01 |
| 23 | I asked before the break, which was -- just to set | 12:55:07 |
| | | 12:55:13 |
| | | 12:55:25 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
ANNETTE TUMOLO - 08/29/2017                    Page 123

| | |
|---|---|
| | 12:55:29 |
| | 12:55:33 |
| | 12:55:34 |
| | 12:55:36 |
| | 12:55:37 |
| | 12:55:46 |
| | 12:55:52 |
| | 12:55:52 |
| | 12:55:56 |
| | 12:55:59 |
| | 12:56:02 |
| | 12:56:03 |
| | 12:56:06 |
| | 12:56:10 |
| 15          MR. REINES:  Recall the privilege | 12:56:12 |
| 16    assertion for communications. | 12:56:14 |
| | 12:56:17 |
| | 12:56:19 |
| | 12:56:25 |
| | 12:56:28 |
| | 12:56:35 |
| | 12:56:39 |
| | 12:56:45 |
| | 12:56:48 |
| 25          MR. STRUB:  Q.  Okay.  I mean, I'll try | 12:56:52 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
ANNETTE TUMOLO - 08/29/2017          Page 133

| | | | |
|---|---|---|---|
| 1 | Q. | -- and in-person meetings? | 13:09:56 |
| 2 | A. | Mm-hmm. | 13:09:57 |
| 3 | Q. | In connection with the acquisition -- | 13:10:08 |

| | |
|---|---|
| | 13:10:15 |
| | 13:10:20 |
| | 13:10:22 |
| | 13:10:24 |
| | 13:10:26 |
| | 13:10:28 |
| | 13:10:30 |
| | 13:10:34 |
| | 13:10:39 |
| | 13:10:42 |
| | 13:10:52 |
| | 13:10:56 |
| | 13:11:01 |
| | 13:11:03 |
| | 13:11:10 |
| | 13:11:10 |
| | 13:11:11 |
| | 13:11:11 |
| | 13:11:14 |

| | | |
|---|---|---|
| 23 | MR. REINES:  I'm going to object to that | 13:11:17 |
| 24 | on attorney-client privilege grounds -- | 13:11:18 |
| | | 13:11:21 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
ANNETTE TUMOLO - 08/29/2017                    Page 234

```
 1                CERTIFICATE OF REPORTER

 2

 3          I, Natalie Y. Botelho, a Certified

 4   Shorthand Reporter, hereby certify that the witness

 5   in the foregoing deposition was by me duly sworn to

 6   tell the truth, the whole truth, and nothing but the

 7   truth in the within-entitled.

 8          The said deposition was taken down in

 9   shorthand by me, a disinterested person, at the time

10   and place therein stated, and that the testimony of

11   said witness was thereafter reduced to typewriting,

12   by computer, under my direction and supervision;

13          That before completion of the deposition,

14   review of the transcript [ ] was|[X] was not

15   requested.  If requested, any changes made by the

16   deponent (and provided to the reporter) during the

17   period allowed are appended hereto.

18          I further certify that I am not of counsel

19   or attorney for either or any of the parties to the

20   said deposition, nor in any way interested in the

21   event of this cause, and that I am not related to

22   any of the parties thereto.

23          DATED:  September 11, 2017

24          _____

25          Natalie Y. Botelho, CSR No. 9897
```

# EXHIBIT D

3/21/2016 Case 3:15-cv-00152-RGA Document 326-1 Filed 04/03/18 Page 48 of 96 PageID #: 33490 ...personalized...

| Frost & Sullivan Press Release | Published: 24 Jun 2011 |
|---|---|

### Frost & Sullivan Recognizes QuantaLife's Innovative Technology for Enabling Advances in Biomedical Research, Diagnostics, and Personalized Medicine

Date Published: 24 Jun 2011

**Path Breaking ddPCR™ System Provides Even More Precise Measurements than Currently Used qPCR Methods**

MOUNTAIN VIEW, Calif. - June 24, 2011 - Based on its recent analysis of the personalized medicine market, Frost & Sullivan recognizes QuantaLife, Inc. with the 2011 North American Frost & Sullivan Award for New Product Innovation for its Droplet Digital™ Polymerase Chain Reaction (ddPCR™) system, a next generation of PCR that provides an absolute quantification measurement of nucleic acid molecules in nanoliter droplet form.

Real-time PCR has long been the gold standard for sensitive DNA quantification. With even greater sensitivity and precision, the ddPCR™ system is market-changing and has far-reaching applications in research and diagnostics. By allowing for detection at lower target levels, the ddPCR™ system has the ability to identify diseases earlier in progression, providing a major advantage for diagnostics and preventative medicine. Therefore, QuantaLife is poised to play a significant role in the development of companion diagnostics central to the emergence of personalized medicine.

"Essentially, this new technology provides even more precise measurements than the gold-standard qPCR methods widely used for fifteen years," says Frost & Sullivan Industry Analyst Christi Bird. "The unmatched resolution allows detection of target molecules at extremely low levels, which has major implications for not only precise life science research applications, but also early diagnosis of disease and development of accurate companion diagnostics for personalized healthcare."

Launched in November 2010, QuantaLife's ddPCR™ system consists of two separate instruments, the droplet generator and the droplet reader, both compact and sleek in design. The smaller of the two instruments, the droplet generator, divides each sample into 20,000 one-nanoliter droplets. After depositing the droplets into a 96-well plate, researchers then transfer the plate to their own standard thermal cyclers to amplify the targeted DNA/RNA molecules. Returned to QuantaLife's droplet reader instrument, droplets are streamed single file past a two color fluorescence detector and read as either positive or negative for the target DNA/RNA molecules. The platform then uses statistics to determine the concentration of the selected target in the original sample, thus providing a digital absolute quantification.

The ddPCR™ system provides several advantages over traditional real-time PCR. In particular, the system can better detect the difference between samples with similar genomic structures, a major advantage in determining copy number variation. This precise technology can also identify a +/-10 percent difference in gene expression between samples. Additionally, the instrument can detect a rare difference against a similar and common background.

"This advantage allows extremely sensitive detection of rare mutations when real-time PCR fails at certain concentration due to competitive amplification of the common DNA," says Bird. "The excitement this technology is already generating is evident from the hefty $17.2 million series B financing round the company received in December 2010."

Overall, QuantaLife exhibits the qualities necessary for an entrepreneurial company to succeed – dedication to innovation, a next-generation platform that significantly exceeds earlier technologies, and a solid plan for future growth. The ddPCR™ system has the ability to significantly improve PCR resolution, impacting a plethora of applications requiring precise measurements. Frost & Sullivan expects even greater innovations from this new company over the next few years as it ramps up commercialization of the ddPCR™ system, builds awareness, and pursues new markets. In recognition of its commitment to technology innovation and improving life sciences research and diagnostics, QuantaLife is the worthy recipient of the 2011 Frost & Sullivan Award for New Product Innovation Award in personalized medicine.

Each year, Frost & Sullivan presents this award to the company that that has developed an innovative element in a product by leverage leading edge technologies. The award recognizes the value added features/benefits of the product and the increased ROI it offers customers, which in turn increases customer acquisition and overall market penetration potential.

Frost & Sullivan's Best Practices Awards recognize companies in a variety of regional and global markets for demonstrating outstanding achievement and superior performance in areas such as leadership, technological innovation, customer service, and strategic product development. Industry analysts compare market participants and measure performance through in-depth interviews, analysis, and extensive secondary research in order to identify best practices in the industry.

About QuantaLife, Inc.

QuantaLife, a venture-backed startup company based in Pleasanton, CA recently developed Droplet Digital™ Polymerase Chain Reaction (ddPCR™) technology, a next generation of PCR that provides an absolute quantification measurement of single molecules in nanoliter droplet form. The company was founded in August of 2008. After launching the ddPCR™ system in November 2010, the firm


Frost & Sullivan Recognizes QuanaLife's Natural Technology for Technology Advances in Fulfilled Green Page Gels and Bererkalized... 

closed $17.2 million in Series B financing in December to accelerate application development for its platform and establish commercial operations in 2011.

## About Frost & Sullivan

*Frost & Sullivan*, the Growth Partnership Company, enables clients to accelerate growth and achieve best-in-class positions in growth, innovation and leadership. The company's Growth Partnership Service provides the CEO and the CEO's Growth Team with disciplined research and best-practice models to drive the generation, evaluation, and implementation of powerful growth strategies. *Frost & Sullivan* leverages 50 years of experience in partnering with Global 1000 companies, emerging businesses and the investment community from more than 40 offices on six continents. To join our Growth Partnership, please visit http://www.awards.frost.com.

Contact:

Mireya Espinoza
P: 210. 247.3870
F: 210.348.1003
E: mireya.espinoza@frost.com

BACK TO TOP        RETURN

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE UNIVERSITY OF CHICAGO | : | |
| | : | |
| and | : | |
| | : | |
| BIO-RAD LABORATORIES, INC. | : | |
| | : | |
| Plaintiffs, | : | Civ. A. No. 15-152-RGA |
| | : | |
| v. | : | |
| | : | |
| 10X GENOMICS, INC. | : | |
| | : | |
| Defendant | : | |
| | : | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION *IN LIMINE* NO. 2 TO PRECLUDE DEFENDANT 10X GENOMICS, INC. FROM OFFERING ARGUMENT OR EVIDENCE REGARDING PLAINTIFF BIO-RAD LABORATORIES, INC.'S STATE OF MIND CONCERNING WHETHER IT INFRINGED THE PATENTS IN-SUIT BEFORE ACQUIRING RIGHTS TO THOSE PATENTS**

At the beginning of its brief, 10X asserts that it does not intend to offer evidence of Bio-Rad's state-of-mind regarding its own products as evidence of non-infringement.  Opp. at 1.  The culminating logic of 10X's opposition, however, shows that this is exactly what 10X plans to do:

> [Bio-Rad] cannot simultaneously issue itself a clean bill of health with respect to the QuantaLife technology based on the freedom to operate analysis while at the same time arguing that the freedom to operate analysis provided Drs. Hindson and Ness with the knowledge necessary to support a claim of willful infringement

*Id.* at 2.  This reasoning is all wrong.  10X—not Bio-Rad—is on trial for willful infringement.  Bio-Rad does not need to rely on its privileged analysis to show that it had a "clean bill of health," nor is it even attempting to do so.  Likewise, 10X cites no evidence to suggest that Bio-Rad is seeking to rely on privileged analysis regarding its own products to show that *10X* willfully infringed.  Permitting 10X to probe Bio-Rad's state-of-mind and insinuate to the jury that 10X can be exonerated for willful infringement based on speculation about Bio-Rad's privileged legal analysis would thus be nothing but a highly prejudicial and irrelevant sideshow.

Given the defects in its primary theory of relevance, 10X asserts as a fallback that it simply wishes to rebut that the patents-in-suit are "foundational" by noting that Bio-Rad took "over five years" to acquire rights.  Yet, this just invites more speculation about Bio-Rad's privileged legal analysis, not to mention historical details from years ago regarding the Bio-Rad/RainDance relationship.  Whether the patents are "foundational" should be assessed by *inter alia* the opinions of the technical experts, the praise for Ismagilov's work, and the testimony of the inventors themselves.  Permitting 10X to whisper to the jury that, because it took Bio-Rad "over five years" to acquire rights to the patents-in-suit, there is hidden legal analysis showing that Bio-Rad believes the patents are worthless is precisely the sort of misleading and prejudicial argument that should be excluded under Rule 403.  For these reasons, 10X's theories based on Bio-Rad's alleged state-of-mind that its own products infringed should be excluded.

Dated:  March 26, 2018

OF COUNSEL:

Edward R. Reines
Derek C. Walter
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000
ed.reines@weil.com
derek.walter@weil.com

Respectfully submitted,

FARNAN LLP

*/s/* Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: 302-777-0300
Facsimile: 302-777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THE UNIVERSITY OF CHICAGO  :
                     :
        and             :
                     :
BIO-RAD LABORATORIES, INC.  :
                     :
        Plaintiffs,     :       Civ. A. No. 15-152-RGA
                     :
        v.              :
                     :
10X GENOMICS, INC.        :
                     :
        Defendant    :
                     :

## PLAINTIFFS' MOTION *IN LIMINE* NO. 3 TO PRECLUDE DEFENDANT 10X GENOMICS, INC. FROM SUGGESTING THAT IT RECEIVED ADVICE OF COUNSEL REGARDING THE PATENTS IN-SUIT

Plaintiffs The University of Chicago and Bio-Rad Laboratories, Inc. ("Bio-Rad") (collectively, "Plaintiffs") move the Court for an order precluding defendant 10X Genomics, Inc. ("10X") from suggesting that it received advice of counsel regarding the patents-in-suit. During discovery, 10X refused to identify or produce any advice of counsel and instead asserted the attorney-client privilege over any such opinions. Furthermore, 10X has steadfastly asserted the attorney-client privilege over communications between it and its attorneys, and then stated before the Court that it was not relying on advice of counsel. 10X has made a strategic choice to assert privilege over advice of counsel and, to avoid unfair surprise and prejudice to Plaintiffs, it should be precluded at trial from suggesting—either formally or informally—that it received any such opinions. Additionally, 10X should be specifically precluded from referring to any alleged advice of counsel that QuantaLife, the entity 10X's principals were formerly associated with, received regarding the patents in-suit. Bio-Rad acquired QuantaLife and therefore owns the attorney-client privilege over such advice and Bio-Rad has not waived the applicable privilege. The same is true for any alleged advice they received while at Bio-Rad.

## A.      10X's Failure To Identify Any Advice Of Counsel Warrants Exclusion

During discovery, Plaintiffs proffered the following interrogatory upon 10X:

Interrogatory No. 13: State any opinion(s) of counsel You may rely on at trial.

*See* Ex. 1 [RainDance Tech., Inc. and The Univ. of Chicago's Third Set of Interrogatories to 10X Genomics, Inc. (Nos. 12-19) (dated Apr. 5, 2017)] at 7.

10X responded:

10X incorporates its General Objections set forth above as if fully set forth herein. 10X further objects to this Interrogatory to the extent that it seeks to shift the burden on any issue for which Plaintiffs bear the burden. 10X further objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. 10X further objects to this Interrogatory as premature, for example, because fact discovery does not close until July 21—approximately two months from now—and

1

because the Court has only just completed its construction of disputed terms in the patents-in-suit. 10X reserves the right to supplement this Response.

*See* Ex. 2 [10X Genomics, Inc.'s Resp. and Obj.to RainDance Tech., Inc. and The Univ. of Chicago (Nos. 12-19) (dated May 22, 2017)] at 6-7.

10X did not supplement its interrogatory response and, thus, deliberately chose not to even identify any advice of counsel as the basis for its willful infringement position. The time for 10X to disclose any such opinions was during the discovery phase—which has long since passed. *See LG Philips LCD Co., Inc. v. Tatung Co.*, 243 F.R.D. 133 (D. Del. 2007) (noting that a patentee must have some timely notification from the accused infringer that reliance on advice of counsel will be asserted in order to take appropriate discovery). Its failure to produce or identify any such opinions warrants their preclusion at trial. *See Philips Elec. N.A. Corp. v. Contec Corp.*, Civ. A. No. 02-cv-00123-KAJ, 2004 WL 769371, at *1 (D. Del. Apr. 5, 2004) (granting plaintiffs' motion *in limine* to exclude defendants' untimely produced evidence).

**B.     10X Has Steadfastly Asserted Privilege Over Its Advice Of Counsel**

As the Court is no doubt well aware, 10X has zealously asserted the attorney-client privilege over its advice of counsel. *See* D.I. 200; D.I. 201. Indeed, 10X's assertion of privilege was so zealous that the Court ordered additional depositions of 10X principals for failure to answer proper questions. *See* Ex. 3 [Excerpts of Tr. of Discovery Hearing (dated Aug. 8, 2017)] at 26, 31 and 47. During that hearing, 10X confirmed that it is not relying on an advice of counsel defense, which the Court acknowledged:

> Plaintiffs' Counsel: And I think what we're likely to hear is something like, well we always perform an FTO lock [sic]. And we raised all this money, and, of course, people wouldn't pay the money unless which [sic] did the FTO.

> Court: I don't actually think they – if they're not relying on advice of counsel, then they're not allowed to say things that they suggest that they are relying on the advice of counsel, right, Mr. Strub?

2

> 10X's Counsel: That's right, your Honor.

*Id.* at 26:17-25.

> 10X's Counsel: This was all work that was done by Wilson Sonsini. And if we had – if we were relying on the advice of counsel, then obviously all this comes out.

*Id.* at 47:4-6.

> Court: So I don't think at trial they hear about the advice, because you clearly said you're not relying on it.

*Id.* at 31:2-3.

The window for 10X to disclose an advice of counsel defense has closed. *See LG Philips LCD*, 243 F.R.D. at 133. If 10X at trial suggests it relied on advice of counsel, Plaintiffs would be unfairly surprised and highly prejudiced as they have neither been given the opinions nor any opportunity to probe their bases. *See Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 863–64 (3d Cir. 1994) (finding patent owner is entitled to discovery on opinions of counsel when accused infringer asserts the defense). Accordingly, 10X should be precluded from suggesting at trial it received any advice of counsel—formally or informally—on the patents in-suit from any source. *See Impala Platinum Holdings, Ltd. v. A-1 Specialized Serv. and Supplies, Inc.*, Civ. A. No. 16-cv-01343, 2017 WL 960941, at *1 (E.D. Pa. Mar. 10, 2017) ("[T]he court may fashion remedies to prevent surprise and unfairness to the party seeking discovery such as where the party claiming privilege during discovery wants to testify at the time of trial, the court may ban that party from testifying on the matters claimed to be privileged." (internal quotations and citations omitted)).

For the foregoing reasons, Plaintiffs respectfully request the Court order that 10X is precluded from offering evidence or eliciting testimony at trial that it received any advice of counsel regarding the patents in-suit.

Dated:  March 16, 2018

OF COUNSEL:

Edward R. Reines
Derek C. Walter
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000
ed.reines@weil.com
derek.walter@weil.com

Respectfully submitted,

FARNAN LLP

*/s/* Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: 302-777-0300
Facsimile: 302-777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiffs*

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| RAINDANCE TECHNOLOGIES, INC. | |
| and | |
| THE UNIVERSITY OF CHICAGO, | C.A. No. 15-152-RGA |
| Plaintiffs, | |
| v. | |
| 10X GENOMICS, INC., | |
| Defendant. | |

**RAINDANCE TECHNOLOGIES, INC. AND THE UNIVERSITY OF CHICAGO'S
THIRD SET OF INTERROGATORIES TO 10X GENOMICS, INC.**

Pursuant to Federal Rule of Civil Procedure 26 and 33, Plaintiffs RainDance Technologies, Inc. ("RainDance") and the University of Chicago, by their attorneys, hereby request that Defendant 10X Genomics, Inc. ("10X") respond to the following interrogatories, separately, in writing under oath consistent with the Definitions and Instructions provided below within thirty (30) days from service hereof.

**DEFINITIONS AND INSTRUCTIONS**

1.      "RainDance" means Plaintiff RainDance Technologies, Inc. and its predecessors, successors, affiliates, subsidiaries, parents, assignees, joint venturers, partners, principals, employees, representatives, agents, officers, directors, attorneys, and all other persons or entities acting or purporting to act on their behalf.

2.      "The University of Chicago" means Plaintiff the University of Chicago and its predecessors, successors, affiliates, subsidiaries, parents, assignees, joint venturers, partners,

principals, employees, representatives, agents, officers, directors, attorneys, and all other persons or entities acting or purporting to act on their behalf.

3.      "10X" means Defendant 10X Genomics, Inc. and their predecessors, successors, affiliates, subsidiaries, parents, assignees, joint venturers, partners, principals, employees, representatives, agents, officers, directors, attorneys, and all other persons or entities acting or purporting to act on their behalf.

4.      "You" and "your" means each individual Defendant responding to these requests for documents and things.

5.      "The '193 Patent," "the '407 Patent," "the '148 Patent," "the '083 Patent," and "the '091 Patent" means U.S. Patent No. 8,304,193, U.S. Patent No. 8,329,407, U.S. Patent No. 8,822,148, U.S. Patent No. 8,889,083 and U.S. Patent No. 7,129,091 respectively.

6.      The "Patents-in-Suit" shall refer to all patents asserted or to be asserted in the future by RainDance and/or the University of Chicago in this action, including, without limitation, U.S. Patent Nos. 8,304,193; 8,329,407; 8,822,148; 8,889,083; and 7,129,091 individually and collectively.

7.      "Related Patents" and "Related Patent" mean all patents and patent applications relating to the patent in question, including any patents or patent applications (including all published and unpublished pending and abandoned applications) from or through which the patent in question claims priority, any patents or patent applications (including all published and unpublished pending and abandoned applications) that claim priority from or through the patent in question, and any foreign counterpart patents or patent applications (including all published and unpublished pending and abandoned applications) of any of the foregoing.

8.      "Named Inventors" means Rustem F. Ismagilov, Joshua David Tice, Helen Song, Cory John Gerdts, Bo Zheng, and/or Lewis Spencer Roach, Jr. individually and collectively.

9.      The term "GemCode platform" means the combination of either 10X's original GemCode Instrument or the Chromium Controller with any of 10X's reagent kits, including without limitation the Chromium Single Cell 3' kit, the Chromium Genome kit, the Chromium Exome kit, and/or the GemCode reagent kit.

10.     "Accused Products" means the GemCode platform, including without limitation all past and future versions of the GemCode platform and any variant of the GemCode platform.

11.     "Prior Art" is used herein in the same sense that it is used in 35 U.S.C. § 102 or 103 that includes any patent, printed publication, prior knowledge, prior use, prior sale or offer for sale, or other act or event defined in 35 U.S.C. § 102, taken singly or in combination.

12.     "Communication" means any form of oral or written interchange, whether in person, by telephone, by facsimile, by telex, by electronic email, or by any other medium.

13.     "Document" shall be interpreted to the full extent permitted by the Federal Rules of Civil Procedure and includes, without limitation, e-mail, files stored on electronic media, copies of letters, notes and records of telephone conversations, intra-corporate communications, minutes, bulletins, specifications, instructions, advertisements, literature, patents, patent applications, specification sheets and diagrams, work assignments, reports, memoranda, memoranda of conversations, notes, notebooks, drafts, data sheets, work sheets, contracts and agreements, memoranda of agreements, assignments, licenses, sublicenses, opinions and reports of experts and consultants, books of account, orders, invoices, statements, bills, checks and vouches, brochures, photographs, drawings, charts, catalogs, pamphlets, magazines, copies of magazines, decals, world-wide web and/or internet postings, trade letters, notices and

3

announcements, and press releases, and all other printed, written, recorded, taped, electronic, graphic, computerized printout or other tangible materials of whatever kind known to, or in the possession, custody, or control of 10X.  A draft or nonidentical copy is a separate document within the meaning of this term.

14.     "Concerning" means relating or referring to, discussing, describing, summarizing, evidencing, or constituting.

15.     The words "identify," "identity," and "identification" mean:

a.  as applied to an individual, state the individual's first name; present or last known address and telephone number; present or last known employer; and present or last known business address and telephone number.

b.  as applied to a document, state the type of document; date of the document; names of the individuals who drafted, authored, or signed the document; names of the individuals to whom the document or a copy thereof was addressed or sent; a summary of the subject matter of the document; the number of pages of the document; the present whereabouts of the document; the name and address of the current custodian; and the Bates number(s), if the document has been produced.

c.  as applied to a patent or patent application, state the country where it was filed or granted; the patent or patent application number; the filing date; the dates of publication and issue, if any; the identity of all inventors; the title; and the identity of all related applications and patents.

d.  as applied to oral communications, state the name of the person making the communication and the name(s) of the person(s) present while the

communication was made, and, where not apparent, the relationship of the person(s) present to the person making the communication; the date and place of the communication; and a summary of the subject matter of the communication.

e.  as applied to an event or chain of events, state the date(s) of each occurrence relevant to the event, including but not limited to those involved in witnessing, supervising, controlling, supporting, requesting, or otherwise participating in the event and/or those who can corroborate or refute the described circumstances of the event; and describe the role and/or contribution of each person so identified.

16.    The words "any," "all," and "each" shall mean any, all, each, and every.

17.    The terms "and" and "or" should be understood as either conjunctive or disjunctive, whichever is necessary to bring within the scope of the interrogatory any responses that might otherwise have been understood to be outside its scope.

18.    Use of the singular includes the plural and vice versa.

19.    The term "person" refers to both natural persons and to corporate or other business entities (including 10X), whether or not in the employ of 10X, and the "acts" of a person (including 10X) are defined to include the acts of directors, officers, owners, members, employees, agents or attorneys acting on the person's behalf.

20.    Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these requests for documents and things are continuing in nature.  If, after producing the requested documents and things, 10X obtains or becomes aware of any further responsive documents or things, 10X must produce to RainDance and the University of Chicago such additional documents and things.

These requests are being propounded in light of the discovery served thus far in this case. RainDance and the University of Chicago stand ready to meet and confer to discuss the best and most efficient way to conduct discovery bilaterally.

21.     If you withhold any document based upon a claim of privilege or any other claim of immunity from discovery, then state so in writing in response to the claim being asserted and describe the facts and circumstances giving rise to it in sufficient detail so as to permit RainDance and the University of Chicago to evaluate, and the Court to adjudicate, the merits of the claim.

22.     If you contend that a portion of a document contains information that is immune from discovery, then produce the document with the immune portion redacted therefrom and describe the redacted portion in a privilege log.

23.     If a document that is responsive to these requests has been destroyed, the response hereto shall identify (i) the preparer of the document; (ii) its addresser (if different), addressee, and each recipient thereof; (iii) each person to whom it was distributed or shown; (iv) the date it was prepared; (v) the date it was transmitted (if different); (vi) the date it was received; (vii) a description of its contents and subject matter; (viii) the date of its destruction; (ix) the manner of its destruction; (x) the name, title and address of the person authorizing its destruction; (xi) the reason(s) for its destruction; (xii) the name, title and address of the person destroying the document; and (xiii) a description of the efforts to locate the document and copies of it.

## INTERROGATORIES

### INTERROGATORY NO. 12:

For each potential workarounds or design-arounds You described in response to Interrogatory No. 3, state all bases for Your contention (if any) that such substitutes were (or are) acceptable substitutes for You and Your business.

### INTERROGATORY NO. 13:

State any opinion(s) of counsel You may rely on at trial.

### INTERROGATORY NO. 14:

Separately, for each version and variation of the Accused Products, state Your future projected monthly unit sales (or, if monthly data is not available, unit sales for time periods that are as close to monthly as possible).

### INTERROGATORY NO. 15:

Separately, for each version and variation of the Accused Products, state Your future projected monthly gross and net revenues and future projected monthly costs and/or expenses (or, if monthly data is not available, gross and net revenues and costs and/or expenses for time periods that are as close to monthly as possible).

### INTERROGATORY NO. 16:

If You have a belief as to what amount would be an appropriate damages award should You be found to infringe any of the patents asserted against You in this case, and assuming (and not admitting) each such patent is not invalid or unenforceable, state the amount of damages and explain Your basis therefore.  Your response should include an identification of all documents, identified by Bates Number, relied on in formulating your response and the person(s) most knowledgeable regarding the information contained in your response.

**INTERROGATORY NO. 17:**

Separately, for each version and variation of the Accused Products, identify Your competitors and their competing products or services.

**INTERROGATORY NO. 18:**

Separately, for each version and variation of the Accused Products, describe the process by which sample DNA is distributed into individual droplets.

**INTERROGATORY NO. 19:**

Separately, for each version and variation of the Accused Products, describe any pattern of distribution of sample DNA into individual droplets that may exist, including, for instance whether the distribution is a normal distribution, a poisson distribution, etc.

Dated: April 5, 2017

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Joseph J. Farnan, Jr. (Bar No. 100245)
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
farnan@farnanlaw.com
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Brian E. Farnan, hereby certify that on April 5, 2017, a copy of RainDance

Technologies, Inc. and The University of Chicago's Third Set of Interrogatories to 10x

Genomics, Inc. was served on the following as indicated:

<u>Via E-Mail</u>
Frederick L. Cottrell, III
Jason J. Rawnsley
RICHARDS, LAYTON&FINGER, P.A.
920 North King Street
Wilmington, DE 19801
cottrell@rlf.com
rawnsley@rlf.com

*Attorneys for Defendant*

<u>Via E-Mail</u>
David I. Gindler
Andrei Iancu
Lauren Nicole Drake
Elizabeth Chenyi Tuan
Dennis J. Courtney
IRELL &MANELLA LLP
10XRainDance@irell.com

*Attorneys for Defendant*

 /s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)

# EXHIBIT 2 TO PLAINTIFFS' MIL NO. 3 REDACTED IN ITS ENTIRETY

# EXHIBIT 3

```
 1                  UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF DELAWARE

 3

 4    BIO-RAD,                    :    CA NO. 15-152-RGA

 5              Plaintiff,        :

 6                                :

 7         v.                     :    August 8, 2017

 8                                :

 9    10X GENOMICS,               :

10                                :

11              Defendant,        :    9:03 o'clock a.m.

12    .........................:

13

14

15             TRANSCRIPT OF DISCOVERY DISPUTE

16         BEFORE THE HONORABLE RICHARD G. ANDREWS

17             UNITED STATES DISTRICT JUDGE

18

19

20    APPEARANCES:

21

22

23    For Plaintiff:     FARNAN LLP

24                       BY:  MICHAEL J. FARNAN, ESQ

25                            -and-
```

```
1                          WEIL GOTSHAL & MANGES LLP

2                          BY:  EDWARD R. REINES, ESQ

3

4

5

6    For Defendant:        RICHARDS, LAYTON & FINGER

7                          BY:  FREDERICK L. COTTRELL, III, ESQ

8                                   -and-

9                          IRELL & MANELLA LLP

10                         BY:  MICHAEL H. STRUB, JR., ESQ

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Court Reporter:        LEONARD A. DIBBS

25                          Official Court Reporter
```

1   each other about that.  I'm not in a good position to --

2         MR. REINES:  Yes, I'm just saying our intent would be

3   to comply with the existing deadlines, except for that technical

4   analysis.

:31:23   5         THE COURT:  Okay.

6         MR. REINES:  And to head off a potential dispute,

7   because I'm not rearguing or anything like that, but there is a

8   suggestion that we might have to move the damages expert

9   deadline from the 21st that Mr. Strub just raised.

:31:40   10         And, you know, they did a 30(b)(6) deposition on how

11   our products work already, the products that are accused.  They

12   did whatever discovery they wanted.  They had all kinds of

13   depositions.

14         And, so, I'm very concerned that the initial ruling is

:31:54   15   going to be used as some do-over on damages, because they don't

16   like what they got.  They were on notice of what we did before

17   they did all these depositions.

18         THE COURT:  All right.

19         Let's move on.

:32:11   20         So then we also have the privilege log issue.

21         And, as far as I can tell, because I guess Bio-Rad

22   submitted pages and pages of stuff with yellow highlighting on

23   it, I have to say that the stuff that I looked at that had

24   yellow highlighting on it looked okay to me.

:32:40   25         Is your problem with the stuff that's actually all this

1  yellow highlighting or is your problem with things that don't

2  appear on the list in the first place?

3      MR. REINES:  No.  I mean, I just wanted to name what

4  the issue is.

:32:55  5      So our concern is, you know, we think there's willful

6  infringement.  There's not many in the way of non-infringement

7  arguments, and validity isn't really in question either.

8      THE COURT:  All right.

9      Well, we don't need to argue the merits.  I understand

:33:04  10  it when you say willful infringement.

11      MR. REINES:  I'm just saying it's what I think the

12  focus of the trial is going to be.

13      And what I've heard from them, and what they confirmed

14  in their response letter is what -- the kind of defense -- and I

:33:14  15  assume the Court has seen this far more than me -- but they're

16  going to have to say something on this topic.

17      And I think what we're likely to hear is something

18  like, well, we always perform an FTO lock.  And we raised all

19  this money and, of course, people wouldn't pay the money unless

:33:32  20  which did the FTO.

21      THE COURT:  I don't actually think that they -- if

22  they're not relying on advice of counsel, then they're not

23  allowed to say things that they suggest that they are relying on

24  the advice of counsel, right, Mr. Strub?

:33:41  25      MR. STRUB:  That's right, your Honor.

1    THE COURT:  I mean, they're not allowed to -- you know,

2    if they can't produce the opinion that says, here, this doesn't

3    infringe, go ahead, they can't also suggest, well, we talked to

4    the lawyer and then we went ahead, you know, you connect the

:33:54   5    dots.  And essentially the legal components gets washed out.

6    MR. REINES:  So my concern, based at least on the

7    trials that I've been involved in -- and, again, you have a

8    better --

9    THE COURT:  Probably not, actually, but --

:34:06   10    MR. REINES:  Exactly.  There's like door opening and

11    there becomes a lot of issues of exactly who spoke to who when

12    about what.  And there's a lot of issues about what they knew

13    about these patents, because they studied these patents for

14    infringement, same founders of this company, like QuantaLife

:34:24   15    previously.

16    THE COURT:  Haven't you already deposed them and found

17    about their studying of the patents?

18    MR. REINES:  No, no.  I mean, the first question that's

19    on this thing is -- -

:34:31   20    THE COURT:  Well, wait, wait, wait.

21    We're still talking about privilege log here, right?

22    MR. REINES:  Oh, the privilege lot and not the

23    privilege questions?

24    THE COURT:  Yes.

:34:40   25    MR. REINES:  Oh, I'm sorry.  Okay.

1   constitute that or don't.

2           THE COURT:  Well, you --

3           MR. REINES:  And if they -- and if they -- if they had

4   20 meetings with attorneys where they learned about the patents,

:36:50      5   that's just relevant.  Well, it's going to be relevant at trial.

6           I mean, it's my instinct about somehow or other that's

7   going to come up that they were constantly meeting about the

8   patents.

9           THE COURT:  All right.

:37:01     10           Well, so, okay.

11           Mr. Strub, do you have to anything to say on this?

12           MR. STRUB:  Well, yes, and as your Honor has pointed

13   out, it's a waste of time.

14           But the other issue is, and what we're concerned about,

:37:14     15   and they want us to say, we received advice of counsel about

16   these patents.

17           But then we'd be barred from saying what advice was

18   unless we waived it?

19           So, then, that's a negative influence.

:37:26     20           THE COURT:  Well, right.

21           That's the reason why my limited experience with this

22   is, when you -- you just can't -- the trial can't be about

23   meetings with attorneys, because the underlying advice is

24   privileged and, therefore, the jury is going to draw all the

:37:43     25   wrong inferences one way or the other, if they hear about

1    meetings with attorneys, and not what was said about them.

2           So I don't think at the trial they hear about the

3    advice, because you clearly said you're not relying on it.

4           And that you don't hear about the meetings, but then

:38:02    5    will be argued -- or if they come into evidence -- then you'll

6    both be arguing about what they mean.

7           MR. STRUB:  That's right, your Honor.

8           MR. REINES:  To me that's a trial management of

9    exclusion.

:38:13    10          And, so, having a privilege log that meets basic

11   predicates, so that should there be an issue that comes up, a

12   door opening or anything else.

13          THE COURT:  All right.

14          Well, I think the privilege log is sufficient, so I'm

:38:24    15   going to deny that.

16          Okay.

17          Let's talk about the privileged questions or the

18   depositions.

19          I looked through the yellow highlighted stuff.

:38:37    20          So I understand 10X says, didn't properly

21   meet-and-confer, didn't properly explain the basis.

22          We're here.  I read the questions.

23          There was some discussion back and forth.  And I'm not

24   going to first decide -- rule on the meet-and-confer process and

:39:06    25   then get to the merits here.

1        So, Mr. Strub, what -- the various things that are

2   highlighted in the depositions, are you saying that these are

3   all good objections, because of Attorney-Client Privilege,

4   because it doesn't seem to me like they are.

:39:26   5        MR. STRUB:  So, your Honor, yes, we are saying that.

6        And you can go -- you know, and there are a lot of

7   these questions -- but one of the questions in here is what we

8   just talked about, did you receive advice of counsel on the

9   Ismagilov patents.

:39:39   10        And they were instructed not to answer for the reasons

11   that we just discussed in connection with the privilege log.

12        THE COURT:  Yeah, you know, the privilege log is a

13   different thing than answering questions at a deposition.

14        MR. STRUB:  I understand that, your Honor.

:39:52   15        But it's the same problem, which is, if the witness

16   said, yes, we received advice of counsel concerning the

17   Ismagilov patents, then unless there --

18        THE COURT:  Well, so, let's skip that, because the way

19   I looked at it, it seemed to me there were two general sets of

:40:11   20   questions.

21        One of which was the repeated, did you receive advice

22   about the Ismagilov patents, which seemed to be particularly in

23   the deposition of the first person.

24        And then the second thing is, there were a bunch of

:40:29   25   questions that had more to do with knowledge, and

46

1          THE COURT:  Okay.

2          MR. STRUB: -- for Bio-Rad and one for 10X on these

3    patents.

4          THE COURT:  Okay.  All right.

:58:03    5          I couldn't -- okay.

6          MR. STRUB:  And Vern Norviel, who if you look at that

7    request that we were just looking at on one, so what the

8    witnesses said unfortunately we don't have this, is, it's Vern

9    Norviel.  Vern Norviel is the Wilson Sonsini lawyer who gave the

:58:17   10   advice of counsel.

11         So what this question is getting to is discussions with

12   Vern Norviel and Wilson Sonsini.  The date when they knew about

13   the patents, that is not in dispute.  They have that

14   information.

:58:30   15         But once you start opening this door about, did Wilson

16   Sonsini say, discuss these patents with you, how long did you

17   sit then discussing them with Wilson Sonsini.  How much analysis

18   did you --

19         THE COURT:  Right, of course.

:58:45   20         But the problem is, that's not actually the question

21   that was asked here.

22         The question was, how much time did you spend with the

23   issue of professor -- I mean, I guess --

24         MR. STRUB:  It's all with Wilson Sonsini.  That's Vern

:58:59   25   Norviel.

1    He said -- you can see -- it's Vern Norviel.  It was

2  Vern -- that changed the team.

3    So I don't know all who does what behind the scene.

4  This was all work that was done by Wilson Sonsini.

:59:16   5    And if we had -- if we were relying on the advice of

6  counsel, then obviously all this comes out.

7    MR. REINES:  Your Honor, just?

8    THE COURT:  Yes, Mr. Reines.

9    MR. REINES:  Thank you, your Honor.

:59:25   10    This isn't privileged.  I understand the Court has

11  this, you know, approach to this, which is, it's unnecessary for

12  the case that's tried.

13    THE COURT:  Well, no, I was thinking about that,

14  because a lot of questions where I was thinking about that were,

:59:39   15  you know, Question No. 3:

16    "Did you receive any advice concerning the validity of

17  Professor Ismagilov's patents at 10X?"

18    That's the question I was -- that kind of question is

19  the one that I was thinking about as unnecessary.

:59:56   20    MR. REINES:  Right.

21    Those are kind of -- it's an interesting question as to

22  whether you have to put on the privilege log, validity,

23  infringement.  To me that's kind of an interesting question as

24  to whether that is topic or substance.

:00:05   25    But the times, and the number of meetings, and who was

1   in attendance, the standard questioning that's permitted in

2   deposition after deposition, and then at trial we make the call

3   as to what's appropriate to come in and when.

4           And I don't know what else to say other than that.

5           MR. STRUB:  And the witnesses were all permitted to

6   answer those questions.

7           How often did you meet with Wilson Sonsini, who was in

8   attendance, to the extent that there were --

9           MR. REINES:  No.

10          MR. STRUB:  There's none of these where there's a

11  Motion to Compel here.  It's all, as you said, your Honor,

12  relating to the advice that was received.

13          THE COURT:  Well, no.  I mean, they're not.  There's

14  some that are -- you know, Question No. 3, that to me was --

15  that was a narrowly drawn question that said -- I forget what it

16  was now -- did you receive any advice concerning the validity?

17          You know, if the answer is yes, then I suppose what's

18  -- the next question is, well, who did you receive it from?

19          You know, at some point the answer is, I received it

20  from an attorney.

21          So what have we accomplished?

22          MR. REINES:  What I'm saying -- it depends on what the

23  question is during the deposition, and who knows where the

24  questioning would have led, but one of them goes to notice of

25  the patent, because, for example --

1          THE COURT:  All right.

2          Well, so, I don't really recall seeing that in the

3    letters, but I think that's probably something you all can work

4    out, but it's a much different than search terms which is what

:17:03   5    was in the letter.

6          MR. STRUB:  Thank you, your Honor.

7          MR. REINES:  Thank you.

8          THE COURT:  All right.

9          So the transcript will serve as the Order of the Court.

:17:09   10          Thank you all.

11          MR. STRUB:  Thank you, your Honor.

12          MR. REINES:  Thank you, your Honor.

13          (The proceedings adjourned at 10:17 o'clock a.m.)

14                          *  *  *  *

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BIO-RAD LABORATORIES, INC. and THE
UNIVERSITY OF CHICAGO,

               Plaintiffs,

     v.

10X GENOMICS, INC.,

               Defendant.

C.A. No. 15-152-RGA

**CONTAINS OUTSIDE ATTORNEYS'
EYES ONLY INFORMATION**

---

**DEFENDANT 10X GENOMICS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION *IN
LIMINE* NO. 3 TO PRECLUDE 10X GENOMICS, INC. FROM SUGGESTING THAT IT
RECEIVED ADVICE OF COUNSEL REGARDING THE PATENTS IN-SUIT**

*Of Counsel*:

David I. Gindler (dgindler@irell.com)
Alan J. Heinrich (aheinrich@irell.com)
Lauren N. Drake (ldrake@irell.com)
Elizabeth C. Tuan (etuan@irell.com)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276
Tel: (310) 277-1010

Michael H. Strub, Jr. (mstrub@irell.com)
Dennis J. Courtney (dcourtney@irell.com)
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Tel: (949) 760-0991

D: March 23, 2018

Frederick L. Cottrell, III (#2555)
Jason J. Rawnsley (#5379)
RICHARDS, LAYTON & FINGER
920 North King Street
Wilmington, DE 19801
Tel: (302) 651-7700
cottrell@rlf.com
rawnsley@rlf.com

*Attorneys for Defendant 10X Genomics, Inc.*

Plaintiffs seek an order that "10X should be precluded from suggesting at trial it received any advice of counsel—formally or informally—on the patents in-suit from any source." Plaintiffs' MIL No. 3 at 3. This part of Plaintiff's motion is not in dispute: 10X does not intend to introduce an opinion of counsel given to 10X concerning the patents-in-suit. *Id.* at Ex. 3; 10X MIL No. 3. [1]

Plaintiffs' motion, however, *also* seeks to exclude advice that 10X *founders* Ben Hindson and Kevin Ness received while at *QuantaLife* before 10X existed. The motion asserts: "Additionally, 10X should be specifically precluded from referring to any alleged advice of counsel that QuantaLife, the entity 10X's principals were formerly associated with, received regarding the patents in-suit. Bio-Rad acquired QuantaLife and therefore owns the attorney-client privilege over such advice and Bio-Rad has not waived the applicable privilege." Plaintiffs' MIL No. 3 at 1. This argument is not well taken because evidence of the advice that Drs. Hindson and Ness received while at QuantaLife is necessary for 10X to be able to defend itself against Bio-Rad's claim that 10X willfully infringed the Ismagilov patents.

The digital PCR product that Drs. Ness, Hindson, and others developed at QuantaLife uses droplets. And while 10X's products and QuantaLife's product perform different reactions and generate different information, they share similarities that are relevant to whether they are covered by the Ismagilov patents: All of the products generally involve conducting reactions in microfluidic droplets that, once formed, are collected and transferred to a thermal cycler where the reactions occur. Ex. A ¶¶ 4-5 (showing QuantaLife workflow). Plaintiffs already have indicated that they intend to argue that Drs. Hindson and Ness's knowledge of the Ismagilov

---

[1] Plaintiffs interrogatory No. 13 sought "any opinion(s) of counsel [10X] may rely on at trial." 10X could not have identified any opinion of counsel provided to QuantaLife in its response. Bio-Rad—not 10X—possess such opinion and "owns the attorney-client privilege over such advice." Plaintiffs' MIL No. 3 at 1. The QuantaLife opinion was disclosed in deposition.

patents while they were at QuantaLife and when they worked at Bio-Rad is relevant to willfulness "because they were going into droplets" at 10X. D.I. 207 at 45:11-20.

What Bio-Rad does not want the jury to hear, however, is the advice that the principals of QuantaLife—including Drs. Hindson and Ness—received concerning the applicability of the Ismagilov patents to their droplet digital PCR product. They received this advice both in connection with QuantaLife's initial venture capital financing and in connection with its subsequent acquisition by Bio-Rad. Thus, although Drs. Hindson and Ness were aware of the Ismagilov patents while at QuantaLife, it is clear from the testimony that plaintiffs' counsel elicited that they were advised that the QuantaLife digital PCR product did not infringe those patents. ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████

A party may not "use the privilege to prejudice his opponent's case." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991). "If you want to litigate [a] claim, then you must waive your privilege to the extent necessary to give your opponent a fair opportunity to defend against it." *Bittaker v. Woodford*, 331 F.3d 715, 720 (9th Cir. 2003); *see also Solin v. O'Melveny & Myers, LLP*, 89 Cal. App. 4th 451, 462-63 (2001) (malpractice claim dismissed when client refused to waive privilege); *Milhouse v. Travelers Commercial Ins. Co.*, 982 F. Supp. 2d 1088, 1108 (C.D. Cal. 2013) (holding insured could not assert mediation privilege when doing so would deprive insured of "due process right to present a defense"), *aff'd*, 641 F. App'x 714 (9th Cir. 2016). While these cases do not arise in the uncommon circumstances presented here—

where the knowledge that 10X's principals acquired while they worked for QuantaLife and Bio-Rad is relevant to a willfulness defense—the legal principle is the same. Plaintiffs cannot tell the jury about Dr. Hindson and Dr. Ness's knowledge of the Ismagilov patents while at QuantaLife without allowing them to respond by explaining the context in which they acquired that knowledge ███████████████████████████████████████████████

Indeed, even if Plaintiffs were to back away from their stated intention to use Dr. Hindson and Dr. Ness's knowledge of the Ismagilov patents while at QuantaLife to support a claim of willfulness, that does not cure the prejudice to 10X. To prove willful infringement, Plaintiffs must prove that 10X's infringement was reckless, wanton, malicious, committed in bad faith, deliberate, consciously wrongful, flagrant, or—as it may be described—characteristic of a pirate. *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1936 (2016). To rebut Plaintiffs' claim of willfulness, Dr. Hindson and Dr. Ness should be permitted to tell the jury the advice that they were given while at QuantaLife concerning whether their droplet-based product infringed what Plaintiffs characterize as the "foundational" droplet patents in this field. It is unfair to allow Plaintiffs to argue willfulness while depriving 10X of the ability to introduce evidence that is indisputably probative on this issue.

Finally, even if the Court allowed Bio-Rad to argue willful infringement without waiving the privilege, at a minimum, Drs. Ness and Hindson should be permitted to testify, ██████████ ████████████████████████████████████████████████████ ██████████████████████████████████████. Bio-Rad already has acknowledged that the mere fact that they received legal advice is not privileged. *See* Ex. C at 74:19-74:25 (stating whether Dr. Hindson "receive[d] an opinion of counsel at QuantaLife regarding the Professor Ismagilov patents" was "not possibly privileged").

<div style="display:flex">
<div>

*Of Counsel*:

David I. Gindler (dgindler@irell.com)
Alan J. Heinrich (aheinrich@irell.com)
Lauren N. Drake (ldrake@irell.com)
Elizabeth C. Tuan (etuan@irell.com)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010

Michael H. Strub, Jr. (mstrub@irell.com)
Dennis J. Courtney (dcourtney@irell.com)
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
(949) 760-0991

Dated: March 23, 2018

</div>
<div>

*/s/ Jason J. Rawnsley*
Frederick L. Cottrell, III (#2555)
Jason J. Rawnsley (#5379)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
rawnsley@rlf.com

*Attorneys for 10X Genomics, Inc.*

</div>
</div>

- 4 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 23, 2018, I caused true and correct copies of the foregoing

document to be served on the following counsel in the manner indicated:


<u>VIA EMAIL</u>
Brian E. Farnan
Michael Farnan
Farnan LLP
919 N. Market St., 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

<u>VIA EMAIL</u>
Edward R. Reines
Derek C. Walter
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
raindance10xservice@weil.com



*/s/ Jason J. Rawnsley*
Jason J. Rawnsley (#5379)
rawnsley@rlf.com

# EXHIBIT A

**Frost & Sullivan Press Release** — Published: 24 Jun 2011

## Frost & Sullivan Recognizes QuantaLife's Innovative Technology for Enabling Advances in Biomedical Research, Diagnostics, and Personalized Medicine

Date Published: 24 Jun 2011

Path Breaking ddPCR™ System Provides Even More Precise Measurements than Currently Used qPCR Methods

MOUNTAIN VIEW, Calif. - June 24, 2011 - Based on its recent analysis of the personalized medicine market, Frost & Sullivan recognizes QuantaLife, Inc. with the 2011 North American Frost & Sullivan Award for New Product Innovation for its Droplet Digital™ Polymerase Chain Reaction (ddPCR™) system, a next generation of PCR that provides an absolute quantification measurement of nucleic acid molecules in nanoliter droplet form.

Real-time PCR has long been the gold standard for sensitive DNA quantification. With even greater sensitivity and precision, the ddPCR™ system is market-changing and has far-reaching applications in research and diagnostics. By allowing for detection at lower target levels, the ddPCR™ system has the ability to identify diseases earlier in progression, providing a major advantage for diagnostics and preventative medicine. Therefore, QuantaLife is poised to play a significant role in the development of companion diagnostics central to the emergence of personalized medicine.

"Essentially, this new technology provides even more precise measurements than the gold-standard qPCR methods widely used for fifteen years," says Frost & Sullivan Industry Analyst Christi Bird. "The unmatched resolution allows detection of target molecules at extremely low levels, which has major implications for not only precise life science research applications, but also early diagnosis of disease and development of accurate companion diagnostics for personalized healthcare."

Launched in November 2010, QuantaLife's ddPCR™ system consists of two separate instruments, the droplet generator and the droplet reader, both compact and sleek in design. The smaller of the two instruments, the droplet generator, divides each sample into 20,000 one-nanoliter droplets. After depositing the droplets into a 96-well plate, researchers then transfer the plate to their own standard thermal cyclers to amplify the targeted DNA/RNA molecules. Returned to QuantaLife's droplet reader instrument, droplets are streamed single file past a two color fluorescence detector and read as either positive or negative for the target DNA/RNA molecules. The platform then uses statistics to determine the concentration of the selected target in the original sample, thus providing a digital absolute quantification.

The ddPCR™ system provides several advantages over traditional real-time PCR. In particular, the system can better detect the difference between samples with similar genomic structures, a major advantage in determining copy number variation. This precise technology can also identify a +/-10 percent difference in gene expression between samples. Additionally, the instrument can detect a rare difference against a similar and common background.

"This advantage allows extremely sensitive detection of rare mutations when real-time PCR fails at certain concentration due to competitive amplification of the common DNA," says Bird. "The excitement this technology is already generating is evident from the hefty $17.2 million series B financing round the company received in December 2010."

Overall, QuantaLife exhibits the qualities necessary for an entrepreneurial company to succeed – dedication to innovation, a next-generation platform that significantly exceeds earlier technologies, and a solid plan for future growth. The ddPCR™ system has the ability to significantly improve PCR resolution, impacting a plethora of applications requiring precise measurements. Frost & Sullivan expects even greater innovations from this new company over the next few years as it ramps up commercialization of the ddPCR™ system, builds awareness, and pursues new markets. In recognition of its commitment to technology innovation and improving life sciences research and diagnostics, QuantaLife is the worthy recipient of the 2011 Frost & Sullivan Award for New Product Innovation Award in personalized medicine.

Each year, Frost & Sullivan presents this award to the company that that has developed an innovative element in a product by leverage leading edge technologies. The award recognizes the value added features/benefits of the product and the increased ROI it offers customers, which in turn increases customer acquisition and overall market penetration potential.

Frost & Sullivan's Best Practices Awards recognize companies in a variety of regional and global markets for demonstrating outstanding achievement and superior performance in areas such as leadership, technological innovation, customer service, and strategic product development. Industry analysts compare market participants and measure performance through in-depth interviews, analysis, and extensive secondary research in order to identify best practices in the industry.

About QuantaLife, Inc.

QuantaLife, a venture-backed startup company based in Pleasanton, CA recently developed Droplet Digital™ Polymerase Chain Reaction (ddPCR™) technology, a next generation of PCR that provides an absolute quantification measurement of single molecules in nanoliter droplet form. The company was founded in August of 2008. After launching the ddPCR™ system in November 2010, the firm

closed $17.2 million in Series B financing in December to accelerate application development for its platform and establish commercial operations in 2011.

About Frost & Sullivan

*Frost & Sullivan*, the Growth Partnership Company, enables clients to accelerate growth and achieve best-in-class positions in growth, innovation and leadership. The company's Growth Partnership Service provides the CEO and the CEO's Growth Team with disciplined research and best-practice models to drive the generation, evaluation, and implementation of powerful growth strategies. *Frost & Sullivan* leverages 50 years of experience in partnering with Global 1000 companies, emerging businesses and the investment community from more than 40 offices on six continents. To join our Growth Partnership, please visit http://www.awards.frost.com.

Contact:

Mireya Espinoza
P: 210. 247.3870
F: 210.348.1003
E: mireya.espinoza@frost.com

 BACK TO TOP     RETURN

# EXHIBIT B TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MIL NO. 3 REDACTED IN ITS ENTIRETY

# EXHIBIT C TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MIL NO. 3 REDACTED IN ITS ENTIRETY

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

THE UNIVERSITY OF CHICAGO  :
:
and  :
:
BIO-RAD LABORATORIES, INC.  :
:
Plaintiffs,  :          Civ. A. No. 15-152-RGA
:
v.  :
:
10X GENOMICS, INC.  :
:
Defendant  :
:

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION *IN LIMINE* NO. 3 TO
PRECLUDE DEFENDANT 10X GENOMICS, INC. FROM SUGGESTING THAT IT
RECEIVED ADVICE OF COUNSEL REGARDING THE PATENTS IN-SUIT**

10X's reply confirms it plans to rely on advice of counsel from a prior employer of its management team, QuantaLife, and that FRCP 37(c)(1), standing alone, precludes any such evidence.   10X ***concedes*** it did not identify the QuantaLife advice of counsel in its interrogatory response, which asked for such information.  Exclusion is automatic under Rule 37(c)(1).  *See Philips Elec. N.A.*, 2004 WL 769371, at *1.  10X's excuse that it could not identify the advice because Bio-Rad owns the privilege is meritless.  The fact of attorney-client advice is not privileged, only its substance.  *Chicago Bd. Options Exch. v. Int'l Sec. Exch., LLC*, 2008 WL 3285751, at *3-*4 (N.D. Ill. 2008).  There is no substantial justification and allowing reliance on the QuantaLife advice would not be harmless because there has been no discovery about such advice.

Moreover, 10X's withholding of its own legal advice forecloses it from relying on QuantaLife advice.  10X cannot selectively choose the particular advice it wants to use—the scope of waiver of privilege precludes this.  *Shinogi Pharma., Inc. v. Mylan Pharma., Inc.*, 2011 WL 6651274, at *3 (D. Del. 2011)*; see also* D.I. 207 at 26:21-25 (Court: "[I]f they're not relying on advice of counsel, then they're not allowed to say things that they suggest that they are relying on the advice of counsel, right, Mr. Strub?  10X: That's right, your Honor.").  Obviously, the withheld 10X advice would be more relevant about 10X infringement than advice received years earlier from another employer with a different product.

Lastly, the Court has stated a witness may not testify about advice of counsel when the underlying opinion is privileged.  *See* D.I. 207 at 30:22-25 ("the trial can't be about meetings with attorneys, because the underlying advice is privileged and, therefore, the jury is going to draw all the wrong inferences one way or the other").  This bar should extend to the QuantaLife advice.

Dated:  March 26, 2018

OF COUNSEL:

Edward R. Reines
Derek C. Walter
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000
ed.reines@weil.com
derek.walter@weil.com

Respectfully submitted,

FARNAN LLP

*/s/* Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: 302-777-0300
Facsimile: 302-777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiffs*

2