# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BIO-RAD LABORATORIES, INC. and THE UNIVERSITY OF CHICAGO, | ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 15-cv-152-RGA |
| v. | ) ) | |
| 10X GENOMICS, INC., | ) ) | |
| Defendant. | ) ) | |

## FINAL JURY INSTRUCTIONS

1.    GENERAL INSTRUCTIONS ...................................................................3

      1.1.   INTRODUCTION ...................................................................3

      1.2.   JURORS' DUTIES ..................................................................4

      1.3.   EXHBITS AND DEMONSTRATIVE EXHIBITS .......................................5

2.    BURDENS OF PROOF ..........................................................................6

3.    PATENT CLAIMS ................................................................................7

      3.1.   THE ROLE OF CLAIMS IN THE PATENT ...........................................7

      3.2.   INDEPENDENT AND DEPENDENT CLAIMS ........................................8

      3.3.   CONSTRUCTION OF CLAIMS ......................................................9

      3.4.   OPEN ENDED OR "COMPRISING" CLAIMS.........................................10

      3.5.   INFRINGEMENT GENERALLY.....................................................11

      3.6.   DIRECT INFRINGEMENT ..........................................................12

      3.7.   CONTRIBUTORY INFRINGEMENT ................................................13

      3.8.   INDUCED INFRINGEMENT.........................................................14

      3.9.   INFRINGEMENT BY SUPPLY OF COMPONENTS ESPECIALLY
             MADE OR ADAPTED FOR USE IN THE PATENTED INVENTION
             TO ANOTHER COUNTRY............................................................15

      3.10.  INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS ........16

4.    INVALIDITY .....................................................................................17

      4.1.   PERSON OF ORDINARY SKILL IN THE ART .......................................18

      4.2.   PRIOR ART .........................................................................19

      4.3.   ANTICIPATION .....................................................................20

      4.4.   OBVIOUSNESS .....................................................................22

|        | 4.5. | ENABLEMENT | 26 |
|        | 4.6. | INDEFINITENESS | 28 |
| 5. | | WILLFUL INFRINGEMENT | 29 |
| 6. | | DAMAGES | 30 |
|        | 6.1. | DAMAGES—GENERALLY | 30 |
|        | 6.2. | REASONABLE ROYALTY AS A MEASURE OF DAMAGES | 31 |
|        | 6.3. | FACTORS FOR DETERMINING A REASONABLE ROYALTY | 32 |
|        | 6.4. | USE OF COMPARABLE LICENSE AGREEMENTS | 35 |
|        | 6.5. | DAMAGES—APPORTIONMENT | 36 |
| 7. | | DELIBERATION AND VERDICT | 37 |
|        | 7.1. | DELIBERATIONS AND VERDICT—INTRODUCTION | 37 |
| 8. | | UNANIMOUS VERDICT | 38 |
| 9. | | DUTY TO DELIBERATE | 39 |
| 10. | | SOCIAL MEDIA | 40 |
| 11. | | COURT HAS NO OPINION | 41 |

## 1.    GENERAL INSTRUCTIONS

### 1.1.    INTRODUCTION

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case.

Please listen very carefully to everything I say. In following my instructions you must follow all of them and not single out some and ignore others. They are all important.

You will have a written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.

## 1.2.    JURORS' DUTIES

You have two main duties as jurors.  The first one is to decide what the facts are from the evidence that you saw and heard here in court.  Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide, under the appropriate burden of proof, which party should prevail on each of the issues presented.  It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them.  This includes the instructions that I gave you before and during the trial, and these instructions.  All of the instructions are important, and you should consider them together as a whole.

Perform these duties fairly.  Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way.

## 1.3.  EXHIBITS AND DEMONSTRATIVE EXHIBITS

During the course of the trial, you have seen many exhibits.  Many of these exhibits were admitted as evidence.  Some of these admitted exhibits or portions of them have been displayed for you on a screen and you will have these admitted exhibits, whether displayed on a screen or not, in the jury room during your deliberations.

There are other exhibits (including charts and animations presented by attorneys and witnesses) that were offered to help illustrate the testimony of the various witnesses.  These illustrations, called "demonstrative exhibits," have not been admitted as evidence, are not evidence, and should not be considered as evidence.  Rather, it is the underlying testimony of the witness that you heard when you saw the demonstrative exhibits that is the evidence in this case.

## 2.    BURDENS OF PROOF

For each issue in this case, either Plaintiffs or 10X Genomics bears the burden of proof, which means that it bears the burden of persuading you to find in its favor.  In a patent case such as this, there are two different burdens of proof.  The first is called  "preponderance of the evidence." The second is called  "clear and convincing evidence."

For any issue on which a party bears the burden of proof by a preponderance of the evidence, that party has carried its burden if you find that what the party claims is more likely true than not, when considered in light of all of the evidence.  To put it differently, if you were to put each party's evidence on the opposite sides of a scale, the evidence supporting the party with the burden of proof would have to make the scales tip somewhat on the side of that party.

Here, Plaintiffs have the burden of proving by a preponderance of the evidence that 10X Genomics has infringed the '193 Patent, '407 Patent, or the '083 Patent, and the amount of damages Plaintiffs should receive to compensate them for any infringement.

For any issue on which a party bears the burden of proof by clear and convincing evidence, that party has carried its burden if you find that what the party claims is highly probable, when considered in light of all of the evidence.  Proof by clear and convincing evidence is a higher burden than proof by a preponderance of the evidence.

Here, 10X Genomics has the burden of proving by clear and convincing evidence that the claims of the '193 Patent, '407 Patent, or '083 Patent are invalid.

3.      **PATENT CLAIMS**

3.1.    **THE ROLE OF CLAIMS IN THE PATENT**

The patent claims are the numbered sentences at the end of each patent.  The claims are important because the words of a claim define the scope of the patent right.  The figures and text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims, but the claims define the extent of the patent's coverage.  Each claim may cover more or less than another claim.  Therefore, what a patent covers depends, in turn, on what each of its claims covers.

### 3.2.   INDEPENDENT AND DEPENDENT CLAIMS

Claims can be stated in two different ways in a patent. The first way a patent claim can be stated is in the form of an "independent" claim. An "independent" claim sets forth all of the requirements that must be met in order for an accused product or method to be covered by that claim, and thus infringe that claim. An independent claim is read alone to determine its scope.

In this case, claim 1 of the '193 Patent; claim 1 of the '407 Patent; and claim 1 of the '083 Patent are each independent claims.

The second way a claim can be stated is in the form of a "dependent" claim. A dependent claim does not itself recite all of the requirements of the claim but instead incorporates the requirements of another claim or claims and adds its own additional requirements. In this way, the claim "depends" on another claim or claims. To determine what a dependent claim covers, it is necessary to look at both the dependent claim and any other claims from which it depends. For example, claim 6 of the '193 Patent is a dependent claim of claim 1 and, as a result, claim 6 includes all the requirements of claim 1 and all the additional requirements of claim 6.

An accused product or method is only covered by, and therefore infringes, a dependent claim if the accused product or method meets all of the requirements of both the dependent claim and the claims from which the dependent claim depends. Because a dependent claim incorporates all of the features of the independent claims from which it depends, if you find that an independent claim is not infringed, then the claims that depend from that independent claim cannot be infringed.

### 3.3.   CONSTRUCTION OF CLAIMS

The law says that it is the Court's duty to define the terms of patent claims.  I have already defined the meaning of some of the words of the patent claims that you are considering in this case.  These definitions are attached to these jury instructions.

You must accept my definition of these words in the patent claims as correct.  You must use the definitions I give you for each claim to make your decisions as to whether the claim is infringed or invalid.  You must ignore any different definitions used by the witnesses or the attorneys.  You should not take my definition of the language of the patent claims as an indication that I have a view regarding how you should decide the infringement or invalidity issues that you are being asked to decide.  These issues are yours to decide.

When I have not defined a term, you should give it its ordinary meaning.

### 3.4.   OPEN ENDED OR "COMPRISING" CLAIMS

Some of the Asserted Claims use the word "comprising."

"Comprising" is interpreted the same way as "including" or "containing."  In patent claims, "comprising" means that the claims are open-ended.  As such, the accused methods must contain or use everything that is in the claim, but may additionally contain or use other things. Thus, if you find that 10X Genomics' methods include all of the requirements in a claim, the fact that 10X Genomics' methods may also include an additional component does not mean that the methods do not infringe the claim.

**3.5.   INFRINGEMENT GENERALLY**

Patent law provides that any person or business entity that makes, uses, or sells, without the patent owner's permission, any product, apparatus, or method covered by at least one claim of a United States patent before the patent expires, infringes the patent.

Infringement is assessed on a claim-by-claim basis. Therefore, there may be infringement as to one claim but no infringement as to another.

In this case, Plaintiffs assert that 10X Genomics infringes one or more asserted claims of the '407 and '083 Patents through its manufacture, use, and/or sale of its GemCode™ and Chromium™ products and that 10X Genomics infringes one or more asserted claims of the '193 Patent through its manufacture, use, and sale of its GemCode™ Long Read and Chromium™ Genome/Exome sequencing products.

In order to prove infringement, Plaintiffs must prove that the requirements of infringement are met by a preponderance of the evidence.

- 11 -

### 3.6.   DIRECT INFRINGEMENT

Direct infringement requires the unauthorized making, using, or sale of a patented invention during the time when the patent was in force. Thus, 10X Genomics' knowledge of Plaintiffs' patents and 10X Genomics' intent are irrelevant to your determination of direct infringement.

To determine infringement, you must compare the accused product or method with each claim that Bio-Rad and Chicago assert is infringed, using my instructions as to the meaning of the patent claims.   A patent claim is infringed only if 10X Genomics' GemCode$^{TM}$ and/or Chromium$^{TM}$ products or methods include each and every requirement or step in that patent claim. If 10X Genomics' products do not contain one or more requirements or steps recited in a claim, 10X Genomics does not infringe that claim. Even if a 10X Genomics product is capable of performing all of the steps in a method claim, 10X Genomics itself does not directly infringe that claim unless 10X Genomics practices every step of the method.

## 3.7.   CONTRIBUTORY INFRINGEMENT

Bio-Rad and Chicago contend that 10X Genomics is liable for contributory infringement by contributing to the direct infringement of the asserted patents by another party.  As with direct infringement, you must determine contributory infringement on a claim-by-claim basis.

10X Genomics is liable for contributory infringement of a claim if Bio-Rad and Chicago prove by a preponderance of the evidence that:

(1)    10X Genomics sells in the United States a component of an infringing product, or component for use in an infringing process;

(2)    the component has no substantial, noninfringing use;

(3)    the component constitutes a material part of the invention;

(4)    10X Genomics was aware of any of the asserted patents;

(5)    the product or process directly infringes the claim; and

(6)    10X Genomics knew that use of the product or process would infringe the asserted patents.

In order to prove contributory infringement, Bio-Rad and Chicago must prove that each of the above requirements is met. A component has no "substantial, noninfringing use" if the component has no meaningful use other than to infringe the claims of a patent.  When applying this standard to a separate and distinct component that is part of a larger product, the analysis must remain focused only on whether the specific component—and not the entire product—is capable of substantial, noninfringing uses.

### 3.8.   INDUCED INFRINGEMENT

Bio-Rad and Chicago contend that 10X Genomics is liable for induced infringement by inducing another party to directly infringe the asserted patents. As with direct infringement, you must determine whether there has been induced infringement on a claim-by-claim basis.

10X Genomics is liable for induced infringement of a claim if Bio-Rad and Chicago prove by a preponderance of the evidence that:

(1) the acts are actually carried out by another party and directly infringe that claim;

(2) 10X Genomics took action during the time the asserted patents were in force intending to cause the infringing acts by another party; and

(3) 10X Genomics was aware of the asserted patents and knew that the acts, if taken, would constitute infringement of that patent, or believed that there was a high probability that the acts, if taken, would infringe the asserted patents and took deliberate steps to avoid learning of that infringement.

If you find that 10X Genomics was aware of the patent, but believed that the acts it encouraged did not infringe that patent, 10X Genomics cannot be liable for inducement.  In order to establish induced infringement, it is not sufficient that another party itself directly infringes the claim. Nor is it sufficient that 10X Genomics was aware of the acts of another party that constitute the direct infringement. Rather, in order to find induced infringement, you must find either that 10X Genomics intended another party to infringe the asserted patents, or that 10X Genomics believed that there was a high probability that another party would infringe the asserted patents, but deliberately avoided learning the infringing nature of the other party's acts.  The mere fact, if true, that 10X Genomics knew or should have known that there was a substantial risk that another party's acts would infringe the asserted patents would not be sufficient for induced infringement.

- 14 -

**3.9.   INFRINGEMENT BY SUPPLY OF COMPONENTS ESPECIALLY MADE OR ADAPTED FOR USE IN THE PATENTED INVENTION TO ANOTHER COUNTRY**

Bio-Rad and Chicago contend that 10X Genomics is liable for supplying components of a claimed invention to another country. This form of infringement applies only to the asserted claims of the '083 Patent. As with direct infringement, you must determine infringement on a claim-by-claim basis. 10X Genomics is liable  under this theory of infringement if Bio-Rad and Chicago prove by a preponderance of the evidence that:

(1) 10X Genomics supplies a component, or causes a component to be supplied, from the United States to a place outside of the United States;

(2) the only substantial use for the component is in a product that would infringe if the combination had occurred in the United States;

(3) 10X Genomics is aware of the '083 Patent and knows that the component has no other substantial use and may be covered by a claim of the patent; and

(4) 10X Genomics intends for the component to be used in a product that would directly infringe the claim if it had been used in the United States.

**3.10.   INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS**

Bio-Rad contends that 10X infringes claims 1 and 9 of the '083 Patent under what is known as the "doctrine of equivalents." If a company makes, uses, or sells within the United States a product that does not meet all of the requirements of a claim and thus does not literally infringe that claim, there can still be direct infringement if that product satisfies that claim "under the doctrine of equivalents."

Under the doctrine of equivalents, a product infringes a claim if the accused product contains elements corresponding to each and every requirement of the claim that is equivalent to, even though not literally met by, the accused product. You may find that an element is equivalent to a requirement of a claim that is not met literally if a person having ordinary skill in the field of technology of the patent would have considered the differences between them to be "insubstantial" or would have found that the structure: (1) performs substantially the same function and (2) works in substantially the same way (3) to achieve substantially the same result as the requirement of the claim.

In deciding whether any difference between a claim requirement and an element is not substantial, you may consider whether, at the time of the alleged infringement, persons of ordinary skill in the field would have known of the interchangeability of the element with the claimed requirement. In order for the element to be considered interchangeable, the element must have been known at the time of the alleged infringement to a person having ordinary skill in the field of technology of the patent. Interchangeability at the present time is not sufficient. In order to prove infringement by "equivalents," Plaintiffs must prove the equivalency of the element to a claimed requirement by a preponderance of the evidence.

- 16 -

## 4.  INVALIDITY

In this case, 10X Genomics contends that claim 1 of the '407 Patent is anticipated and, therefore, invalid.  10X Genomics also contends that claims 10 and 11 of the '407 Patent, and all of the asserted claims of the '193 Patent are obvious in view of the prior art.

10X Genomics further contends that all asserted claims of the '193 Patent and the '407 Patent are invalid for failure to enable the full scope of the invention, and that all asserted claims of the '083 Patent are invalid as indefinite.

In making your determination, you must consider each of these patent claims separately and individually.

## 4.1.    PERSON OF ORDINARY SKILL IN THE ART

The question of invalidity of a patent claim is determined from the perspective of a person of ordinary skill in the art in the field of the invention at the time of the invention date.

You must determine the level of ordinary skill in the field of the invention. In deciding what the level of ordinary skill is, you should consider all the evidence introduced at trial, including but not limited to: (1) the levels of education and experience of the inventor and other persons actively working in the field; (2) the types of problems encountered in the field; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; and (5) the sophistication of the technology.

## 4.2.   PRIOR ART

Under the patent laws, a person is granted a patent only if the invention claimed in the patent is new and not obvious in light of what came before.  That which came before is referred to as the "prior art."  In this case, the following items are prior art to each of the asserted patents: *Quake* (DTX-013), *Corbett* (DTX-018), *Schubert* (DTX-016), and *Erbacher* (DTX-020).

The burden of proof on 10X Genomics to prove that the prior art renders a claim invalid never changes regardless of whether the Examiner in the Patent Office considered the prior art reference during the prosecution of the application which matured into a patent.  In deciding the issue of invalidity, you may take into account the fact whether or not the Patent Office considered the prior art when it issued the patents.  Prior art that differs from the prior art considered by the Patent Office may carry more weight than prior art that was considered and may make 10X's burden of showing that it is highly probable that a patent claim is invalid easier to sustain.

**4.3.   ANTICIPATION**

In general, inventions are new when they have not been made, used, or disclosed before. The legal name for a challenge to the validity of a patent claim on the basis that the claim is not new is anticipation.

In this case, 10X Genomics contends that the invention of claim 1 of the '407 Patent is anticipated by Quake (DTX-13). 10X Genomics must prove by clear and convincing evidence that claim 1 of the '407 Patent was not new based on Quake.

Invalidity by anticipation requires that a single prior art reference disclosed each and every requirement, or limitation, of a claimed invention arranged as in the claim. You may not combine two or more items of prior art to find anticipation. In determining whether every one of the elements of the claimed invention is found in a particular prior art reference, you should take into account what a person of ordinary skill in the art would have understood from his or her review of that reference.

In determining whether a single prior art reference anticipates a patent claim, you should take into consideration not only what is expressly disclosed in that prior art reference but also what is inherently present or disclosed in that reference, or inherently results from its practice. A prior art reference inherently anticipates a patent claim if the element or feature missing from the reference would necessarily result from what that reference teaches to a person of ordinary skill in the art.

A party asserting inherent anticipation must prove that the allegedly inherent element was necessarily present in that reference. The fact that it was likely present is not sufficient. It is not required, however, that a person of ordinary skill actually recognized or appreciated the inherent disclosure at the time the prior art reference was first known or used. Thus, the prior use of the

- 20 -

patented invention that was unrecognized and unappreciated can still be an invalidating anticipating reference, provided the allegedly inherent feature was necessarily and inevitably present in the reference.  Evidence outside of the prior art reference itself may be used to show that elements that are not expressly disclosed in the reference are inherent in it.

### 4.4. OBVIOUSNESS

Even though an invention has not been identically disclosed or described before it was made by an inventor, in order to be patentable, the invention must also not have been obvious to a person of ordinary skill in the art of the claimed invention at the time the invention was made. Unlike anticipation, which allows consideration of only one item of prior art, obviousness may be proven by considering more than one item of prior art. In this case, 10X Genomics contends that claims 10 and 11 of the '407 Patent and all asserted claims of the '193 Patent are obvious over prior art and the knowledge of a person of skill in the art.

10X Genomics must prove by clear and convincing evidence that the inventions of claims 10 and 11 of the '407 Patent and the asserted claims of the '193 Patent would have been obvious to a person of ordinary skill in the art at the time the invention was made. The issue is not whether the claimed inventions would have been obvious to you as a layperson, or to a genius in the field of technology, but whether it would have been obvious to one of ordinary skill in the art at the time the invention was made.

In determining whether a claimed invention would have been obvious, you must avoid using hindsight; that is, you should not consider what is known today or what was learned from the teachings of the asserted patents. You should not use the patent as a road map for selecting and combining items of prior art. You must put yourself in the place of a person of ordinary skill in the art at the time the invention was made.

In determining whether a claimed invention would have been obvious, you must consider (1) the scope and content of the prior art; (2) the level of ordinary skill in the pertinent art; and (3) the differences between the claimed invention and the prior art.

To determine the scope and content of the prior art, you must determine what prior art is reasonably pertinent to the particular problems the inventors faced. The person of ordinary skill in the art is presumed to be aware of all of the pertinent prior art.

I have already instructed you on how you are to determine the level of ordinary skill in the art. Once you have made that determination, you are to apply it in your determination whether the asserted claims would have been obvious.

The next factor that you must consider is the differences, if any, between the prior art and the claimed inventions. Importantly, a claim is not proved obvious merely by demonstrating that each of the elements was independently known in the prior art. Most, if not all, inventions rely on building blocks of prior art, and claimed discoveries almost of necessity will likely be combinations of what is already known. Therefore, you should consider whether a reason existed at the time of the invention that would have prompted a person of ordinary skill in the art in the relevant field to combine the known elements in the way the claimed invention does. The motivation to modify the prior art to arrive at the claimed invention need not be the same motivation that the inventor had.

In arriving at your decision on the issue of whether the claimed inventions of the asserted patents would have been obvious to a person of ordinary skill in the art, you may take into account such factors as: (1) whether the claimed inventions were merely the predictable result of using prior art elements according to their known functions; (2) whether the claimed inventions provide an obvious solution to a known problem in the relevant field; (3) whether the prior art teaches or suggests the desirability of combining elements claimed in the inventions; (4) whether the prior art teaches away from combining elements in the claimed inventions; and (5) whether it would have been obvious to try the combinations of elements, such as when there is a design need or

market pressure to solve a problem and there are a finite number of identified, predictable solutions.

In arriving at your decision on the issue of whether the claimed inventions of the asserted patents would have been obvious to a person of ordinary skill in the art, you should take into account any "secondary considerations," also called "objective evidence," that may have existed at the time of the invention and afterwards that suggest that the claimed invention was obvious or not, such as:

1. Whether the invention was commercially successful as a result of the merits of the claimed invention (rather than due to advertising, promotion, salesmanship, or features of the product other than those allegedly found in the claim);

2. Whether the invention satisfied a long-felt need;

3. Whether others had tried and failed to make the invention;

4. Whether others invented the invention at roughly the same time; and

5. Whether others sought or obtained rights to the patent from the patent holder.

Some of these factors weigh in favor of obviousness and others weigh against a finding of obviousness. For example, evidence that others invented the invention at roughly the same time can be evidence of obviousness.

These factors should be considered along with all the other evidence in the case in determining whether the claimed invention would have been obvious. However, there must be a connection between the secondary consideration and the claimed inventions if this evidence is to be given weight by you in arriving at your conclusion on the obviousness issue. For example, if commercial success is due to advertising, promotion, salesmanship or the like, or is due to features

of the products other than those claimed in the patents in suit, then any commercial success may have no relation to the issue of obviousness.

### 4.5.   ENABLEMENT

10X Genomics contends that all asserted claims of the '193 and '407 Patents are invalid because the patents do not disclose sufficient information to enable one skilled in the field of the invention, at the time the application was filed, to make and use the full scope of the claimed invention. This requirement is known as the enablement requirement, and it is designed to prevent both inadequate disclosure of an invention and overbroad claiming that might otherwise attempt to cover more than was actually invented. The purpose of this requirement is to ensure that the public, in exchange for the patent rights given to the inventor, obtains from the inventor a sufficient disclosure of how to carry out the claimed invention. If a patent claim is not enabled, it is invalid. Each claim must be analyzed for compliance with the enablement requirement.

In considering whether a patent claim satisfies the enablement requirement, you must keep in mind that patents are written for persons of skill in the field of the invention. Thus, a patent need not expressly state information that skilled persons would be likely to know or could obtain. 10X Genomics bears the burden of establishing lack of enablement by showing by clear and convincing evidence that a person skilled in the art, upon reading the patent document, would not be able to make the full scope of the claimed invention work without undue experimentation. The fact that some experimentation may be required for a skilled person to make or use the full scope of the claimed invention does not mean that a patent's written description fails to meet the enablement requirement. Factors you may consider in determining whether making the full scope of the claimed invention would require undue experimentation include:

1. the quantity of experimentation necessary;

2. the amount of direction or guidance disclosed in the patent;

3. the presence or absence of working examples in the patent;

- 26 -

4.      the nature of the invention;

5.      the state of the prior art;

6.      the relative skill of those in the art;

7.      the predictability of the art; and

8.      the breadth of the claims.

If you find that one or more of these claims did not comply with the enablement requirement, you must find each such claim invalid.

**4.6.    INDEFINITENESS**

The patent laws have requirements for the way in which patent claims are written.  Patent claims must be sufficiently clear that a person of ordinary skill in the field of the invention reading them is able to determine what the claims cover and what they do not cover.  If a claim does not meet that requirement, then the claim is said to be indefinite and is invalid.

In this case, 10X Genomics contends that the two asserted claims of the '083 Patent are invalid because the language of the claims is indefinite.  To prevail on that contention, 10X Genomics must show that it is highly probable that a person of ordinary skill in the art would not understand what is and is not covered by the claims of the patents.

The amount of detail required for a claim to be definite depends on the particular invention, the prior art, and the written description contained in the patent.  Absolute clarity is not necessary. Rather, a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

5.    **WILLFUL INFRINGEMENT**

To prove willful infringement, Plaintiffs must persuade you that 10X Genomics infringed a valid claim of the Plaintiffs' patents, and that it is more likely true than not that 10X Genomics intentionally ignored or recklessly disregarded that claim. You must base your decision on 10X Genomics' knowledge and actions at the time of infringement. Evidence that 10X Genomics has knowledge of the patent at the time of infringement by itself is not sufficient to show willfulness. Rather, to show willfulness, you must find that 10X Genomics engaged in additional conduct evidencing deliberate or reckless disregard of Plaintiffs' patent rights.

In deciding whether 10X Genomics willfully infringed, you should consider all of the facts surrounding the infringement including: whether 10X Genomics intentionally copied Plaintiffs' patented technology in developing the accused method; whether 10X Genomics knew, or should have known, that its conduct involved an unreasonable risk of infringement; and whether 10X Genomics had a reasonable belief at the time of infringement that its products did not infringe the asserted patent.

If you do decide that there was willful infringement, that decision should not affect any damage award you give in this case.

## 6.      DAMAGES

### 6.1.    DAMAGES—GENERALLY

I will now instruct you about the measure of damages.  By instructing you on damages, I am not suggesting which party should win this case on any issue.

The damages you award must be adequate to compensate Plaintiffs for any infringement you determine to have occurred.  Damages are not meant to punish an infringer.  Your damages award, if you reach this issue, should put the parties to the hypothetical negotiation in approximately the same financial position that they would have been in if the parties to the hypothetical negotiation had reached agreement for 10X Genomics to license the patents before the infringement began.

Plaintiffs have the burden to prove the amount of their damages by a preponderance of the evidence.   While Plaintiffs are not required to prove the amount of their damages with mathematical precision, they must prove them with reasonable certainty.

If you find that Plaintiffs have established infringement of a valid patent claim of the patents-in-suit, Plaintiffs will be entitled to a reasonable royalty to compensate them for that infringement.

## 6.2.    REASONABLE ROYALTY AS A MEASURE OF DAMAGES

A royalty is a payment made to a patent holder in exchange for the patent holder's permission to make, use, or sell the patented invention.  A reasonable royalty is the amount of royalty payment that a patent holder and the infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first began. In considering this hypothetical negotiation, you should focus on what the expectations of the parties to the negotiation would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations.  In determining this, you must assume that the parties to the hypothetical negotiation believed the patent was valid and infringed and were willing to enter into an agreement.

The relevant date for the hypothetical license negotiation is the beginning of the second quarter of 2015, just before the alleged infringement began.  Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.

The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty the parties would have preferred.

### 6.3.   FACTORS FOR DETERMINING A REASONABLE ROYALTY

In determining the reasonable royalty, you should consider all the facts known and available to the parties to the hypothetical negotiation at the time the infringement began. The parties in this case dispute who the parties are to the hypothetical negotiation: Plaintiffs contend RainDance would have been the licensor; and 10X Genomics contends that both RainDance and University of Chicago would have been the licensors. The parties agree that 10X Genomics would have been the licensee. It is you, the jury, who will decide who the licensor would have been in the hypothetical negotiation. Some of the kinds of factors that you may consider in making your determination of the amount of a reasonable royalty are:

(1)   The royalties, if any, received by the licensor(s) for the licensing of the patents-in-suit.

(2)   The nature and scope of the license, such as whether the license is non-exclusive or exclusive.

(3)   The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.

(4)   The licensor's or licensors' established policy and program to enforce its patent rights, if any, or license its patents under special conditions to preserve its monopoly.

(5)   The portion of the realizable profits that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, or business risks.

(6)     The commercial relationship between the parties to the negotiation such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter.

(7)     The duration of the patent and term of the license.

(8)     The established profitability of the products made under the patents, their commercial success, and their popularity.

(9)     The nature of the patented inventions, the character of any commercial examples of them, and the benefits to those who have used the inventions.

(10)    The extent to which Defendant has made use of the inventions and any evidence probative of the value of that use.

(11)    The opinion testimony of qualified experts.

(12)    The amount that the parties to the hypothetical negotiation would have agreed upon at the time the infringement began if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

No one factor is dispositive, and you can and should consider the evidence that has been presented to you in this case on each of these factors. You may also consider any other factors which in your mind would have increased or decreased the royalty Defendant would have been willing to pay and the licensor(s) would have been willing to accept, acting as normally prudent business people. The final factor establishes the framework which you should use in determining

- 33 -

a reasonable royalty, that is, the payment that would have resulted from a negotiation among the

parties to the negotiation taking place at a time prior to when the infringement began.

## 6.4.    USE OF COMPARABLE LICENSE AGREEMENTS

When determining a reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for rights to the patents in question, or for rights to similar technologies.  A license agreement need not be perfectly comparable to a hypothetical license that would be negotiated among the parties to the negotiation in order for you to consider it.  However, if you choose to rely upon evidence from any other license agreements, you must account for any differences between those licenses and the hypothetically negotiated license between the parties to the negotiation in terms of the technologies and economic circumstances of the contracting parties, when you make your reasonable royalty determination.  Licenses that were not the product of an arms-length negotiation should be adjusted accordingly.

## 6.5.  DAMAGES—APPORTIONMENT

A damages award must reflect the portion of the royalty attributable to the respective inventions of the Asserted Claims.  In other words, your damages award must reflect the value you find attributable to the patented inventions, and not any value attributable to features or benefits of the accused products not covered by the asserted patents.

7.      **DELIBERATION AND VERDICT**

7.1.    **DELIBERATIONS AND VERDICT—INTRODUCTION**

Now let me finish by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case. If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. I will probably have to talk to the lawyers about what you have asked, so it may take me some time to get back to you. Any questions or messages normally should be sent to me through your foreperson, who by custom of this Court is juror No. 1.

One more thing about messages. Do not ever write down or tell anyone outside of the jury how you stand on your votes. For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be. That should stay secret until you are finished.

**8.     UNANIMOUS VERDICT**

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so consistent with your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict. Remember at all times that you are not partisans. You are judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

A verdict form has been prepared for you. The verdict form asks you a series of questions about the parties' contentions. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in the form, and you will all sign it. You will then return to the courtroom and your foreperson will give your verdict. Unless you are directed otherwise in the verdict form, you must answer all of the questions posed, and you all must agree on each answer.

**9.     DUTY TO DELIBERATE**

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room.  In fact, it is your duty to talk with each other about the evidence and to make every reasonable effort you can to reach a unanimous agreement.  Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say.  Try your best to work out your differences.  Do not hesitate to change your mind if you are convinced that other jurors are right and your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with.  In the end, your vote must be exactly that—your own vote.  It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say.  So you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself.

## 10.   SOCIAL MEDIA

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case.  You may not use any electronic device or media, such as the telephone, a smart phone, computer, the internet, or website such as Facebook, Instagram, Snapchat, MySpace, LinkedIn, YouTube, or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.  In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case.  You can only discuss the case in the jury room with your fellow jurors during deliberations.

## 11. COURT HAS NO OPINION

Let me finish up by repeating something that I said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way. You must decide the case yourselves based on the evidence presented.