```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF DELAWARE

 3

 4    BIO-RAD LABORATORIES,            )
      INC. and THE                     )
 5    UNIVERSITY OF CHICAGO,           )
                                       )
 6                                     )
                      Plaintiffs,      )
 7                                     )
                                       ) C.A. No. 15-152-RGA
 8    v.                               )
                                       )
 9    10X GENOMICS, INC.,              )
                                       )
10              Defendant.             )

11
                                       J. Caleb Boggs Courthouse
12                                     844 King Street
                                       Wilmington, Delaware
13
                                       Thursday, November 8, 2018
14                                     1:17 p.m.
                                       Oral Argument
15

16    BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

17    APPEARANCES:

18              FARNAN LLP
                BY:  BRIAN E. FARNAN, ESQUIRE
19
                          -and-
20
                WEIL GOTSHAL & MANGES, LLP
21              BY:  EDWARD REINES, ESQUIRE
                BY:  DEREK C. WALTER, ESQUIRE
22              BY:  CHRISTOPHER LAVIN, ESQUIRE

23                                     For the Plaintiffs

24

25
```

1    APPEARANCES CONTINUED:

2

3            RICHARDS LAYTON & FINGER, P.A.
             BY:  FREDERICK L. COTTRELL, III, ESQUIRE
             BY:  ALEXANDRA EWING, ESQUIRE
4            BY:  JASON RAWNSLEY, ESQUIRE

5                      -and-

6

7            TENSEGRITY LAW GROUP LLP
             BY:  MATTHEW D. POWERS, ESQUIRE
             BY:  ROBERT L. GERRITY, ESQUIRE
8            BY:  AZRA HADZIMEHMEDOVIC, ESQUIRE

9                      -and-

10

11           IRELL & MANELLA LLP
             BY:  DAVID GINDLER, ESQUIRE
             BY:  LAUREN DRAKE, ESQUIRE
12

13                              For the Defendant

14                      PROCEEDINGS

01:12:06 15

01:12:06 16           THE COURT:  All right.  Let's be seated.

01:17:19 17   Mr. Powers.

01:17:23 18           MR. POWERS:  I just wanted to clear up one thing

01:17:26 19   that arose before.  Mr. Reines said he had sent us one

01:17:29 20   e-mail and several reminders.  It didn't ring a bell with

01:17:33 21   me.  I didn't want to speak without speaking with a teammate

01:17:34 22   real quick.  It turns out that he was sending it to the

01:17:37 23   wrong e-mail address, so I have given him the proper e-mail

01:17:41 24   address again so hopefully that will be resolved.

01:17:43 25           As to the underlying issue we have no intention

01:17:46 1   of the designating deposition testimony on something Your

01:17:49 2   Honor said was out.  We didn't know they intended to use

01:17:50 3   Mr. Saxonov on Monday, so now we're prioritizing that for

01:17:55 4   purposes of getting that done.  I'm confident that issue

01:17:58 5   will get resolved, but I wanted to explain to the Court why

01:18:02 6   it appears that we were unresponsive to his e-mails.

01:18:06 7               THE COURT:  So we can come back to those issues.

01:18:08 8   Let's first do the thing that we were setting time aside for

01:18:13 9   to discuss this motion, this Daubert motion on

01:18:18 10  Mr. Malackowski which I believe is your motion.

01:18:23 11              MR. POWERS:  It is, Your Honor.

01:18:25 12              THE COURT:  And I did get and I am aware now

01:18:28 13  that lost profits is no longer an issue.

01:18:32 14              MR. POWERS:  So Your Honor, just to put it in

01:18:39 15  context, you'll recall the original opinion relied on three

01:18:45 16  specific benchmark agreements.  And I'll be somewhat

01:18:50 17  circumspect --

01:18:51 18              THE COURT:  I know -- I couldn't tell you the

01:18:52 19  names, but I know exactly what you're talking about.

01:18:56 20              MR. POWERS:  I don't think we need to go into

01:18:57 21  details to do this argument.

01:18:59 22              And what Mr. Malackowski did, those three

01:19:03 23  agreements it's important to note are all on different

01:19:06 24  patents.  That's important legally.  There was different

01:19:10 25  licensors and there were different licensees.  And different

01:19:14  1   technologies.  That much is conceded.

01:19:18  2              But he took exactly the same royalty rate from

01:19:21  3   those three agreements despite radical differences among

01:19:26  4   them individually, and radical differences between their

01:19:29  5   technologies and ours, and our business and our products.

01:19:34  6   He took them identically without changing the rate at all to

01:19:38  7   account specifically for factors relating to contributions

01:19:42  8   made to our products by 10X's technology which obviously was

01:19:46  9   not an issue at all in those other three benchmarks.  Your

01:19:51 10   Honor struck that opinion on the grounds that that's not

01:19:54 11   sufficient evidence of apportionment.

01:19:56 12              And the argument that was -- that's now being

01:20:01 13   made and to which Your Honor's original Daubert specifically

01:20:05 14   responded, Your Honor's Daubert ruling in a footnote said

01:20:09 15   that if they appear to be relying on the fact that the prior

01:20:14 16   three benchmark agreements, albeit with different patents,

01:20:19 17   different technologies, different licensors and different

01:20:22 18   licensees, those must have been apportioned in some fashion

01:20:26 19   by those parties because the parties are paying a certain

01:20:29 20   rate on certain products and didn't pay a higher rate or

01:20:32 21   lower rate.  So there is some implicit apportionment that

01:20:36 22   went on in those agreements.

01:20:38 23              That Mr. Malackowski would have to show, and I

01:20:41 24   quote, that those agreements were apportioned in a

01:20:44 25   comparable fashion, close quote.  And we think Your Honor's

01:20:47 1    ruling is exactly right, that's what Mr. Malackowski has to

01:20:51 2    prove.  And what that means is that he would have to show

01:20:58 3    that the -- and this is how Malackowski, Mr. Malackowski

01:21:04 4    understood your order and tried to respond to your order.

01:21:06 5    That the ratio, if you will, of license technology value to

01:21:10 6    unlicensed value in the products of those three benchmark

01:21:14 7    licenses had to be the same, or presumably greater than the

01:21:18 8    value here in the accused products, the value of this

01:21:24 9    Ismagilov technology, over as a numerator and the

01:21:27 10   denominator being the value of the technology that 10X and

01:21:29 11   others contributed because 10X, of course, has licensed

01:21:34 12   technologies from Harvard, for example, and we're paying

01:21:37 13   royalties to Harvard on those licenses, obviously we

01:21:42 14   shouldn't be paying money to Chicago for technologies we're

01:21:46 15   paying monies to Harvard for.  And we shouldn't be paying

01:21:50 16   monies to Chicago or Bio-Rad for technologies not covered by

01:21:55 17   the Ismagilov patents, but created independently by 10X and

01:22:00 18   covered by 10X patents.

01:22:02 19        So I think we're all conceptually agreed as to

01:22:06 20   what Mr. Malackowski had to do in his supplemental report

01:22:10 21   which is establish exactly what Your Honor's order demanded

01:22:14 22   which was the apportionment that happened with those three

01:22:18 23   benchmark licenses is the same type of apportionment that

01:22:21 24   happened here or is that applicable here, and that's exactly

01:22:24 25   what he did not do and said repeatedly he could not do.

01:22:27  1          And just to show that we're all really on the

01:22:30  2     same page, I would like to hand up if I may Exhibit 25 from

01:22:35  3     Mr. Malackowski's deposition.

01:22:37  4               THE COURT:  Okay.

01:22:50  5               MR. POWERS:  This is an exhibit he drew in his

01:22:53  6     own hand without being told what to draw and it's expressing

01:22:58  7     his view of the analytic basis and assumption behind his

01:23:03  8     opinion of apportionment.  Just to make sure that his

01:23:09  9     notations clear, the top notation is R sub H equals a

01:23:14 10     function of PIS over UL, PIS stands for patents-in-suit, UL

01:23:21 11     is unlicensed, so he's saying H is the hypothetical

01:23:26 12     negotiation.  He's saying the royalty rate resulting from a

01:23:29 13     hypothetical negotiation is a result of that fraction,

01:23:32 14     whatever the value is contributed by the patents-in-suit

01:23:34 15     over the rest of the value contributed by other sources,

01:23:38 16     including Harvard and 10X's own technology.

01:23:40 17          Then even you saw R sub one, R sub one, R sub

01:23:46 18     two and sub three, those you are all the same the benchmark

01:23:49 19     licenses we have all been talking about, it's a function of

01:23:53 20     L over UR, which is licensed value over unlicensed value.

01:23:57 21     The bottom left, he says RH has to be greater than or equal

01:24:01 22     to R1, R2 and R3.

01:24:04 23          And so he is admitting, frankly, that his

01:24:10 24     analysis, which is, I'll get to this a little bit more in a

01:24:14 25     bit, you unique in my experience, I have never seen somebody

01:24:20 1   try to justify apportionment based on this theory that it

01:24:24 2   must be the item apportionment done by different people over

01:24:28 3   different theories over different products and proving that

01:24:31 4   proposition.  He's already way out there on a limb, a very

01:24:35 5   specific, very unusual, very untested completely unsupported

01:24:41 6   legally theory, but that's the theory he chose.  But that's

01:27:16 7   the theory he took, so we stuck with that theory.  And that

01:27:20 8   theory is excessively quantitative, specifically because he

01:27:24 9   wants to take the same royalty rate from those three

01:27:28 10  agreements and be able to justify that by the fact that

01:27:31 11  these ratios are greater than or equal to that same ratio.

01:27:37 12  So they're absolutely right that in a normal apportionment

01:27:41 13  analysis, there's qualitative components to it for sure, and

01:27:44 14  it doesn't have to be a hundred-percent precise.

01:27:47 15          That's where you have a straight-forward

01:27:49 16  analysis of here's what we think the royalty -- here's what

01:27:52 17  the royalty rate should be, but we acknowledge this, this,

01:27:55 18  and this are contributing to the patent, to the product.

01:27:58 19  And this product, this particular feature has value from

01:28:02 20  this source, and that source, and you deduct that.

01:28:06 21          There's qualitative input to that analysis.  It

01:28:08 22  results ultimately in percentage reductions, but that's how

01:28:11 23  that apportionment would work in a normal case.  The key

01:28:14 24  point is here he's chosen a bizarre, frankly, untested

01:28:21 25  theory that says if that's based on this completely

01:28:26 1  quantitative analysis that says I can use these rates from

01:28:29 2  this other agreement, solely because the ratio is the same.

01:28:33 3          And let's be clear as to why that's needed.  If

01:28:36 4  the rate he's assuming that the ratio of R sub one, R sub

01:28:40 5  two, and R sub three is the rate, and he wants to take that

01:28:47 6  exact rate and use it on ours.

01:28:50 7          Now, apportionment law says the rate that you

01:28:54 8  choose for our patents and our products, rather, has to be

01:28:57 9  based on the actual contribution in our case of the patented

01:29:04 10 technology versus other technology.  He's chosen not to try

01:29:09 11 to do that.

01:29:10 12         So now he has to prove the exact quantitative

01:29:12 13 relationship that he set out in Exhibit 250 of his

01:29:16 14 deposition.  So when Bio-Rad argues that you can have

01:29:22 15 qualitative aspects to apportionment, that is most certainly

01:29:26 16 true in the normal case.  That does not apply when someone

01:29:29 17 has picked this completely strange method of trying it to do

01:29:34 18 apportionment where you're relying on what he's admitted is

01:29:38 19 a quantitative analysis because inherently, they only

01:29:45 20 justify that rate of X if X is greater than or equal to the

01:29:49 21 ratios of those other agreements.

01:29:51 22         And with that premise, there is no question that

01:29:57 23 he's utterly failed to do that.  He's admitted he's utterly

01:30:01 24 failed to do that.  He doesn't know even what's in the

01:30:04 25 numerator or denominator on any of those equations, much

01:30:09 1    less trying to value it in some way.

01:30:11 2              And so to be a little more concrete about that,

01:30:15 3    and let's just take the accused products.  So for the

01:30:19 4    accused products, he has to establish that the ratio of the

01:30:27 5    value contributed by Ismagilov over the value contributed by

01:30:32 6    the Harvard patents, by our own technology which is

01:30:36 7    undisputed, but that there's a lot of it, that that ratio

01:30:39 8    equals 15 percent.  Because that's the rate he wants to

01:30:45 9    impute.  If that ratio is different, he should apportion

01:30:47 10   down to 12 percent, or ten percent, or one percent.  So it

01:30:51 11   matters what the ratio is.

01:30:53 12             And he has no idea what the ratio is.  In

01:30:58 13   fairness, the best he could do -- I think the fairest

01:31:01 14   description of what he's done is to say in those three

01:31:07 15   benchmark agreements, there's a lot of value in the

01:31:11 16   numerator.  We don't know how much, but there's a lot.

01:31:13 17             And it's different in each one.  It's different

01:31:15 18   in R one, R two, and R three.  But there's a lot in each.

01:31:20 19             And then the hypothetical negotiation, he says,

01:31:23 20   Well, there's a lot in ours, too.  So the numerators are all

01:31:27 21   comparable.  There's a lot.  Nothing more than that.

01:31:30 22             Now, the denominators are what are the

01:31:33 23   unlicensed contributors to value of the either licensed

01:31:36 24   products in the case of the benchmark agreements or the

01:31:39 25   accused products here.  Well, for the licensed products, he

01:31:45 1    looks at a couple of brochures that he grabbed off the

01:31:49 2    internet and says, Well, they claim this and this, and that

01:31:52 3    seems to be something not covered by the patent.  So I'll

01:31:55 4    count that in the denominator.  Have no idea how valuable it

01:31:58 5    is or anything else or whether that's right, whether the

01:32:00 6    customers should care about that, whether it contributed

01:32:03 7    value or not.  No clue.

01:32:05 8         And in the accused products, we have detailed

01:32:10 9    evidence from Mr. Sullivan, our expert, going through a

01:32:16 10   large number of contributed values from either 10X or

01:32:21 11   Harvard technology, and explaining a detail why each of

01:32:25 12   these contribute meaningfully significantly to the value of

01:32:29 13   the accused product.

01:32:31 14        THE COURT:  Doesn't Malackowski respond to that?

01:32:36 15        MR. POWERS:  Exactly.  I was just getting to

01:32:38 16   that.  So Mr. Malackowski's response to that is sort of

01:32:42 17   two-fold.  One is he quibbles with a few of them.  And says,

01:32:47 18   Well, but arguendo, I'll assume it has some value.  He

01:32:52 19   actually flat out disagrees that a few of them have value

01:32:55 20   based on really nothing more than his subjective view.  And

01:32:59 21   if you read his report, it's -- I don't -- he's not -- has

01:33:03 22   no foundation or background to make that decision, don't

01:33:05 23   think that should be included in apportionment.

01:33:08 24        So, for example, the method of manufacturing the

01:33:11 25   gel beads where he comes off making that decision as someone

01:33:15 1   who doesn't know about how customers value that, it's

01:33:18 2   obviously inappropriate.  But what he does is say, Well,

01:33:22 3   there's a long list of things that Dr. Sullivan says have

01:33:26 4   contributed value that aren't licensed.  I'm going to

01:33:28 5   quibble about a few, but I'll begrudgingly accept

01:33:31 6   "arguendo."  I'll outright just dismiss a few without

01:33:36 7   foundation to do so, and I'll accept some others, but not

01:33:41 8   give them any particular value.

01:33:42 9          And when we asked him at his deposition what he

01:33:46 10  would include in the denominator in any of these, he said,

01:33:50 11  as we put in the briefs several times, Well, this isn't a

01:33:55 12  laundry list.  It's not about making a list.  I don't need

01:33:57 13  to make a list.  The point is there's substantial unlicensed

01:34:00 14  value in each one.

01:34:01 15         And that's as good as his opinion gets.  So he

01:34:06 16  has an opinion that says, I can take the exact percentage

01:34:11 17  rate from these three agreements based on a formula that

01:34:15 18  requires that the ratio in those three agreements is greater

01:34:19 19  than or equal to the same ratio in the accused products in

01:34:22 20  the hypothetical negotiation.  But I don't know what's in

01:34:28 21  the numerator, or the denominator, or in terms of value on

01:34:30 22  any of them.  And I'm not sure even conceptually what's in

01:34:35 23  the denominator in most of them.

01:34:36 24         But I can say there's a lot of value in the

01:34:39 25  numerator for all of them and a lot of value in the

01:34:41 1  denominator for all of them.  And that makes them

01:34:41 2  comparable.

01:34:44 3       That is truly as good as his opinion gets.  And

01:34:48 4  so our problem, obviously, with that opinion is two-fold.

01:34:53 5       One, it is legally unsupported.  There is no

01:34:58 6  decision that I'm aware of, and Bio-Rad has cited none that

01:35:03 7  expressly adopts that methodology.  And the entire point of

01:35:08 8  Daubert -- let's make sure we're not losing that -- the

01:35:12 9  entire point of Daubert is to preclude experts from giving

01:35:16 10  opinions that seem impressive based on the expert, but in

01:35:20 11  fact, are not based on a methodology that has been approved

01:35:24 12  and generally adopted.  That's the purpose of Daubert.

01:35:28 13       And the fact that Bio-Rad is unable to cite a

01:35:32 14  single decision, Federal Circuit or District Court which

01:35:36 15  adopts that methodology and says that is an approved

01:35:40 16  methodology for doing apportionment, I think dooms this from

01:35:43 17  the beginning.  That should end the inquiry because that is

01:35:46 18  what Daubert is about.

01:35:48 19       But the second point and equally powerful is

01:35:51 20  that even if one were to assume that that's an acceptable

01:35:54 21  methodology, you have to apply it in a reasonable way.  And

01:36:02 22  the methodology says I can use the exact same reasonable

01:36:06 23  royalty from these three licenses over here because this

01:36:09 24  ratio is greater than or equal to.

01:36:11 25       But I don't know what the ratio is in any of

01:36:13 1    them.  I don't know how the numbers went into any of the

01:36:18 2    three agreements.  So I can't prove what Your Honor said he

01:36:21 3    must prove, which is it was apportioned in a comparable

01:36:24 4    fashion because he doesn't know.

01:36:27 5            And as to the accused products which is where

01:36:31 6    the apportionment law is much severe, that's the whole

01:36:34 7    point.  I have apportionment.  You have to be able to.

01:36:36 8    Looking in the contribution of value in the 10X products,

01:36:40 9    and there his full analysis is, A, to quibble with a few of

01:36:46 10   them without foundation or basis, but to accept them

01:36:51 11   arguendo, again, without really giving them any credit.

01:36:54 12           B, to accept a few others, but without

01:36:57 13   quibbling, but to say, I don't know what their value is.

01:37:01 14   And, you know, C, to say that roughly this all seems

01:37:05 15   comparable because there's a lot on each side.  That is.

01:37:09 16   Under no set of circumstances, a reasonable way to apply a

01:37:13 17   theory which has not been accepted legally at all.

01:37:16 18           And so, that is --

01:37:20 19           THE COURT:  When you say a theory that has not

01:37:22 20   been legally accepted, is there a case rejecting the theory,

01:37:31 21   or is it essentially just that, you know, in the end, it's

01:37:45 22   maybe not novel, but it's just a different set of facts, so

01:35:28 23   we normally have --

01:35:29 24           MR. POWERS:  It's not a different set of facts,

01:35:32 25   it's a different theory.  The theory could have been argued

01:35:35 1   in a thousand patent cases because in a thousand patent

01:35:38 2   cases you have an assertedly comparable license, and you're

01:35:43 3   trying to compare that to this agreement, to this

01:35:47 4   hypothetical negotiation, and that's standard.  But

01:35:51 5   apportionment is typically done as Your Honor knows from

01:35:55 6   many, many cases very, very different.

01:35:57 7           I'm aware of only one case where this has been

01:36:01 8   tried and that was by Mr. Malackowski with Bio-Rad's lawyers

01:36:06 9   in a prior case against Oriosa and the theory was neither

01:36:12 10  proven nor rejected.

01:36:13 11          And we challenge Bio-Rad to give us a case that

01:36:21 12  would bless this methodology, because that is the point of

01:36:24 13  Daubert, and/or to show some other source, some licensing

01:36:32 14  executive society treatise that says how licensing is done,

01:36:37 15  something that would meet the test of Daubert conceptually

01:36:41 16  that says we're going to allow this methodology to go to the

01:36:45 17  jury because it's accepted.

01:36:46 18          And there has been nothing coming back from them

01:36:51 19  that accepts it.  And there is so many reasons to be

01:36:55 20  doubtful about it.  You're comparing -- you're trying to

01:36:59 21  take -- the whole point of apportionment is to account for

01:37:03 22  our specific circumstances.  That's the whole point.  And

01:37:08 23  their argument is we can avoid all of that by saying that

01:37:12 24  there is a lot of value in these other three licenses and a

01:37:16 25  lot of unlicensed value and, therefore, it must be the same.

01:37:19 1    And that's just simply not a theory that ought to be

01:37:24 2    approved by any court, and certainly not by this court, and

01:37:28 3    certainly not by this court with these facts.

01:37:31 4            Now, the only really new fact upon which

01:37:38 5    Mr. Malackowski attempted to rely in his supplemental

01:37:42 6    report, Bio-Rad's briefs said he considered almost all these

01:37:47 7    things.  Well, almost all these things were considered in

01:37:49 8    his original report.  The only new thing he relied on was

01:37:54 9    the conversation he had with Mr. Shinoff.  As you'll recall,

01:37:57 10   we took Mr. Shinoff's deposition.

01:37:59 11           THE COURT:  By the way, I understand I believe

01:38:02 12   he's a Ph.D., so I'll call him Dr. Shinoff.

01:38:06 13           MR. POWERS:  I'm happy to agree.  I think all

01:38:09 14   Ph.D.s ought to be called doctors.

01:38:13 15           THE COURT:  Unless they're lawyers.

01:38:15 16           MR. POWERS:  Unless they are lawyers, agreed.

01:38:17 17   Dr. Shinoff, his --

01:38:19 18           THE COURT:  Actually I was curious about that,

01:38:20 19   because I notice the references to Ph.D. and I was wondering

01:38:26 20   is this a Ph.D. in business administration?

01:38:29 21           MR. POWERS:  No, it's in a health-related field.

01:38:31 22   It's just not related to microfluidics or anything related

01:38:36 23   to this at all.  He's taken one class I think on

01:38:39 24   biochemistry at one point.

01:38:40 25           THE COURT:  What is his Ph.D. in?

01:38:42 1              MR. POWERS:  Something about vaccines as I

01:38:45 2      recall.

01:38:47 3              MR. REINES:  Biourology.

01:38:50 4              THE COURT:  Biourology.  Go ahead, talk about

01:38:53 5      Dr. Shinoff.

01:38:54 6              MR. POWERS:  I think it's Shinoff.  Dr. Shinoff

01:38:59 7      testified at great length that he had no foundation to talk

01:39:03 8      about the most important part of the equation, which is the

01:39:07 9      contribution of value from the unlicensed aspects of the

01:39:11 10     accused products compared to Ismagilov.  That's the most

01:39:16 11     important part of apportionment, that's what apportionment

01:39:18 12     is supposed to take into account.  He never used the 10X

01:39:22 13     product.  He never talked to customers about a 10X product.

01:39:27 14     He has no foundation at all to give opinions, though he's

01:39:31 15     quite willing to give them about what the value is of the

01:39:35 16     unlicensed aspects of the accused products.  In some cases

01:39:41 17     he didn't even know what they were.  In many cases he didn't

01:39:45 18     know what the unlicensed value was.  He didn't even know

01:39:48 19     what the unlicensed item was, didn't know what surfactant

01:39:52 20     used for example, which is a key part of our technology,

01:39:55 21     licensed at Harvard, paid for to Harvard, a huge value to

01:40:00 22     our technology.  He didn't know what it was.  He had some

01:40:03 23     guesses and maybe surmises, but no idea.  And that was true

01:40:07 24     of several aspects of things that would be in the

01:40:09 25     denominator.  And he basically said I have no idea on that

01:40:14  1    question.

01:40:15  2                So he can provide no meaningfully input to

01:40:20  3    Mr. Malackowski on the most important part of the

01:40:26  4    apportionment equation which is the contribution of the

01:40:28  5    unlicensed aspects to the value of the 10X products.  There

01:40:32  6    is extensive evidence in the record which is Dr. Sullivan's

01:40:37  7    report which shows all those things are very substantial

01:40:42  8    contributions, and there will be evidence in the trial about

01:40:45  9    the contribution of those unlicensed features.

01:40:48 10                So Dr. Shinoff is -- and we went through in

01:40:52 11    detail so his position on, for example, what should be in

01:40:56 12    the numerator, he couldn't give a quantitative assessment of

01:41:01 13    that, of course, but he did exactly what Your Honor said

01:41:04 14    Bio-Rad can't do which is assert that substantial because

01:41:08 15    it's quote foundational, i.e., you have to have it in order

01:41:13 16    to do droplets.

01:41:15 17                And he doesn't have the basis to do that

01:41:19 18    opinion.  That's an opinion, no doubt.  He's not an expert

01:41:23 19    witness.  He has no foundation to give that opinion.  That's

01:41:27 20    just what he's been told to say.  But he has no foundation

01:41:31 21    to give it.

01:41:31 22                THE COURT:  Remind me his position at Bio-Rad

01:41:35 23    relating to quality control or marketing or what?

01:41:37 24                MR. POWERS:  Licensing.  From a business

01:41:40 25    development licensing role.

01:41:43  1          THE COURT:  All right.

01:41:47  2          MR. POWERS:  And on the benchmark licenses,

01:41:53  3   Dr. Shinoff had more foundation there than he does in 10X.

01:41:57  4   He has zero at 10X, but on those licenses as well, he was

01:42:02  5   unable to provide the basic information that Mr. Malackowski

01:42:05  6   would need in order to do his equation.  The equation that

01:42:08  7   he wrote out that said is the basis for his opinion.

01:42:12  8          THE COURT:  Did Mr. Malackowski or Dr. Shinoff

01:42:14  9   in their depositions say how long they had spoken to each

01:42:19 10   other on the topics that became the basis for

01:42:25 11   Mr. Malackowski's footnotes?

01:42:27 12          MR. POWERS:  Well, the facts are as follows, at

01:42:31 13   least according to the depositions.  Dr. Shinoff did not

01:42:35 14   speak to Mr. Malackowski before the supplemental report was

01:42:39 15   submitted.  He spoke with an associate of Mr. Malackowski

01:42:43 16   who wrote up some notes.  And --

01:42:47 17          THE COURT:  So before he would get into the

01:42:49 18   notes, how long did he talk to the associate?

01:42:51 19          MR. POWERS:  An hour.  That was his estimate, an

01:42:55 20   hour.

01:42:55 21          THE COURT:  Go ahead.

01:42:55 22          MR. POWERS:  Mr. Malackowski had no direct

01:42:58 23   conversation at all with Dr. Shinoff before the report was

01:43:00 24   submitted.  He had a discussion apparently with his

01:43:04 25   associate, and he got the notes.  The notes are an exhibit

01:43:09  1  to Mr. Malackowski's deposition, because we didn't learn

01:43:16  2  until Dr. Shinoff's deposition that he hadn't actually

01:43:19  3  talked to Mr. Malackowski, so we asked for the notes and got

01:43:22  4  them that night and used them the next day in

01:43:25  5  Mr. Malackowski's deposition.

01:43:26  6          And Mr. Malackowski couldn't remember the

01:43:29  7  details of how much he got from the associate versus how

01:43:32  8  much he got from the notes, and he couldn't remember the

01:43:36  9  time of the conversation.

01:43:37 10          THE COURT:  How much time Malackowski spoke to

01:43:42 11  the associate, what I was interested in is how long did

01:43:48 12  Shinoff and Malackowski talk to each other and the answer is

01:43:51 13  an hour.

01:43:52 14          MR. POWERS:  Fair enough.  And our understanding

01:43:55 15  from Mr. Malackowski is that after the deposition -- sorry,

01:44:00 16  after the supplemental report was submitted, Dr. Shinoff

01:44:03 17  then had a conversation directly with Mr. Malackowski before

01:44:06 18  his deposition at which according to them, essentially the

01:44:11 19  same substance was transmitted as what was transmitted to

01:44:15 20  the associate.  The allegation was there was nothing really

01:44:20 21  new or different.

01:44:20 22          There was after the report before the deposition

01:44:22 23  a direct conversation finally between Dr. Shinoff and

01:44:26 24  Mr. Malackowski.

01:44:27 25          So Dr. Shinoff, which is really the only new

01:44:32 1    evidence, quote unquote, that Mr. Malackowski had, other

01:44:36 2    than a couple of data sheets he pulled off the internet for

01:44:40 3    some of the products that aren't products in suit, but

01:44:43 4    others, simply cannot give him remotely close to the type of

01:44:52 5    information that would be reliable in making the assessment

01:44:55 6    that his quantitative approach demanded.

01:45:00 7           And so our view is that the report should be

01:45:07 8    struck not only because the methodology, this very strange

01:45:10 9    untested apportionment methodology had not been approved by

01:45:16 10    anyone, but even if a provable, it certainly has been done

01:45:19 11    in a fashion that is not sufficiently reliable to get in

01:45:23 12    front of a jury.

01:45:24 13           Really what this comes down to at the end of the

01:45:26 14    day is pure ipse dixit.  I know you're Your Honor is deeply

01:45:34 15    familiar with Joiner and other law on that question.  But

01:45:38 16    he's saying, trust me, I think the ratios between those is

01:45:41 17    roughly the same so, therefore, you can take this exact same

01:45:44 18    percentage over.  That's just not the type of opinion that

01:45:48 19    Daubert permits to go to a jury.

01:45:50 20           And I do want to note beyond those two points,

01:45:56 21    because those two points are sort of at the core of the

01:46:00 22    issue, the methodology is not accepted and the application

01:46:02 23    for the methodology to the facts is flawed, and absent.  But

01:46:07 24    there are reasons for intense skepticism about both the

01:46:12 25    methodology and its application here.

01:46:14 1          Let's start with the Applera license.  Again,

01:46:17 2     I'll be circumspect, but I don't believe I need to go

01:46:22 3     further than that for the argument.  That's really the lead

01:46:25 4     license they're relying on, it's almost always first.  The

01:46:30 5     Applera license has so many things that are different about

01:46:33 6     it that we could talk for quite some time about it, but I

01:46:36 7     don't think we need to, I think the top three or four are

01:46:39 8     enough.

01:46:40 9          THE COURT:  On that, didn't either you or your

01:46:42 10    predecessors already have a chance to raise these issues,

01:46:49 11    and you raised them and I rejected them or you didn't raise

01:46:53 12    them.  And what we talked about so far I think is fairly

01:47:01 13    brought up by the fact that we have had new reports and --

01:47:08 14    but you now seem to be transitioning to parts that the judge

01:47:14 15    wants to bring out a stamp that says rehash and pound it

01:47:19 16    down.

01:49:21 17         MR. POWERS:  Partially fair, but partially not.

01:49:50 18    Your Honor is correct, absolutely, that arguments against

01:49:54 19    comparability were made.  And Your Honor, I think, rejected

01:49:58 20    those arguments and said the license agreements can be used.

01:50:01 21    That doesn't mean you can just take the rate wholesale.

01:50:04 22         So that argument has been redacted, and I'm not

01:50:07 23    attempting to rehash that one.  What I'm saying is now he

01:50:10 24    has this intensely specifically quantitative analysis that

01:50:15 25    requires an understanding of the value contributed by the

01:50:18  1    licensed technology over the value contributed by other

01:50:22  2    technology.

01:50:22  3              And my point here is not to ask you to find that

01:50:26  4    they're not comparable.  I'm asking you to find that there's

01:50:31  5    reasons for skepticism that the value in the numerator is

01:50:36  6    equivalent to the value of the numerator here.  And when you

01:50:39  7    have someone who's just assuming basically, well, there's a

01:50:42  8    lot of value in both numerators, I'm going to assume that's

01:50:42  9    comparable.

01:50:46 10              But there's reason to understand that the value

01:50:48 11    in the Applera numerator is a thousand times more than the

01:50:52 12    value here.  That's directly relevant to the issues raised

01:50:56 13    by this motion which is:  Are the values in the ratios the

01:51:00 14    same?  So that's a new argument.  That's the new application

01:51:04 15    of the prior argument.

01:51:06 16              So Your Honor's right, I'm not asking you to

01:51:08 17    revisit your question.  You've decided it, and we

01:51:11 18    respectfully disagree, but that's not for now.

01:51:14 19              But he is taking a position now in the

01:51:16 20    supplemental report that the value of the Applera numerator,

01:51:21 21    i.e., the value contributed by those values is roughly

01:51:24 22    comparable to the value of Ismagilov.  And the fact that the

01:51:28 23    Applera licensing program was worth over $2 million, is one

01:51:33 24    of the most successful licensing programs in history, that

01:51:36 25    it covered the Nobel prize winning PCR patents from Kary

01:51:41 1    Mullis, that those patents are comparable to Ismagilov where

01:51:47 2    the licenses were rejected by 19 out of 20 suits or -- and

01:51:52 3    they've gotten -- I don't think I can say the number -- an

01:51:56 4    extraordinarily small number of royalties, that is, orders

01:52:02 5    and orders and orders of magnitude below the number of the

01:52:05 6    Applera license.  That's the value of the numerator.

01:52:10 7            And so there's intense reason for skepticism

01:52:13 8    that his ipse dixit, it's about the same.  It is

01:52:18 9    sufficiently reliable to give to this jury.

01:52:21 10           The same is true with regard to the Caliper

01:52:26 11   license.  The Caliper license, and the numerator had 550

01:52:32 12   patents.  550.

01:52:36 13           Now, Mr. Malackowski, for reasons that he

01:52:41 14   doesn't explain, or support, or defend chose only five of

01:52:45 15   those.  And basically said, I think the value of those five

01:52:51 16   is roughly equivalent to Ismagilov.  There's really no

01:52:55 17   foundation at all, either for selecting the five or for

01:52:58 18   attributing value to the five.  And that is highly suspect.

01:53:04 19   He has no basis to say that there's only five that are worth

01:53:07 20   having.

01:53:09 21           Then in the supplemental report, he appears to

01:53:14 22   rely on Dr. Shinoff.  Dr. Shinoff's testimony, when we get

01:53:18 23   to it -- we got it in deposition -- was not that he had any

01:53:22 24   information about the validity of the Caliper RainDance

01:53:25 25   license, but he got it from someone named Mr. Link.

01:53:28  1          He had a phone call with Mr. Link, either the

01:53:31  2     very day that he talked with Malackowski's associate or the

01:53:34  3     day before.  Now, Mr. Link told him, don't know why, don't

01:53:38  4     know the basis.  We know nothing about it.  Well, I think

01:53:41  5     only two really matter.

01:53:44  6          We don't know if the two that Mr. Link thinks

01:53:47  7     matters are within the five that Mr. Malackowski chose.  We

01:53:50  8     know Mr. Malackowski didn't talk to Mr. Link.  We have no

01:53:54  9     idea.  And their argument appears to be that Mr. Malackowski

01:53:59 10     can now rely on the statement from Dr. Shinoff who has no

01:54:03 11     foundation at all, who's getting it from a conversation with

01:54:06 12     Mr. Link.

01:54:07 13          Dr. Shinoff doesn't know which two patents

01:54:10 14     Mr. Link thought were the ones that mattered.  He doesn't

01:54:13 15     know why.  He doesn't know what value they had.  It was as

01:54:19 16     sketchy as you get for double hearsay, and yet that appears

01:54:23 17     to be the sole basis Mr. Malackowski has, even assuming that

01:54:27 18     the two that Mr. Link told Dr. Shinoff about are within the

01:54:30 19     five that Mr. Malackowski had earlier relied upon.  So

01:54:34 20     that's Caliper RainDance.

01:54:37 21          Applied Bio versus QuantiLife, key issue there

01:54:42 22     is Applied Bio only applied to kits.  And you will recall in

01:54:48 23     this case, there's a big difference and a big argument about

01:54:51 24     the licenses that only apply to kits versus instruments.

01:54:55 25     And in this case, they're trying to say apply a kit license

01:54:59  1   to an instrument product, and to instruments and kits.

01:55:04  2           And there are all sorts of reasons explaining

01:55:08  3   why the value contributed to a kit might be a lot higher to

01:55:15  4   that kit because often a kit has, for example, a reagent.

01:55:20  5   And a reagent -- the patent may cover the entirety of the

01:55:23  6   reagent.  In fact, it's quite common.

01:55:27  7           So there's not an apportionment issue at all,

01:55:30  8   and so the value in that license is huge.  It's a hundred

01:55:34  9   percent.  No discussion by Mr. Malackowski about that issue

01:55:39 10   at all.

01:55:40 11           So for all three of his benchmark licenses,

01:55:43 12   there is extreme basis for skepticism about the ipse dixit

01:55:49 13   of I think this unquantified, unnamed, not even conceptually

01:55:57 14   defined value in the numerator and denominator.  And these

01:56:01 15   three patents, just should be comparable to the conceptually

01:56:04 16   undefined and unquantified value of the numerator or

01:56:09 17   denominator for the accused products.

01:56:12 18           I only want to make one other point, if I may.

01:56:17 19           THE COURT:  All right.

01:56:19 20           MR. POWERS:  And this goes back to Your Honor's

01:56:21 21   question earlier, he did respond to Dr. Sullivan on some of

01:56:25 22   these points relating to the unlicensed value.  And Your

01:56:33 23   Honor may think this ship has sailed because of all the

01:56:35 24   things that have happened, but in the normal course in this

01:56:38 25   Court, you don't get a reply rebuttal report, and that's

01:56:42 1   essentially what he did.  He could have done that in his

01:56:44 2   initial report.  He could have said, I understand these are

01:56:47 3   the allegations, and I don't think so.

01:56:49 4        So he took a bit advantage.  It's one thing to

01:56:54 5   say, Here's my defense of my apportionment, which is really

01:56:56 6   what was invited by Your Honor's Daubert.  It's another

01:56:59 7   thing to say, While I'm at it, I'm going to try to go do

01:57:03 8   some extraneous other things that I would like to have done

01:57:06 9   in my initial report, but didn't.

01:57:08 10       So that's the issue we were raising in the brief

01:57:10 11  with regard to the improper response to Dr. Sullivan.  I

01:57:18 12  just want to note it.

01:57:19 13       THE COURT:  Is that the way it's portrayed in

01:57:21 14  the briefing?  You haven't exactly said this, but this is

01:57:27 15  what I take it you're saying is those things should be

01:57:30 16  struck?

01:57:30 17       MR. POWERS:  Yes.  We had two points about that

01:57:34 18  section of his report.  One is they should be struck because

01:57:37 19  it's improper.  It's just responding to Sullivan which Your

01:57:41 20  Honor didn't invite, I don't think.

01:57:42 21       THE COURT:  No.  I don't think I did.

01:57:44 22       MR. POWERS:  And the second point is it's

01:57:46 23  without foundation.  And so we went on at length after that

01:57:48 24  to explain how he said based on my lay opinion, I can say I

01:57:53 25  don't think that factor matters or this factor, and over and

01:57:56 1   over again his report makes clear he really has no

01:57:59 2   foundation to quibble with the items raised by Dr. Sullivan.

01:58:04 3           THE COURT:  But given that we're talking about

01:58:08 4   numerator and denominator, and part of you what have

01:58:15 5   Dr. Sullivan said was, and then you have characterized him

01:58:22 6   as saying that, you know, I've looked at the things that are

01:58:27 7   in the denominator, and they're all these contributions.  So

01:58:33 8   that the denominator ought to be very big.  It seems like

01:58:37 9   the denominator part that 10X contributed to 10X's product.

01:58:49 10          Doesn't that become more relevant than it might

01:58:52 11  have been otherwise at the time of a reply report given

01:58:57 12  where we were at that time?

01:58:58 13          MR. POWERS:  I think that's partly fair.  That's

01:59:00 14  why I raised it in the manner that I did.  I think he went

01:59:03 15  beyond that, and that's why we raise the issue.

01:59:07 16          I think there was an attempt to exploit the gap

01:59:10 17  in his original report that we thought was improper.

01:59:13 18  Certainly, some of that would be appropriate if he's trying

01:59:15 19  to value the denominator, but he really wasn't.  I mean, he

01:59:19 20  was going through and, as I say, quibbling at some level,

01:59:25 21  but "accepting the arguendo," as he put it without saying

01:59:28 22  what that meant in terms of value.  So I'll leave that to

01:59:36 23  Your Honor, but --

01:59:37 24          THE COURT:  Okay.

01:59:37 25          MR. POWERS:  -- I think he went beyond the

01:59:40  1    proper role of a supplemental report invited by your Daubert

01:59:43  2    ruling, and that's why we raise the issue.

01:59:46  3                THE COURT:  Okay.  Thank you, Mr. Powers.

01:59:50  4                MR. REINES:  After all that, do you want to take

01:59:53  5    a break or push through it?

01:59:54  6                THE COURT:  Why don't we go through unless you

01:59:56  7    want to take a break.

01:59:57  8                MR. REINES:  No.  No.  I'm good.

01:59:59  9                THE COURT:  I do have a question which is

02:00:03 10    perhaps only tangentially related to what we're talking

02:00:09 11    about.  With the dropping out of the lost profits, has that

02:00:13 12    led to a recalculation of the amount of reasonable royalty

02:00:17 13    damages?

02:00:18 14                MR. REINES:  No, just falls away.  There is a

02:00:21 15    reasonable royalty opinion that's still intact that --

02:00:24 16                THE COURT:  Okay.  And then the reasonable

02:00:27 17    royalty, what's the damages figure?

02:00:30 18                MR. REINES:  It's 24?

02:00:33 19                THE COURT:  Twenty-four million?

02:00:35 20                MR. REINES:  Twenty-four million.  It's 24

02:00:37 21    million.  And we've asked for an update to get current for

02:00:40 22    now, and we haven't heard back.  I don't know if that was to

02:00:44 23    the right email address or not.

02:00:46 24                No more argument.

02:00:48 25                MR. POWERS:  That one did go to the right email

02:00:49  1    address.  As Your Honor will recall, both sides supplemented

02:00:53  2    financial and other information a month ago maybe.

02:00:58  3             MS. HADZIMEHMEDOVIC:  September 15th.

02:01:00  4             MR. POWERS:  That went through Q2 of 2018.  I

02:01:04  5    don't even know if Q3 is finalized yet, but the idea that we

02:01:07  6    should supplement again just for those three months a couple

02:01:10  7    days before trial would be highly unusual.

02:01:12  8             MR. REINES:  Your Honor, can I address that?

02:01:14  9             THE COURT:  Sure.

02:01:14 10             MR. REINES:  So I had a trial against Mr.

02:01:16 11    Gindler in January where we won about 25 million.  And the

02:01:21 12    argument that was made by the Irell team that if we didn't

02:01:25 13    ask for the up-to-date, financials up-to-date for trial, we

02:01:28 14    forfeited it.

02:01:30 15             THE COURT:  Well, so why don't we just say that

02:01:32 16    the number -- because I assume then you're looking for some

02:01:37 17    kind of damages awards that will cover through the end of

02:01:40 18    the second quarter of 2018.  And if you win, the question of

02:01:47 19    relief or for infringement after that date will be subject

02:01:51 20    to the further proceedings.

02:01:52 21             MR. REINES:  Yeah, but the argument was made

02:01:54 22    that we forfeited by not asking and not having it, so forth

02:01:58 23    and so on.

02:01:59 24             THE COURT:  Yeah.  So Mr. Powers, what I just

02:02:01 25    said, does that work for you?

02:02:02   1          MR. POWERS:  It does.

02:02:03   2          THE COURT:  Okay.

02:02:04   3          MR. REINES:  Okay.  Great.  Thank you.

02:02:05   4          All right.  Your Honor, so just as a reset, the

02:02:10   5   use of comparable licenses for reasonable royalty is as old

02:02:14   6   as the hills.  They have to be comparable.  That's the

02:02:16   7   longest established law, and that's typically by licensing

02:02:19   8   professionals and damages experts assessing one license, on

02:02:24   9   one hand, and another license, on the other hand.

02:02:26  10          In recent years, recent months more, but

02:02:30  11   nevertheless, two or three years, it's been increased to

02:02:33  12   this apportionment.  And so enterprising defendants have

02:02:36  13   been starting to argue that when you do the comparable

02:02:38  14   license, you have to take someone else's license and do an

02:02:41  15   apportionment analysis.  And judges around the country have

02:02:46  16   rejected that, Judge Freeman, Judge Hilton, Judge --

02:02:49  17          THE COURT:  What about Judge Andrews?

02:02:53  18          MR. REINES:  We don't have an opinion on.

02:02:55  19          THE COURT:  Never mind.  Go ahead.

02:02:57  20          MR. REINES:  Yeah.  So in terms of Judge

02:02:59  21   Andrews, I don't think the argument had been presented.  I

02:03:01  22   actually -- so I just want to do a reset.  The idea that

02:03:04  23   you're doing apportionment as a subcategory for

02:03:06  24   comparability of licenses, that's a new thing.  So the idea

02:03:09  25   that what's going on here is somehow Malackowski is coming

02:03:16 1    up with something new --

02:03:16 2            THE COURT:  So what you're trying to explain is

02:03:18 3    why the thousand cases we don't see this idea in?

02:03:21 4            MR. REINES:  You don't see this debate until the

02:03:22 5    last couple of years, exactly right.

02:03:24 6            THE COURT:  Okay.

02:03:24 7            MR. REINES:  And then you see it a lot.  The

02:03:26 8    three judges I just mentioned, cases we submitted.  The

02:03:29 9    judge says, No, it doesn't have to be quantitative.  That

02:03:31 10   doesn't make sense.

02:03:32 11           And so people have been doing that qualitative

02:03:35 12   comparison that Mr. Powers spoke about eloquently in that

02:03:37 13   daily genre round table, which I commend to you, because

02:03:40 14   that's the way people always have done it.  They have

02:03:42 15   licensing professionals like Dr. Shinoff who was a licensing

02:03:46 16   professional, by any measure.  Mr. Malackowski, their

02:03:50 17   licensed professional.  They size up one, they size up the

02:03:53 18   other.  That's what's always gone on.

02:03:55 19           Now, here to you, Judge, and I think you may not

02:03:59 20   be able to weigh in on the chorus of rejecting this falls

02:04:03 21   precision of qualitative apportionment analysis because

02:04:08 22   Mr. Powers moved back from the briefing and set the bar a

02:04:12 23   little lower for himself.  He said the law doesn't require

02:04:15 24   quantitative, which he has to say given his public

02:04:18 25   statements and so forth.

02:04:20  1                    THE COURT:  He doesn't have to be consistent

02:04:22  2      with his public statements.

02:04:24  3                    MR. REINES:  Well --

02:04:24  4                    THE COURT:  He's not arguing to a court, but in

02:04:27  5      any event.

02:04:29  6                    MR. REINES:  He searches for credibility.  You

02:04:31  7      both have credibility, but maybe at the end of trial neither

02:04:35  8      one of you will.

02:04:35  9                    MR. REINES:  We'll see.  So the argument that

02:04:37 10      was made is that this exhibit is the basis for -- is a

02:04:44 11      strange format for a methodology for reasonable royalty, and

02:04:51 12      that this binds him, Mr. Malackowski, to do a quantitative

02:04:55 13      analysis because everyone knows when you have VL and you

02:04:59 14      have the fractions, it's got to be quantitative.  So having

02:05:02 15      set up this quantitative model, he had to meet it.  And

02:05:05 16      we're not arguing that the law requires it which, of course,

02:05:08 17      we gave you three cites dead on, and in the exact same

02:05:11 18      context that said, no, you don't.  Exact same context.

02:05:15 19                    So I looked at the testimony because we didn't

02:05:18 20      get this in advance.  Oh, I brought it up right here.  And

02:05:23 21      the question was -- this is the page, at 249.  It's

02:05:25 22      important to make sure that I understand your reference to

02:05:29 23      the ratio.  I think you said qualitative ratio that you were

02:05:32 24      establishing in you supplemental report.  It goes on, and

02:05:35 25      then it asks him to draw it out.

02:05:37 1        This, at an analytical level, is correct whether

02:05:40 2   you do quantitative or qualitative.  This is a parlor trick

02:05:45 3   that the fact that he put it in Quake's form somehow

02:05:49 4   obligates him to go do a qualitative analysis.  That makes

02:05:52 5   no sense.

02:05:53 6        Yes.  It's true that in order to be a comparable

02:05:56 7   license, the value of this to the value that needs to be in

02:06:00 8   the ratio, that's at or greater than the rate.  That's just

02:06:03 9   the analytics.  So this is analytical.  It doesn't bind you

02:06:07 10  to false precision of an impossible quantitative analysis

02:06:11 11  that would be the ground for another attack.

02:06:15 12       So the theory of the methodological attack is

02:06:21 13  gone because he conceded.  He said to you, and we'll have a

02:06:26 14  transcript, that he's not saying the law requires this.

02:06:28 15  He's saying that it comes out of this exhibit that didn't

02:06:31 16  make it into their brief, Exhibit 25.  And that's just a

02:06:36 17  fallacy.  Now, but I'm not saying there's not another half

02:06:38 18  to his argument because there is.  At the end, we were

02:06:40 19  getting odds and ends, but the other half of the argument is

02:06:44 20  that the application of the methodology was so unreliable,

02:06:48 21  good old-fashioned, the defense counsel argument, that the

02:06:53 22  methodology was applied in such an ipse dixit unreasonable

02:06:57 23  way without sufficient evidence.  That's not good enough.

02:07:00 24       I think when you shake it off, that's really the

02:07:03 25  argument.  Because the methodological one is just -- as I

02:07:07 1   said, it's a parlor trick in terms of the evidentiary attack

02:07:11 2   on this.  These patents are like -- for example, the

02:07:14 3   QuantiLife is a droplet PCR product that everyone knows

02:07:19 4   about Dr. Shinoff knows about it from patents and everything

02:07:22 5   else.

02:07:22 6          I mean, he's the -- one of their competitors

02:07:26 7   that he's responsible for, you know, that they acquired the

02:07:29 8   company.  He owns the company.  He owns their patent

02:07:31 9   portfolio.  He doesn't understand that product.

02:07:35 10         It has droplets.  It does PCR.  It has software.

02:07:39 11  So let's look a little bit.  And then the other thing that

02:07:42 12  was striking -- let me stop for a second.  The other thing

02:07:46 13  that was striking about Mr. Powers' argument was, on one

02:07:48 14  hand, he wants to argue this at the evidentiary level

02:07:52 15  because for the reasons stated, methodological doesn't work.

02:07:55 16         And at the evidentiary level, he says, I don't

02:07:57 17  want to discuss details.  I'm not going to get into

02:08:00 18  specifics and that frees him from the record of a systematic

02:08:04 19  analysis of the record.  And then he starts dropping into

02:08:07 20  things that I don't think are often supported by the record

02:08:09 21  like.  For example, the MJ case was about PCR machines.

02:08:17 22         THE COURT:  I'm sorry.  The MJ case is what?

02:08:19 23         MR. REINES:  That is the case they were talking

02:08:21 24  about that related to the Applera license.  It involved PCR.

02:08:30 25         THE COURT:  Okay.

02:08:31 1          MR. REINES:  And the characterizations of that

02:08:34 2   license are not anchored in the record.  They're just

02:08:37 3   argument.  They're the kind of argument you'd expect that

02:08:40 4   you'd -- sorry about that.

02:09:06 5          That was funny.  Sorry about that.

02:09:13 6          THE COURT:  It's okay.

02:09:13 7          MR. REINES:  It's like my house with the Alexa

02:09:17 8   thing.  Okay.

02:09:17 9          So I addressed the quantification.  What I

02:09:24 10  wanted to get to was -- well, actually I think this is worth

02:09:31 11  it.  Forget who said it.  License negotiation based on

02:09:37 12  qualitative factors when people are in the real world.

02:09:38 13         THE COURT:  No.  No.  I did read the stuff that

02:09:41 14  you had in your brief, and I'm sure in the real world nobody

02:09:45 15  sits around with pens and pencils trying to figure out three

02:09:48 16  decimal places on this patent, that things that really

02:09:52 17  cannot be quantified.

02:09:54 18         MR. REINES:  Right.  Right.  But --

02:09:57 19         THE COURT:  And I think based upon what

02:10:02 20  Mr. Power said today, and that there is a rule for, for lack

02:10:12 21  of a better description, of a qualitative assessment being

02:10:17 22  because one could say -- and Mr. Powers, you don't need to

02:10:29 23  jump up and down here -- but one could say that one thing is

02:10:36 24  larger than another thing without really being able to say

02:10:41 25  what size either thing is.

02:10:43  1          MR. REINES:  It's called false precision.  Yeah,

02:10:45  2   trying to bring it to a number rather than saying, Look,

02:10:48  3   this is -- I mean, keep in mind here, the basic premise of

02:10:52  4   his argument, and I think this is undeniable, is that the

02:10:56  5   droplet inventions of Professor Malackowski, the first

02:11:00  6   reaction in droplets, which is now you're going to hear for

02:11:03  7   a week about the booming fields of droplets and how

02:11:06  8   everybody wants to get their hands in droplets, and how

02:11:09  9   great 10X has done with droplets, and how great Bio-Rad's

02:11:14 10   done with droplets, and how this is the next big thing on

02:11:18 11   the horizon.  That the droplet inventions aren't anything

02:11:20 12   compared to Caliper's microfluidic invention or the PCR

02:11:24 13   invention that was at issue in the Applera.

02:11:27 14          I said MJ.  I apologize for that.  It's just a

02:11:29 15   different name for it.  And that if the premise is that

02:11:34 16   droplets is nothing because they copied, and copied, and

02:11:38 17   copied Quake and Professor Ismagilov did nothing, then maybe

02:11:42 18   this has some force.  But to use things that are in very

02:11:46 19   closely related fields, in very similar products, about

02:11:51 20   analysis of DNA in, you know, fluidic systems, whether they

02:11:57 21   be PCR, in thermocycler, or in droplet PCR, or used for

02:12:04 22   other applications, they're very similar fields.

02:12:10 23          Their knowledge about them, there's 18

02:12:11 24   paragraphs of analysis of the Caliper license.  It's far in

02:12:15 25   excess of the thousands of cases that have been going in

02:12:18  1    time memorial about comparable licenses.

02:12:22  2           He goes through.  He looks at -- these are

02:12:25  3    essentially the features that they're saying need to be

02:12:27  4    accounted for.  Surfactant chemistry is ironic.  You may

02:12:32  5    recall the whole concept of using a fluorinated surfactant

02:12:36  6    as part of the inventive idea of the Chicago patents.

02:12:40  7           That's our basic idea.  They take it and then

02:12:43  8    put a .02 percent whatever in or do whatever little bell or

02:12:48  9    whistle, and now they want credit for surfactant that we

02:12:51 10    should get less than.  Our range is this eight-to-15-percent

02:12:54 11    royalty.  This is not an example of like -- the one case

02:12:59 12    that they cite is that Csiro case where someone took a $2 to

02:13:05 13    $200 range and then boiled it down to $1 to $2.

02:13:09 14           It's okay.  That's just a dramatic difference,

02:13:12 15    that it stuns the common sense.  That's really what the

02:13:16 16    standard should be.  It's just the kind of thing that's

02:13:19 17    offensive that someone would say that we're comparable for

02:13:22 18    what we sell to the PCR invention and the Caliper

02:13:25 19    inventions, and we think the Chicago portfolio of droplet

02:13:29 20    patents that cover a variety of different features, that

02:13:31 21    that's comparable.

02:13:33 22           Is that worth a jury decision or not?  That's

02:13:36 23    really the question you're being asked when you boil off a

02:13:39 24    lot of rhetoric.  A lot of rhetoric.

02:13:42 25           These are the different issues that they raised.

02:13:44   1    Bar codes, integration with downstream sequences, software.

02:13:49   2    And if you look through the RainDance microdroplet, that's

02:13:54   3    the addition for the PCR patent that went to the -- for the

02:14:02   4    Caliper license is one of the things that RainDance that

02:14:04   5    they had Chicago patents at the time.  This is the

02:14:07   6    forefather of Bio-Rad.

02:14:10   7            We had droplets.  So I mean whatever they're

02:14:13   8    claiming for gel beads, I don't think anyone is saying they

02:14:17   9    are.  They may argue it, but gel beads is a bigger invention

02:14:20  10    than droplets.  The whole concept of reactive reactions in

02:14:24  11    droplets, we're not saying we invented the first droplet.

02:14:28  12    It's the inventions that we have, but it's all foundational.

02:14:31  13    No one was doing it until we came up with it in any

02:14:34  14    meaningful way.

02:14:35  15            And then surfactant chemistry, the exact same

02:14:39  16    thing that they're claiming.  So RainDance said, We have

02:14:43  17    surfactant chemistry out of the Chicago portfolio.  That's

02:14:45  18    relative to the Caliper license.

02:14:49  19            RainDance integrates upstream and downstream

02:14:52  20    work flows, integration with downstream sequencing.

02:14:56  21    Software.  I mean, sample software interface permits

02:15:00  22    intuitive operation.

02:15:01  23            So the RainDance product had all these other

02:15:04  24    attributes that had to be taken into account of the Caliper

02:15:09  25    license that made it an eight to 15, you know, whatever that

02:15:11  1    particular license was.  And so what does someone have to

02:15:16  2    do?  You have to get a Ph.D. software person to come in and

02:15:19  3    say, Okay, the RainDance software is the same or better

02:15:24  4    than, you know, the current 10X software, and we're going to

02:15:30  5    value that and put numbers on it, and you stack up every

02:15:34  6    single feature of the thing.

02:15:35  7              Nobody's going to do that.  There's a false

02:15:38  8    standard that's being created.  Basically, the question is:

02:15:40  9    Are these licenses comparable?  We believe droplets is a

02:15:43 10    major invention.  We think the evidence is going to show

02:15:46 11    that.  We think an eight-to-15 percent, you know, range of

02:15:50 12    royalty is not something I was thrilled at seeing compared

02:15:54 13    to what I think the innovation is.  The $85 million that was

02:15:58 14    paid for, you know, for the company to get the patent

02:16:02 15    portfolio.  These aren't junk patents.  And in this narrow

02:16:09 16    area when you pull up the lens and all of these kind of

02:16:14 17    analytical tools for DNA, to say that eight-to-15 percent

02:16:20 18    range royalty is a reasonable range, it just is.  And I plan

02:16:24 19    on establishing that with Your Honor's, you know, resolution

02:16:29 20    of this motion, and what we believe is the correct way.

02:16:32 21              So none of that, you know, stuns the conscience.

02:16:37 22    Mr. Powers didn't want to argue about details.  Like these

02:16:40 23    details, what are they exactly saying the difference is?

02:16:43 24    Software is software.  Integration integration.  Droplets

02:16:48 25    are an innovation that RainDance brought to the Caliper

02:16:54 1    negotiating table.  It's not perfect, but it's a related

02:16:59 2    thing.

02:16:59 3             So I'm not going to go through every single one,

02:17:03 4    but when you look at these here to the Applera, 18-paragraph

02:17:07 5    analysis, discusses the unlicensed features, the

02:17:13 6    patentability software, computers.  There's other features

02:17:17 7    in there.  The buffer.  The polymerase.

02:17:25 8             So the question is:  Is this a showing that is

02:17:28 9    so poor on the merits because this methodological argument

02:17:32 10   has no weight?  I'm sorry.  So poor that it doesn't deserve

02:17:38 11   to go to the jury, that we should go to the jury with no

02:17:41 12   theory at all after we have pages of analysis on each one of

02:17:43 13   these licenses that far exceeds the standard of what's going

02:17:47 14   on in courtrooms around America for the last ten years in

02:17:51 15   this field and far exceeds the benchmark that intelligent

02:17:56 16   commentators in round tables are setting forth.  Not just

02:17:58 17   Mr. Powers, but the others at that table.

02:18:00 18            And I think the answer is we're being -- there's

02:18:03 19   this momentum towards this ridiculously high standard for

02:18:07 20   what would have to be sufficient for a jury to determine

02:18:09 21   whether these are comparable licenses or not.  And I think I

02:18:14 22   don't need to go on beyond that.  It's a relatively short

02:18:17 23   argument.

02:18:18 24            But if there's any questions you have, this is

02:18:20 25   very important to us in and our client, obviously.  And I

02:18:24  1    know you know that, but I would be remiss if I didn't say

02:18:29  2    it.

02:18:38  3                THE COURT:  All right.  I think I've got your

02:18:40  4    position.

02:18:44  5                MR. REINES:  I think that's it, Your Honor.  I

02:18:47  6    think that's the gist of the point.

02:18:49  7                THE COURT:  All right.

02:18:49  8                MR. REINES:  Thanks.

02:18:52  9                THE COURT:  Hold on a moment here.  Yes,

02:19:01 10    Mr. Powers, presumably you will be brief as Mr. Reines was

02:19:07 11    brief.

02:19:08 12                MR. POWERS:  I will, Your Honor.  Just a few

02:19:11 13    points.  Is now okay to start or do you still want to wait?

02:19:15 14                THE COURT:  No, I'm ready.

02:19:18 15                MR. POWERS:  First, the methodological

02:19:20 16    challenge, Bio-Rad says it just falls away.  No, it doesn't.

02:19:25 17    The methodological challenge asks whether the methodology

02:19:29 18    chosen by this expert is one that is generally accepted or

02:19:32 19    used in the field.  And we asked for a case that said this

02:19:37 20    idea, that you're going to eyeball three other licenses and

02:19:41 21    say, Well, without doing a quantitative analysis, I'm going

02:19:45 22    to assume that the ratios there are the same; and therefore,

02:19:48 23    I can use exactly the same rate.  That methodology has been

02:19:51 24    approved by nobody.

02:19:52 25                And the judge that they just cited out was Judge

02:19:56 1   Hilton, presumably the Oriosa case that they cited, and I've

02:20:02 2   read both her Daubert ruling and her Rule 50 ruling -- and I

02:20:07 3   can hand them up, Your Honor -- but let me summarize what

02:20:11 4   they say because they do not in any way bless this

02:20:14 5   methodology.

02:20:15 6           The Daubert ruling -- there were two challenges.

02:20:22 7   There were two, well, there's a challenge to Mr. Malackowski

02:20:25 8   in that case, and one of them was the same challenge here

02:20:29 9   that he just looked at the licenses and assumed the same

02:20:33 10  apportionment.  And the response to that was, Well, there

02:20:38 11  may not need to be apportionment at all.

02:20:40 12          This was the plaintiff's argument, because we

02:20:44 13  think the patent covers the entire product.  And if it

02:20:47 14  covers the entire product, you don't have to apportion it.

02:20:50 15  And Judge Hilston's ruling did not clearly, under no theory,

02:20:55 16  bless the approach by Mr. Malackowski on this question.  She

02:20:58 17  didn't rule on it.  She said there's a dispute of fact on

02:21:01 18  whether you need to apportion it at all, so I'm going to

02:21:04 19  wait until the evidence comes in and see what it says.

02:21:10 20          And from her ruling, this is Exhibit AA at

02:21:14 21  Page 5, and I'm happy to hand it up if you want it, but the

02:21:19 22  holding is not ambiguous.  Because at the very least, it is

02:21:24 23  disputed whether there are unpatented features requiring

02:21:26 24  apportionment.  The Court declines to exclude Malackowski's

02:21:30 25  reasonable royalty opinion at this stage; however, the Court

02:21:32  1    may revisit this issue if evidence at trial shows the

02:21:36  2    Harmony test includes unpatented features for which

02:21:38  3    apportionment is required.

02:21:40  4              THE COURT:  So you're now reading the Daubert

02:21:43  5    ruling?

02:21:43  6              MR. POWERS:  I'm reading the Daubert.  She did

02:21:45  7    not bless this approach.  I'm going to wait and see what

02:21:48  8    happens at trial because it may not be apportionment at all,

02:21:49  9    which was their primary argument.

02:21:51 10              And so the assertion that at Daubert, Judge

02:21:57 11    Hilton blessed this approach is just untrue.  Then -- and if

02:22:01 12    Your Honor wants a copy of it, I've got copies of it.  But

02:22:04 13    that was --

02:22:05 14              THE COURT:  Well, Exhibit AA, you filed that;

02:22:09 15    right?

02:22:10 16              MR. POWERS:  Yes.

02:22:13 17              THE COURT:  I'm trying to recall, I was looking

02:22:14 18    at some Exhibit AA in the last two days, and I think it must

02:22:18 19    have been this.  And I think when I found it, I was less

02:22:21 20    than certain why I was looking for it in the first place.

02:22:27 21              MR. POWERS:  I could hand it up to you if Your

02:22:29 22    Honor would like.

02:22:29 23              THE COURT:  Sure.  Sure.  Might as well hand up

02:22:34 24    the other one while you're at it, if you've got another one.

02:22:43 25              MR. POWERS:  Okay.

02:22:56  1              THE COURT:  All right.

02:22:56  2              MR. POWERS:  On the Rule 50 motion, what

02:23:00  3    happened, of course, they went to trial, and then the same

02:23:03  4    issues were raised on the Rule 50 motion.  And her ruling on

02:23:06  5    that issue starts on Page 31.

02:23:10  6              THE COURT:  I certainly didn't look at this.

02:23:13  7              MR. POWERS:  I don't think this was submitted.

02:23:15  8    I'm not -- I don't believe it was.  And I'm not entirely

02:23:19  9    sure the other one was, but I think so.

02:23:22 10              So her ruling starts at Page 31, and it covers

02:23:27 11    about two pages total.  And, obviously, Your Honor can read

02:23:35 12    it for yourself, but the summary is what -- this is now

02:23:38 13    coming after the jury has come back with a verdict.  So it's

02:23:41 14    not ruling on the propriety of Mr. Malackowski's

02:23:48 15    methodology.  What she says is, Well, the jury, obviously,

02:23:51 16    did some apportioning because they came back with only

02:23:54 17    25 percent of what the plaintiff wanted.  And the law says I

02:23:57 18    must give a lot of deference to jury verdicts, and that's

02:24:00 19    what I'm going to do.

02:24:01 20              So that was her ruling, and it's quite clear

02:24:04 21    from the language she chose that that's what she was doing.

02:24:08 22    And there was certainly nothing in her ruling which in any

02:24:13 23    way blessed at all the methodology that Mr. Malackowski used

02:24:16 24    there and tries to use here.

02:24:19 25              And the other cases that they've cited are

02:24:23 1    merely cases that talk about it's okay to use some

02:24:27 2    qualitative information.  There's no doubt that's true.

02:24:30 3    That's been true for a while.  The issue isn't that.

02:24:33 4            The issue is whether a wholly qualitative

02:24:37 5    approach -- there's two issues.  One is whether a wholly

02:24:40 6    qualitative approach with no quantitative assessment of the

02:24:43 7    value contributed by the unlicensed components -- because

02:24:46 8    that's what apportionment -- let's just step back.

02:24:49 9    Apportionment requires them to make certain that they're not

02:24:52 10   asking for a royalty on value that we contributed, or we

02:24:55 11   licensed from Harvard.

02:24:56 12           So they have to eight account for that.  And

02:24:59 13   they didn't attempt to account for that in the normal way.

02:25:01 14   They just didn't.

02:25:02 15           And so now the way -- and the way that

02:25:05 16   Malackowski in his supplemental report attempts to justify

02:25:09 17   it is with this totally untested, unapproved theory that

02:25:13 18   says, If I meet this equation, it's okay.  I don't have to

02:25:16 19   do an actual analysis of a normal apportionment analysis.  I

02:25:21 20   can just rely on --

02:25:22 21           THE COURT:  You seem to be repeating yourself.

02:25:24 22           MR. POWERS:  I just want to reset the issue, but

02:25:27 23   I'll move on.  So the methodological issue is plain, clear,

02:25:30 24   and real.  There is no case to defend this.

02:25:35 25           The second point I want to address is toward the

02:25:37  1    end of the argument, Bio-Rad argued, Well, the range is

02:25:40  2    really eight to 15.  That's reasonable.

02:25:42  3             No.  No.  No.  That's not right.  For the three

02:25:45  4    licenses we're talking about, there's no range.  They say

02:25:49  5    it's 15.

02:25:53  6             And so that opinion that those three licenses

02:25:55  7    because they were 15 supports this license of 15, that's a

02:25:59  8    stand-alone opinion.  And that's the opinion they want to

02:26:02  9    put to trial.  It's not a range of eight to 15.  That's the

02:26:05 10    opinion we're challenging first.

02:26:06 11             And so when Mr. Reines was implicitly backing

02:26:11 12    off from it saying, Well, the range is eight to 15, that

02:26:13 13    sounds pretty reasonable.  No.  No.  No.  No.  It is 15 for

02:26:17 14    those three licenses.  Where the eight comes in is on

02:26:20 15    Chicago, and we have separately asked to strike that for the

02:26:23 16    lack of apportionment for different grounds.  Because the

02:26:29 17    Chicago license does include the patents-in-suit, so it's

02:26:32 18    actually quite different from the other three.  It's a

02:26:35 19    different licensee, but it's a totally different category.

02:26:39 20             The apportionment issues on Chicago are more

02:26:41 21    straight forward, and there's two of them.  One is the

02:26:44 22    Chicago license covers a whole lot more patents than just

02:26:48 23    the patents-in-suit.  And so you have to apportion that.

02:26:52 24             We're not getting that whole value, so that

02:26:56 25    doesn't go in our numerator.  But it went into the RainDance

02:27:00  1   numerator.  And so if you're comparing those, you've got to

02:27:04  2   apportion the value of the patents-in-suit versus all of the

02:27:09  3   others, Ismagilov patents that were licensed to RainDance.

02:27:13  4   He doesn't do that.

02:27:14  5               The second thing he doesn't do is do a straight

02:27:17  6   forward -- doesn't even attempt to do it in this case, a

02:27:20  7   straight-forward apportionment analysis that says -- So

02:27:24  8   let's be clear.  He's not relying on the same theory for

02:27:28  9   Chicago.  He doesn't say the ratios is the same.

02:27:32 10               THE COURT:  So Mr. Powers, I'm correct in

02:27:35 11   thinking that we didn't talk about Chicago at all in your

02:27:38 12   opening point; right?

02:27:40 13               MR. POWERS:  We didn't.  It's in the brief.

02:27:41 14               THE COURT:  Right, but I was thinking this is a

02:27:45 15   more traditional thing where you make your argument.  He

02:27:48 16   makes a response.  You respond to his response.  You don't

02:27:51 17   keep going on to new and different things.

02:27:53 18               MR. POWERS:  I'm responding to the eight.

02:27:55 19               THE COURT:  Okay.  All right.  Well, I don't

02:27:57 20   need to hear anymore about that.

02:27:58 21               Is there anything else you want to say?

02:28:00 22               MR. POWERS:  Let's see.  Only three very quick

02:28:09 23   things.

02:28:09 24               THE COURT:  Okay.

02:28:10 25               MR. POWERS:  One is I refer you to the Csiro

02:28:14  1    opinion where the judge there struck Mr. Malackowski's

02:28:18  2    report or he didn't strike --

02:28:21  3                    THE COURT:  C-S-I-R-O?

02:28:23  4                    MR. POWERS:  C-S-I-R-O.

02:28:26  5                    THE COURT:  No.  No.  Everybody pronounces these

02:28:28  6    things differently.  And, yeah, and there's enough odd names

02:28:31  7    going around.  So that when you pronounce it differently

02:28:34  8    than your opponent, it makes me wonder:  Are we talking

02:28:37  9    about another one?  But in any event --

02:28:39 10                    MR. POWERS:  The pronunciation is subtle.  And

02:28:41 11    that's an opinion that -- it was a bench trial in that case,

02:28:46 12    and the judge expressly declined to follow Mr. Malackowski's

02:28:50 13    reasoning because it was -- it wasn't the same theory as

02:28:53 14    this.  So it wasn't blessing or rejecting this theory.  This

02:28:57 15    theory is not really been addressed by anybody

02:29:02 16    substantively.

02:29:02 17                    But he rejected Mr. Malackowski's approach

02:29:07 18    because it was wholly qualitative, and that goes back to the

02:29:10 19    point of:  Is qualitative okay?  Of course, some qualitative

02:29:14 20    analysis or inputs are okay, but the lesson of the law is

02:29:18 21    you can't be wholly qualitative because you have to account

02:29:21 22    for the value in some meaningful way.  It doesn't have to be

02:29:24 23    to three decimal points, but it has to be in a meaningful

02:29:27 24    way.

02:29:28 25                    But my earlier point is the key one on this

1  which is he's chosen a methodology that's totally unique,

2  that is wholly quantitative.  The ratio has to be greater

3  than or equal to that is quantitative, and he doesn't do it.

4         The second point is when Mr. Reines was talking

5  and was going on and on about how the value of this

6  Ismagilov is huge because he is the first guy to do

7  reactions in droplets.  And then he said something very

8  interesting which was, Well, if they can say that Ismagilov

9  copied reaction and copies from Quake, then I guess that

10  argument has force.

11         Well, that goes to the argument we're going to

12  have in about 20 minutes because that is the argument that

13  he's copying huge chunks from Quake, and therefore, that

14  affects the value of the numerator substantially.  The

15  reality is that Ismagilov was not the first person to invent

16  the concept of reactions in droplets.  Quake did that

17  unambiguously.  And Ismagilov copied half of his

18  projectional application from Quake.

19         THE COURT:  All right.  Your second argument,

20  now you're not responding.  Now, you're going and you're

21  skipping to the next one.

22         Do you actually have some point to make here, or

23  are you just wasting my time?

24         MR. POWERS:  My point is responding to his point

25  about Ismagilov having value, and by pointing out that we do

02:30:54 1    say he copied it, and therefore, it doesn't.

02:30:56 2            The third and last point is he points to two or

02:30:59 3    three things in the Caliper license.  It says, Well, Caliper

02:31:02 4    had surfactants.  Caliper had software; therefore, the value

02:31:06 5    must be the same.  Of course, that doesn't mean that.  The

02:31:08 6    Caliper software could have been terrible, and our software

02:31:11 7    could be great.  That happens to be true.  Just saying they

02:31:14 8    both have software doesn't mean the denominator value is the

02:31:17 9    same.

02:31:18 10           THE COURT:  This is, in my opinion, a proper

02:31:19 11   response.  So keep going.

02:31:20 12           MR. POWERS:  And that was it.

02:31:22 13           THE COURT:  Okay.  Well, thank you.  All right.

02:31:29 14   So I will take that under advisement.  Actually, I'm sorry.

02:31:34 15   I do have a question, which is this:  Let's assume that I

02:31:47 16   let the plaintiff do what they're going to do or what they

02:31:50 17   want to do, is there any prejudice other than the normal

02:32:02 18   prejudice found when things are reversed on appeal that the

02:32:07 19   defendant is going to suffer?

02:32:10 20           MR. POWERS:  I think the prejudice that we'd

02:32:19 21   suffer has already been suffered, so I can't say there's

02:32:23 22   going to be further prejudice, other than I think we'll be

02:32:27 23   back here in two-and-a-half years.

02:32:29 24           THE COURT:  Okay.  Well, I appreciate that

02:32:32 25   answer.

02:32:32  1          All right.  So I have a limited amount of time

02:32:42  2     today.  I don't know if Mr. Cottrell is going to

02:32:49  3     Philadelphia tonight.

02:32:50  4          MR. COTTRELL:  I know it's tonight.  We have a

02:32:51  5     van.  I'm not sure I can make it tonight.

02:32:53  6          THE COURT:  Well, I figure you might have

02:32:55  7     business.  I don't know, maybe Mr. Farnan's going.  He

02:32:57  8     usually makes time for these kinds of things.

02:33:00  9          MR. FARNAN:  I am planning on going, Your Honor.

02:33:02 10          THE COURT:  All right.  Well, in any event, I'm

02:33:04 11     going.  So why don't we take a short break, and then we'll

02:33:09 12     come back and deal with these issues that were being raised

02:33:12 13     this morning.

02:33:13 14          Okay?

02:33:15 15          MR. REINES:  Thank you.

02:33:15 16          THE COURT:  So by short break, I mean ten

02:33:17 17     minutes.

02:33:18 18          THE CLERK:  All rise.

02:55:47 19          (A brief recess was taken.)

02:55:48 20          THE CLERK:  All rise.

02:55:55 21          THE COURT:  All right, please be seated.  All

02:56:02 22     right.  So just on what we were just arguing about, damages,

02:56:08 23     we're going to put something in writing.  My expectation

02:56:15 24     based on what I've heard and what I've read is that we are

02:56:26 25     going to deny the defendant's motion but I say expectation

02:56:36 1   because you do have to write these things up.  And but just

02:56:41 2   in terms of your preparations, we'll get you something

02:56:46 3   tomorrow at some point.  But certainly you should go on the

02:56:51 4   principle that plaintiff is going to be able to present

02:56:56 5   Mr. Malackowski to do this unless and until you hear

02:57:00 6   otherwise.

02:57:00 7            Okay?

02:57:01 8            All right.  So we had these other things that

02:57:05 9   have come up this morning, and so I did look very quickly.

02:57:18 10  And I thank Mr. Cottrell for the citation.  I don't consider

02:57:25 11  what I said at discovery dispute to be any kind of ruling on

02:57:32 12  whether or not the copying aspect.  The copying aspect of

02:55:14 13  Quake provisional application is a relevant issue to

02:55:18 14  anything.  Maybe it is, but I certainly haven't decided that

02:55:27 15  yet.  So I thought why don't we start off by -- since that

02:55:33 16  seems to be the main issue, why don't we start off by

02:55:37 17  talking about that.

02:55:38 18            And I guess what I'm curious about, and maybe it

02:55:42 19  was said this morning, but I just didn't get it is exactly

02:55:49 20  what the theory as to why was in the provisional application

02:55:55 21  is relevant to anything.  And I say that because as I

02:56:00 22  understand it, the defendant's prior art, which is Quake and

02:56:09 23  this, that or the other thing, there is undisputed that

02:56:16 24  those things are prior art; right?

02:56:18 25            MR. REINES:  Yes, Your Honor, it's not

02:56:20  1    contested.

02:56:22  2             THE COURT:  So there is no particular reason why

02:56:30  3    the provisional applications seems to be relevant for prior

02:56:35  4    art purposes that in terms of Quake being, you know,

02:56:47  5    compelling prior art for whatever provisions, for whatever

02:56:51  6    purposes the defendant wants to use it seems to me Quake the

02:56:58  7    sixteen pages if that's what it is that copied the

02:57:01  8    provisional application, they say whatever it is they say,

02:57:05  9    those sixteen pages, and you, of course, will be able to put

02:57:11 10    those sixteen pages up against the claim that's construed

02:57:14 11    and say look, here is disclosure of hundred percent, I guess

02:57:19 12    since you're talking obviousness, not a hundred percent, but

02:57:23 13    something less than a hundred percent and here is the

02:57:26 14    complimentary reference that fills in the blank or the gap.

02:57:30 15             I don't see what the purpose -- and to the

02:57:35 16    extent that defendant would say, which I think they have

02:57:39 17    said, and I don't actually understand this, but to say well,

02:57:44 18    the Patent Office didn't understand the first time around

02:57:49 19    that there were sixteen pages of Quake copied into the

02:57:58 20    provisional application, even though we concede they had

02:58:02 21    Quake and they had the provisional application in their

02:58:05 22    file, so somehow or another this is a relevant fact to

02:58:10 23    whether or not we -- this invokes the Federal Circuit's oft

02:58:19 24    stated principle that prior art that was before the Patent

02:58:24 25    Office is less compelling for obviousness than prior art

02:58:28  1    that was not.

02:58:29  2           MR. POWERS:  We're not making that argument.

02:58:30  3    We're not making the argument that because Ismagilov copied

02:58:35  4    Quake, that somehow tainted the patent office's initial

02:58:38  5    review of Quake.

02:58:39  6           THE COURT:  So what are you making?

02:58:43  7           MR. POWERS:  There are several.  One is with

02:58:45  8    regard to prior art, Your Honor is correct that the

02:58:49  9    references we have selected down for trial don't depend on

02:58:53 10    the provision of the prior art regardless.  But that's not a

02:58:58 11    complete answer and not even a half complete answer.  There

02:59:02 12    was prior art that we had that would have been prior art but

02:59:06 13    for the provisional like the Thorsen thesis which is trial,

02:59:11 14    Defendants' Exhibit 293, DTX-293, which we asserted this

02:59:16 15    prior art.

02:59:17 16           They took the position in interrogatories and in

02:59:19 17    their expert report that the patents were entitled to, at

02:59:23 18    least four of them were entitled to the priority date of the

02:59:27 19    provision.  They took that position and squarely in

02:59:31 20    interrogatory answers and in their expert report.  We

02:59:35 21    dropped the Thorsen reference because the debate then would

02:59:38 22    have been whether that provisional supported those claims.

02:59:42 23    And now we're being told that that provisional which was the

02:59:45 24    basis for us dropping the prior art references is no longer

02:59:50 25    relevant just because we've been subjected to the got you

02:59:54  1    that we have dropped the prior art references based on their

02:59:57  2    position.  That it seems to me is completely inequitable.

03:00:01  3             THE COURT:  But the thing that is is that is

03:00:07  4    when you drop prior art and it turns an issue into a

03:00:12  5    nonissue, we don't say well, let's give the jury the

03:00:17  6    nonissue anyhow.

03:00:18  7             MR. POWERS:  It would have been an issue.  If

03:00:20  8    they're no longer relying on that provision, which they are,

03:00:24  9    the reality is their expert's report still says that that

03:00:28 10    provision is the reduction to practice.

03:00:30 11             THE COURT:  Right.  But given the prior art that

03:00:36 12    you're asserting, it makes no difference.

03:00:42 13             MR. POWERS:  Well, I'll get to that in a minute,

03:00:45 14    but my point is we would have asserted other art, but we

03:00:49 15    dropped it because the provisional was relevant, and now

03:00:52 16    it's totally unfair to us to say well, because we assert --

03:00:55 17    we took -- Bio-Rad took this position that the revision was

03:01:00 18    the reduction to practice date and the priority date, they

03:01:03 19    took that position, we then relied on that, that made that

03:01:07 20    relevant.  We relied on that by dropping references that we

03:01:11 21    otherwise would have kept because they're very, very good,

03:01:15 22    and now to say to us that it's no longer relevant because

03:01:19 23    even though it's obviously relevant to other things because

03:01:22 24    we have now dropped the reference, that seems very unfair.

03:01:25 25             THE COURT:  So what other things is it relevant

03:01:27  1    to?

03:01:28  2            MR. POWERS:  Invalidity and damages.  It's

03:01:30  3    relevant to two issues of invalidity.  One is the Graham

03:01:34  4    factors, which is the second argument and the most important

03:01:37  5    is what are the differences between the prior art and the

03:01:41  6    claimed invention.  And the idea that it's not relevant to

03:01:44  7    that question that the named inventor copied parts of

03:01:49  8    another person's work saying this is my invention that

03:01:55  9    that's not relevant to the differences, I can't even believe

03:01:58 10    we're having the argument.  It shows directly that he did

03:02:02 11    not invent that material.

03:02:03 12            THE COURT:  But you have that material, it's

03:02:07 13    undisputed it came first.  They're not going to say he

03:02:10 14    invented those sixteen pages.

03:02:12 15            MR. POWERS:  They're going to say he invented

03:02:15 16    aspects that are covered in those sixteen pages, and how

03:02:18 17    better to show that's not true --

03:02:20 18            THE COURT:  Than to have the sixteen pages that

03:02:23 19    you have; right?

03:02:24 20            MR. POWERS:  To show the identity of what was

03:02:27 21    copied.  The point is it goes directly to his credibility,

03:02:30 22    too.  Here is a guy who signed an oath that said I invented

03:02:35 23    all of this.  This is what I invented.  And sixteen out of

03:02:38 24    thirty-four pages he copied from someone else.  That goes

03:02:42 25    directly to his credibility.  We ought to be allowed to

03:02:46 1    challenge that.

03:02:47 2                    THE COURT:  Do I have the provisional

03:02:48 3    application?

03:02:50 4                    MR. POWERS:  I have a copy with the portions

03:02:52 5    that are highlighted that are copied, if you would like.

03:02:55 6                    THE COURT:  Okay.  That would be a good thing.

03:02:56 7                    MR. POWERS:  This is DTX-386.  And there is many

03:03:10 8    portions that are copied.  I would direct Your Honor to --

03:03:13 9                    THE COURT:  Hold on.

03:03:15 10                   MR. POWERS:  He's got two, one for your clerk.

03:03:18 11                   THE COURT:  No, that's all right.  And I guess

03:03:23 12   do you happen to have lying around -- well, actually let me

03:03:28 13   look at this for a moment.

03:03:29 14                   MR. POWERS:  I would direct Your Honor's

03:03:31 15   attention starting on page seven.  By seven in this case, I

03:03:34 16   mean the actual number of seven of the document, it's 12 at

03:03:37 17   the bottom of the production number.  That starts the first

03:03:43 18   major chunk.

03:03:45 19                   THE COURT:  Page 12.

03:03:46 20                   MR. POWERS:  Page 12 on the bottom right, page 7

03:03:49 21   in the original document, on the left-hand side.

03:03:53 22                   THE COURT:  Right.  I'm just reading the numbers

03:03:55 23   at the bottom.  But I have found them.

03:04:01 24                   MR. POWERS:  So you see in yellow the portions

03:04:03 25   that are identical, and what happened in many of these cases

03:04:08  1    is that Ismagilov copied Quake identically, but then

03:04:13  2    replaced some words.  So for example he replaced channel

03:04:17  3    with port or port with channel.  He replaced droplet with

03:04:22  4    plug, so Quake would say droplet, and Ismagilov would change

03:04:26  5    that to plug.  You see over on then page 10 in the original

03:04:31  6    document, page 11 and 12.

03:04:33  7            THE COURT:  But I take it when the patent

03:04:35  8    application was actually filed for the thing that became the

03:04:41  9    patent, all this language was gone or rewritten or

03:04:45 10    something.

03:04:45 11            MR. POWERS:  No, no, chunks of it are still

03:04:48 12    there for sure.  There is less of it.  They did go back and

03:04:52 13    rewrite it some.  But that, it goes even further to

03:04:58 14    credibility.  That means they knew they copied it and

03:05:01 15    decided to change more or some of it.

03:05:03 16            THE COURT:  You have to figure they knew they

03:05:05 17    copied it because somebody wrote this.

03:05:07 18            MR. POWERS:  Well, somebody knew.  And

03:05:10 19    presumably Dr. Ismagilov knew.  I don't know whether the

03:05:14 20    patent attorney knew.  There has been no discovery on this

03:05:18 21    question.

03:05:18 22            If you go to page 21 to 33, that's another huge

03:05:22 23    chunk of copying, which we see it's almost the entire page

03:05:25 24    where they'll just change a word here and there to make it

03:05:29 25    more consistent with the wording they're using in Ismagilov,

03:05:32 1   they'll change substrate to something else, they'll change

03:05:36 2   droplet to plug.  So the amount of copying and the place of

03:05:40 3   the copying in terms of the descriptions of the preferred

03:05:44 4   embodiments so --

03:05:46 5               THE COURT:  So Mr. Powers, I presume somebody on

03:05:49 6   your side deposed Dr. Rustem Ismagilov?

03:05:54 7               MR. POWERS:  This was not discovered before his

03:05:58 8   deposition so there is no questioning of him on this issue.

03:06:01 9   This was discovered by running a program against the

03:06:04 10  documents and learning it that way.  So the first point is

03:06:30 11  that this issue caused us to drop prior art.

03:06:33 12              THE COURT:  I got that point.

03:06:34 13              MR. POWERS:  The second point is it relates

03:06:37 14  directly to Graham factor 2, differences between the prior

03:06:40 15  art and the invention and the patents.

03:06:42 16              The other point is, of course, underlying that,

03:06:47 17  a person of ordinary skill in the art is presumed by law to

03:06:51 18  be aware of all the prior art and all the issues in this

03:06:53 19  prior art.

03:06:54 20              THE COURT:  True.

03:06:54 21              MR. POWERS:  So the person of ordinary skill in

03:06:56 22  the art would know this was copied.  So for the jury not to

03:07:00 23  know what the person of ordinary skill in the art knows

03:07:03 24  would be completely improper.

03:07:09 25              THE COURT:  So I don't actually understand that.

03:07:14  1   The obviousness analysis is not, I think, is not is the

03:07:20  2   provisional application obvious, are the claims obvious;

03:07:24  3   right?

03:07:25  4                MR. POWERS:  That's true.  But are the claims

03:07:28  5   obvious against the portions of the specification in Quake

03:07:35  6   that were copied by Ismagilov, so the syllogism if you will,

03:07:40  7   the logical syllogism is they're claiming priority for the

03:07:45  8   claims at issue, the ones that we're weighing for

03:07:48  9   obviousness, to the provisional saying the provisional is

03:07:51 10   the one that supports this.

03:07:52 11                We ought to be able to say if the language in

03:07:54 12   the provisional totally supports those claims and discloses

03:07:59 13   those claims, then the very same language in Quake supports

03:08:04 14   and discloses those claims.  That syllogism is lost if the

03:08:08 15   point of copying or identicallity is taken away.  Just

03:08:13 16   showing them the language in Quake requires this jury then

03:08:17 17   to sit down and make the comparison and try to decide what

03:08:21 18   that language in Quake means versus those claims and they

03:08:25 19   have to do that with other things.

03:08:26 20                THE COURT:  They have to do that with the

03:08:28 21   traditional things.

03:08:29 22                MR. POWERS:  Of course.

03:08:31 23                THE COURT:  Your expert helping them through and

03:08:33 24   who knows what else.

03:08:34 25                MR. POWERS:  I'm not saying otherwise and I'm

03:08:36  1   not saying that's not appropriate for them to do.  I mean, I

03:08:40  2   am saying it's different and more powerful and highly

03:08:42  3   relevant argument to say that if Bio-Rad or in this case

03:08:46  4   Ismagilov took the position, Bio-Rad in interrogatory

03:08:51  5   answers and in its expert report has taken this position,

03:08:54  6   that if they're taking the position that that language in

03:08:56  7   the provisional supports, discloses those claims, the ones

03:09:02  8   at issue, then there is no way that identical language in

03:09:07  9   Quake couldn't.  And that syllogism is a powerful, important

03:09:10 10   and highly relevant soliloquy and different from just

03:09:15 11   showing them Quake.

03:09:17 12           THE COURT:  I guess the other thing, and maybe I

03:09:19 13   should be listening to you more than I am flipping through

03:09:24 14   these pages here, but presumably -- I guess what's the thing

03:09:54 15   to be concerned about is the connection between, I don't

03:10:00 16   know if this is the right word, but the specification of the

03:10:04 17   provisional and the claims of the provisional which I take

03:10:13 18   it those are not highlighted in yellow are different than

03:10:16 19   the claims in the patent.

03:10:18 20           MR. POWERS:  I'm sure they are different in some

03:10:20 21   ways, but --

03:10:22 22           THE COURT:  So just because the specification

03:10:26 23   is, let's say copied, that doesn't actually mean that the

03:10:34 24   claims are copied.  In fact, one would think based on the

03:10:39 25   fact that nothing is highlighted in yellow, they're not

03:10:43 1    copied.  And the claims are what's mostly describe the

03:10:49 2    invention here.

03:10:50 3          MR. POWERS:  That's missing the point of the

03:10:53 4    syllogism.  The syllogism goes as follows.  Bio-Rad takes

03:10:56 5    the position in this case in interrogatory answers and in

03:10:59 6    experts reports that the specification of the provision is

03:11:05 7    sufficient to enable, describe, et cetera, the claims in the

03:11:08 8    patents-in-suit.  So they're directly relying on that

03:11:13 9    language to support these claims, not the claims of the

03:11:18 10   provisional or anything else.

03:11:20 11         THE COURT:  Even if they're directly relying on

03:11:22 12   it, how did that go to whether or not the claims are

03:11:25 13   obvious?

03:11:26 14         MR. POWERS:  If the exact same language is in

03:11:29 15   Quake, there is no logical room at all, zero to argue that

03:11:36 16   the same language that supports those claims it fully

03:11:40 17   discloses those claims in the provisional, doesn't fully

03:11:44 18   disclose and render obvious those claims in Quake.

03:11:47 19         THE COURT:  But then what about the fact that I

03:11:50 20   guess 50 percent of the specification, if you will, in the

03:11:57 21   provisional is not in Quake.

03:12:01 22         MR. POWERS:  That's just other language.  My

03:12:03 23   point is that you can't say that the spec doesn't disclose

03:12:09 24   -- does disclose the claims, but the same language doesn't

03:12:12 25   disclose the other.  They can argue, certainly that they

03:12:16  1   think the non-copied language was essential, they're wrong,

03:12:20  2   but that's just an argument for both sides to make.

03:12:24  3              THE COURT:  But right now, but the thing is the

03:12:27  4   way the case has shaped up, you know, whether this enables

03:12:37  5   claims in the ultimate case at issue is not an issue in this

03:12:44  6   case; right?

03:12:44  7              MR. POWERS:  It certainly is.  We're saying that

03:12:46  8   that's what Quake discloses and that renders obvious the

03:12:50  9   claims.

03:12:51 10              THE COURT:  But you have an enablement defense.

03:12:53 11              MR. POWERS:  We do have an enablement defense

03:12:56 12   but that's a different issue, the issue is not enablement,

03:13:00 13   the issue is does that language in the specification

03:13:02 14   disclose enough to make the claims obvious or anticipated

03:13:07 15   and if it does for their purposes in prior art, the same

03:13:11 16   language in Quake kills it.  There is no room for those two

03:13:15 17   arguments.  They have taken that position, those are binding

03:13:19 18   admissions, and we can use those binding admissions against

03:13:22 19   them.

03:13:22 20              THE COURT:  I understand what you're saying,

03:13:25 21   dubious, but let's me -- is there anything else you want to

03:13:29 22   say about that?

03:13:30 23              MR. POWERS:  Two other things.  One is that they

03:13:32 24   have expressly taken the position, for example, on secondary

03:13:35 25   considerations of nonobviousness, that particular factors

03:13:40  1    that they copied from Quake are what makes this special

03:13:44  2    sauce.  So, for example, he relies on something called

03:13:49  3    compartmentalized microreactors.

03:13:51  4            THE COURT:  Where is this?

03:13:52  5            MR. POWERS:  That's in the rebuttal report on

03:13:55  6    page 68.

03:13:55  7            THE COURT:  Where is this in the provisional?

03:13:58  8            MR. POWERS:  I don't remember where that is

03:14:00  9    exactly, but we can find it for you.  But the point is that

03:14:05 10    for now take it on faith, we'll prove it to you, but take it

03:14:09 11    on faith that the exact language that they're relying on

03:14:12 12    about these compartmentalized microreactors is in Quake and

03:14:18 13    copied verbatim from Quake.  So how can you let their expert

03:14:23 14    say this thing that's in the patents about compartmentalized

03:14:29 15    microreactors, that's the secondary considerations of

03:14:33 16    nonobvious when they copied the language from Quake?

03:14:35 17            THE COURT:  If he copied it, can't you ask the

03:14:38 18    expert, here is Quake, let me read you a paragraph, doesn't

03:14:41 19    that say exactly what you just said?

03:14:43 20            MR. POWERS:  I was handed a note to back up the

03:14:46 21    representation that it's in the provisional at page ten.

03:14:50 22            THE COURT:  Okay.  Thank you.  All right.  And

03:14:57 23    so you have two points, Mr. Powers.  What was the other one?

03:15:01 24            MR. POWERS:  The secondary considerations and

03:15:05 25    the fact that their expert relied upon this.  The last point

03:15:08  1    is damages.  So it's obviously relevant to validity because

03:15:12  2    it shows the importance of Quake and all the other issues

03:15:15  3    that I described, but it's also relevant to damages.

03:15:18  4              On damages the question is what's the degree of

03:15:20  5    improvement of this over the prior art.  And the fact that

03:15:25  6    his disclosure is copied straightforward from Quake goes

03:15:30  7    directly to the question to that degree of improvement.

03:15:33  8              THE COURT:  So what are you going to do, say

03:15:35  9    sixteen pages are the same, sixteen pages are different, so

03:15:39 10    it's a 50 percent improvement?

03:15:40 11              MR. POWERS:  It's 50 percent different, but 50

03:15:43 12    percent zero improvement.  The rest may be no improvement at

03:15:47 13    all, but we know 50 percent is no improvement.  That's

03:15:50 14    highly relevant.  This jury, it's hard to believe we're

03:15:54 15    having this argument.

03:15:55 16              THE COURT:  I'm sorry you don't believe it, but

03:15:57 17    we are.

03:15:57 18              MR. POWERS:  I get that we are, but this jury

03:16:00 19    should know what the person of ordinary skill in the art

03:16:03 20    knows, that's the -- they are supposed to make the decision

03:16:06 21    from that perspective.  If we keep information from the jury

03:16:09 22    of what that person of skill in the art knows, then we are

03:16:12 23    not constructing -- that jury is not having the information

03:16:15 24    it should have.  And it is directly relevant to validity.

03:16:19 25    It is directly relevant to damages.  And it is really

03:16:22  1   relevant to Dr. Ismagilov's credibility.

03:16:26  2        THE COURT:  All right.  So you say it's relative

03:19:03  3   to his credibility.  Let's assume for the sake of argument,

03:19:06  4   I tell you you can't offer this for any of these purposes

03:19:11  5   you've just mentioned, but you can feel free to

03:19:14  6   cross-examine Dr. Ismagilov about whether or not when he was

03:19:21  7   inventing this, he didn't copy half his patent from Quake.

03:19:30  8        MR. POWERS:  As long as I'm permitted then to

03:19:32  9   prove him wrong if he says no, then obviously that solves

03:19:36 10   the credibility problem.  Then you've addressed that.  But I

03:19:38 11   think it's still obviously relative to damages, but I think

03:19:43 12   I understand Your Honor's point.

03:19:45 13        THE COURT:  I guess maybe I didn't say it

03:19:50 14   correctly because I can see that it may be, or you don't

03:19:55 15   have to agree with me.  You don't have to disagree, either,

03:20:00 16   but it seems to me that it may or may not be relevant to Dr.

03:20:07 17   Ismagilov's credibility.  I mean, it seems like a dishonest

03:20:13 18   kind of thing, so it seems like the kind of thing one could

03:20:19 19   logically inquire about on cross-examination.  But I -- and

03:20:27 20   for that purpose, it seems to me, without having heard from

03:20:32 21   Mr. Reines, you have a much better argument than you do for

03:20:40 22   these other things, which seem to be wanting to -- you know,

03:20:50 23   seem to be of little probative value for the things that

03:20:56 24   you're saying you ought to look for, but seem to be

03:21:01 25   extremely prejudicial and unfairly misleading because, you

03:21:09  1   know, they're going to hear this complex testimony about

03:21:12  2   obviousness and everything else and, you know, you're going

03:21:17  3   to simplify it by saying, Look, 50 percent of it is copied.

03:21:21  4   Ha.  You know, Pa, and that will be the end of your

03:21:26  5   argument.

03:21:26  6              And that seems like, you know, for those points,

03:21:31  7   that seems like an unfair argument and not one that gets us

03:21:36  8   to a sideshow.  For all I know -- well, actually I expect

03:21:42  9   you don't have this, but you know, I think it may look a lot

03:21:50 10   worse.  I mean, it's just hard to say.  I don't know.

03:21:54 11              But in any event, I think I've got what you say.

03:21:56 12   Let me hear from Mr. Reines.

03:22:02 13              MR. REINES:  Thank you, Your Honor.  There's

03:22:09 14   really -- I break this into three issues.  Let's start with

03:22:14 15   the issue of credibility or impeaching Dr. Ismagilov for

03:22:21 16   being a plagiarist essentially.  The Court's reaction that

03:22:25 17   this is probably improper, or may be improper, or someone

03:22:28 18   can infer it's improper is the source of our concern on that

03:22:31 19   issue.  So let me just address that narrow issue.  And that

03:22:35 20   is, there's no inequitable conduct allegation.

03:22:39 21              THE COURT:  No, I understand that.

03:22:40 22              MR. REINES:  There's no rule that says you

03:22:42 23   shouldn't do it.  In fact, if you think of common patent

03:22:45 24   prosecution where you copy things for interference when it's

03:22:48 25   the same exact claim, you get a claim that's exactly someone

03:22:51 1   else's claim.  You actually literally copy it verbatim in

03:22:55 2   that case.

03:22:55 3            THE COURT:  Yeah, but you're doing that not in

03:22:58 4   secret.

03:22:58 5            MR. REINES:  But if they're both -- Quake was

03:23:00 6   before the Patent Office, so they're not secret.

03:23:03 7            THE COURT:  Well --

03:23:05 8            MR. REINES:  And then --

03:23:05 9            THE COURT:  You know, there's the law and

03:23:07 10  there's reality, but go ahead.

03:23:10 11            MR. REINES:  Thank you.

03:23:10 12            THE COURT:  But so just on terms of credibility,

03:23:15 13  what's your point on that?

03:23:17 14            MR. REINES:  The main point on credibility,

03:23:20 15  there may be an inference that someone has of wrongdoing,

03:23:23 16  but there is no wrongdoing because, A, there's no rule

03:23:25 17  that's been broken.  And B --

03:23:26 18            THE COURT:  Right.  But you're going to call Dr.

03:23:31 19  Ismagilov for some reason.  I assume he's going to do

03:23:33 20  something more than come in, smile at the jury, say hi, I'm

03:23:36 21  Dr. Ismagilov.  This is my patent, I hope you don't

03:23:39 22  invalidate it.  Thank you very much.  Cross-examination.

03:23:44 23            I mean, you're going to use it to tell the

03:23:46 24  story, and you know, set the foundation for whatever it is

03:23:51 25  your people are going to say about the importance of this

03:23:54  1    patent.  I mean, you're calling him for a reason, right, not

03:23:57  2    just to fill time, because you don't have that much time.

03:24:01  3    And so, if you're doing that for that, isn't it fair for

03:24:05  4    them to test whether or not he's an honest man or not?

03:24:08  5            MR. REINES:  Not at all, and the reason is

03:24:11  6    because, one, there's no rule violation.  There's no

03:24:14  7    allegation that it's wrong wrongdoing.  There's treatises

03:24:16  8    that says it's inappropriate.  That's first of all.

03:24:19  9            THE COURT:  Do I know about those treatises.

03:24:21 10            MR. REINES:  We can get you it, but it wasn't.

03:24:23 11    This was an issue -- I really want to get to one point, but

03:24:26 12    this was an issue in the discovery hearing where you held

03:24:30 13    that the patent prosecution analysis about this copying was

03:24:34 14    all irrelevant.

03:24:35 15            THE COURT:  I did say --

03:24:36 16            MR. REINES:  Irrelevant.

03:24:37 17            THE COURT:  I think I might have said

03:24:39 18    irrelevant.  What I think I said, I'm certainly not going to

03:24:41 19    have experts in here talking about it, and I'm not treating

03:24:51 20    that in terms of -- what I think was an issue was, you know,

03:25:00 21    this thing about whether it's before the Patent Office or

03:25:04 22    not, I think is irrelevant.

03:25:05 23            MR. REINES:  So to me, the key thing is, and as

03:25:09 24    Mr. Powers is bewildered by this argument -- I guess I join

03:25:12 25    him in sharing in that -- which is the Patent Office was

03:25:16 1    told that there was this common subject matter and was told

03:25:22 2    that that was the basis for all the arguments that

03:25:24 3    Mr. Powers is making and rejected them.

03:25:26 4            THE COURT:  Right.  Right.  You're now talking

03:25:29 5    about what happened --

03:25:30 6            MR. REINES:  In the re-exam.

03:25:31 7            THE COURT:  -- like last year.  This year even.

03:25:33 8            MR. REINES:  Right.  And the point being how

03:25:35 9    could it be a fair process to imply that he did something

03:25:38 10   wrong to the Patent Office by secretly copying or whatever

03:25:44 11   that inference was, and not allow the fact that the Patent

03:25:47 12   Office was alerted to exactly such claim by 10X, and

03:25:52 13   nevertheless, found no wrongdoing?

03:25:56 14           THE COURT:  All they were asked to do was to

03:25:58 15   determine whether or not or actually -- so I'm -- maybe I'm

03:26:04 16   now an ex parte re-exam.  What are the limits of what can

03:26:09 17   happen?

03:26:09 18           MR. REINES:  The challenger can put in the

03:26:14 19   initial document which states the basis and all that, and

03:26:16 20   then there's a determination of essentially institution --

03:26:23 21   substantially new question of patentability, and then

03:26:26 22   becomes an ex parte process.

03:26:27 23           THE COURT:  Right.  But what I'm asking is:  In

03:26:31 24   terms of what was the argument as to why --

03:26:42 25           MR. REINES:  It's the same.

03:26:43  1    THE COURT:  -- the re-exam, 16 paragraphs of

03:26:45  2 copying from Quake made any difference?

03:26:47  3    MR. REINES:  For this, that it's obvious and the

03:26:51  4 heading is of citation of prior art.

03:26:54  5    THE COURT:  Well, and I'm sorry, Mr. Reines,

03:27:04  6 right.  So that has nothing to do with credibility.  That

03:27:07  7 has to do with, I think, where Mr. Powers started that

03:27:16  8 somehow or another copying language in a provisional

03:27:19  9 application is relevant to whether the claims are obvious or

03:27:25 10 not, and you know, doesn't really seem to be that they are.

03:27:31 11 That doesn't mean -- and maybe Mr. Walter has gotten you

03:27:35 12 something on this, but that doesn't necessarily mean that

03:27:40 13 taking some other patent application or taking some other

03:27:44 14 thing and copying 16 pages of it and changing words here or

03:27:51 15 there, you know, that's an honest or dishonest thing.

03:27:56 16 That's a different issue.

03:27:57 17    MR. REINES:  And what I'm saying is in terms of

03:27:59 18 rehabilitation, it seems to me to be a straight-forward

03:28:03 19 thing.  If the slur is made, aren't you bad because you

03:28:06 20 copied this common subject matter, which is what we're

03:28:10 21 talking about.  That to say:  Wasn't that presented to the

03:28:14 22 Patent Office to consider Quake?  And they didn't find that

03:28:17 23 there was anything wrong.  There was no --

03:28:19 24    THE COURT:  Yeah.  So you're really right to the

03:28:22 25 -- here's the --

03:28:24 1          MR. REINES:  That doesn't make sense.  I don't

03:28:25 2   have anything to add.  I mean, basically the point is if the

03:28:30 3   Patent Office considered it, considered the argument and was

03:28:31 4   happy issuing the patent for happily ever after, that is

03:28:35 5   legitimate rehabilitation to a reasonable factfinder of the

03:28:39 6   slur, that:  Did he just steal the invention from Quake by

03:28:43 7   copying?  That's my belief.

03:28:44 8          You know, if you don't share that, I respect you

03:28:46 9   so much.  That's that.  You know, it's just:  Would that be

03:28:49 10  rehabilitation?  If someone says didn't you copy Quake?

03:28:53 11  Isn't this really Quake's invention, not yours, because you

03:28:55 12  put it in yours?  Aren't you a bad guy?

03:28:57 13         And if you can say -- and didn't 10X make those

03:29:00 14  arguments to the Patent Office, and the Patent Office said,

03:29:04 15  No, Professor Ismagilov, you still have a patent because we

03:29:07 16  still think you meet the standards for patentability and no

03:29:10 17  comment about that there's any impropriety.

03:29:13 18         THE COURT:  How does that not --

03:29:15 19         MR. REINES:  So any way, I don't want to beat it

03:29:18 20  too hard.

03:29:19 21         THE COURT:  You know, I guess what it is is the

03:29:24 22  Patent Office, the re-exam, their job is not to assess Dr.

03:29:34 23  Ismagilov's credibility.  Their job is to decide whether or

03:29:38 24  not the patent is obvious.

03:29:40 25         Right?

03:29:41 1          MR. REINES:  I'm sure they have duties, if they

03:29:44 2   found misconduct, to report it within the Patent Office.

03:29:49 3   So, no, I don't agree with that.

03:29:50 4          And more to the point, on the question of if

03:29:55 5   there's any suggestion that the common subject matter, and

03:29:59 6   they want to give the documents to the jury to cart around

03:30:04 7   for a week, if there's any suggestion --

03:30:05 8          THE COURT:  I'm sorry, Mr. Reines, that I keep

03:30:07 9   interrupting.

03:30:08 10          MR. REINES:  That's okay.

03:30:08 11          THE COURT:  When you say "the common subject

03:30:10 12   matter," you're talking about these 16 pages of -- I'm just

03:30:15 13   not a hundred percent clear what you're talking about.

03:30:18 14          MR. REINES:  I'm talking about subject matter.

03:30:19 15   I'm using the words instead of copying because I don't know

03:30:22 16   if they got some of it from some third source or something

03:30:25 17   like that.

03:30:25 18          THE COURT:  So when you say common subject

03:30:27 19   matter, you mean the 16 pages that are highlighted in

03:30:30 20   yellow?

03:30:30 21          MR. REINES:  Yes, and there's edits within them.

03:30:32 22   I apologize if that was confusing.

03:30:34 23          THE COURT:  You don't need to apologize, but I

03:30:36 24   did not fully -- I mean, I didn't understand exactly what

03:30:39 25   you meant.

03:30:39  1          MR. REINES:  So on credibility, I think I've

03:30:41  2   made the point the best I could.  The fact that the Patent

03:30:44  3   Office nevertheless issued it with the copying addresses the

03:30:48  4   credibility question about whether he stole the invention by

03:30:51  5   copying, which is the inference that Your Honor thought

03:30:54  6   might be reasonable.

03:30:55  7          THE COURT:  Well, no, actually more to me is

03:31:02  8   just credibility.  In other words --

03:31:10  9          MR. REINES:  You don't think a factfinder would

03:31:12 10   be more likely to find him credible if they found that that

03:31:15 11   allegation was brought to the same Patent Office that

03:31:19 12   initially issued the patent, and said, What you did is fine,

03:31:21 13   when the suggestion is that putting something in in the

03:31:24 14   first place is improper?

03:31:25 15          THE COURT:  And so --

03:31:27 16          MR. REINES:  I don't --

03:31:28 17          THE COURT:  Is that what they actually said?

03:31:32 18   There's a sentence saying --

03:31:33 19          MR. REINES:  No.

03:31:34 20          THE COURT:  -- we know that you copied 16 pages,

03:31:36 21   and that's fine.

03:31:37 22          MR. REINES:  No, they did not.

03:31:39 23          THE COURT:  What did they say?

03:31:40 24          MR. REINES:  They just did just like Your Honor

03:31:43 25   said in the other portion of the analysis, which we haven't

03:31:45  1    discussed yet, which is this indirect method of establishing

03:31:48  2    obviousness, and appropriate.  And is it persuasive and

03:31:52  3    that --

03:31:53  4            THE COURT:  And in the end, they said this is

03:31:56  5    not obvious, so the patent has, you know, lived long?

03:32:01  6            MR. REINES:  They said what the PTAB said.  They

03:32:04  7    said what the re-exam unit said, and they said what the

03:32:06  8    original Patent Office said.  Quake is not invalidating.

03:32:09  9            THE COURT:  Okay.

03:32:10 10            MR. REINES:  And we should absolutely be able to

03:32:12 11    present the re-exam to explain that part of the story

03:32:14 12    because inevitably the argument is going to be made in some

03:32:18 13    form or another of this commonality, whether it's through

03:32:21 14    jury books or direct attack on the credibility of someone.

03:32:24 15    And I think that if, in fact, the credibility, on the

03:32:31 16    credibility question that this was whether there was

03:32:33 17    impropriety in the patent prosecution, then it wasn't

03:32:36 18    irrelevant to have legal people come in and say, Is this,

03:32:39 19    you know -- then we would have wanted to have the ability

03:32:42 20    to -- I mean, we cross-examined their expert and

03:32:45 21    demonstrated it was appropriate, or used the treatises.

03:32:48 22            Are we really going to then debate in front of

03:32:50 23    the jury with the treatise, show them to their technical

03:32:53 24    expert or whatever and say, Isn't it appropriate to do that

03:32:56 25    and get into a mini-debate as to whether they're

03:32:59  1    non-inequitable conduct argument is valid or not?

03:30:06  2          It is a slur.  So the -- it's a slur to imply

03:30:39  3    that it's -- that he was violating the Patent Office rules.

03:30:43  4          THE COURT:  I don't think you have to go to, you

03:30:51  5    know -- I don't think the cross-examination, I don't know if

03:30:56  6    Mr. Powers said exactly what he had in mind, but I take it

03:31:00  7    the first question is, you know, Dr. Ismagilov, did you

03:31:06  8    write this provisional application?  Did you copy sixteen

03:31:10  9    pages from Quake into it?  I presume his answer is I changed

03:31:16 10    a few words, but since it was saying the same thing, yes.

03:31:26 11    And I'm not sure what the third question is.

03:31:33 12          MR. REINES:  So I think on that issue, it's

03:31:36 13    much -- it's not so simple because there is lawyers involved

03:31:39 14    and there is patent prosecution involved, and I don't think

03:31:42 15    it just begins and ends with him just saying yes, I did it.

03:31:46 16          THE COURT:  And maybe he won't, maybe he'll

03:31:48 17    say -- I mean that's, you know, without having been deposed

03:31:54 18    on the subject, maybe you know what he'll say, but

03:31:57 19    Mr. Powers doesn't and I don't.  Right?

03:31:59 20          MR. REINES:  Right.  So it's a complete

03:32:05 21    collateral matter that's a slur that would warrant bringing

03:32:09 22    in evidence that's not relevant to the main questions, and

03:32:12 23    keeping out the re-exam is unfair in view of that.  That's

03:32:18 24    the persuasion that I have.

03:32:22 25          THE COURT:  So I understand what you're saying

03:32:24 1    there.  What else would you like to say on this subject?

03:32:27 2           MR. REINES:  I want to be concise.  On the

03:32:28 3    merits of the obviousness issue, Mr. Powers' syllogism is I

03:32:36 4    think not a correct way that anyone would ever attempt to

03:32:39 5    show obviousness.  It's got all kinds of false assumptions

03:32:43 6    in it which is that just because there is some text that

03:32:47 7    common that means that concepts are being taken from one

03:32:50 8    place to the other.

03:32:51 9           Like I said, three different times the Patent

03:32:54 10   Office found that not to be the case in the face of direct

03:32:57 11   argument on that point.  So it's an indirect and collateral

03:33:00 12   way, and what's really intended is what Your Honor said is

03:33:02 13   to have somehow have false revision or quantification of

03:33:06 14   fifty percent or something like that, which we talked about

03:33:09 15   in another context how that could be so false.  Or to just

03:33:13 16   slur, I mean, this is hard and unfair prejudice.  We know

03:33:18 17   what he wants to do, he wants to make them look dirty on

03:33:22 18   something where no one has ever found it wrong, there is no

03:33:25 19   rule violated, he didn't have inequitable conduct, the

03:33:29 20   Patent Office has taken that argument and rejected it which

03:33:33 21   would go to immateriality.  If they wanted to imply there

03:33:37 22   was significant wrongdoing, you would have to say it doesn't

03:33:41 23   matter, the Patent Office has looked at it.

03:33:43 24          THE COURT:  Do the scientific experts that you

03:33:45 25   have on either side, Mr. Powers said something and I forget

03:33:50 1    exactly what it was, maybe I misunderstood it, did either of

03:33:55 2    them ever comment on whether -- on the sixteen pages?

03:34:09 3                    MR. REINES:  Yes.

03:34:09 4                    THE COURT:  And what did they say?

03:34:11 5                    MR. REINES:  I don't know that I could do a full

03:34:14 6    summation that I would be comfortable with.  Do you know,

03:34:16 7    Mr. Walter.

03:34:18 8                    MR. WALTER:  Very briefly.  Mr. Wang points out

03:34:21 9    that it was copied.

03:34:21 10                   THE COURT:  Mr. Wang is?

03:34:22 11                   MR. WALTER:  Mr. Wang is their invalidity

03:34:25 12   expert.

03:34:25 13                   MR. POWERS:  Dr. Chang.

03:34:28 14                   MR. WALTER:  Dr. Chang.

03:34:29 15                   THE COURT:  You always call people by their last

03:34:32 16   name.  Dr. Chang, yes.

03:34:33 17                   MR. WALTER:  It is a mistake we have been making

03:34:35 18   internally within our team.

03:34:38 19                   THE COURT:  That's all right.  Let's not do that

03:34:40 20   next week.

03:34:41 21                   MR. WALTER:  Right.  He says it's material to

03:34:42 22   the claims and our expert responds and said no, actually

03:34:47 23   this is fact background.

03:34:51 24                   THE COURT:  In terms of, in other words, for

03:34:54 25   lack of a better word, whether there is scientific norms

03:34:58  1    about what you can do with somebody else's work as opposed

03:35:02  2    to, you know, the merits kind of argument.

03:35:04  3               MR. WALTER:  I don't think there is any

03:35:06  4    testimony.  I think there is deposition testimony from

03:35:08  5    Dr. Chang that --

03:35:10  6               MR. REINES:  They may try to work around the

03:35:13  7    deposition testimony, but he didn't say that they did

03:35:16  8    anything wrong.

03:35:17  9               THE COURT:  Okay.

03:35:17 10               MR. REINES:  In prosecution, in pursuing the

03:35:20 11    patent in prosecution.

03:35:21 12               THE COURT:  Okay.  All right.

03:35:27 13               MR. REINES:  All right.

03:35:28 14               THE COURT:  So what else do you have to say?

03:35:30 15               MR. REINES:  Nothing on this.  And then on

03:35:33 16    Saxston, you probably will be more relieved to know since

03:35:36 17    Mr. Powers did have an opportunity to process that, we're

03:35:38 18    going to work together and see if we can narrow or eliminate

03:35:42 19    that issue without your involvement.

03:35:44 20               THE COURT:  That's ideal.

03:35:46 21               MR. REINES:  I figured that might be.

03:35:47 22               THE COURT:  I guess ideal would be to bring it

03:35:49 23    to a conclusion.

03:35:50 24               MR. REINES:  We hope to.

03:35:51 25               THE COURT:  That is a good start.

03:35:59 1        MR. REINES:  I guess the only other thing that I

03:36:01 2   didn't fully hit and again I try to be concise is the jury

03:36:06 3   notebook issue.

03:36:07 4        THE COURT:  That's what I was looking at my list

03:36:09 5   here.  So I think I did actually rule on this.  And I don't

03:36:23 6   know whether this is a sticking point, but for the juror

03:36:25 7   notebooks, yes, Quake ought to be in it.  If the arguments

03:36:30 8   is they want to put the provisional patent application in

03:36:33 9   it, no, I don't think that should be in it.  Does that take

03:36:37 10  care of the notebooks issue?

03:36:39 11       MR. REINES:  I mean, we would still maintain the

03:36:41 12  objection, I mean, for what it's worth, but that -- I don't

03:36:46 13  know what's going to be permitted, but what's going to be

03:36:51 14  suggested, we have quasi technical people on the jury, to

03:36:55 15  have them go through the comparison exercise.

03:36:57 16       THE COURT:  Wait a second.  So in the notebooks,

03:37:00 17  what is the comparison exercise?  They have Quake and they

03:37:05 18  have your patent.

03:37:06 19       MR. REINES:  Right, there is commonality.  If

03:37:08 20  the allegation is being made that there is copying and it's

03:37:11 21  pernicious, it overemphasizes --

03:37:15 22       THE COURT:  I thought this was limited to

03:37:16 23  provisional application.

03:37:18 24       MR. REINES:  No, the actual patent has some

03:37:21 25  common subject matter, it's not the same degree.

03:37:24 1          THE COURT:  So it's one thing for me to possibly

03:37:33 2   exclude things that I consider to be excludable as either

03:37:41 3   irrelevant or as so little probative value that the

03:37:47 4   prejudicial value and the waste of time value is

03:37:50 5   sufficiently high, which is what I would be doing in terms

03:37:55 6   of the provisional application.  Quake is their lead for

03:37:59 7   better or for worse prior art reference; right?

03:38:03 8          MR. REINES:  It is the centerpiece of their

03:38:05 9   prior art which is why the re-examine is so important.

03:38:10 10         THE COURT:  So what I said when we talked about

03:38:12 11  this before, and I think this is exactly what I'm saying

03:38:15 12  now, is if you want to put a notebook in front of them with

03:38:19 13  your patents, they have got counterclaims; right?

03:38:24 14         MR. POWERS:  Yes, Your Honor.

03:38:25 15         THE COURT:  They have got counterclaims where

03:38:27 16  they're the equivalent of your patent is Quake.  So if the

03:38:32 17  jury gets a juror notebook, they're going to have Quake and

03:38:36 18  they're going to have your patents plus whatever else you

03:38:40 19  decide to put in there.  I'm not keeping Quake out of the

03:38:44 20  case because there is some overlap.  And just because they

03:38:48 21  get it, that doesn't -- I mean, they get it.  That's going

03:38:56 22  to come in to evidence.

03:38:59 23         MR. REINES:  All right.  So on the jury notebook

03:39:01 24  question, the argument that we're making, let me be clear

03:39:05 25  about this, is that the norm is not to have prior art, but

03:39:09  1    let's just say that's a neutral thing, in the facts of this

03:39:12  2    case where there is inflammatory arguments that are going to

03:39:16  3    be made or want to be made or hinted at or implicit or

03:39:20  4    whatever it is, having the jurors walk around with a

03:39:23  5    notebook with the two things next to them is not wise

03:39:29  6    because it exacerbates a problem area.

03:39:33  7              That's our request on the jury notebook.  And at

03:39:34  8    a minimum because the original argument that the court --

03:39:37  9    the court didn't address the argument about copying when it

03:39:41 10    kept out the ex parte re-exam in the order the other day,

03:39:45 11    what it focused on is we believe the fictions.  We believe

03:39:48 12    the combination is different from what is the Patent Office,

03:39:51 13    we didn't get to reply so we didn't get to make a point.

03:39:55 14              THE COURT:  I'm sorry about that.  I looked at

03:39:57 15    the docket.  Did I tell you --

03:40:01 16              MR. REINES:  It was oral, I think.

03:40:02 17              THE COURT:  No, I understand there wasn't a

03:40:05 18    written order.  Oral orders unfortunately count.  Did I tell

03:40:09 19    you that you had within a certain time to respond?

03:40:13 20              MR. REINES:  Yes.

03:40:13 21              THE COURT:  What time did I tell you?

03:40:15 22              MR. REINES:  It was the end of the day Tuesday.

03:40:17 23              THE COURT:  So I ordered slightly before the end

03:40:21 24    of the day Tuesday?

03:40:22 25              MR. REINES:  I talked to Mr. Farnan and I said

03:40:24  1    what's the wisdom of asking for reconsideration.

03:40:27  2              THE COURT:  I'm sorry, that's part of --

03:40:29  3              MR. REINES:  That's okay.

03:40:30  4              THE COURT:  Well, you know, partly because --

03:40:48  5    because you were writing letters, right.

03:40:51  6              MR. REINES:  It was letter format.

03:40:52  7              THE COURT:  So normally when I have letters, I

03:40:55  8    only have opening and answering, and so I thought it was

03:40:58  9    through, that's the reason I did it, if I had -- and I'm

03:41:02 10    sure I said exactly what you said, which was yeah, you can

03:41:06 11    reply, even though -- well, like I said, I'm sorry about

03:41:10 12    that.

03:41:12 13              MR. REINES:  I wasn't gratuitously raising that,

03:41:16 14    the point I was going to make is since the grounding of the

03:41:18 15    decision and the argument that seems to have won the day is

03:41:22 16    they actually have an different combination from the ex

03:41:25 17    parte versus what they're arguing at trial, I would at a

03:41:29 18    minimum, the book should have all the kind of other

03:41:32 19    references that were supposedly crucial in the book, too, so

03:41:36 20    it's not walking around with Quake and the patents.

03:41:38 21              And I guess if the Court is comfortable, we

03:41:42 22    don't need to do this at all, that would resolve it.  We're

03:41:45 23    not insisting on the patents being given to the jury.  Maybe

03:41:48 24    that's the best solution of all.

03:41:50 25              THE COURT:  That's always a possible solution.

03:41:52  1          MR. REINES:  We would request that.  We would

03:41:56  2     request that.  It avoids a touchy issue here.

03:41:59  3          THE COURT:  Okay.  Usually it's the parties who

03:42:02  4     want to give a notebook to the jury.  You know, I think it's

03:42:06  5     a helpful thing, but I never tell people to do a notebook

03:42:11  6     unless they want to do a notebook.

03:42:12  7          MR. REINES:  So we're withdrawing that.

03:42:14  8          THE COURT:  So if you want to -- I don't know,

03:42:16  9     is there anything to give them now, my claim construction

03:42:19 10     order, or do you want to just forego --

03:42:23 11          MR. REINES:  The claim construction order can go

03:42:24 12     with the jury instructions.

03:42:26 13          THE COURT:  Yes.  Actually what I prefer on that

03:42:29 14     is just have a separate, you know, whoever, I guess that

03:42:35 15     would be Mr. Reines, would you have your expert say, you

03:42:39 16     know, here is Joint Exhibit 1, the Judge's claim

03:42:45 17     construction order, did you consider this, and then it will

03:42:48 18     be admitted or -- and I will -- and the jury will get it.

03:42:53 19     But you know, particularly, you know, reading claim

03:42:59 20     construction orders and jury instructions is just death.

03:43:03 21          MR. REINES:  I meant give it with them.  I just

03:43:05 22     meant as a practical matter, just --

03:43:08 23          THE COURT:  I can give it as a package when we

03:43:12 24     get there.

03:43:12 25          MR. REINES:  And so the relief that we would

03:43:14  1    request at a minimum is exclusion of the provisional which

03:43:18  2    is a side show.  Second is no insinuation or implication

03:43:24  3    that it's wrongdoing.  They don't have an allegation that it

03:43:27  4    is.  And it gets into again a collateral matter.  And it

03:43:32  5    would justify a hundred percent -- well, I have already

03:43:36  6    argued the ex parte coming in and to keep that out.  That's

03:43:40  7    it.  I would keep it out in general the argument of copying.

03:43:44  8          The real answer is to let this re-exam in and

03:43:48  9    let them argue that copying shows obviousness which is what

03:43:52 10    they want to do.  If both things are in there, it's fair

03:43:55 11    balanced thing.  It's no more complicated to consider the ex

03:43:57 12    parte re-exam concept, they went back, they explained this

03:44:00 13    point, the patent found still nonobvious.  It's no more

03:44:04 14    complicated than that with the ninety things that we're

03:44:07 15    doing next week anyway.

03:44:09 16          THE COURT:  Sometimes you have heard the phrase

03:44:11 17    the camel, the straw that breaks the camel's back.

03:44:15 18          MR. REINES:  All right.  Thank you, Your Honor.

03:44:21 19          MR. POWERS:  One quick point about the re-exam.

03:44:31 20    The reason for Your Honor's prior ruling remains primacy

03:44:37 21    here which is the confusion that they want to sew is to say

03:44:40 22    that the Patent Office blessed this in light of the

03:44:45 23    allegations of copying.  But what the Patent Office actually

03:44:49 24    ruled on was a different combination, so it did not rule on

03:44:52 25    the combination that the jury is going to hear.  So that is

03:44:56 1    intensely confusing and prejudicial to us, so that's the

03:45:00 2    reason I think Your Honor ruled previously and that reason

03:45:03 3    applies with greater force here when they're trying to make

03:45:05 4    the argument that the Patent Office blessed it.

03:47:37 5           The second point is that they keep saying that

03:47:44 6    the Patent Office blessed this over Quake.  It's not a

03:47:48 7    question of Quake.  It's a question of Quake plus X or Quake

03:47:52 8    plus Y that's.  The obviousness combination.

03:47:54 9           The Patent Office ruled on that Quake plus X,

03:47:57 10   and that's not at issue in front of this jury.  Quake plus Y

03:48:00 11   is, and Quake plus Z, and Quake plus A.  And that

03:48:04 12   combination is not ruled on in the re-exam.

03:48:07 13          Second, I did not hear any real rebuttal as to

03:48:13 14   how this doesn't bear on his credibility.  He did something

03:48:17 15   which on its face makes it look like he didn't invent what

03:48:22 16   he claimed to invent.  That goes to his credibility we get

03:48:25 17   to.  We should be able to test that with him in front of the

03:48:28 18   jury.

03:48:28 19          And I think it's telling that Mr. Reines, who

03:48:34 20   does know what he'll say, made no proffer about it.  He

03:48:37 21   didn't say, Well, he's going to put on an explanation.  Here

03:48:37 22   it is.

03:48:42 23          No, he didn't say that.  So we know that the

03:48:45 24   answer is it's not something that looks good.

03:48:48 25          And that bears on his credibility specifically.

03:48:52  1    Not just generally, but specifically on the what he

03:48:56  2    invented, and that goes to the heart of any

03:49:00  3    cross-examination of the inventor.

03:49:05  4            With regard to the experts, I think that raises

03:49:10  5    another point of relevance because it goes to the

03:49:13  6    credibility of their expert.  Mr. Reines correctly

03:49:18  7    summarized Dr. Chang's position which says, obviously, this

03:49:22  8    shows the significance of Quake, that he would copy so much

03:49:25  9    of it into his own application.  And then he goes on to

03:49:29 10    talk about the substance.

03:49:29 11            Their expert's response is, Oh, this is just an

03:49:32 12    in general background.  And that's how Mr. Reines summarized

03:49:37 13    it, and that's generally accurate.

03:49:38 14            Well, that goes directly to that witness'

03:49:41 15    credibility because there is no argument that those 16 pages

03:49:46 16    are other than in the background, portions of a preferred

03:49:49 17    embodiment of my invention, and then two pages of

03:49:53 18    description.  Not a general background of the prior art.  So

03:49:56 19    now we have another witness whose credibility is directly

03:50:00 20    implicated by all of this.

03:50:04 21            Finally, the argument that the provisional

03:50:06 22    should be kept out is absolutely inconsistent with their

03:50:11 23    positions in the case.  Their position in the case is that

03:50:14 24    that patent is entitled to that priority date.  If that's

03:50:19 25    provisional, and provisional is the basis for that.  So they

03:50:23  1   have to prove that, and that's the provisional that has to

03:50:26  2   be in evidence for that.

03:50:28  3            And we should be allowed to test that assertion

03:50:30  4   by them.  That, again, goes to the credibility of their

03:50:34  5   expert who took that position.  It goes to Bio-Rad's

03:50:38  6   credibility because they took that position in an

03:50:39  7   interrogatory answer, and that's binding.

03:50:42  8            And they can't now run from all of that.

03:50:45  9   Obviously, fundamentally it goes to Ismagilov's credibility.

03:50:50 10   But putting all of that aside, the sort of bootstrap

03:50:54 11   argument that they're allowed to rely on the provisional up

03:50:58 12   until trial, which causes us to make decisions to drop prior

03:51:01 13   art references that otherwise we would very much like to

03:51:04 14   have used, because if they are relying on it, as they said

03:51:07 15   they did, those references would not be prior art.  If

03:51:10 16   they're not relying on it, those references would be prior

03:51:13 17   art.

03:51:13 18            So now we are severely prejudiced by not being

03:51:16 19   able to rely on prior art references that clearly would be

03:51:19 20   prior art that have very different implications and are very

03:51:23 21   strong.  And they should not be allowed to have it both

03:51:27 22   ways.  They took the position against prior art that they

03:51:33 23   are entitled to provisional priority date.  They're stuck

03:51:35 24   with that.

03:51:36 25            THE COURT:  So Mr. Powers, I ask you this

03:51:38 1   question.  I don't know whether -- it's kind of out of the

03:51:42 2   blue, so you might not know the answer.  But in the Pretrial

03:51:48 3   Order, does it say an issue for trial is what the priority

03:51:51 4   date of the patents is?

03:51:54 5                MR. POWERS:  Don't know the answer.

03:51:56 6                THE COURT:  Does somebody?

03:51:56 7                MR. POWERS:  I suspect there is something like

03:51:58 8   that, but I don't know the answer.  We'll find out.  I

03:52:02 9   haven't memorized it.

03:52:03 10               MR. REINES:  Your Honor, I don't believe that's

03:52:05 11  in there.  But on this question, if they thought the

03:52:07 12  provisional was so crucial to bring in, they could have kept

03:52:10 13  the prior, and whether it was adequate --

03:52:13 14               MR. POWERS:  We don't -- the point is we didn't

03:52:16 15  question whether it was adequate to support it.  On that

03:52:19 16  issue, we thought they had bettered that argument.  So given

03:52:23 17  the fact that they took that position, we relied on that

03:52:26 18  position and dropped the prior art reference.  So it's not

03:52:28 19  like we should be faulted for not preserving argument that

03:52:33 20  we didn't think was viable.

03:52:34 21               THE COURT:  No.  No.  So, no.  That's the point.

03:52:37 22  I know everybody in the room knows this is we narrow down

03:52:41 23  the issues.  You mostly narrow down the issues as we get to

03:52:44 24  trial.  And so I wouldn't normally, and this never comes up,

03:52:55 25  but if the plaintiff said, I'd like to introduce the

03:52:59  1    provisional application, because even though the priority

03:53:03  2    date is irrelevant to the question of any prior art being

03:53:07  3    prior art, and it's irrelevant to the question of whether or

03:53:13  4    not the asserted claims relate back to -- you know, there's

03:53:18  5    no disputed issue about this, I'd like to introduce it any

03:53:22  6    way.  You know, my inclination would be it's irrelevant.

03:53:27  7    It's not an issue in the case.  The jury is going to get a

03:53:30  8    thousand exhibits in a week anyhow.  Why are we giving them

03:53:33  9    exhibits about irrelevant things?

03:53:36 10            And so I think I understand what you're saying,

03:53:41 11    Mr. Powers, that you'd really like it in the case.  And if

03:53:48 12    you had to assert the prior art that is accurate to do so,

03:53:52 13    you would do so.  But I don't know, maybe expecting a

03:53:56 14    different ruling from me or whatever, you chose instead to

03:54:01 15    not argue about the priority date.

03:54:06 16            And so to me, the plaintiff needs to introduce

03:54:12 17    that, or they can't have a priority date that's not in

03:54:15 18    dispute.  I reject that.

03:54:21 19            MR. POWERS:  But it would have been in dispute.

03:54:24 20    My point is it's prejudicial to us.

03:54:25 21            THE COURT:  We can't try the hypothetical case.

03:54:28 22    We have to try the actual case.

03:54:29 23            MR. POWERS:  I'm not talking about the trial.

03:54:31 24    I'm talking about the consequences of taking a binding

03:54:34 25    position and causing reliance on that, and then trying now

03:54:39 1    to avoid the consequences of that decision.

03:54:42 2                    THE COURT:  But --

03:54:43 3                    MR. POWERS:  That is what I am talking about.

03:54:45 4                    THE COURT:  But they're not actually -- I think

03:54:48 5    their binding position is this is the priority date.

03:54:50 6    They're not backing off of that.  This is why we have the

03:54:53 7    priority date.  They're not backing off of that.  Their

03:54:58 8    position hasn't changed.

03:54:59 9                    MR. POWERS:  Their position -- well, if they

03:55:01 10   don't introduce it the provisional, the provisional has to

03:55:04 11   change.

03:55:05 12                   THE COURT:  Well, I think it --

03:55:07 13                   MR. POWERS:  Well, how is that?

03:55:09 14                   THE COURT:  Well, it's not a disputed issue at

03:55:12 15   trial.  It's too late to make that a disputed issue.  It's

03:55:17 16   agreed as to what the priority date is.

03:55:20 17                   MR. POWERS:  Oh, it's not agreed.  So in answer

03:55:23 18   to Your Honor's question, Page 256, the Pretrial Order issue

03:55:26 19   number three was priority date.  So it's in the Pretrial

03:55:30 20   Order.  But --

03:55:31 21                   THE COURT:  But when you say it's not agreed,

03:55:33 22   neither side has experts that are going to call and argue

03:55:37 23   about, you know, whether or not the description in the

03:55:43 24   provisional supports a claim it essentially issues.

03:55:46 25                   MR. POWERS:  So we should be allowed.  I may not

03:55:52  1    be making myself clear, or you may not be agreeing.

03:55:55  2              THE COURT:  I'm not sure which.

03:55:56  3              MR. POWERS:  But let me try again.  I don't

03:55:58  4    disagree with you that where we are now is where we are

03:56:02  5    based on what's happened until now.  My point is a prejudice

03:56:06  6    point which ought to prevent them from changing their

03:56:09  7    position.  Their position -- you say their position hasn't

03:56:13  8    changed.  It has.

03:56:14  9              THE COURT:  Okay.  How?

03:56:15 10              MR. POWERS:  They cannot possibly rely on that

03:56:17 11    priority date for the provisional without putting it into

03:56:21 12    evidence.  That is their position.  They intend to -- they

03:56:24 13    have taken that position and --

03:56:27 14              THE COURT:  See, that's where I disagree.  I

03:56:29 15    think their position is the priority date is whatever it is.

03:56:33 16    They didn't in these interrogatories or admissions say, and

03:56:38 17    we admit that this will be Exhibit Number 1 at the trial.

03:56:43 18              MR. POWERS:  They took the position that the

03:56:45 19    priority date was May 2002 based explicitly on the

03:56:49 20    provision.

03:56:49 21              THE COURT:  Right.  But that is not the same

03:56:51 22    thing as saying, and therefore, we agree that no matter

03:56:53 23    what, and that will be an exhibit at trial.

03:56:55 24              MR. POWERS:  They didn't say that.  But my point

03:56:59 25    is a prejudice point that they should not now -- because the

03:57:04 1    normal -- so if they had taken that position, and we had

03:57:09 2    used the prior art, they would have to prove it.  And so we

03:57:14 3    ought to be allowed to use the other prior art that now

03:57:16 4    makes that a real issue because we compromised on our

03:57:20 5    position that that was their position.  And either they

03:57:24 6    ought to be forced to put in the provisional and prove it,

03:57:26 7    and we can say this --

03:57:29 8              THE COURT:  No, but see that's the thing,

03:57:31 9    Mr. Powers, is they don't have to prove it because it's not

03:57:36 10   an issue in the trial.

03:57:39 11             MR. POWERS:  And the only reason it's not an

03:57:40 12   issue in the trial is because we reasonably relied on their

03:57:44 13   position, and now they're changing that position.

03:57:46 14             THE COURT:  Okay.  Well, I don't think we're

03:57:49 15   making any progress here in terms of understanding each

03:57:52 16   other, but I'm quite sure that I'm not going to require a

03:58:00 17   provisional application to be put into evidence for what is

03:58:05 18   at this point an undisputed priority date.  And what's more

03:58:12 19   is that is essentially irrelevant to the prior art that

03:58:17 20   you're actually going to introduce.

03:58:20 21             MR. POWERS:  It's not at all irrelevant.  It's

03:58:22 22   relevant to Quake which is a primary reference.  It shows

03:58:26 23   the supports of Quake.

03:58:27 24             THE COURT:  All right.  We've spoken enough on

03:58:30 25   this.  All right.

03:58:31  1          So what do you have to say about the re-exam

03:58:36  2    certificate where apparently I issued an Order without

03:58:39  3    waiting for their reply.  I guess, you actually have already

03:58:43  4    addressed that.

03:58:44  5          MR. POWERS:  I've addressed that, and I think

03:58:46  6    that they've said everything that they've said they would

03:58:48  7    have said in reply at the original argument.  They made all

03:58:52  8    their original arguments, so I think that issue should

03:58:55  9    remain the same.

03:58:56 10          THE COURT:  Okay.

03:58:58 11          MR. REINES:  Your Honor, just --

03:58:59 12          THE COURT:  Well, hold on.  Are you done?

03:59:01 13          MR. POWERS:  I'm done on the re-exam issue.

03:59:07 14          THE COURT:  Yeah.  What other issue is left?

03:59:09 15          MR. POWERS:  So there's a couple of quick minor

03:59:11 16    ones.  You will recall at the last hearing --

03:59:15 17          THE COURT:  Well, actually before you go on to

03:59:17 18    the new stuff, which I think is what you're doing --

03:59:20 19          MR. POWERS:  Yes.

03:59:20 20          THE COURT:  -- Mr. Reines wants to say something

03:59:22 21    about the old stuff.  So why don't we finish the old stuff

03:59:25 22    before going on to the new stuff.

03:59:27 23          MR. REINES:  Thank you, Your Honor.  There's two

03:59:29 24    meritless assertions that I want to address.  One is that

03:59:33 25    the distinction between the re-exam and what's going to be

03:59:36 1   litigated here is the combination.  Clearly, the issue, sole

03:59:41 2   issue of the re-exam is to make the point about what Quake

03:59:44 3   teaches because the argument is what Quake teaches.

03:59:47 4          What we would have -- what we had written up for

03:59:49 5   the reply is if you look at the two different references,

03:59:53 6   they both just teach PCR conditions.  The figure is actually

03:59:56 7   identical to the two.  We never got an opportunity to make

04:00:00 8   that point.

04:00:01 9          It's just a --

04:00:02 10         THE COURT:  I'm sorry.  Because you're going

04:00:05 11  quicker than I can follow you.

04:00:07 12         MR. REINES:  Sure.

04:00:07 13         THE COURT:  What you're saying is the secondary

04:00:09 14  references, X and Y, you're holding them up to show they're

04:00:13 15  the same?

04:00:14 16         MR. REINES:  Yes --

04:00:14 17         THE COURT:  Okay.

04:00:15 18         MR. REINES:  -- for all intents and purposes.

04:00:17 19  On top of that, the issue for which, under American Hoist we

04:00:21 20  would rely on the re-exam is that its's what Quake teaches

04:00:24 21  that's the issue.  It's not -- it's clear that that's the

04:00:28 22  issue.

04:00:28 23         So the argument to say, Well, they're different

04:00:31 24  because of the secondary reference when the whole point

04:00:34 25  that's being made is the copying.  The only point to rely on

04:00:38   1    the re-exam is it's got the copying issue in it.  So that's

04:00:41   2    point one which is identical between the two.  In other

04:00:44   3    words, the issue that they want to argue about was made to

04:00:46   4    the Patent Office and didn't carry water.

04:00:50   5            The second thing that is meritless that I want

04:00:53   6    to point out is this argument about Thorsen being a

04:00:56   7    reference and just coming attractions for the Court on this

04:01:00   8    point.

04:01:00   9            The reason they dropped Thorsen had nothing to

04:01:02  10    do about this.  That's just a baseless point.  Thorsen is

04:01:06  11    the one where they -- is Quake's doctoral student, and it's

04:01:11  12    his thesis where they actually tried to do work on using the

04:01:17  13    Quake stuff that was never done for reactions, and it

04:01:20  14    failed.  And Thorsen will be definitely explored next week.

04:01:26  15            But more I'm going to just -- there's an

04:01:29  16    assertion that's being made that's not -- doesn't have a

04:01:31  17    basis to it.

04:01:32  18            THE COURT:  Okay.  All right.  Thank you.

04:01:36  19            All right, Mr. Powers.  What else do you want to

04:01:39  20    talk about?

04:01:39  21            MR. POWERS:  The last time we were before you,

04:01:42  22    you asked both of us pointed questions as to whether the

04:01:45  23    list of will-call witnesses was, in fact, the final final

04:01:49  24    list of will call.  Both of us said yes.

04:01:53  25            We were told by counsel for Bio-Rad a few days

04:01:58 1    ago that they're considering calling Dr. Shinoff, but aren't

04:02:05 2    telling us one way or another.  I think we should get an

04:02:08 3    answer to that today.

04:02:09 4              The second thing is -- and we asked whether they

04:02:13 5    wanted to make a motion for leave to call him, and they've

04:02:17 6    not made such a motion.  And we would object to such a

04:02:20 7    motion.  We would object to even the issue being considered

04:02:22 8    and ask Your Honor to say he can't come.

04:02:25 9              The second question is by noon today, we were

04:02:27 10   supposed to have gotten the final list of claims, and it's

04:02:31 11   4:00, and we haven't gotten them.  And --

04:02:33 12             THE COURT:  All right.  Well, let's deal with

04:02:35 13   the second thing first.

04:02:38 14             MR. REINES:  There was no -- yeah.  There was no

04:02:41 15   known order.  Again, this is sort of in the Thorsen

04:02:44 16   category.  The statement was that we would get ours out by

04:02:47 17   the end of today, and then you clarified that the invalidity

04:02:52 18   position from 10X should come tomorrow at noon.

04:00:26 19             THE COURT:  I remember that.

04:00:27 20             MR. REINES:  There won't be anything in the

04:00:29 21   record anywhere that says anything other than that, this is

04:00:31 22   kind of like the Thorsen part.

04:00:33 23             MR. POWERS:  I don't think Your Honor said end

04:00:34 24   of day.

04:00:35 25             THE COURT:  Didn't I originally say end of the

04:00:39 1    day for them, then end of tomorrow for you, and then

04:00:44 2    somebody with a silver tongue or something talked me into

04:00:48 3    like gee, that's kind of late, and I said yeah, okay, how

04:00:52 4    about noon on Friday.  I think that's the way it went.

04:00:55 5             MR. POWERS:  The switch was their's was going to

04:00:58 6    be later and you moved that up to Thursday and moved ours to

04:01:02 7    Friday as well.  I just want a definite time when we're

04:01:05 8    going to get it.

04:01:06 9             THE COURT:  When was the definite time?

04:01:08 10            MR. REINES:  The end of the day today.  Five

04:01:10 11   o'clock.

04:01:11 12            THE COURT:  Thank you, Mr. Reines.

04:01:12 13            MR. REINES:  No problem.

04:01:13 14            THE COURT:  You have gave us the certainty I'm

04:01:15 15   looking for.

04:01:19 16            All right.  So there was also a question which I

04:01:21 17   guess I had put off by this reckoning tomorrow of

04:01:25 18   indefiniteness.  Is that still up in the air?

04:01:27 19            MR. POWERS:  We'll provide that tomorrow.

04:01:29 20            MR. REINES:  So that may entail from our

04:01:32 21   perspective, we'll see it, and then I assume we'll submit a

04:01:37 22   letter to the Court whether they think it's appropriate for

04:01:41 23   the jury to see it after we see it.

04:01:43 24            THE COURT:  Sure.  Go ahead.  Submit it.  What

04:01:45 25   about Dr. Shinoff?  First off, you probably know, is it

04:01:52 1    Dr. Shinoff or Shinoff?

04:01:54 2                MR. REINES:  Shinoff, like the shin in your leg.

04:01:57 3                THE COURT:  Thank you.

04:01:58 4                MR. REINES:  So the situation with that first of

04:02:00 5    all, I have never known to go from a may to a will is an

04:02:05 6    order thing.

04:02:05 7                THE COURT:  Do you know what you're doing with

04:02:07 8    him?

04:02:08 9                MR. REINES:  Yes.  And that is it turns

04:02:13 10   logically on what happens with Daubert that came up.  I

04:02:17 11   think we need to see the Daubert before we can make the

04:02:20 12   decision.  We told them it's likely we are going to call

04:02:23 13   him.  It's not a will, because I don't want to give him a

04:02:27 14   false will.  It depends what's happens.

04:02:29 15               When we get the ruling, we'll look at it, we'll

04:02:32 16   let them know in a timely way.  I expect to cooperate on

04:02:35 17   witnesses.  Everything else is not debated, and we told them

04:02:39 18   we think we should plan on him coming forward, but it really

04:02:43 19   turns on Daubert because he's so bound up with that.

04:02:48 20               THE COURT:  So basically what you're saying is

04:02:53 21   if the Daubert motion is denied, then you're expecting you

04:03:00 22   will call him.  If it's granted, you're expecting you won't

04:03:04 23   call him.

04:03:04 24               MR. REINES:  I would be lying if I told you that

04:03:06 25   we made the final conclusion on that, to be honest.  It's

04:03:11 1    obviously a difficult decision and it would involve client

04:03:16 2    involvement since he's the client, A.  And B, if it got

04:03:20 3    stricken, it would require further discussion.  Plus there

04:03:22 4    is the two-day notice and we'll comply with the two-day

04:03:27 5    notice.  So you know, they just took his deposition, and I'm

04:03:31 6    not sure what the issue is.

04:03:32 7            MR. POWERS:  Can we get a final answer one way

04:03:35 8    or the other at the close of business tomorrow?

04:03:37 9            THE COURT:  I think I don't know when I'm going

04:03:40 10   to get out whatever it is I'm getting out.  You know, it

04:03:52 11   strikes me that you kind of got an answer which is

04:03:58 12   reasonably likely, but reasonably likely if you lose the

04:04:06 13   motion, probably very likely if you lose the motion I guess.

04:04:10 14   But it seems like something less than certainty.  So

04:04:15 15   Mr. Reines, after you get the motion, when are you going to

04:04:22 16   decide?

04:04:22 17           MR. REINES:  We'll meet obviously with the

04:04:24 18   client as promptly and they should be able, it depends what

04:04:28 19   time of day or whatever, we will do our very best to get

04:04:31 20   them an answer within -- I mean, depends when it comes, but

04:04:36 21   within a matter of hours, not days.  How about that?

04:04:40 22           THE COURT:  All right.

04:04:41 23           MR. REINES:  I'm not going to delay informing

04:04:44 24   them of the situation, I represent to the court, as soon as

04:04:47 25   we practically can we will let them know and put it as a

04:04:52  1   priority item.

04:04:53  2              THE COURT:  All right.  Do you have any more to

04:05:01  3   say?

04:05:01  4              MR. POWERS:  Not to that.  Your Honor, there is

04:05:03  5   two housekeeping matters I want to address.

04:05:04  6              THE COURT:  Okay.  Housekeeping.

04:05:06  7              MR. POWERS:  One is Your Honor made a comment at

04:05:07  8   the last hearing that you would expect the parties to

04:05:11  9   exchange opening slides.

04:05:13 10              THE COURT:  I did, or I don't know what I did,

04:05:15 11   but I would.

04:05:16 12              MR. POWERS:  And I want to advise the Court that

04:05:18 13   we reached agreement that we will do so with the timing

04:05:22 14   sequence for objections and resolutions, et cetera, with the

04:05:25 15   agreement that neither party will make any substantive

04:05:28 16   changes to the slides upon receiving the others, other than

04:05:31 17   whatever specifically is required to cure an objection.

04:05:34 18              MR. REINES:  And we're in agreement.  I think we

04:05:36 19   both would want that requirement, so we're in agreement.

04:05:39 20              THE COURT:  As long as you're in agreement, it's

04:05:42 21   considered to be so ordered.

04:05:43 22              MR. POWERS:  The last housekeeping item deals

04:05:45 23   with the process for admitting exhibits through experts.

04:05:49 24   This is primarily damages experts where there is a bunch of

04:05:53 25   them.

04:05:53 1                    THE COURT:  Okay.

04:05:53 2                    MR. POWERS:  And our proposal is to vary from

04:05:59 3       the normal practice of admitting them one by one at each

04:06:03 4       time just because the parties will have met and conferred

04:06:06 5       about the exhibits the night before with the slides, et

04:06:09 6       cetera, and the list of exhibits.

04:06:12 7                    THE COURT:  So you have agreement as to how you

04:06:17 8       would like to do that?

04:06:19 9                    MR. POWERS:  We have raised it.  I don't think

04:06:20 10      we have an agreement.  We don't have a disagreement, we just

04:06:23 11      don't have an agreement.

04:06:24 12                   MR. REINES:  We haven't heard on this.  If it's

04:06:27 13      good for damages and technical, we're comfortable on both.

04:06:31 14      I think it's smart.

04:06:32 15                   MR. POWERS:  Then we have agreement.

04:06:34 16                   THE COURT:  Well, it sounds like you have an

04:06:36 17      agreement; right?

04:06:38 18                   MR. REINES:  Assuming that it applies to all

04:06:40 19      experts, yes.

04:06:41 20                   MR. POWERS:  Yes.

04:06:41 21                   THE COURT:  Okay.

04:06:50 22                   MR. POWERS:  There is one more item on my list

04:06:53 23      that Your Honor may not have time to take up, but I would

04:06:55 24      like to have a process for taking it up.  There are exhibits

04:07:01 25      that both sides have been trying to preclear.

04:07:04  1                THE COURT:  Okay.

04:07:05  2                MR. POWERS:  There are a few disputes that

04:07:07  3      remain, some which I think are going to be relevant to

04:07:12  4      openings.  And so we wanted to have a process by which we

04:07:17  5      could do that before Monday morning.  And I think it's

04:07:23  6      probably -- we have I think three or four, they have I think

04:07:27  7      three or four.  We're prepared to do it now.  But I do think

04:07:34  8      it would be better to do it now than Monday morning for

04:07:37  9      opening.

04:07:38 10                THE COURT:  No, I understand Monday mornings is

04:07:40 11      not a good time to do it.

04:07:46 12                MR. POWERS:  I'll just give you an example as to

04:07:49 13      how easy this will be.  There is an e-mail to Dr. Saxonov

04:07:56 14      from Dr. Ismagilov where they're objecting, they think it's

04:08:00 15      hearsay, but it's an e-mail that he received and that he

04:08:04 16      produced, so it's hard to see --

04:08:08 17                THE COURT:  Presumably what purpose are you

04:08:10 18      offering it for?

04:08:11 19                MR. POWERS:  One of them is a very long list of

04:08:14 20      companies that they have attempted to license his patents to

04:08:18 21      who refused, and it's coming from the University of Chicago,

04:08:23 22      so it's an admission by Chicago, so the idea that this is

04:08:28 23      hearsay I think is silly.  It's from one party to another.

04:08:31 24      And it's clearly an admission.

04:08:33 25                THE COURT:  When you say party, Dr. Ismagilov,

04:08:36 1 is he a party?

04:08:38 2     MR. POWERS:  No, University of Chicago.

04:08:40 3     THE COURT:  I know the University of Chicago is.

04:08:42 4     MR. POWERS:  It's from the licensing person in

04:08:44 5 Chicago who is also going to be a witness, to Ismagilov who

04:08:50 6 is going to be a witness, there is no set of facts that

04:08:54 7 makes that e-mail not come in.  They're trying to keep it

04:08:56 8 out.

04:08:57 9     THE COURT:  You're saying the author of the

04:08:59 10 e-mail is going to show up and testify?

04:09:01 11     MR. POWERS:  Yes.

04:09:01 12     THE COURT:  So presumably --

04:09:03 13     MR. POWERS:  And the recipient.

04:09:05 14     THE COURT:  So let me ask first the plaintiff.

04:09:20 15 Plaintiffs, do you want to do this right now or is

04:09:26 16 Mr. Powers taking you by surprise here?

04:09:29 17     MR. REINES:  No, I think it's a wise idea.  I

04:09:32 18 mean, it's an imposition on you, but if you're willing to

04:09:36 19 hang with us, it helps both sides.  I'm perfectly willing to

04:09:40 20 do this.

04:09:41 21     THE COURT:  I'm wondering whether you would

04:09:44 22 rather to do it tomorrow morning or whether you are

04:09:46 23 organized right now.  In that case we can keep on going.

04:09:51 24     MR. REINES:  I think we can probably do it now.

04:09:53 25     MR. POWERS:  I think it's probably better to do

04:09:55 1      it now.

04:09:55 2                      THE COURT:  Let's do it now then, at least until

04:09:57 3      I lose enthusiasm.

04:10:03 4                      So this particular exhibit, does it have a

04:10:06 5      number?

04:10:07 6                      MR. POWERS:  It does, Your Honor.

04:10:26 7                      THE COURT:  I take it Mr. Walters, you're now in

04:10:29 8      charge.

04:10:30 9                      MR. WALTERS:  I'm in charge.  Mr. Lavin, my

04:10:32 10     colleague, is going to be addressing these exhibit issues.

04:10:36 11                     THE COURT:  Mr. Lavin.  Go ahead.  I would like

04:10:40 12     to get us on the same page, Mr. Powers, with what you're

04:10:43 13     talking about.

04:10:44 14                     MR. POWERS:  There is a few of them.  The first

04:10:47 15     one, Your Honor, is DTX-689.

04:11:21 16                     THE COURT:  All right.  So Mr. Lavin, what's

04:11:24 17     your objection to this exhibit.

04:11:29 18                     MR. LAVIN:  Based on the parties' conversation

04:11:32 19     yesterday it was more of we were doing an exchange of

04:11:34 20     exhibits, so I think the ones that Mr. Powers is referring

04:11:37 21     to are 689.

04:11:39 22                     THE COURT:  689.

04:11:40 23                     MR. LAVIN:  612.

04:11:42 24                     THE COURT:  Let's do one at a time because all I

04:11:44 25     have is the one.

04:11:47 1          MR. LAVIN:  It was a reciprocal exchange.  We

04:11:50 2  were considering these exhibits whereas we have our own

04:11:53 3  exhibits that we would like to get in as well.

04:11:54 4          THE COURT:  What you're telling me is you don't

04:11:56 5  necessarily object to this.  It sounds like what you're

04:12:00 6  telling me is you haven't actually finished, this is

04:12:03 7  important, you want to get it resolved, but you haven't

04:12:06 8  tried to finish resolving it yourself?

04:12:09 9          MR. LAVIN:  That's correct.  We were only made

04:12:11 10  aware of these exhibits yesterday.

04:12:13 11          MR. POWERS:  There has been quite a bit of

04:12:15 12  discussion about this.  We're now at an impasse.

04:12:18 13          THE COURT:  It sounds like maybe you're not at

04:12:20 14  an impasse based on what Mr. Lavin says.  I'm looking at

04:12:26 15  this, I don't think they're going to be maintaining their

04:12:29 16  objection to this.

04:12:30 17          MR. POWERS:  They have for quite some time,

04:12:32 18  that's why I wanted to raise it.

04:12:34 19          THE COURT:  I appreciate that.  Why don't we do

04:12:37 20  this.  You said there is a handful of exhibits.  You may not

04:12:39 21  have used the word handful, you said there was a bunch of

04:12:42 22  easy ones.  Why don't you all -- why don't we recess for

04:12:48 23  today.  I will meet you whatever time you want tomorrow.

04:12:54 24  Honestly I will be here all day and can see you on short

04:13:00 25  notice or I can see you -- or I can set time right now which

04:13:07 1    will be 9:00 a.m. tomorrow, if you like.

04:13:11 2            MR. POWERS:  My suggestion would be to set it

04:13:13 3    later to give the parties more time hopefully to resolve it

04:13:16 4    if that's going to be possible.

04:13:17 5            THE COURT:  Like I said, I'm here all day.  What

04:13:22 6    time would you like?

04:13:22 7            MR. POWERS:  Why don't we say three o'clock just

04:13:25 8    to give parties time.

04:13:27 9            THE COURT:  Are you available then?

04:13:28 10           MR. REINES:  Yes, we're available.

04:13:30 11           THE COURT:  Three o'clock tomorrow.  And what

04:13:33 12   would be helpful is to the extent you don't resolve this

04:13:36 13   between yourselves, and I understand you probably won't

04:13:39 14   resolve everything, is to have basically two sets of

04:13:44 15   exhibits to just hand up of whatever the exhibits are that

04:13:47 16   are in dispute so we can not be shuffling around trying to

04:13:51 17   get to the same page.  Okay?

04:13:53 18           MR. POWERS:  Yes.  Your Honor, one final point.

04:13:56 19   I know that you haven't yet ruled, but I want to be clear

04:13:59 20   that our position is that if the provisional is not

04:14:03 21   admitted, they can't make a claim for priority back to the

04:14:06 22   provisional.

04:14:07 23           THE COURT:  Okay.

04:14:08 24           MR. POWERS:  Which means they're stuck with the

04:14:10 25   2003 date which then changes all sorts of things.  It

04:14:16  1   changes the effective date for purposes of simultaneous

04:14:18  2   invention which is an issue.  They can't have it both ways,

04:14:21  3   they're either stuck with an affirmative change in their

04:14:24  4   position, or the provisional has to come out.

04:14:28  5              THE COURT:  Let me ask you this.  If they

04:14:30  6   introduce into evidence the provisional application, are you

04:14:36  7   expecting testimony to go along with it?

04:14:39  8              MR. POWERS:  Certainly testimony, testing

04:14:44  9   Dr. Ismagilov's credibility would be relevant.

04:14:47 10              THE COURT:  No, no, you misunderstand my

04:14:49 11   question.

04:14:49 12              MR. POWERS:  The experts certainly on priority,

04:14:51 13   yes.

04:14:52 14              THE COURT:  So you won't have experts presumably

04:14:56 15   -- so you want it to be an issue where we have the experts

04:15:00 16   argue as to whether or not the application essentially

04:15:07 17   enables the later claims?

04:15:10 18              MR. POWERS:  They have taken that position in

04:15:12 19   the interrogator and we should be allowed to test that.

04:15:15 20   Their expert has taken a position on it, it's an issue.

04:15:19 21              THE COURT:  What do you have to say about that?

04:15:20 22              MR. REINES:  I have to say that it's not

04:15:22 23   relevant to any issues for trial.  If showing enablement and

04:15:25 24   reliance on new matter, therefore that implies that it's

04:15:29 25   part of the invention, therefore part of the invention is

04:15:32 1    obviousness, that's too many steps in the logic chain in any

04:15:37 2    event.

04:15:38 3              THE COURT:  Here is the thing is so tell me,

04:15:41 4    Mr. Reines, so do you agree that the pretrial order says the

04:15:56 5    priority of the patents is at issue for the trial?

04:15:59 6              MR. REINES:  There is eighty issues in there or

04:16:03 7    more.  And was it at one point something that someone puts

04:16:06 8    in, yes.  Is it an actual issue at trial, the answer is no.

04:16:10 9    The prior art is not a question about it, the difference is

04:16:12 10   one year.  No one is arguing there is a difference in the

04:16:15 11   state of art or anything else based on that, and it's just a

04:16:20 12   justification for a side show.

04:16:22 13             THE COURT:  I understand that.  Basically what I

04:16:27 14   would like to do is to say, which is what I think based on

04:16:33 15   what I heard is true, is too late.  It's not a disputed

04:16:45 16   fact.  The parties whether it's in the pretrial order or not

04:16:49 17   have been treating it as not a disputed fact, and just

04:16:54 18   because it may be the case that I would allow the

04:17:00 19   provisional agreements into other reasons, I'm not going to

04:17:03 20   turn it into a disputed fact two days before trial.  That's

04:17:06 21   what I'm inclined to do.

04:17:08 22             What I'm kind of asking you, Mr. Reines is, is

04:17:13 23   that what you want me to say?

04:17:15 24             MR. REINES:  Yes, Your Honor.

04:17:18 25             MR. POWERS:  However, Your Honor, it's part of

04:17:20  1    the file history which comes in.

04:17:21  2                THE COURT:  No, it's not coming in.  The file

04:17:24  3    history is not coming in.

04:17:26  4                MR. POWERS:  Typically the file histories are

04:17:27  5    relevant and admissible and relevant to the intrinsic

04:17:32  6    record.

04:17:32  7                THE COURT:  You know, Mr. Powers, I know you

04:17:37  8    have tried lots of these cases and you have tried lots of

04:17:39  9    these cases in lots of different places, but --

04:17:46 10                MR. POWERS:  And lots here.

04:17:47 11                THE COURT:  -- I have my own views about what's

04:17:50 12    usual, and there is no actual good point to putting file

04:17:56 13    histories in before the jury.  It's irrelevant to

04:18:01 14    infringement.  It's irrelevant to damages.  And generally

04:18:07 15    irrelevant to invalidity.  Irrelevant to everything other

04:18:11 16    than giving them a chance to second guess claim construction

04:18:14 17    and to do other things that they're not supposed to do.  So

04:18:24 18    you know, I'm not putting the file history into evidence

04:18:27 19    just because one side or the other -- because it is, in

04:18:32 20    fact, part of the intrinsic record, but it's -- you know,

04:18:36 21    unless somebody points out to me some actual relevant

04:18:39 22    portion, it's irrelevant.

04:18:42 23                MR. POWERS:  Sorry, I understand what Your Honor

04:18:44 24    is saying and won't attempt to argue further, but I do want

04:18:50 25    to note that I assume that whatever you rule as to the

04:18:53  1   provisional doesn't apply to the actual patents-in-suit.

04:18:56  2                   THE COURT:  No.

04:18:57  3                   MR. POWERS:  If he copied key portions of the

04:19:01  4   patents-in-suit from Quake.

04:21:30  5                   THE COURT:  The patents-in-suit, they're going

04:21:33  6   to come into evidence.  I mean, they're usually Exhibits 1

04:21:38  7   through 5 or how many patents you're going to have by today

04:21:41  8   at 5:00.  I guess if I stay around long enough, I can find

04:21:44  9   out when everyone else does.

04:21:45 10                   So, yeah, that's coming in.  But, I mean, there

04:21:59 11   is a question, and I will be thinking about it.  Maybe we

04:22:02 12   can talk about it more tomorrow.  But the fact that they're

04:22:06 13   coming in -- when I say we can talk about it more tomorrow,

04:22:16 14   we can talk about it more about exactly what arguments you

04:22:20 15   can make based on, Here's the patent, the asserted patent,

04:22:24 16   and here is Quake.  Right?

04:22:25 17                   Just because you have these -- you know, I don't

04:22:32 18   know what the answer is.

04:22:34 19                   MR. POWERS:  The answer is substantial portions

04:22:36 20   were copied directly.

04:22:37 21                   THE COURT:  No.  No, that's not the question I

04:22:39 22   don't know the answer to, even though I didn't know the

04:22:41 23   answer to that one, either.  What I mean is I'm not sure

04:22:47 24   what you as a defendant can -- so, yeah, I mean, actually as

04:23:01 25   I'm thinking about it, obviously, for obviousness, I think

04:23:06 1    that when you have a specification, you can, you know, say,

04:23:19 2    Here it's citing Quake or here it's not.  Actually, even

04:23:22 3    though it's not citing Quake, you can see it's the same as

04:23:26 4    Quake.

04:23:27 5              You know, but there's a question which I have to

04:23:32 6    think about:  Can you say the word copy, or do you just say

04:23:35 7    the word the same?

04:23:39 8              MR. POWERS:  Understood, Your Honor.  One final

04:23:41 9    question.

04:23:41 10             I understand Your Honor's issue in the priority

04:23:44 11   date, but I do want to make it really clear because Your

04:23:47 12   Honor's saying there's no question about the priority.  It's

04:23:50 13   not at issue.  If they don't agree that the Thorsen thesis

04:23:53 14   is prior art, then it is an issue, and so they should be put

04:23:57 15   to that today because we shouldn't bear the risk that their

04:24:02 16   position changed.  If they're going to no longer rely on the

04:24:07 17   provisional, and claim the priority date of that

04:24:10 18   provisional, then they're stuck with the 2003 date.  And the

04:24:14 19   Thorsen thesis is 2002.

04:24:17 20             THE COURT:  No, but see that's the thing is

04:24:20 21   they're not saying the priority date is anything other than

04:24:23 22   what they've said all along.

04:24:26 23             MR. POWERS:  But they can't defend that.  They

04:24:27 24   have to prove that.  That's something they do have to prove.

04:24:31 25   That's their burden of proof.

04:24:32  1          THE COURT:  Well, so if it turns out that I

04:24:34  2  don't think the provisional agreement should come into

04:24:37  3  evidence, I'm going to let them prove that without putting

04:24:40  4  the provisional in evidence.

04:24:44  5          MR. POWERS:  It's not physically possible for

04:24:46  6  them to claim prior art to the provisional -- well, without

04:24:47  7  citing to the provision.

04:24:49  8          THE COURT:  Well, they can cite to that.  They

04:24:50  9  just don't have to put it into evidence.

04:24:54 10          MR. POWERS:  And if we dispute that, how is the

04:24:56 11  jury to resolve that question if they don't have the

04:24:59 12  provisional in front of them?

04:25:00 13          THE COURT:  Well, we'll get to that when we get

04:25:01 14  to that, but I don't think it's going to come to that.

04:25:04 15          MR. POWERS:  Well, it does come to that.

04:25:06 16          THE COURT:  Okay.  Let's finish for the day.  So

04:25:12 17  I will see you at three o'clock tomorrow.

04:25:18 18          I don't think I'm going to get agreement, but

04:25:19 19  when you talk about various things, just think about --

04:25:33 20  well, actually is there any evidence that you know of in

04:25:41 21  this case, Mr. Powers, that there's something unethical or

04:25:51 22  otherwise dishonest about what about Professor Ismagilov or

04:26:00 23  about the provisional application having the 16 pages that

04:26:05 24  are virtually the same as 16 pages in Quake?

04:26:11 25          MR. POWERS:  I would say there are at least two

04:26:16 1    things I'm aware of.

04:26:17 2                    THE COURT:  Okay.

04:26:18 3                    MR. POWERS:  And beyond just, first, obviously

04:26:22 4    it's understood by people dealing with the Patent Office,

04:26:24 5    they have a duty of candor and honesty.  And to claim

04:26:28 6    something as their own when they copied it violates that.

04:26:32 7    So that would make it improper and dishonest.

04:26:35 8                    Second, Dr. Ismagilov is an academic.  He was a

04:26:42 9    professor at Chicago and is a professor at Caltech.  There

04:26:45 10   are well-recognized policies that bind academic admissions

04:26:52 11   that they are extremely familiar with that say you never

04:26:55 12   copy somebody else's work without giving them attribution.

04:26:59 13   So the norms under which Dr. Ismagilov grew up, and

04:27:05 14   operated, and enforced on his students would absolutely

04:27:10 15   prohibit what he did.  So I think those two at a minimum.

04:27:14 16                   The third, obviously, is I think without citing

04:27:20 17   a point of law, to have someone say the preferred embodiment

04:27:24 18   of my invention is "X" in your patent application and in

04:27:29 19   your patent where you have sworn that everything in the

04:27:32 20   patent application, that patent is true, and you invented

04:27:35 21   it.  And you have say that when you actually copied those

04:27:40 22   exact words.

04:27:41 23                   THE COURT:  But --

04:27:43 24                   MR. POWERS:  It goes directly to his

04:27:44 25   credibility.

04:27:45  1          THE COURT:  But if he, in fact, says in the

04:27:47  2   patent application, the preferred embodiment is "X," and you

04:27:51  3   have Quake saying, at some point in the past, the preferred

04:27:58  4   embodiment is "X" and describing the same thing, you know,

04:28:05  5   that seems to me to be fair cross-examination.

04:28:11  6          MR. POWERS:  We certainly agree, and that's what

04:28:13  7   we've been asking to do.  Now, we can't do that effectively

04:28:16  8   if the provisional is not in evidence.

04:28:18  9          THE COURT:  No, but I don't understand why

04:28:19 10   that's the case.  You know, it's like you want to have the

04:28:23 11   middleman.  You've got the patent.  You've got Quake.  If

04:28:28 12   Quake is then paragraph after paragraph in the patent, you

04:28:35 13   don't need the middleman.

04:28:38 14          MR. POWERS:  We need the middleman because it's

04:28:41 15   the basis upon which they've claimed priority, and it's the

04:28:45 16   first application that he filed.

04:28:46 17          THE COURT:  No, but to show the fact that it's

04:28:49 18   the same as Quake, you don't need it.  If it's the same as

04:28:52 19   Quake, it's the same as Quake, whether there is one or

04:28:55 20   multiple things in the middle that are also the same as

04:28:58 21   Quake.

04:28:59 22          MR. POWERS:  There are more in the provisional

04:29:01 23   than there are in the patent.

04:29:02 24          THE COURT:  Okay.  All right.

04:29:05 25          MR. POWERS:  And so that --

04:29:06  1              THE COURT:  Do you have one more thing?

04:29:08  2              MR. POWERS:  No, I don't.

04:29:09  3              THE COURT:  Okay.

04:29:10  4              MR. REINES:  Thank you.

04:29:10  5              THE COURT:  Mr. Reines, you're a few behind on

04:29:14  6   the one more thing.

04:29:15  7              MR. REINES:  Well, yeah.  I think I'm never

04:29:16  8   going to catch up.  And it's never one more thing.  It's

04:29:19  9   always two or three more things.

04:29:20 10              On the question of the impropriety issue, which

04:29:25 11   is whether it's improper, this violation of the duty of

04:29:29 12   candor, this is what I'm thinking.  And maybe I'm lost at

04:29:34 13   this, but if someone presented you and said, We have an

04:29:37 14   inequitable conduct argument.  Just hear me out.  Please be

04:29:41 15   concise.  But we don't have materiality.  We just have a

04:29:45 16   duty of the candor violation, but we don't have the other

04:29:48 17   elements of inequitable conduct.  And they wanted to come to

04:29:51 18   trial and prove the duty of candor, I'd like to think you

04:29:55 19   would issue a limine order immediately precluding that.

04:30:00 20              Thank you.

04:30:00 21              THE COURT:  Okay.  All right.  Well, I will see

04:30:10 22   you all tomorrow at three o'clock.

04:30:12 23              MR. REINES:  Thank you, Your Honor.

04:30:13 24              THE COURT:  And I will be available to help you

04:30:21 25   for however long.  You may not think' it's helpful, but I

04:30:24  1    will be available to hear you for however long it takes.

04:30:28  2                    THE CLERK:  All rise.

        3                    (Court was recessed at 4:30 p.m.)

        4                    I hereby certify the foregoing is a true and

        5    accurate transcript from my stenographic note in the

        6    proceeding.

        7

        8                              /s/  Heather M. Triozzi
                                       Official Merit Reporter
        9                              U.S. District Court

       10

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25