# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THE UNIVERSITY OF CHICAGO and
BIO-RAD LABORATORIES, INC.

Plaintiffs,

v.

10X GENOMICS, INC.

Defendant.

C.A. 15-152-RGA

**FILED UNDER SEAL**

## PLAINTIFFS BIO-RAD LABORATORIES, INC. AND
## THE UNIVERSITY OF CHICAGO'S OPENING BRIEF IN SUPPORT OF THEIR
## POST-TRIAL MOTION

Dated:  December 12, 2018

OF COUNSEL:
Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
Amanda Branch (admitted *pro hac vice*)
Christopher S. Lavin (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000
edward.reines@weil.com
derek.walter@weil.com
amanda.branch@weil.com
christopher.lavin@weil.com

Robert T. Vlasis III (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7024
robert.vlasis@weil.com

FARNAN LLP
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: 302-777-0300
Facsimile: 302-777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 1

II.    SUMMARY OF ARGUMENT ....................................................................................... 1

    A.    Permanent Injunction ....................................................................................... 3

        1.    Irreparable Harm ................................................................................... 5

        2.    Monetary Damages Are Inadequate To Compensate Plaintiffs ............... 10

        3.    The Balance of Harms Favors An Injunction ........................................... 11

        4.    The Public Interest Favors An Injunction ................................................ 11

        5.    A Permanent Injunction Against 10X Is Warranted ................................. 12

    B.    Enhanced Damages ......................................................................................... 12

        1.    This Case Was Exceptional And Attorneys' Fees Should Be Awarded ............................................................................................... 12

        2.    10X Willfully Infringed ......................................................................... 13

        3.    10X Presented Unusually Weak Defenses ................................................ 14

        4.    There Was Substantial Litigation Misconduct ......................................... 18

    C.    Enhanced Damages ......................................................................................... 22

    D.    Plaintiffs Are Entitled To Pre-Verdict Supplemental Damages .......................... 23

    E.    Plaintiffs Are Entitled To Awards Of Pre And Post-Judgment Interest ............... 25

        1.    Awarding Prejudgment Interest To A Prevailing Patentee Is The Rule ...................................................................................................... 25

        2.    Prejudgment Interest Should Be Awarded At The Prime Rate Compounded Quarterly From The Date Of First Infringement ............... 26

        3.    Plaintiffs Are Entitled To Statutory Post-Judgment Interest ................... 28

III.    CONCLUSION ............................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ActiveVideo Networks, Inc. v. Verizon Comm'ns, Inc.*,
    C.A. No. 10-cv-00248, 2011 WL 4899922 (E.D. Va. Oct. 14, 2011),
    *aff'd*, 694 F.3d 1312 (Fed. Cir. 2012) .............................................................. 24, 26

*Aero Prods. Intern'l, Inc. v. Intex Recreation Corp.*,
    C.A. 02-cv-02590, 2005 WL 1498667 (N.D. Ill. June 9, 2005) ............................ 25

*Air Separation, Inc. v. Underwriters at Lloyd's of London*,
    45 F.3d 288 (9th Cir. 1995)..................................................................................... 28

*Apple Inc. v. Samsung Elecs. Co.*,
    809 F.3d 633 (Fed. Cir. 2015) ............................................................ 5, 10, 11, 12

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
    C.A. 03-cv-0597-PHX-MHM, 2009 WL 920300 (D. Ariz. Mar. 31, 2009),
    *aff'd*, 670 F.3d 1171 (Fed. Cir. 2012) ...................................................................... 24

*Beatrice Foods Co. v. New England Printing and Lithographing Co.*,
    923 F.2d 1576 (Fed. Cir. 1991)............................................................................... 25

*Bio-Rad Labs., Inc. v. Nicolet Inst. Corp.*,
    807 F.2d 964 (Fed. Cir. 1986) ................................................................................ 26

*Broadcom Corp. v. Emulex Corp.*,
    732 F.3d 1325 (Fed. Cir. 2013) ............................................................................ 4, 5

*Crystal Semiconductor Corp. v. TriTech Microelectronics Intern'l, Inc.*,
    246 F.3d 1336 (Fed. Cir. 2001)............................................................................... 25

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
    717 F.3d 1336 (Fed. Cir. 2013) ............................................................................ 9, 10

*E.I. DuPont de Nemours and Co. v. Unifrax I LLC*,
    C.A. 14-cv-01250-RGA, 2017 WL 4004419 (D. Del. Sept. 12, 2017)........... 6, 10, 24

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) .................................................................................................. 5

*Edwards Lifesciences AG v. CoreValve, Inc.*,
    699 F.3d 1305 (Fed. Cir. 2012) ............................................................................ 4, 11

*Endo Pharm. Inc. v. Teva Pharm. USA, Inc.*,
    C.A. 14-cv-01389-RGA, D.I. 203 (D. Del. Nov. 30, 2016)...................................... 6

*Evonik Degussa Gmbh v. Materia, Inc.*,
   C.A. 09-cv-00636-NLH/JS, 2017 WL 3434156 (D. Del. Aug. 10, 2017) ............................... 6

*Finjan Software, Ltd. v. Secure Computing Corp.*,
   C.A. No. 06-cv-00369 (GMS), 2009 WL 2524495 (D. Del. Aug. 18, 2009),
   *aff'd in part, rev'd in part on other grounds*, 626 F.3d 1197 (Fed. Cir. 2010)........................ 26

*Fresenius Med. Care Holdings, Inc. v. Baxter Intern'l, Inc.*,
   C.A. 03-cv-01431 SBA, 2008 WL 928535 (N.D. Cal. Apr. 4, 2008).................................... 27

*Friend v. Kolodzieczak*,
   72 F.3d 1386 (9th Cir. 1995) ........................................................................................ 28

*Gen. Motors Corp. v. Dexev Corp.*,
   461 U.S. 648 (1983) ..................................................................................................... 25

*Genband US LLC v. Metaswitch Networks Corp.*,
   861 F.3d 1378 (Fed. Cir. 2017) ..................................................................................... 10

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
   579 U.S. ___, 136 S.Ct. 1923 (2016) ............................................................................ 22

*Illumina, Inc. v. Qiagen, N.V.*,
   207 F.Supp.3d 1081 (N.D. Cal. 2016) ............................................................................. 9

*In re: Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Lit.*,
   C.A. 09-md-02118, D.I. 429 (D. Del. Apr. 2, 2013) .......................................................... 6

*Invista N.A. S.À.R.L. v. M & G USA Corp.*,
   35 F.Supp.3d 583 (D. Del. 2014) ................................................................................... 6

*Laitram Corp. v. NEC Corp.*,
   115 F.3d 947 (Fed. Cir. 1997) ....................................................................................... 26

*Lam, Inc. v. Johns- Manville Corp.*,
   718 F.2d 1056 (Fed. Cir. 1983) ..................................................................................... 27

*Murphy v. F.D.I.C.*,
   C.A. 88-cv-01396-EFL, 1995 WL 125435 (N.D. Cal. Mar. 15, 1995)................................. 28

*Nickson Indus., Inc. v. Rol Mfg. Co.*,
   847 F.2d 795 (Fed. Cir. 1988) ....................................................................................... 26

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   572 U.S. 545 (2014) ..................................................................................................... 12

*Power Integrations, Inc. v. Fairchild Semiconductor Intern'l, Inc.*,
   711 F.3d 1348 (Fed. Cir. 2013) ..................................................................................... 24

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
  702 F.3d 1351 (Fed. Cir. 2012) ........................................................................... 4, 5

*Presidio Components, Inc. v. American Tech. Ceramics Corp.*,
  C.A. No. 08-cv-00335-IEG-NLS, 2013 WL 4068833 (S.D. Cal. Aug. 12, 2013) ................... 26

*Read Corp. v. Portec, Inc.*,
  970 F.2d 816 (Fed. Cir. 1992) ......................................................................... 22, 23

*Rite-Hite Corp. v. Kelley Co.*,
  56 F.3d 1538 (Fed. Cir. 1995) ................................................................... 11, 12, 27

*SRI Intern'l, Inc. v. Cisco Sys.*,
  254 F.Supp.3d 680 (D. Del. 2017) ........................................................................ 13

*Stryker Corp. v. Davol, Inc.*,
  75 F.Supp.2d 746 (W.D. Mich. 1999), *aff'd*, 234 F.3d 1252 (Fed. Cir. 2000) ...................... 24

*Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*,
  862 F.2d 1564 (Fed. Cir. 1988) ........................................................................... 27

*Theme Promotions, Inc. v. News Am. Mktg. FSI, Inc.*,
  731 F. Supp.2d 937 (N.D. Cal. 2010) ..................................................................... 28

*Trebro Mfg., Inc. v. Firefly Equip., LLC*,
  748 F.3d 1159 (Fed. Cir. 2014) ............................................................................. 5

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
  939 F.2d 1540 (Fed. Cir. 1991) ....................................................................... 26, 27

*Vanda Pharm Inc. v. Roxane Labs., Inc.*,
  203 F.Supp.3d 412 (D. Del. 2016) .......................................................................... 6

*Windsurfing Intern'l, Inc. v. AMF, Inc.*,
  782 F.2d 995 (Fed. Cir. 1986) ............................................................................ 11

*Wis. Alumni Res. Found. v. Apple, Inc.*,
  261 F.Supp.3d 900 (W.D. Wis. 2017) ..................................................................... 27

## CONSTITUTIONS

U.S. Const. art. I, § 8, cl. 8 ................................................................................. 4

## STATUTES AND REGULATIONS

28 U.S.C. § 1961 ............................................................................................ 28

28 U.S.C. § 1961(a) ........................................................................................ 28

35 U.S.C. § 283 ........................................................................................................................... 5

35 U.S.C. § 284 ............................................................................................................... 22, 24, 25

35 U.S.C. § 285 ......................................................................................................................... 12

## I.      NATURE AND STAGE OF THE PROCEEDINGS

On November 13, 2018, the jury rendered its verdict finding that 10X Genomics, Inc. ("10X") willfully infringed U.S. Patent Nos. 8,889,083 ("the '083 Patent"), 8,329,407 (the "'407 Patent"), and 8,304,193 (the "'193 Patent") (collectively, the "Chicago Patents") owned by The University Of Chicago ("Chicago") and exclusively licensed to Bio-Rad Laboratories, Inc. ("Bio-Rad") (collectively, Chicago and Bio-Rad may be referred to as "Plaintiffs").  D.I. 477.

On November 26, 2018, the Court authorized the submission of post-trial motions, including this motion for permanent injunction, exceptional case, enhancement of damages, attorneys' fees, supplemental damages, and prejudgment and post-judgment interest.  D.I. 506.

## II.     SUMMARY OF ARGUMENT

Although 10X represented to the Court more than three months ago that it had finalized the design and specification of its design around droplet product, it nonetheless continues to expand its infringing product sales in the face of the resounding jury verdict of infringement that answered 100 questions in Plaintiffs' favor spanning three different patents.  Instead of ceasing sales of its infringing products, 10X has asked Plaintiffs to agree to a ███████ transition to change its infringing design and for a stay pending appeal.

10X has flatly refused to defend its stay and phase-in requests.  10X refused to identify any issue likely to succeed on appeal or why it would take so long to introduce a non-infringing product.  If such relief were truly warranted, it should have been able to support its requests. 10X is a direct competitor that has severely disrupted the emerging marketplace for droplet products, inflicting irreparable harm with its infringement.  A permanent injunction should be entered forthwith.

In addition, this is an exceptional case because 10X's infringement is willful and exacerbated by its litigation misconduct.  On two of the infringed patents, 10X had no non-

1

infringement position.   On the third, its infringement position was based on its pirate-like addition of technologically irrelevant fluorine atoms to its chips.   Coupled with 10X's dissembling response on willfulness at trial, this case stands-out as exceptional.   10X only attempted to establish a good faith basis for its infringing activity through its former employee, Dr. Ness.   However, his direct examination testimony was based on Dr. Ness's review of the Chicago Patents after his deposition and the state of mind he had when he was no longer a 10X employee.   Such testimony is totally irrelevant to the state of mind of the 10X control group. And the supposed distinction from the Chicago Patents identified by Dr. Ness—that the purportedly large number of partitions the 10X Accused Products create preclude them from infringing—has nothing to do with the claims of the Chicago Patents.   Regardless, on cross-examination, Dr. Ness confirmed that, while he was actually at 10X, he did not know enough about the Chicago Patents to deny that the patents were invalid or that 10X's products somehow avoided infringement.

Although 10X labored to have Dr. Ness present its willfulness story (such as it was), it did not attempt to establish a good faith basis for infringing the three Chicago Patents through any witness actually at 10X.   Dr. Hindson, Dr. Saxonov, and Dr. Stuelpnagel only addressed their failed attempt to design around the '083 Patent through the addition of technologically meaningless traces of fluorine.   They never stated that they had any basis for adopting the droplet technology even though they were tracking the Chicago Patents for intellectual property reasons and at trial they did not present non-infringement grounds for two of the infringed patents.   Even beyond that, 10X engaged in litigation misconduct.   This includes, for example, 10X's clear violation of the Protective Order, pursuit of a contrived dispute regarding the priority of the patents-in-suit and the presentation of numerous factually baseless positions to the jury.

A doubling of the damages award is warranted and, at a minimum, Plaintiffs' attorneys' fees should be reimbursed. Plaintiffs received only a reasonable royalty at trial and should be reimbursed their attorneys' fees paid out of such royalties to be made at least whole, given 10X failed to introduce evidence at trial that it had a good faith belief that it did not infringe the Chicago Patents.

Finally, Plaintiffs are entitled to pre- and post-judgment interest, as well as supplemental damages for sales up to the verdict date.

### A.   Permanent Injunction

10X's infringement allows it to compete "head-to-head" with Bio-Rad and a permanent injunction is warranted. As Bio-Rad's President of its Life Science Group, Annette Tumolo, explains in her declaration submitted with this brief, 10X is inflicting irreparable harm with its infringing competition by gaining a head start in the single cell marketplace, locking up market share by establishing "sticky" customer relationships, raising sales and marketing costs, depressing prices, and soiling Bio-Rad's reputation as an industry leader. *See* Declaration of Annette Tumolo (hereafter, the "Tumolo Decl.") ¶¶ 5-6, 12-14. As explained below, the Federal Circuit has stated time-and-again that, normally, infringing competition causes irreparable harm that can only be properly remedied by a permanent injunction.

10X has requested that Plaintiffs agree to a stay of any such injunction pending appeal and for a lengthy ▉▉▉▉▉ transition period to move to its design around system. It has offered no justification for either request – refusing to support them at all. *See* Declaration of Christopher S. Lavin (hereafter, the "Lavin Decl.")," Ex. 1, at 1-3. 10X has been aware of the risk of injunction for years and has developed a design around given the likelihood of such an outcome. Months ago, thinking ahead, the Court specifically asked 10X about the status of its design around. D.I. 365 (Hearing Tr. (9/5/18)) at 20:25-21:1 ▉▉▉▉▉▉▉▉▉▉

███████████  ███████████████████████████████████████

█████████████████████████████████████████  *Id.* at 3:23-4:2; *see also id.* at

21:1-6 ███████████████████████████████████████████████████

█████████████████████████████████████████  10X's steadfast refusal

to even identify the status of its redesign or to explain its delays justifies denial of its requests. *See* Lavin Decl., Ex. 1, at 1-3.

In any event, an injunction is compelled when the governing law is applied to the facts. Normally an injunction is entered against an infringing competitor that is a proven infringer.  *See Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1314 (Fed. Cir. 2012) ("Absent adverse equitable considerations, the winner of a judgment of validity and infringement may normally expect to regain the exclusivity that was lost with the infringement."); *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1338 (Fed. Cir. 2013) ("The courts have a long history of remedying trespass on property rights—including patent rights—by removing the trespasser."); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1362 (Fed. Cir. 2012) (holding that a proper *eBay* analysis "proceeds with an eye to the 'long tradition of equity practice' granting 'injunctive relief upon a finding of infringement in the vast majority of patent cases,'" and noting that "the axiomatic remedy for trespass on property rights is removal of the trespasser").

The principle that patentees normally receive injunctions against competitors is rooted in the Constitution, which provides inventors an "***exclusive*** right to their respective…discoveries." U.S. Const. art. I, § 8, cl. 8.[1]  Pursuant to this Constitutional Grant of exclusive rights, Congress specifically authorized injunctions to stop patent infringement, authorizing courts to "grant

---

[1] Emphasis supplied unless otherwise specified.

injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."  *See* 35 U.S.C. § 283. "[H]istorically courts have 'granted injunctive relief upon a finding of infringement in the vast majority of patent cases.'"  *Apple Inc. v. Samsung Elecs. Co*., 809 F.3d 633, 639 (Fed. Cir. 2015) (*quoting eBay Inc. v. MercExchange, L.L.C*., 547 U.S. 388, 395 (2006)).

The four-factor *eBay* test for a permanent injunction is well-established.  *eBay*, 547 U.S. at 391 (2006).  To obtain a permanent objection, a plaintiff must demonstrate:

(1) that it has suffered an irreparable injury;

(2) monetary damages are inadequate to compensate for that injury;

(3) the balance of hardships between the plaintiff and defendant support an injunction; and

(4) the public interest would not be disserved by a permanent injunction.

*Id.*  These factors support an injunction as established below.

### 1. Irreparable Harm

Direct competition alone "strongly" suggests the potential for irreparable harm.  *See Presidio Components*, 702 F.3d at 1363 (overturning denial of permanent injunction, explaining "[d]irect competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm"); *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1164 (Fed. Cir. 2014) (overturning denial of preliminary injunction and *quoting Presidio Components* "[d]irect competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm").  In *Broadcom*, the Federal Circuit confirmed that direct competition establishes irreparable harm when market share is taken: "The district court determined that Broadcom and Emulex were competitors and that Broadcom lost market share while Emulex gained it—thus Broadcom established irreparable harm."  732 F.3d at 1338.

Courts in this District regularly enjoin infringing competitors.  *See, e.g., E.I. DuPont de Nemours and Co. v. Unifrax I LLC*, C.A. 14-cv-01250-RGA, 2017 WL 4004419, at *4-*6 (D. Del. Sept. 12, 2017) (granting permanent injunction); *Evonik Degussa Gmbh v. Materia, Inc.*, C.A.  09-cv-00636-NLH/JS, 2017 WL 3434156, at *2-*4 (D. Del. Aug. 10, 2017) (same); *Endo Pharm. Inc. v. Teva Pharm. USA, Inc.*, C.A. 14-cv-01389-RGA, D.I. 203 (D. Del. Nov. 30, 2016) (slip op.) (same); *Vanda Pharm. Inc. v. Roxane Labs., Inc.*, 203 F.Supp.3d 412, 436 (D. Del. 2016) (same); *Invista N.A. S.À.R.L. v. M & G USA Corp.*, 35 F.Supp.3d 583, 611 (D. Del. 2014) (same); *In re: Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Lit.*, C.A. 09-md-02118, D.I. 429 (D. Del. Apr. 2, 2013) (slip op.) (same).

Bio-Rad and 10X are competitors in the market for products that perform genetic analysis on a droplet platform.  As Ms. Tumolo explained, "we look at our droplet business as one.  I mean, we formed this technology center around droplets, not around one product or another." Trial Tr. at 132:11-15;[2] *see also id.* at 194:10-25 ("I think what's at issue in this case is our droplet business.").  Ms. Tumolo further explained, without challenge, that Bio-Rad's 2019 droplet products will flexibly support a variety of different applications.  Specifically she testified that, within the next year, Bio-Rad will introduce its "next generation platform that will actually be quite flexible about what the droplet applications you do are, but one application we will certainly make sure we have is single cell."  *Id.* at 135:6-14.  Ms. Tumolo also confirmed that Bio-Rad has invested over a half-billion dollars in its droplet business, including $20-25 million a year in research and development and the creation of a digital biology center to house its droplet business.  *Id.* at 125:23-126:5; *id.* at 121:6-122:14.  The jury implicitly found that the

---

[2] All trial transcript references are to the rough trial transcript.

parties are competitors when it adopted Bio-Rad's damages' request and that finding should be adopted by this Court.

Within their overall competition in the business of genetic analysis using droplets, 10X and Bio-Rad are undisputedly head-to-head competitors with their single-cell droplet products. 10X's counsel acknowledged this squarely to the jury: "of course 10X and Bio-Rad are competing head to head."  *Id.* at 92:3-4; *id.* at 1519:4-8 (same); *see also id.* at 168:6-8 (Bio-Rad's single cell product "competes directly with 10X's single cell product.").

This direct competition creates the irreparable harm attendant to lost market share, increased marketing costs and lost reputation for innovation.  Indeed, Bio-Rad was forced to bring a single cell product to market early in view of the head start 10X had introducing its product.  *Id.* at 130:3-8 ("we felt a lot of pressure to get that product on the market because 10X had a really, really big head start, frankly we felt using our technology").

10X disrupted Bio-Rad's roadmap for its droplet product line, which has been in place since its 2011 acquisition of QuantaLife.  *See* Tumolo Decl. ¶ 3.  After the 10X founders stated they would not use droplets for their products, they introduced their infringing single-cell product.  *Id.* ¶ 4.  This severely harmed Bio-Rad's droplet roadmap, forcing Bio-Rad to introduce an early-stage single cell product, and giving 10X a major head start in the competition for single-cell products.  *Id.*  As Ms. Tumolo explained at trial, droplet technology is key to making a scalable and efficient single cell product of the type sold by 10X and Bio-Rad.   *See id.*; Trial Tr. at 117:11-118:22.

10X's infringing head-start gave it an entrenched competitive lead that is very hard, if not impossible, for Bio-Rad to overcome—if 10X's infringement continues unabated.  *See* Tumolo Decl. ¶ 5.  10X's first-to-market position is allowing 10X to engage with most of the important

early adopters and key opinion leaders. *Id.* Collaboration with these key opinion leaders is driving early publications and therefore is creating a strong bias towards 10X's single cell product in the market. *Id.* The influence on market choice by these early adopters and key opinion leaders is substantial and long-term. *Id.*

10X's infringing head-start is also allowing it to develop customer relationships that are hard to overcome. Customers of tools such as the droplet systems at issue in this case routinely make subsequent purchases from a vendor with whom they are already familiar. *Id.* ¶ 6. Even worse, such on-going "sticky" customer-relationships also have a multiplier effect because they are used to attract new customers based on a growing installed base and word-of-mouth. *Id.* Once a vendor such as 10X is "in the door" of a customer it is expensive to displace them with a competing product. *Id.* Bio-Rad's sales and marketing team has to work much harder to do so, increasing costs. *Id.* Successful displacement often requires price-cutting that is hard to quantify and difficult to recoup for subsequent sales to that customer and in the marketplace more generally. *Id.*

Although Bio-Rad brought its single cell product to the market earlier than planned, that product is performing well. *See id.* ¶¶ 7-8. It has hundreds of customers and studies are being published based on the use of that product. *Id.* Bio-Rad is capable of replacing 10X's infringing sales. *See id.* ¶¶ 7, 11. Bio-Rad's system can generate similar data with similar sensitivity as the 10X system. *Id.* ¶ 11. 10X's primary market argument is one of efficiency and throughput. *Id.* Moreover, as noted, in 2019 Bio-Rad expects to introduce an even more robust system to leap-frog 10X in performance. *Id.* ¶ 9. That flexible new platform will support droplet applications including single cell processing. *Id.*

Since 2011, Bio-Rad has emphasized to the investment and research community that it is investing an enormous amount in its droplet technology, that it has key intellectual property in that space that it controls, and that these positions will be a major growth driver for the company. *Id.* ¶ 12. 10X's infringement of Bio-Rad's droplet technology unfairly impeaches Bio-Rad's reputation.

The irreparable harm caused by 10X's infringement is exacerbated by the emerging and expanding nature of the marketplace. It is well-established that infringement in an emerging marketplace can cause a competitor irreparable harm. For example, in *Illumina, Inc. v. Qiagen, N.V.*, 207 F.Supp.3d 1081, 1093 (N.D. Cal. 2016), the court entered a preliminary injunction given the irreparable harm of the infringer's direct competition at a "crucial inflection point in the development of the market for DNA sequencing equipment." This case is no different except that infringement has already been established at trial and thus this case presents an even more compelling basis for an injunction.

Likewise, Bio-Rad's reputation as an innovator in the genetic tools marketplace is impeached by 10X's infringing use of Bio-Rad's infringing technology. In *Douglas Dynamics, LLC v. Buyers Prods. Co.,* 717 F.3d 1336, 1344-45 (Fed. Cir. 2013), the Federal Circuit reversed a denial of a permanent injunction based on reputational injury. The Court explained that "Douglas's reputation as an innovator will certainly be damaged if customers found the same 'innovations' appearing in competitors' snowplows." *Id.* "Exclusivity is closely related to the fundamental nature of patents as property rights. It is an intangible asset that is part of a company's reputation, and here, Douglas's exclusive right to make, use, and sell the patented inventions is under attack by Buyers's infringement." *Id.*

The irreparable harm Bio-Rad will suffer from 10X's infringing activities is causally linked to 10X's infringement of the droplet technology. *Apple,* 809 F.3d at 640 ("The purpose of the causal nexus requirement is to establish the link between the infringement and the harm, to ensure that there is 'some connection' between the harm alleged and the infringing acts."); *see also Genband US LLC v. Metaswitch Networks Corp.*, 861 F.3d 1378, 1384 (Fed. Cir. 2017) (reversing denial of permanent injunction because causal nexus test not applied properly). This test is normally at issue for multi-function products such as mobile phones, where any particular patented feature may have little to do with consumer purchase decisions. 10X's specialized droplet products are based on a foundation of infringing technology that puts them on the other end of the "causal nexus" spectrum.

10X tried to use microwells and capsules as the container for the reactions in its systems, but was forced to move to droplets for its reactions due to issues with chemistry and scalability. Trial Tr. at 764:13-766:12; *id.* at 952:13-19; *id.* at 953:21-954:8. Ms. Tumolo explained that "[d]roplets are enabling and scalable, and that's why they win over all those other technologies." *Id.* at 200:15-17. Because 10X tried to avoid the infringing technology in its product development, but failed, the causal nexus between the infringement of the Chicago Patents and the irreparable harm is manifest.

## 2. Monetary Damages Are Inadequate To Compensate Plaintiffs

Damages will not compensate a patent holder for the loss of market share. *Douglas*, 717 F.3d at 1345 ("[M]ere damages will not compensate for a competitor's increasing share of the market, a market which [Plaintiff] competes in, and a market that [Plaintiff] has in part created with its investment in patented technology."). This Court applied this basic principle in *DuPont,* 2017 WL 4004419, at *5 ("Monetary damages are inadequate to compensate Plaintiff here

10

because Plaintiff would be forced to compete against a rival gaining market share with Plaintiff's technology.").

The on-going and expanding irreparable harm established above is not adequately compensable by a royalty number.   *See* Tumolo Decl. ¶¶ 12-14.   That is why infringing competition such as this is normally enjoined.   *See, e.g., Edwards Lifesciences*, 699 F.3d at 1314 ("Absent adverse equitable considerations, the winner of a judgment of validity and infringement may normally expect to regain the exclusivity that was lost with the infringement.").

### 3.      The Balance of Harms Favors An Injunction

The equities do not favor 10X at all.   10X is a willful infringer that prepared for a loss with a supposedly non-infringing design ███████████████████████   10X will not state whether its design around is in a product ready for sale.   But any failure to have it ready is its own fault.

Even leaving the design around issue and 10X's willfulness aside, the balance of harms favor Plaintiffs.   A party that builds a business based on infringement cannot complain if that infringing business is halted.   It is axiomatic that one "who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Windsurfing Intern'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n. 12 (Fed. Cir. 1986).

### 4.      The Public Interest Favors An Injunction

The public interest nearly always favors an injunction, absent some compelling reason to the contrary.   *Apple,* 809 F.3d at 647.   Only "in rare instances" have courts "exercised their discretion to deny injunctive relief in order to protect the public interest." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1547 (Fed. Cir. 1995).

Here, 10X's Accused Products are for research only.  *See* Tumolo Decl. ¶ 10.  It is not used for any medical test or therapy.  10X's argument that the research performed on an infringing system counsels against an injunction proves far too much.  Bio-Rad's products can be used for the same single cell application.  Moreover, the law (and Constitution) recognizes that the innovation incentives promoted by enforcing proven patent rights normally does not give way to an appeal to the public interest of having a competing product as both *Apple* and *Rite-Hite* establish.

### 5.      A Permanent Injunction Against 10X Is Warranted

All of the relevant factors establish that 10X should be enjoined from making, selling, offering to sell, using and importing the 10X Accused Products in the United States.  It should also be enjoined from otherwise infringing, directly or indirectly, the '083, '193, and '407 Patents.  A proposed form of the permanent injunction is submitted with this brief attached as Exhibit A.

### B.      Enhanced Damages

### 1.      This Case Was Exceptional And Attorneys' Fees Should Be Awarded

The Patent Act provides that in "exceptional" cases, a court may award to the prevailing party attorneys' fees.  *See* 35 U.S.C. § 285 ("The court in exceptional cases may award reasonable attorney fees to the prevailing party.").  The Supreme Court has stated: "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.  District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).  A preponderance of the evidence standard applies.  *Id.* at 557.

### 2.      10X Willfully Infringed

The jury's finding that 10X willfully infringed was richly-deserved and favors a fees award.  *See, e.g.*, *SRI Intern'l, Inc. v. Cisco Sys.*, 254 F.Supp.3d 680, 723 (D. Del. 2017).  10X's principals acknowledged that they were aware of Professor Ismagilov's work and the Chicago Patents for years and that they had attempted to recruit him multiple times.  *See* Trial Tr. at 787:14-22; *id.* at 786:24-787:3; *id.* at 788:14-789:25; *id.* at 790:11-17.  10X presented just one witness—Dr. Kevin Ness—to explain why 10X supposedly thought it could use the droplet technology in its products notwithstanding the Chicago Patents.  *Id.* at 930-32.  It did not even attempt to present such testimony from Dr. Hindson, Dr. Saxonov or Dr. Stuelpnagel, who actually work at 10X.

As to Dr. Ness, he was a former employee who had not been at 10X for years.  He presented only a groundless theory that 10X would not infringe because 10X's products scaled more than the embodiments in the patents.  *Id.* at 930:8-23.  This supposed non-infringement belief had no basis in any claim requirement.  Moreover, 10X's willfulness presentation based on Dr. Ness was a sham.  10X represented to the Court that it was presenting Dr. Ness's post-deposition, non-willfulness position because 10X refreshed Dr. Ness' recollection about his state of mind while at 10X.

The Court cautioned 10X that Dr. Ness's willfulness testimony needed to be about his state of mind while ***at 10X***, not after his deposition admissions when he was no longer at 10X.  *Id.* at 931:18-21 ("So I think you have to be careful with the question here because the only thing that's really relevant is what he thought at the time.  Views he formed after the fact are not relevant.").  10X, without basis, nevertheless attempted to suggest that Dr. Ness' willfulness testimony was a "refreshed recollection" of his state of mind while at 10X.  *Id.* at 931:24-932:1

("Dr. Ness, did reviewing the patents after your deposition remind you what the differences were when you formed your personal view while you were at 10X?").

On cross-examination, Dr. Ness admitted that 10X's attempt to use his post-deposition, post-10X employment review of the Chicago Patents to present a willfulness story was a total contrivance that disregarded this Court's caution:

> Q: You don't – at least as of the time of your deposition, you didn't have a personal belief as to whether the 10X products infringed the Chicago patents at or not?  At that point, you didn't know whether that happened?
>
> A: Yeah, because, again, I didn't know the patents.
>
> \*   \*   \*
>
> Q: And just to be certain about this, while you were at 10X, you didn't have a belief, one way or the other, as to whether the 10X products infringed the Chicago patents, correct, based on -- not the work that you did subsequently to prep for trial, I'm talking about, or after the deposition, but as of the date of the deposition?
>
> A: Correct.

*Id.* at 935:1-5; *id.* at 938:7-13; *see id.* at 937:1-2 ("I probably have not really ever read an entire patent.").

Dr. Ness's presentation of a groundless non-infringement position that he developed after he left 10X is especially inculpatory given his testimony that he has never read any patents—including his own—and thus had never read the patents-in-suit.  *See id.* at 937:1-2; *id.* at 937:10-13.  Accordingly, this case is exceptional not just because 10X's infringement was willful, but also because of the contrived and baseless manner in which 10X attempted to rebut willfulness.

### 3.  10X Presented Unusually Weak Defenses

After deliberating for only a few hours, the jury reached a unanimous verdict in Plaintiffs' favor on 100 verdict questions.  This was not surprising because 10X presented

exceptionally weak defenses on both validity and infringement.  10X's defenses were not just garden variety-thin, but had been previously rejected multiple times over and/or were foreclosed by the Court's rulings.

### a.    10X's Invalidity Defenses Were Not Viable

As to validity, 10X's primary defense was to contend that the '193 and '407 Patents were invalid in view of the *Quake* prior art reference.  Yet, both of these patents had withstood this very attack not just in IPR proceedings, but also *ex parte* reexaminations.  *See* D.I. 26 at 2; D.I. 378.  10X's invalidity defense based on *Quake* was so weak that 10X could not even meet the threshold standard necessary to get IPRs instituted before the PTAB.  *See* D.I. 26 at 2.  Failing to absorb the clear reality that *Quake* does not invalidate the '193 and '407 Patents, 10X nonetheless tried its luck with *ex parte* reexaminations.  Just as 10X's IPRs did not make it very far, its reexamination requests came to a quick halt after Plaintiffs submitted their first substantive paper identifying the numerous deficiencies in 10X's invalidity theories.  *See* D.I. 378.

10X's attempt to argue that the '193 and '407 Patents were invalid in view of *Quake* after multiple divisions of the Patent Office had rejected this argument epitomizes a weak position justifying attorneys' fees.  Indeed, at trial, 10X's expert, Dr. Chang, was repeatedly exposed as having presented half-baked invalidity arguments based on the disclosure in *Quake*.  *See* Trial Tr. at 1034:7-11, 1035:18-22, 1036:17-1037:1, 1044:16-21.  Dr. Chang did not even attempt to establish that the skilled artisan would have had a reasonable expectation of being able to successfully combine *Quake* with the prior art to yield the claimed inventions.

To nonetheless try to bolster this unsupportable invalidity argument, 10X relied on a suspect theory that Professor Ismagilov had copied from *Quake*.  Although the Court had ruled that 10X could rely upon this theory only for credibility, 10X blatantly attempted to use it as

direct evidence of invalidity.  *See, e.g.*, Trial Tr. at 101:7-11, 1508:16-21, 1509:10-20, 1510:14-16, 1511:17-22, 311:12-313:8, 316:8-16, 326:12-17.   This was highlighted from the very first stage of trial, where 10X solemnly affirmed it would be "very explicit" in its opening that the copying issue pertained only to credibility.  *Id.* at 7:15-24.   Yet, following 10X's opening, the Court noted that there was not a "single word" about credibility.  *Id.* at 108:19-109:1.   10X's sole justification was that it "forgot" the copying theory was to be used only for credibility.  *Id.*  The weakness of 10X's attempt to distort the common practice of patent attorneys' reusing information from other filings into something nefarious was underscored by the testimony of 10X's CEO, Dr. Ben Hindson, who admitted that his own patent filings were loaded with reused material.  *See id.* at 774:19-24; *id.* at 780:21-781:1.   10X's bogus copying theory unnecessarily complicated this case, and its attempt to rely on it for improper purposes makes even clearer that this case is exceptional.

As a secondary invalidity attack on the '193 and '407 Patents, 10X presented a flimsy enablement argument based on the notion that these patents failed to teach conducting reactions off chip.  Yet, 10X's own expert acknowledged that this simply was not so—the patents include successful embodiments showing off-chip reactions.  *See id.* at 1054:14-19, 1055:2-8.   To support this "off-chip" theory, 10X further argued that the '193 and '407 Patents failed to teach "bushy" surfactants of the kind taught in a 2008 publication and used in 10X's products.  This "bushy" surfactant theory—which was never presented during discovery—illustrates why this case is exceptional.  Indeed, at trial, 10X depicted its surfactants using never-before disclosed and unsupported images that purported to show its surfactants as being deceptively "bushier" than in the internal documents it had prepared before litigation.  *Compare* PTX341-003 *with* DDX6.11.   10X's "bushy" surfactant theory was revealed to be nothing more than a suspect

theory based on a trumped up image dreamt up for trial that is unsupported in fact. 10X's expert who supported this theory was impeached repeatedly, including his admission that he was not even an expert in surfactants. *See, e.g.*, Trial Tr. at 1045:20-1046:6.

As to the '083 Patent—which 10X had also failed to invalidate in an IPR—10X's only invalidity theory at trial was that the claims were indefinite because they claimed a surface tension relationship that was supposedly "impossible" to measure. *See* Trial Tr. at 96:1-96:5. Plaintiffs' expert, however, had presented detailed experiments establishing that 10X's products undoubtedly satisfied the claimed surface tension relationship. 10X did not even bother to depose him on these experiments, and none of 10X's three technical experts presented any rebuttal report criticizing the experiments. *See, e.g.*, *id.* at 1096:20-1097:1, 1095:15-21. 10X's indefiniteness theory was not even presented during expert discovery; 10X could at most point to a "single sentence" in an expert report that allegedly constituted a disclosure of its trial theory. *See* D.I. 428 at 2-4. Any suggestion from 10X that the claims of the '083 Patent were indefinite is belied by the fact that it previously pursued an IPR for this patent, and neither 10X nor its expert had any problem understanding the allegedly indefinite claim element, as 10X's expert confirmed at trial. *See* Trial Tr. at 1099:11-24, 1099:21-1100:10. 10X's pursuit of an indefiniteness theory that was not just baseless, but also blatantly inconsistent with its prior position before the PTAB justifies attorneys' fees.

### b.      10X Had No Infringement Defenses

Just as 10X's invalidity positions lacked merit, so too did its non-infringement positions. For the '407 Patent, 10X did not have a single legally cognizable non-infringement defense. Going into trial, 10X's only theory was that it did not infringe because it took the droplets off the chip and put them in a thermocycler such that reactions allegedly do not occur in a microfluidic system. Yet, the Court made clear at trial that this theory was inconsistent with its claim

construction. *See id.* at 21:18-22:13, 275:2-6.  10X presented the theory anyhow, both through

its expert and at closing.  *See id.* at 1072:17-1073:9, 1532:22-1534:2.  10X's presentation of a

non-infringement defense contrary to the Court's construction plainly establishes that this case is

exceptional.

Similar to the '407 Patent, for the '193 Patent 10X had no non-infringement defense

whatsoever for its GemCode products.  For its later-released Chromium products, 10X's sole

non-infringement defense was the argument that the Landlord reaction was not autocatalytic.

Yet, 10X's expert admitted at trial that Landlord behaved in a way that exactly matched the

Court's definition of an autocatalytic reaction.  *See id.* at 1138:19-1139:2.

Likewise, for the '083 Patent, 10X had no viable non-infringement defense for the

GemCode products.  10X's only argument was that Plaintiffs had not proven that its products

satisfied the claimed surface tension relationship.  Yet, as documented above, Plaintiffs' position

was supported by direct experimental measurements of 10X's products as detailed in a report of

their expert, Dr. Samuel Sia.  10X never deposed Dr. Sia on this report, and none of its three

experts presented any rebuttal report critiquing the analysis.  Surely, if there were a legitimate

basis for 10X to attack Plaintiffs' surface tension experiments, they would have taken these

measures during discovery given that it had only one argument.  As to the Chromium products,

10X's only additional non-infringement position was the pirate-like addition of technologically

irrelevant amounts of fluorine atoms to its chips.  This approach—which was conceived of by

10X's attorneys and business people—was properly found by the jury to nonetheless infringe.

### 4.    There Was Substantial Litigation Misconduct

10X's willful infringement taken in combination with the weakness of its defenses is

more than enough to make this case exceptional.  But beyond that, 10X engaged in a pattern of

litigation misconduct as documented below.  The examples are extensive.

In an attempt to provide 10X's in-house attorneys with an advantage during settlement discussions, 10X's outside attorney ████████████████████████████████████████ ████████████████████████████████████████████████████████ *See* D.I. 324.  Far from aiding settlement, ████████████████████████████████████████ ████████████████████████████████████.  After the violation was brought to the Court's attention, 10X's outside attorney ██████████████████.  *See* Lavin Decl., Ex. 2 (Teleconference Tr. (5/22/18)) at 8:7-13.  It was not until 10X's outside attorney ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████      *See* D.I. 350 (Hearing Tr. (6/18/18)) at 20:2-21:9.  As the attorney in question stated, ████████████████████████████████████████ ████████████████████████.  *Id.*  Despite having made such representations, among the many 10X attorneys at trial, the attorney in question played no role at trial and was not even present in the courtroom as a spectator.   There is no valid explanation for this bait-and-switch.

As another example, at trial, 10X argued that it should be able to rely upon a provisional application to support its theory that the inventor of the patents-in-suit inappropriately copied material from the prior art *Quake* reference.   10X's convoluted position was based on the argument that cross-examination on the provisional application would reveal some basis for it to suddenly rely upon the *Thorsen* reference as anticipatory prior art, even though its expert presented no such opinions.   As the Court remarked, 10X's counsel was "playing games," "playing fast and loose," did not "have a leg to stand on," and "adding on an argument that I don't think you should be making."   *See* D.I. 484 (Hearing Tr. (11/2/18)) at 47:18-49:4.

Ultimately, after 10X's counsel had forced the parties and Court to waste substantial time addressing its positions, the Court rejected 10X's theory, ruling that 10X had simply made a "strategic move" in deciding not to challenge priority and that its position was "illogical." *See* D.I. 429 at 1-2; *id.* at 2 n.2.

10X's pursuit of baseless positions that unnecessarily multiplied proceedings was not just a trial phenomenon, but began in the earliest stages of the case.  For instance, after almost all of its IPR requests had been denied, 10X requested a stay of this case on the basis of two of the six patents-in-suit still being subject to IPR.  *See* D.I. 25.  As the Court found, virtually every relevant factor weighed against a stay.  *See* D.I. 38 at 23:4-27:4.  10X's request for a stay on the basis of IPR proceedings when four of six patents were not even subject to IPR was plainly without basis and only served to waste Court and party resources.

As another example, after failing to plead inequitable conduct, 10X nonetheless submitted a lengthy expert report from a former Commissioner of Patents that attempted to back-door an untimely inequitable conduct allegation based on 10X's copying theory.  *See* D.I. 215 at 1-2.  Plaintiffs were forced to move the Court to strike the report, which the Court did.  *See* D.I. 224 (Hearing Tr. (9/6/17)) at 33:22-24 ("I am a hundred percent confident that I would exclude this at trial.  I would exclude it under Rule 54.  I would probably exclude it as being just irrelevant.").

As another example, Plaintiffs needed to repeatedly compel 10X to provide discovery. Most notably, with regard to the issue of willful infringement, 10X interposed a litany of inappropriate privilege objections during the deposition of three of its principals and Plaintiffs were forced to seek the Court's relief to get additional deposition time.  *See* D.I. 200 at 1-2.  As the Court ruled, the objections "obstructed the plaintiff from getting information that I think they

are not only entitled to, but that seems like it could be important" and that there was "too much

objection going on." *See* D.I. 207 (Hearing Tr. (8/8/17)) at 50:11-13; *id.* at 51:1-6.

As yet another example, during the final days of expert report preparation, and long after

10X had produced to Plaintiffs samples of its products for testing, 10X suddenly decided to

designate these samples as highly-confidential attorneys' eyes only.  With just a few days before

expert reports, Plaintiffs were forced to halt all of their product testing midstream and seek this

Court's relief on two separate occasions so that product testing could be completed.  *See* D.I. 200

at 3; D.I. 215 at 3.

Finally, throughout trial, counsel for 10X misrepresented key facts, including the

following:

- 10X's lead counsel asserted that Dr. Sia's supplemental report on product testing was "unauthorized."  *See* Trial Tr. at 874:19-875:10.  In fact, the supplemental report was authorized and agreed to by 10X.  *See* D.I. 207 (Hearing Tr. (8/8/17)) at 17:18-25.  The report came outside the normal schedule due to 10X's tardy designation of its products as attorneys' eyes-only, which forced Plaintiffs to halt their testing midstream and seek the Court's relief on two separate occasions.

- During closing, 10X's counsel falsely asserted that its chips were shipped from Germany, relying on a document that was never mentioned at trial, was not in evidence, and was excluded by the Court's motion *in limine* ruling.  *See* Trial Tr. at 1532:4-8; D.I. 371 at 1.  This is a groundless position because 10X ships its products from California.  *See* Trial Tr. 1244:5-16.  Notably, just before closing statements 10X asked the Court to preclude presentation of this very evidence to the jury only to later do an about-face and itself present it to the jury.  *See id.* at 1426:4-1429:11.

- During closing, 10X's lead counsel asserted that the *Quake* reference discloses fluorinated oil as a carrier fluid.  *Id.* at 1541:1-10.  In fact, *Quake* never uses fluorinated oil as a carrier fluid—which is a crucial distinction from the invention.

- During closing, 10X's lead counsel asserted that there was zero evidence of surface tension relationship in the '083 Patent being satisfied and that Plaintiffs' only theory was only that droplets need to flow.  *Id.* at 1527:7-1528:6.  In fact, Plaintiffs' expert, Dr. Sia, had presented testimony

regarding direct experimental measurements showing that 10X's products satisfied the claimed surface tension relationship. *Id.* at 381:22-393:13.

- During closing, 10X's lead counsel asserted that there was no evidence 10X used the products in the United States because Plaintiffs' counsel failed to present such evidence or that its chips, oils, or any substantial component of the claim is shipped abroad. *Id.* at 1531:23-1532:8. In fact Dr. Hindson testified that 10X used the Accused Products domestically. *Id.* at 734:16-735:3. And the testimony of 10X's V.P. of Finance was that all of its products were assembled in the U.S. such that they had to be shipped abroad. *Id.* at 1244:5-16.

- During closing, 10X's lead counsel argued to the jury that Bio-Rad did not hold back money for the Chicago Patents during the QuantaLife acquisition. *Id.* at 1517:14-25. In fact, the Chicago Patents had not issued at that time such that it would have made no sense for Bio-Rad to do this.

## C.    Enhanced Damages

Under 35 U.S.C. § 284 "the court may increase the damages up to three times the amount found or assessed." The Supreme Court has described § 284 "as providing that punitive or increased damages could be recovered in a case of willful or bad-faith infringement." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. ___, 136 S.Ct. 1923, 1930 (2016) (internal quotation marks omitted). Section 284 "allows district courts to punish the full range of culpable behavior. In so doing, they should take into account the particular circumstances of each case and reserve punishment for egregious cases typified by willful misconduct." *Id.* at 1926. When considering whether to enhance damages, courts consider the *Read* factors, including: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) the closeness of the case; (6) the duration of defendant's misconduct; (7) any remedial action by the defendant; (8) defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct. *See Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992).

Application of the *Read* factors to the evidence documented above in connection with Plaintiffs' request for attorneys' fees show that enhancement is warranted.

- Willful infringement was clear and 10X had no good-faith belief it did not infringe (*Read* factor 2).

- The scope of litigation misconduct was extensive and persisted from the beginning of the case through trial (*Read* factors 3, 6).

- The case was not close, 10X presented weak defenses, and the jury quickly ruled in Plaintiffs' favor (*Read* factor 5).

- 10X made clear at trial that it is "the market leader by far.  And that's shown by the sales" (*Read* factor 4).  *See* Trial Tr. at 93:12-14.  In fact, sales of the infringing 10X instruments and consumables have consistently increased year-over-year since infringement began in 2015.  Revenues from sales of infringing instruments increased from ███████ in 2015 to well over ██████ thus far in 2018.  S*ee* PTX1255; Lavin Decl., Ex. 3 (10X-000272410).   Similarly, revenues from infringing consumables increased from less than ██████ in 2015 to over ██████ in 2018. *Id.*

- Relatedly, the market for droplets is rapidly expanding, and 10X witness Kevin Ness testified that it could potentially be worth a few hundred million to a billion dollars (*Read* factor 8).  *See* Trial Tr. at 947:8-11.

- Finally, 10X has taken no post-trial remedial actions and has refused to state whether it will even do so (*Read* factor 7).

Thus, the *Read* factors overwhelmingly favor enhancement.

### D.   Plaintiffs Are Entitled To Pre-Verdict Supplemental Damages

Until recently, 10X only provided infringing sales data through the second quarter of 2018.  *See* PTX1255 (Defendants' sales data presented only through second quarter of 2018). Thus, the jury was not presented with any evidence, opinion, or argument from either side concerning infringing sales as of July 1, 2018 and thereafter.   *See* Trial Tr. 612:14-613:2 (Plaintiffs' expert Mr. Malackowkski confirming damages calculated only through the second quarter of 2018); Declaration of James Malackowski (hereafter, the "Malackowski Decl.") ¶¶ 5, 9 (same).   Indeed, at the Nov. 1 pre-trial hearing, the Court stated "if [Plaintiffs] win, the question of relief or for infringement after [July 1, 2018] will be subject to the further

proceedings." S*ee* D.I. 489 (Hearing Tr. (11/1/18)) at 121:22-122:17.   Plaintiffs are therefore

entitled to pre-verdict supplemental damages for infringing 10X Accused Products sales

occurring from July 1, 2018, through the date of the verdict, November 13, 2018.[3]   *See* 35 U.S.C.

§ 284 ("When the damages are not found by a jury, the court shall assess them.").   Indeed,

without an award of supplemental damages, Plaintiffs will not be compensated for 10X's

infringement since July 1, 2018*.  See ActiveVideo Networks, Inc. v. Verizon Comm'ns, Inc.*, C.A.

No. 10-cv-00248, 2011 WL 4899922, at *1 (E.D. Va. Oct. 14, 2011) ("[T]he patentee is entitled

to damages for the entire period of infringement and should therefore be awarded supplemental

damages for any periods of infringement not covered by the jury verdict.") (internal quotations

omitted), *aff'd*, 694 F.3d 1312 (Fed. Cir. 2012); *Stryker Corp. v. Davol, Inc.*, 75 F.Supp.2d 746,

747-48 (W.D. Mich. 1999), *aff'd*, 234 F.3d 1252 (Fed. Cir. 2000) (affirming district court's grant

of pre-verdict supplemental damages against infringer).

Although various methods exist for computing supplemental damages for pre-verdict

sales, ultimately, "supplemental damages are calculated consistent with the damages awarded in

the jury verdict." *See Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, C.A. 03-cv-

0597-PHX-MHM, 2009 WL 920300, at *3 (D. Ariz. Mar. 31, 2009), *aff'd*, 670 F.3d 1171 (Fed.

Cir. 2012), *vacated in part on other grounds*, 682 F.3d 1003 (Fed. Cir. 2012); *E.I. DuPont de*

*Nemours and Co. v. Unifrax I LLC*, C.A. 14-cv-01250-RGA, 2017 WL 4004419, at *7-*8 (D.

Del. Sept. 12, 2017) (applying the royalty rate the patentee determined the jury likely used);

*accord. Aero Prods. Intern'l, Inc. v. Intex Recreation Corp.*, C.A. 02-cv-02590, 2005 WL

---

[3] Plaintiffs are also entitled to supplemental post-verdict damages through the date that 10X ceases infringement.  *See, e.g., Power Integrations, Inc. v. Fairchild Semiconductor Intern'l, Inc.*, 711 F.3d 1348, 1380-81 (Fed. Cir. 2013) (error to deny patentee an accounting for infringing post-verdict sales).  The Parties have stipulated and the Court has ordered a severance and stay of such ongoing royalties pending resolution of any appeal.  *See* D.I.506 at 2.

1498667, at *2 (N.D. Ill. June 9, 2005) (setting supplemental damages for the period between the jury verdict and the imposition of permanent injunction at 13.5% based upon extrapolation from the jury's general verdict).

Here, the amount of pre-verdict supplemental damages can be readily calculated based on (i) the supplemental sales data recently produced by 10X on December 3, 2018 (*see* Lavin Decl. ¶ 6); and (ii) the 15% implied royalty rate that the jury applied to infringing sales.  *See* Malackowski Decl. ¶¶ 5-8.  Applying this 15% royalty rate to the supplemental infringing sales results in supplemental pre-verdict damages of ▇▇▇▇.  *See* Malackowski Decl. ¶ 11.  Thus, Plaintiffs seek an award of pre-verdict supplemental damages in the amount of ▇▇▇▇.

### E.     Plaintiffs Are Entitled To Awards Of Pre And Post-Judgment Interest

#### 1.     Awarding Prejudgment Interest To A Prevailing Patentee Is The Rule

Plaintiffs are also entitled to an award of prejudgment interest on the jury's verdict amount and the requested supplemental damages under 35 U.S.C. § 284.  Awarding prejudgment interest to a prevailing patentee in a patent infringement action is "the rule, not the exception."  *Crystal Semiconductor Corp. v. TriTech Microelectronics Intern'l, Inc.*, 246 F.3d 1336, 1361 (Fed. Cir. 2001).  Prejudgment interest is awarded "to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement."  *Gen. Motors Corp. v. Dexev Corp.*, 461 U.S. 648, 655-56 (1983) (explaining that "damages consist not only of the value of the royalty payments but also of the foregone use of the money between the time of infringement and the date of the judgment").

Prejudgment interest is to be assessed on the entire compensatory damages award. *Beatrice Foods Co. v. New England Printing and Lithographing Co.*, 923 F.2d 1576, 1580 (Fed. Cir. 1991).  Typically, this includes the jury's verdict award and any supplemental damages award the Court may grant.  *See, e.g., Presidio Components, Inc. v. American Tech. Ceramics*

*Corp.*, C.A. No. 08-cv-00335-IEG-NLS, 2013 WL 4068833, at *16 (S.D. Cal. Aug. 12, 2013)

(awarding prejudgment interest of supplemental damages award); *ActiveVideo Networks*, 2011

WL 4899922, at *6 ("Further, as prejudgment interest runs from the date of infringement to the

date of judgment, the Court FINDS that ActiveVideo is entitled to prejudgment interest on its

damages award, including on its supplemental damages.").

> **2.      Prejudgment Interest Should Be Awarded At The Prime Rate Compounded Quarterly From The Date Of First Infringement**

It is well-settled that "prejudgment interest should be awarded from the date of

infringement to the date of judgment." *Nickson Indus., Inc. v. Rol Mfg. Co.*, 847 F.2d 795, 800

(Fed. Cir. 1988) (citations omitted); *see also Bio-Rad Labs., Inc. v. Nicolet Inst. Corp.*, 807 F.2d

964, 967 (Fed. Cir. 1986).  Accordingly, Plaintiffs are entitled to prejudgment interest accruing

from the date of first infringement, occurring in the second quarter of 2015, through the

November 13, 2018 jury verdict.  *See* Trial Tr. 651:13-16, 1154:18-1155:4.

The Court has wide discretion to determine the rate of prejudgment interest "and may

award interest at or above the prime rate." *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540,

1545 (Fed. Cir. 1991) (citations omitted); *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed.

Cir. 1997) (recognizing district court's discretion in determining appropriate rate of prejudgment

interest and whether to award compound interest).  Courts recognize "that the prime rate best

compensate[s] a patentee for lost revenues during the period of infringement because the prime

rate represents the cost of borrowing money, which is a better measure of the harm suffered as a

result of the loss of the use of money over time." *See, e.g., Finjan Software, Ltd. v. Secure

Computing Corp.*, C.A. No. 06-cv-00369 (GMS), 2009 WL 2524495, at *13 (D. Del. Aug. 18,

2009), *aff'd in part, rev'd in part on other grounds*, 626 F.3d 1197 (Fed. Cir. 2010) (internal

quotations and citations omitted).  Furthermore, "it is not necessary that a patentee demonstrate

that it borrowed at the prime rate in order to be entitled to prejudgment interest at that rate." *Uniroyal*, 939 F.2d at 1545; *see also Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1579–80 (Fed. Cir. 1988) (holding that a patentee does not have to make "an affirmative demonstration, i.e., proof of borrowing at or above prime . . . to be entitled to an award of prejudgment interest at the prime rate") (internal quotation marks omitted).   The Federal Circuit has repeatedly endorsed awarding prejudgment interest at the prime rate in patent infringement cases.   *See, e.g., Lam, Inc. v. Johns- Manville Corp.*, 718 F.2d 1056, 1066 (Fed. Cir. 1983) ("The district court may fix the interest and select an award above the statutory rate, or select an award at the prime rate.") (internal quotations and citations omitted).   Thus, the Court should apply the prime rate.

In addition to the rate of prejudgment interest, the court must also determine whether to award simple or compound interest and, if there is to be compounding, the time period for the compounding.   *See Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1555 (Fed. Cir. 1995).   In "applying prejudgment interest, courts have recognized that compounding is necessary to fully compensate the patentee."   *Fresenius Med. Care Holdings, Inc. v. Baxter Intern'l, Inc.*, C.A. 03-cv-01431 SBA, 2008 WL 928535, at *2 (N.D. Cal. Apr. 4, 2008) (internal quotations and citation omitted).   "Because a patentee's damages include the foregone use of money, compounding is needed to account for the time value of money."   *Id.* (internal quotations and citation omitted).   When considering the time period for any compounding, a court considers the parties' practices in royalty payments.   *See, e.g., Wis. Alumni Res. Found. v. Apple, Inc.*, 261 F.Supp.3d 900, 924 (W.D. Wis. 2017) (awarding compounded quarterly interest based on the parties' respective practices).   For example, the Federal Circuit has approved of quarterly compounding*.   See, e.g., Studiengesellschaft*, 862 F.2d at 1579–80.

27

Here, the most relevant example of the parties' payment practices is found in the license agreements the damages experts relied upon in evaluating the hypothetical negotiation. *See* PTX415-006 at § E (setting forth quarterly payments); PTX128-011 at §§ 3.5-3.6 (same); PTX412-021-22 at § 3.7 (same); PTX413-005 at § 3.4.1 (same).  As each of the four license agreements used in the hypothetical negotiation specify quarterly payments, interest should be compounded quarterly.  Plaintiffs therefore request that the Court award prejudgment interest on the jury verdict damages award and the supplemental damages requested herein, based on quarterly compounded prime rates, for a total amount of ▮▮▮▮▮▮.  *See* Malackowski Decl. ¶¶ 12-14.

### 3.    Plaintiffs Are Entitled To Statutory Post-Judgment Interest

Finally, the granting of post-judgment interest is automatic under the governing statute. *See* 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court."); *see also Murphy v. F.D.I.C.,* C.A. 88-cv-01396-EFL, 1995 WL 125435, at *2 (N.D. Cal. Mar. 15, 1995); *Theme Promotions, Inc. v. News Am. Mktg. FSI, Inc.,* 731 F. Supp.2d 937, 951 (N.D. Cal. 2010) (citing *Friend v. Kolodzieczak,* 72 F.3d 1386, 1391-92 (9th Cir. 1995)).  Under Section 1961, the amount of post-judgment interest is determined by using the "weekly average 1-year constant maturity Treasury yield . . . compounded annually." Post-judgment interest should be compounded upon the entirety of the final monetary judgment entered in favor of Plaintiffs.  Thus, any augmentation of damages beyond the jury verdict— including supplemental damages, prejudgment interest, and costs—should be added to the jury's damages award and serve as the aggregate principal upon which post-judgment interest must be compounded.  28 U.S.C. § 1961; *see also Air Separation, Inc. v. Underwriters at Lloyd's of London,* 45 F.3d 288, 291 (9th Cir. 1995) ("[P]ostjudgment interest under 28 U.S.C. § 1961 applies to the prejudgment interest component of a monetary award."); *Murphy*, 1995 WL

125435, at *2 ("[p]laintiffs are awarded postjudgment interest on the total judgment amount (including taxable costs) as provided by 28 U.S.C. Section 1961 from [date of entry of this judgment] until this judgment is satisfied").

Here, the precise amount of post-judgment interest owed to Plaintiffs will depend upon any damages awarded by the Court beyond the jury verdict (*e.g.*, supplemental damages, prejudgment interest, and/or costs), as well as when 10X pays Plaintiffs—a date that cannot be ascertained at this time.   Accordingly, Plaintiffs request that the Court order that the post-judgment interest be awarded on the final money judgment entered in favor of Plaintiffs in an amount to be later determined subject to an accounting.

## III.    CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs: (i) a permanent injunction, (ii) enhanced damages, (iii) attorneys' fees, (iv) an accounting of post-verdict and pre-injunction 10X Accused Products sales, (v) an award of supplemental damages, (vi) an award of prejudgment interest, and (vii) an award of post-judgment interest.

Dated:  December 12, 2018

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: 302-777-0300
Facsimile: 302-777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

OF COUNSEL:

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
Amanda Branch (admitted *pro hac vice*)
Christopher S. Lavin (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000
edward.reines@weil.com
derek.walter@weil.com
amanda.branch@weil.com
christopher.lavin@weil.com

Robert T. Vlasis III (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7024
robert.vlasis@weil.com

*Attorneys for Plaintiffs*

30

# EXHIBIT A

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE UNIVERSITY OF CHICAGO and BIO-RAD LABORATORIES, INC. <br><br> Plaintiffs, <br><br> v. <br><br> 10X GENOMICS, INC. <br><br> Defendant. | Civ. A. No. 15-152-RGA |

**[PROPOSED] PERMANENT INJUNCTION**

Before the Court is the Motion for Permanent Injunction brought by plaintiffs Bio-Rad Laboratories, Inc. and The University of Chicago (collectively, "Plaintiffs") against defendant 10X Genomics, Inc. ("10X").

WHEREAS 10X has infringed claims 1 and 9 of Plaintiffs' U.S. Patent No. 8,889,083 (the "'083 Patent"), claims 6 and 8 of the U.S. Patent No. 8,304,193 (the "'193 Patent"), and claims 1, 10, and 11 of U.S. Patent No. 8,329,407 (the "'407 Patent");

WHEREAS, the Court finds that Plaintiffs will suffer irreparable harm if 10X continues its infringement, that monetary damages cannot adequately compensate Plaintiffs for this resulting irreparable harm, and that the balance of equities and public interest favor entry of a permanent injunction;

NOW THEREFORE, having considered the entire record in this action, the verdict of the jury, relevant orders of the Court, and the papers submitted by the parties, and good cause having been shown:

## I.   PROHIBITED ACTIVITIES – '083 AND '407 PATENTS

IT IS HEREBY ORDERED that defendant 10X and any of its parents, subsidiaries, successors, assigns, officers, agents, servants, employees, attorneys, and persons or entities in active concert or participation with them (including any affiliated entities), who receive actual notice of this Permanent Injunction, are hereby permanently enjoined and restrained from infringing, or inducing or contributing to, the infringement of claims 1 and 9 of the '083 Patent and claims 1, 10, and 11 of the '407 Patent (collectively, the "'083 and '407 Asserted Claims") until these Patents' expiration, by:

(a) using within the United States any product that infringes the '083 and '407 Asserted Claims, including without limitation the Chromium Genome/Exome, GemCode Long Read, Chromium Single Cell 3', or Chromium Single Cell V(D)J systems (collectively the "'083 and '407 Accused Products"), and those no more than colorably different;

(b) inducing infringement by 10X's United States customers of the '083 and '407 Asserted Claims, by engaging in activities including, without limitation, the following: (i) advertising, marketing, or otherwise promoting the '083 and '407 Accused Products; (ii) entering or fulfilling product orders, or setting, determining, or approving terms of sale, for the '083 and '407 Accused Products; (iii) providing customer service or other technical support relating to the '083 and '407 Accused Products; (iv) negotiating or entering into licensing, representative, reseller, or distributor agreements relating to the '083 and '407 Accused Products; (v) developing, designing, manufacturing, or having manufactured products substantially similar to the '083 and '407 Accused Products; (vi) writing,

modifying, updating, drafting or otherwise preparing documentation regarding the operation, use, or intended of any the '083 and '407 Accused Products;

(c) contributing to infringement of the '083 and '407 Asserted Claims by selling within the United States the '083 and '407 Accused Products or their components and products no more than colorably different; and/or

(d) supplying from the United States for combination abroad any component especially made or especially adapted for use in claims 1 and 9 of the '083 Patent and not a staple article or commodity of commerce suitable for substantial noninfringing use, including the '083 and '407 Accused Products or their components and products no more than colorably different.

## II.     PROHIBITED ACTIVITIES – '193 PATENT

IT IS FURTHER HEREBY ORDERED that defendant 10X and any of its parents, subsidiaries, successors, assigns, officers, agents, servants, employees, attorneys, and persons or entities in active concert or participation with them (including any affiliated entities), who receive actual notice of this Permanent Injunction, are hereby permanently enjoined and restrained from infringing, or inducing or contributing to, the infringement of claims 6 and 8 of the '193 Patent (collectively, the "'193 Asserted Claims") until the expiration of the '193 Patent, by:

(a) using within the United States any product that infringes the '193 Asserted Claims, including without limitation the Chromium Genome/Exome and GemCode Long Read (collectively the "'193 Accused Products"), and those no more than colorably different;

(b) inducing infringement by 10X's United States customers of the '193 Asserted Claims Asserted Claims, by engaging in activities including, without limitation, the

following: (i) advertising, marketing, or otherwise promoting the '193 Accused Products; (ii) entering or fulfilling product orders, or setting, determining, or approving terms of sale, for the '193 Accused Products; (iii) providing customer service or other technical support relating to the '193 Accused Products; (iv) negotiating or entering into licensing, representative, reseller, or distributor agreements relating to the '193 Accused Products; (v) developing, designing, manufacturing, or having manufactured products substantially similar to the '193 Accused Products; (vi) writing, modifying, updating, drafting or otherwise preparing documentation regarding the operation, use, or intended of any the '193 Accused Products; and/or

(c) contributing to infringement of the '193 Asserted Claims by selling within the United States the '193 Accused Products or their components and products no more than colorably different.

## III.   <u>NOTICE</u>

IT IS FURTHER ORDERED that, within thirty (30) days from the date of this signed Permanent Injunction, 10X shall provide a copy of this Permanent Injunction to each of its parents, subsidiaries, successors, assigns, officers, agents, servants, employees, attorneys, and persons or entities in active concert or participation with them (including any affiliated entities), as well as to any and all manufacturers, distributors, retailers, licensees, customers, and all other persons or entities who have been, or are reasonably expected to be involved in the foregoing prohibited activities, including but not limited to any company to which 10X has previously directly or indirectly sold or offered for sale one or more of the Enjoined Products, and any company to which

10X intends in the future to directly or indirectly sell or offer to sell one or more of the Enjoined

Products.

IT IS FURTHER ORDERED that, within thirty (30) days from the date of this signed

Permanent Injunction, 10X shall file with the Court and serve on all parties a notice stating the

names and addresses of each party that it has notified in compliance with this section.

## IV.    CONTINUING JURISDICTION

The Court specifically retains jurisdiction to enforce, modify, extend, or terminate this

Permanent Injunction as the equities may require, upon a proper showing, and to adopt procedures

for resolution of any dispute whether a product not specifically covered by this Permanent

Injunction is more than colorably different from the adjudged infringing products.


**IT IS SO ORDERED.**


Dated: _____        _____

The Honorable Richard G. Andrews
United States District Judge