

July 29, 2019

**VIA E-FILING**
The Honorable Richard G. Andrews
United States District Judge
J. Caleb Boggs Federal Building
844 N. King Street
Unit 9, Room 6325
Wilmington, DE 19801-3555

      Re:    **Bio-Rad Laboratories, Inc., et al. v. 10X Genomics, Inc.**
              <u>C.A. No. 15-cv-152-RGA</u>

Dear Judge Andrews,

      Pursuant to Your Honor's July 24, 2019 Order, attached as Exhibit A is the parties' proposed revised permanent injunction embodying Your Honor's rulings. The parties were unable to reach agreement on several provisions contained in the proposed permanent injunction and, therefore, have submitted competing proposals as specified in Exhibit A. Plaintiffs and Defendant provide their reasoning for their respective proposals below.

    **I.**      <u>**Bio-Rad Position**</u>

      The main dispute about the form injunction arises because 10x apparently wants to continue to sell the infringing Chromium instrument and infringing reagents (such as surfactants and oils) for use with redesigned chips. Bio-Rad is concerned that these products may be able to work with the chips found to infringe at trial.

      Originally, 10x represented to Bio-Rad it was going to prevent compatibility of its instruments with the infringing consumables through firmware, but now it refuses to identify how it is going to do so and vociferously refuses to commit to do so as a protection *in the injunction*. This situation creates serious issues with the enforceability of the injunction. There is a real risk that going-forward supposedly non-infringing instruments and "staple" reagents (apparently identical to the infringing editions) can be used with the infringing chips by the hundreds of customers in 10x's large historical installed base of more than a thousand infringing systems. On-going sales of consumables to historical customers are supposed to be subject to a 15% royalty on old systems, but that can be skirted by customer commingling of "new" reagents (identical to the infringing reagents that 10x now unilaterally declares to be staples) with old infringing chips. This type of practice is all-too-common for patented laboratory reagents generally in this industry. Creating new SKU numbers for identical reagents is not a meaningful protection. And without protections in place the infringing consumables such as the infringing chips can be used by historical 10x customers on new instruments for which no royalty is paid. The jury verdict provides that 10x should pay 15% on all the components of the system including the instruments. Bio-Rad is in a much worse position than 10x to ensure that no such infringement takes place and that there is no evasion of the Court Ordered royalty - provisions in the injunction are necessary to accomplish this.

Originally, after 10x revealed that it planned to continue to sell the same infringing instrument, 10x asked for a provision in the injunction that specified that 10x would include in the word of 10x's counsel "firmware" in its Chromium instruments going forward that would prevent them from being used with the infringing chips and other consumables it plans to sell supposedly for use only on the historical installed base.  Bio-Rad agreed that made sense and drafted a provision, which is at Section IV.   10x now opposes such a provision and it has ***not*** proposed any form of protection to prevent the problems identified in this letter such as enforceably committing that it will not sell new instruments that work with the infringing components.   It should be included.  Otherwise, 10x will be able to support customer infringement with a blind eye.   It is very difficult for Bio-Rad to trace the sales of new devices and consumables in the laboratories of 10x's customers to police such infringement.

Not only does proposed Section IV protect against this problem, but Bio-Rad's proposed Sections I and II specify what 10x cannot do based on the facts found by the jury (the main differences are in the indirect infringement provisions), which also protects against the risk that 10x's customer will purchase less expensive supposedly "non-infringing" components of the system rather than the components that bear the 15% royalty.  Bio-Rad asked 10x what components that were found to infringe need to be used in identical infringing form with their redesigned chip and why.  10x did not identify anything.  Now vaguely citing "gaskets" and "chemicals" 10x labels them staples that they should be able to freely sell.  Yet, 10x does not identify any aspect of its system that is part of the claimed invention that should be considered a staple rather than a product specially designed for infringement, as the jury found.  In substance, 10x's proposed Sections I and II are merely an injunction not to infringe, rather than specifying the acts that are enjoined.   The law favors injunctions that specify the facts as found by the jury.  Indeed, 10x is explicit in its proposed Sections I and II that it wants to continue with the activities found to infringe by the jury such as selling the components of the infringing systems but post-injunction "for a non-infringing use."   This is mischief.  At trial 10x failed to identify any non-infringing use for the components of the infringing system and the jury found that they were especially adapted for infringing uses.  To this day, 10x has not shown that it has any non-infringing uses for the components found to infringe.  As the Court noted in its Memorandum Order granting the injunction, 10x has not demonstrated it has substantial non-infringing uses for the infringing components.   D.I. 568 at 10.  Moreover, 10x has failed to prove that, if it sells the components found to infringe "for a non-infringing use" that it has any plans or way to enforce a benign purpose.  The burden of that risk should be borne by 10x.  In its Memorandum Order, this Court rejected 10x's argument that the injunction should somehow accommodate its redesign – which the Court has not even seen. D.I. 568 at 10.  10x's attempt to turn that ruling on its head throughout its lengthy argument should be rejected.

Bio-Rad's Sections 1 and 2 should be adopted.

Beyond this fundamental problem, there are five other disputes that warrant resolution:

1. In its proposed Section I, 10x attempts to defer the effectiveness of the injunction until the Federal Circuit lifts a stay.   This makes no sense.  This Court refused to order a stay and 10x has not even filed for a stay request with the Federal Circuit.  10x's reference to lifting a

stay is a presumptuous attempt to grant itself a stay. The Federal Circuit is more than capable of staying this Court's injunction if it were somehow to decide that is appropriate.

2. In Section III, Bio-Rad proposes that the royalties for the supply of infringing consumables should be based on the price paid by the ultimate customer whereas 10x wants to pay merely on the price 10x charges its distributors, sales agents or other intermediaries. This is unfair because if 10x uses a sales channel (such as through a specialty distributor that takes 20-30% of the revenue), that should not reduce Bio-Rad's royalty. This would encourage off-loading the sales process to reduce the royalty. 10x points to the trial evidence. Bio-Rad's concern is not based on 10x's pre-verdict practices, but what its economic incentives are post-verdict – which is to off-load the sales and marketing process.

3. 10x has argued that the going-forward sales of infringing consumables to its Historical Installed Base and the sales on all its infringing products made from the verdict date to the injunction date should not be at a 15% rate, but a new on-going royalty rate that should be calculated later. It proposed to stay and sever such an analysis for resolution post-trial. To narrow the disputed issues, Bio-Rad does not oppose that structure. As part of this, 10x has agreed to pay the 15% royalty found by the jury into an escrow subject to a true up after an on-going royalty is set post-appeal. However, 10x opposes Bio-Rad's inclusion of the post-verdict and pre-injunction infringing sales in that escrow as set forth in Section III. 10x made sales after the verdict and Bio-Rad at a minimum deserves royalties on that revenue. It should be put into escrow just like the consumable sales to 10x's historical base. There is no reason to treat it differently. 10x's main argument is that this has nothing to do with the injunction. It has everything to do with the injunction because 10x wants to sell infringing components on to the instruments it sold after the willful infringement verdict. That should only be permitted if 10x puts into escrow the royalties for the infringing instruments that will be using the infringing reagents.

4. Bio-Rad requests an accounting broken down on a per-product basis in the quarterly accounting report, rather than lumping all products together. This reasonable identification of infringing sales will help reveal if there are anomalies that warrant an audit or reveal potential injunction violations. Because this per-product royalty report only discloses an aggregate amount of legacy product sales per quarter this is a reasonable request.

5. Notice is important to ensure that the injunction applies to those acting in concert with 10x. The parties agree that notice of the injunction (making it binding) should be given to all customers, but Bio-Rad believes that 10x's sales agents, employees and vendors such as those involved with supplying components to the system should be included. In addition, importantly, new customers, etc. should be informed of the injunction so they can abide by it. 10x states that the Court has already rejected this. But this is not notice to customers to which it intends to sell systems, but actual new customers that might be purchasing the components that can be used in either the infringing chip or whatever new chips 10x sells.

## II.     10X Genomics' Position

10X is taking operational, technical and marketing steps to make sure that its actions are consistent with the injunction.  First, consistent with the spirit of the Court's ruling, 10X is implementing a plan to modify all instruments it sells after the Effective Date such that they will be technically configured to run only 10X's redesigned chip (called the "Next GEM chip"), where 10X believes there is no credible argument of infringement.   A customer who purchases a new instrument after the Effective Date will only be able to operate that instrument with Next GEM chips—older chips will not work.  10X is modifying its systems operationally so that these new instruments will have new and unique part numbers.  10X is doing the same for the Next GEM chips, that are designed for the new instruments. Other consumables that have been optimized for the Next GEM chips will also have new part numbers.  This will all be done so that it will be easy to track (and audit) what products are being sold.  10X will make sure that all existing customers are told about the injunction.  10X agrees  to provide Bio-Rad with appropriate sales information and full audit rights regarding sales after the Effective Date.  There is also no reason for this Court to delve into the sorts of design decisions that Bio-Rad demands—e.g., that it be implemented with a particular sort of firmware with certain ill-defined qualities.  As this Court indicated, the redesign is not before it—it has not even been accused yet.  The Court's Opinion specifically stated that any dispute about infringement of 10X's redesigned system is not appropriate for resolution now.  If and when Bio-Rad can document concerns that the redesign is insufficient to prevent infringement, it will be free to seek relief.

What 10X's proposed language does do—and Bio-Rad's does not—is comply with this Court's opinion granting the injunction. This Court's decision to grant Plaintiffs' motion for an injunction was premised in part on a finding that current 10X customers would be able to continue their research and that new customers would have access to 10X's redesigned, next generation system. D.I. 568 at 9. Indeed, the Court stated that 10X's public interest argument would be "compelling" but for those two facts. *Id*. But Bio-Rad's proposed injunction language threatens to both block ongoing research on 10X's currently installed systems and to prevent customers from adopting 10X's redesigned system. If Bio-Rad's language is adopted, there is no reassurance that the compelling public interest needs acknowledged by the Court will be met.

It is critical that any injunction entered clearly allow 10X to advance two objectives. The first is to continue providing its redesigned Next GEM products (introduced in May 2019 for three product lines) to new customers. 10X's Next GEM business has neither been accused of nor found to be infringing. And this injunction is not the place to start adjudicating the merits of the redesign or the conditions under which it may continue. The second objective is to allow 10X to support its existing customers who are engaged in ongoing scientific research, as they decide when to transition to that new system on a time table that will not interfere with their important, ongoing research.

In conferring with Bio-Rad on proposed injunction language, 10X has endeavored to minimize disputes and focus only on critical matters that are important to achieving those two objectives.

Given the importance and intricacy of these disputes, 10X respectfully requests that the Court hear oral argument on the remaining questions regarding the scope of the injunction.

**Disputed Sections I & II: Prohibited Activities**.

Bio-Rad's proposed language in these sections is inconsistent with this Court's Opinion (D.I. 568) and would invite unnecessary disputes over 10X's ability to offer its redesigned Next GEM system and the ability of 10X's existing customers to continue their important research. There are three important disputes between the parties in these two sections.

**1**. The parties dispute whether 10X can sell components that have a substantial non-infringing use.

10X's proposed language for enjoining the sale (and supply) of components (subsections I.(c), I.(d), and II.(c)) mirrors the statutory requirements of §§ 271(c) and 271(f) and enjoins 10X from selling or supplying components that contribute to infringement while permitting 10X to make, use, sell and supply components for a non-infringing use. By definition under §§ 271(c) and 271(f), components sold or supplied for a substantial non-infringing use do not contribute to infringement and so there is no basis to enjoin those actions. Bio-Rad's language ignores this important statutory requirement, inviting unnecessary disputes about whether 10X can sell components for use with its redesigned Next GEM system.

As part of the library kits, reagents, and other consumables that 10X sells for use with its new, redesigned Next GEM system, 10X includes a variety of components like enzymes, chemicals, and even rubber gaskets that are commodity components (sometimes sourced from third-parties) that have substantial non-infringing uses (including use with 10X's redesigned system). Such enzymes, chemicals and rubber gaskets also exist in the accused 10X system.

Bio-Rad's proposal for these same sections (subsections I.(c), I.(d), and II.(c)) is inconsistent with this Court's Opinion (D.I. 568 at 10 declining to rule now on 10X's redesigned system) and will invite unnecessary disputes over whether 10X is barred from selling *any* component of the accused 10X systems regardless of whether that component is a commodity component now being sold for a non-infringing use (e.g., for use with 10X's redesigned system), and regardless of whether that component bears any relation to the patent claims found to be infringed. By arguing that the sale of such components would be an act of contributory infringement, Bio-Rad assumes the conclusion that use of components with the redesigned Next GEM system is still infringing—precisely the conclusion this Court declined to reach at this stage.

These provisions regarding sale of components are important because, as the Court saw at trial, 10X's products are complex, multi-component systems. Those components were found to infringe only when arranged and operated in a very specific way to infringe the claims. D.I. 562 (Trial Tr., Sia) at 361:2-13, 394:11-396:14. Multiple reagents had to be loaded into the microfluidic chip, that chip then had to be loaded in the 10X instrument in order to form the droplets, and then a host of additional steps had to be performed after that to complete the workflow. *Id*. Certain components that have nothing to do with the infringement verdict—an enzyme, a chemical, a rubber gasket— may be common across different systems. 10X's proposal ensures that 10X can continue to sell such standard components for use with systems that have not been found to infringe any Bio-Rad patent claims, including the redesigned Next GEM system. The patent laws do not, for example,

give Bio-Rad the right to prohibit the sale of a standard reagent that has many noninfringing uses to customers who possess an instrument that has been modified so as not to infringe.

Bio-Rad's proposed language, however, seeks to enjoin far more than the infringement the jury found. Bio-Rad excludes the language that limits this piece of the injunction to components "especially made or especially adapted for use in an infringement of [the asserted] patents," and excluded the language that permits sales of components that are "a staple article or commodity of commerce suitable for substantial non-infringing use." This modification appears meant to bar 10X from selling *any* component found in the accused 10X systems regardless of whether that component is being sold for a non-infringing use (e.g., for use with 10X's redesigned Next GEM system) and regardless of whether that component bears any relation to the patent claims found to be infringed.

There is no basis for enjoining such components. Bio-Rad's infringement case at trial focused heavily on 10X's microfluidic chip—the plastic chip containing the microchannels used to form the droplets. D.I. 562 (Trial Tr., Sia) at 367:1-20 (testimony of Plaintiff's infringement expert Dr. Sia "Q. . . . What evidence do you have that 10X products are part of a microfluidic system? A. Well, we just first of all, we just saw the chip, okay? **Everything revolves around that chip**, what is introduced into that microfluidic chip, microfluidic chip goes into the instrument that runs the chip. So that's a microfluidic system."); *see also, e.g.*, *id.* at 361:14-365:24, 394:11-396:14, 399:19-407:14, 425:8-428:8 (additional testimony from Dr. Sia focused on the microfluidic chip). It is that microfluidic chip which 10X has fundamentally redesigned in the Next GEM products. The Next GEM system, which will work only with these redesigned chips, now operates in a non-infringing way.

10X should not be barred from selling its new, redesigned system simply because that system as a whole may use some common components that are similar to (or even the same as) a component used in the old system. The key component—the chip—is different. When components are sold for use with the redesigned system they are now being sold for a non-infringing use and therefore cannot contribute to infringement. *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341, 81 S. Ct. 599, 602 (1961) ("[I]t is settled that if there is no direct infringement of a patent there can be no contributory infringement."). As noted above, 10X will assign different model numbers to the Next GEM chips, instruments, and Next GEM-optimized consumables. This will permit 10X to track the consumables provided for use with existing accused instruments (for which Bio-Rad seeks an ongoing royalty) separately from the products sold for use with the redesigned Next GEM system.

10X's proposal (including an express provision that 10X should be permitted to sell components for a non-infringing use) ensures that any later dispute about whether 10X's redesigned Next GEM system violates this order will focus on an analysis of whether the *system* and its use as a whole is more than colorably different from the *systems* and uses accused at trial—not on a piecemeal analysis of whether particular components are different when compared in isolation.

**2**. Both parties also define the "Effective Date" of the injunction in Section I. The only dispute is over whether to account for a potential stay of the injunction by the Court of Appeals for the Federal Circuit. This Court has already anticipated the possibility of such a stay. D.I. 568 at 12 ("I

will delay the effective date of the permanent injunction by two weeks from its entry to give the Court of Appeals an opportunity to consider any expedited appeal . . . "). It therefore makes sense to acknowledge that possibility and its effect in the injunction itself. If no stay is granted, then 10X's proposed language (like Bio-Rad's) sets the Effective Date for two weeks from the signing of the order (as ordered by the Court, D.I. 568 at 12). If the Federal Circuit grants a stay, then Bio-Rad's proposal could wind up defining the "Effective Date" for a date during the stay and well before the injunction actually goes in to effect. Obviously, if the Federal Circuit stays the order, the order should not go into effect. Bio-Rad's refusal to acknowledge that will sow confusion and lead to wasteful additional litigation. Disputes might arise, for example, over whether 10X must provide notice of the injunction even in the event that the Federal Circuit stays the injunction before it ever takes effect.

**3**. The parties also dispute the language in Section I describing which entities are enjoined. Fed. R. Civ. Pro. 65(d)(2) ("defendant 10X and any of its officers, agents, servants, employees, attorneys, and persons or entities in active concert or participation with them"). Bio-Rad's proposal goes far beyond the Rule and seeks to enjoin a long list of additional entities namely "customers, vendors, sales agents (including third party resellers and distributors)." Much of this language is unnecessary, and it extends the effect of this litigation far beyond the ordinary bounds. 10X's proposed language adequately protects Bio-Rad because it already includes "persons or entities in active concert or participation with" 10X as enjoined entities. Adding more parties to the list—in particular "customers"—is improper. Bio-Rad never sued customers and never gave them an opportunity to weigh in on this litigation or the scope of this injunction. It is improper therefore to create a vehicle for holding thousands of customers in contempt. "[C]ourts of equity have long observed the general rule that a court may not enter an injunction against a person who has not been made a party to the case before it." *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1394 (Fed. Cir. 1996) (vacating injunction against non-parties).

Bio-Rad's unnecessary and improper additional language appears to be intended as a tool for Bio-Rad to use to frighten 10X's customers. This is not only unnecessary, but also particularly inappropriate here where the Court's decision to grant Bio-Rad's injunction hinged on the ability of 10X's customers to continue their research. D.I. 568 at 9. Bio-Rad should not be permitted to include unnecessary language that risks scaring customers into thinking they will not be permitted to do precisely what this Court has already decided to allow—namely, to continue their important research using 10X's products.

**Disputed Section III: Historical Installed Base**

**1. Revenue vs. price to end user.** The escrow payments should be calculated based on the net revenue 10X receives from sales. That is consistent with the damages base applied at trial. *See* PTX1255 (spreadsheet identifying 10X net revenue) (admitted under seal); Tr. 612:24-613:9 (Mr. Malackowski testifying about the damages base and relying on PTX1255). Until this proposed injunction order, Bio-Rad has never sought damages based on the ultimate price to the end user. (Bio-Rad's latest proposal refers to the "selling price to the end use," which is an undefined term, never before litigated as a royalty base metric.)

This becomes an issue when 10X sells through distributors, which it does internationally. 10X does not control the prices at which its distributors sell to end customers. It receives payment only for the price at which it sells products to the distributor. Indeed, it does not typically know the prices at which its products are sold or the ultimate price paid by the end user. Bio-Rad did not present this information as part of its damages case and cannot now, after the close of the record, impose an additional and significant financial and logistical burden on 10X. As to the financial burden: Assuming, for example, that the distributor (who needs to make a margin) offers the products at 40% more than the distributor buys the products from 10X, that effectively increases the royalty rate to over 21%. If 10X sells a product to a distributor for net revenue of $1,000, it should pay into escrow a royalty of $150. Under Bio-Rad's proposal, though, if the distributor sells that product for $1,400, the royalty would increase to $210 even though 10X still receives only $1,000 related to the sale of the product. This effectively increases the royalty from 15% to 21%. It is also impractical for 10X to calculate escrow payments based on the ultimate price to the end user. Some of 10X's products are sold through distributors and 10X does not control (and in most cases does not know) the ultimate price paid by the end user. Calculating escrow based on the ultimate consumer prices is simply a mechanism for Bio-Rad to artificially inflate 10X's payments. Further, 10X should not be ordered to demand this information from its distributors. Bio-Rad did not join 10X's distributors in this case. 10X respectfully requests that the Court proceed with "net revenue" as Bio-Rad so proceeded at trial.

**2. Post-verdict, pre-injunction sales.** For sales incurred *after* the Effective Date of the injunction, 10X will deposit a 15% escrow payment so that scientists can continue their important research using 10X's products.[1] As reflected in the draft injunction, the parties have agreed that the release of those funds will await this Court's determination on what the going-forward royalty rate should be (if any). That was necessary because the parties agreed—and this Court ordered—that "[d]etermination of ongoing royalties is SEVERED AND STAYED pending resolution of any appeal" D.I. 506; *see* D.I. 503-1 (reflecting Bio-Rad's agreement).

Yet Bio-Rad now seeks an order requiring 10X to deposit a 15% royalty on sales from the date of entry of judgment on the verdict to before the effective date of the injunction. That is the consequence of Bio-Rad's proposed language that "within forty-five (45) days of the Effective Date 10X shall identify the aggregate number of units and selling price of each infringing product sold before the entry of the injunction and after the verdict that is not included in the supplemental damage award together with a payment in escrow of a 15% royalty of the price to the end user of all such sales."

Pre-injunction royalties have nothing to do with this injunction. And a requirement to deposit those royalties is not appropriate at this time. It is a direct contraction of this Court's order severing and staying resolution of that portion of 10X's liability pending appeal. D.I. 506. Not only did Bio-Rad agree to stay the determination of post-verdict royalties less a year ago, *see* D.I. 503-1, Bio-Rad has never even *moved* for an award of the post-verdict royalties it now seeks.

Accordingly, neither party has briefed the appropriate amount of post-verdict royalties or to which sales any post-verdict royalties might apply. For example, neither party has briefed, nor has the

---

[1] As noted in the proposed injunction, this is without prejudice to 10X's ability to propose and pursue a different royalty rate on appeal or to argue that such royalties are not proper at all.

Court resolved, the important issue of whether 10X should be required to pay *any* royalties on consumables for use with instruments on which Bio-Rad has already recovered a royalty by virtue of the jury's verdict. Use of such instruments is now effectively licensed as a result of Bio-Rad's royalty recovery. Thus there is a real question of whether 10X owes a royalty on the sale of consumables that are sold for use with these effectively licensed instruments. As such, the sale of consumables for use with those instruments can no longer induce or contribute to any act of infringement (nor has Bio-Rad ever alleged that such consumables infringe directly). *See, e.g.*, *Impression Prods. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1528 (2017) ("Exhaustion is a distinct limit on the patent grant . . . . [T]he Patent Act just ensures that the patentee receives one reward . . . ."); *Glenayre Elecs., Inc. v. Jackson*, 443 F.3d 851, 864 (Fed. Cir. 2006) ("[A] party is precluded from suing to collect damages for direct infringement by a buyer and user of a product when actual damages covering that very use have already been collected from the maker and seller of that product.").

Even before any of that, 10X plans to challenge the jury's royalty rate on appeal. If the Federal Circuit agrees, no royalties may be owed or, at minimum, the ongoing royalty rate will need to be adjusted as well.

For these reasons, the determination of the applicability and the amount (if any) of any post-verdict royalty is an issue best resolved after appeal, a position both Bio-Rad and the Court agreed with less than a year ago. D.I. 503-1, 506. Bio-Rad has not provided any reason to reconsider the Court's prior Order severing and staying the determination of ongoing royalties, or to withdraw its own agreement to that stay.

**3. Aggregate sales vs. per-product sales royalty report.** 10X has agreed to report the "total, aggregate amount of Permitted Historical Installed Base Sales" but has significant competitive concerns about reporting "the aggregate selling price for each type of consumable product (for example by SKU) for which the royalty is paid" as Bio-Rad proposes. Reporting the total, aggregate amount of revenue is sufficient for Bio-Rad to ensure that 10X is depositing an appropriate amount of money into escrow—particularly when 10X has willingly agreed that Bio-Rad can audit these amounts through an independent auditor as is standard in license agreements. 10X should not be required to report, on an on-going quarterly basis, the price and volume of each consumable on a per-product basis. 10X's product-by-product sales numbers are not publicly available, this Court continues to preserve them under seal, and they are highly competitively sensitive. Reporting sales on by "selling price" and quantity on per-product basis will provide Bio-Rad with granular information about the success of each product line that is not publicly available as well as pricing information which is highly confidential to both 10X and its customers. This concern is acute because Bio-Rad does not yet have a product that competes with three of 10X's offerings. Bio-Rad's interests are fully protected by its right to request an annual accounting audit by an independent, third-party auditor who would have access to the detailed SKU-level product-by-product information, which Bio-Rad seeks for itself. At the same time, 10X's interests are also protected by the auditor's confidentiality obligations. At a minimum, if the Court decides over 10X's objection that 10X must provide per-product sales information, the Court should permit 10X to produce that information with the understanding that is for outside attorneys' eyes only.

9

**Disputed Section IV: Future Instrument Sales.** The Court should not include Section IV, directed to "Future Instruments Sales" of 10X's redesigned products. It is not appropriate to use this injunction as a vehicle for addressing products that have yet to even be accused.

As the Court held in its opinion granting the injunction, "[w]hether 10X's new product is 'colorably different' is a separate legal issue that has yet to be addressed and which may never need to be addressed." D.I. 568 at 10. Bio-Rad's proposed section attempts to bring within the scope of the injunction exactly the new product (10X's redesigned system) that the Court held would be inappropriate to address at this time.

This provision is doubly inappropriate because Bio-Rad did not even ask the Court to address 10X's forthcoming products in its motion or reply.[2] It would be improper and highly prejudicial to 10X if the Court were to enter this impracticable and premature provision in the injunction, without providing 10X a full and fair opportunity to litigate its impropriety and scope, if any. Even though Bio-Rad was well aware of both 10X's efforts at design-around and how the accused products worked, Bio-Rad's motion for injunctive relief did not argue for, and its proposed order did not include, this provision. Bio-Rad's proposed provision is entirely new, and yet it has the potential to seriously harm 10X's ability to support its customers who have purchased products that have **not** been the subject of this litigation at all, and 10X respectfully requests that the Court not include any such provision in its injunction order.

Consistent with the spirit of the Court's ruling, 10X's plan is that all instruments it sells after the Effective Date will be configured to run only 10X's redesigned Next GEM chip. But Bio-Rad attempts to limit 10X to one specific potential method to do so—by adding "verifiably installed non user-modifiable firmware on all such instruments to preclude them from use with such infringing consumables or consumables not colorably different." It is impractical to limit user's ability to modify firmware to stay up-to-date, particularly if those updates continue to limit the use of the instrument to use with Next GEM chips. Firmware for 10X's instruments is regularly updated for a host of reasons, including to include settings for new experiments, assays, or techniques that have not yet been developed as well as improvements to the existing methods. Indeed, this is a key benefit for researchers and other customers who purchase an instrument— they can be confident that their instrument will be able to keep pace with and support the rapidly evolving, cutting edge techniques. Bio-Rad has also never explained what it means by "verifiably" installed, so even if nothing else, it increases the likelihood of future disputes. Requiring installation of "verifiably installed non user-modifiable" firmware (as Bio-Rad proposes) thus would be both impractical, burdensome, and directly contrary to the design and purpose of 10X's instruments.

**Part V: Notice Provision.** The parties dispute to which entities 10X is required to give notice of the injunction. Consistent with the Court's Opinion, 10X proposes that it provide notice to 10X's "existing customers." D.I. 568 at 11. 10X maintains a customer list, and will, consistent with the

---

[2] Nor did 10X ever request that such a provision be included in the injunction, contrary to Plaintiffs' letter. 10X did inform Bio-Rad of its intent to modify Next GEM instruments sold after the injunction such that those instruments will not operate with the old accused chips, but 10X never requested that a provision regarding future instruments be included in this order.

10

terms of the injunction, provide notice to its customers within 5 business days from the Effective Date of the injunction.

Bio-Rad's proposal would require 10X to send the injunction to a much wider range of parties: "each new customer, vendor, sales representatives (including third party resellers and distributors), employee, and all other persons in active concert or participation with them."

Right off the bat, that provision is inconsistent with the Court's Opinion. The Court specifically rejected Bio-Rad's proposal to require 10X to provide notice to customers to which it "intends in the future" to sell the accused products. D.I. 568 at 11. 10X's new customers and new business partners such as distributors will not be affected by this order because after the Effective Date 10X plans to sell new, redesigned instruments and their corresponding chips and reagents to any new customer. It would be highly prejudicial to 10X if it were ordered to disrupt its new business for these redesigned products—products that Bio-Rad has not accused of infringement, and that this Court has not addressed at all, let alone found to infringe—by potentially confusing those new customers as to the scope of the injunction.

The list is also facially overbroad in requiring 10X to send notice to each existing and new "vendor, sales representatives (including third party resellers and distributors), employee and all other persons in active concert or participation with them)." That laundry list is outside the scope of the Court's Opinion. There is no need for 10X to notify its vendors, because 10X plans not to sell new instruments compatible with the old chips after the Effective Date of the injunction. As to the category Bio-Rad terms "sales representatives (including third party resellers and distributors)," 10X's customer list includes its distributors, so by notifying its customers 10X will also be notifying its distributors. As to employees, 10X will of course take measures to make any relevant employee aware of the order and take deliberate steps to be ready to comply when it goes into effect. But there is no reason to order 10X to provide a copy of the injunction orders dense legalese to all of its employees.

We are available at the Court's convenience should Your Honor have any questions.

Respectfully submitted,

/s/ Brian E. Farnan

Brian E. Farnan

cc: Counsel of Record (via E-mail)