IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BIO-RAD LABORATORIES, INC. and
THE UNIVERSITY OF CHICAGO,

Plaintiffs,

v.

10X GENOMICS, INC.,

Defendant.

No. 15-cv-152-RGA

MEMORANDUM ORDER

Presently before the Court are various issues raised in response to the Court's order and memorandum opinion on Plaintiffs' post-trial motions (D.I. 568-69). (D.I. 570-73).

**(1) Interest Applicable to the Jury's Verdict**

The parties dispute whether pre- or post-judgment interest should apply to the jury's verdict of $23,930,719 for the period from the entry of judgment (November 14, 2018) to the entry of final judgment. Plaintiffs argue for pre-judgment interest and 10X argues for post-judgment interest. (D.I. 571).

"[A]n award must be granted pursuant to a money judgment to trigger post-judgment interest," and "to count as a money judgment a judgment must include both an identification of the parties for and against whom judgment is being entered, and a definite and certain designation of the amount owed." *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 175 (3d Cir. 2010) (internal quotation marks omitted). On November 14, 2018, I entered judgment for Plaintiffs and against 10X on the jury's verdict in the amount of $23,930,719. (D.I.


478). The judgment was a "money judgment" triggering post-judgment interest as it included "both an identification of the parties for and against whom judgment is being entered, and a definite and certain designation of the amount owed." *See Travelers*, 609 F.3d at 175; *Amgen v. Hospira*, 336 F. Supp. 3d 333, 365 (D. Del. 2018). Therefore, I award post-judgment interest on the jury's verdict beginning on November 14, 2018.[1]

### (2) Scope of the Permanent Injunction

#### (a) Sections I and II—Prohibited Activities

The parties dispute how broadly 10X should be enjoined from selling, or supplying for combination abroad, components of its accused products. Plaintiffs seek to enjoin 10X from selling or supplying any components of the accused products. (D.I. 572, Ex. A at 3, 6). 10X proposes that the injunction be limited to components that "are especially made or especially adapted for use in an infringement of [the asserted] patents, and are not a staple article or commodity of commerce suitable for substantial noninfringing use." (*Id.* at 4, 7). 10X's proposal mirrors the statutory language for infringement under 35 U.S.C. § 271(c) and (f).

Plaintiffs' proposal would prevent 10X from selling any components of its accused products, even for allegedly non-infringing uses. I see no reason to enjoin activities that do not constitute infringement. Therefore, I would adopt 10X's proposed language, which follows the statutory requirements under § 271(c) and (f).

Plaintiffs' real concern is that, because 10X will continue to sell the same consumables (reagents) for use with its new allegedly non-infringing systems, customers can avoid the 15% royalty by purchasing those "new" consumables for use with old infringing systems. (D.I. 570 at 1-2). 10X is enjoined from deliberately selling its "new" reagents for use with old systems. It is

---

[1] The parties agree that pre-judgment interest applies to the supplemental damages. (D.I. 571).

possible, however, that customers may purchase "new" reagents ostensibly for use with new systems while actually using them with old systems.

The customer issue is closely tied to the parties' dispute over which entities are enjoined. Plaintiffs seek to enjoin 10X and its "officers, agents, servants, employees, attorneys, customers, vendors, sales agents (including third party resellers and distributors) and persons or entities in active concert or participation with them, who receive actual notice of this Permanent Injunction." (D.I. 572, Ex. A at 2, 5). Therefore, 10X's customers would be directly enjoined from using 10X's products in an infringing manner. In contrast, 10X's proposal excludes its customers, vendors, and sales agents. (*Id.* at 3, 6).

An injunction may not be "so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law." *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 13 (1945). "Federal Rule of Civil Procedure 65(d) reflects the standards when it declares that an injunction 'binds only' 'the parties,' 'the parties' officers, agents, servants, employees, and attorneys,' and 'other persons who are in active concert or participation' with them 'who receive actual notice of [the injunction] by personal service or otherwise.'" *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1365-66 (Fed. Cir. 2017).

10X's customers, vendors, and sales agents[2] are third parties whose rights have not been adjudged and thus cannot be enjoined in this action. Therefore, I would adopt 10X's proposed language limiting the list of enjoined parties to 10X and its "officers, agents, servants, employees, attorneys, and persons or entities in active concert or participation with them, who receive actual notice of this Permanent Injunction." (D.I. 572, Ex. A at 3, 6).

---

[2] I assume "sales agents" is a category of third parties. In the alternative, "sales agents" may be a subcategory of "agents." In that case, including "sales agents" as well as "agents" would be needlessly cumulative.

3

Lastly, the parties disagree on the effective date of the permanent injunction. I denied 10X's request for a stay pending appeal but delayed the effective date of the injunction by two weeks. (D.I. 568 at 12). 10X proposes that the effective date be defined as the later of two weeks from the date of the signed permanent injunction "or the date on which any stay granted by the Court of Appeals for the Federal Circuit is lifted." (D.I. 572, Ex. A at 3). 10X agrees that if no stay is granted, the effective date is two weeks from entry of the injunction. (D.I. 570 at 7). I see no reason to base the effective date on the end of a stay that may or may not occur. Should the Federal Circuit grant a stay, it will be best positioned to determine the appropriate scope of that stay.

**(b) Section III—Historical Installed Base**

The parties raise several disputes relating to the products sold prior to the effective date of the injunction ("Historical Installed Base"). The parties agree that 10X will place some portion of the royalties relating to the Historical Installed Base in an escrow account. (D.I. 570, Ex. A at 7-9).

First, the parties dispute the royalty base that should apply to consumables sold for the Historical Installed Base. 10X proposes its net revenue from those sales, while Plaintiffs propose the selling price to the end user. (D.I. 572, Ex. A at 7-8).

Plaintiffs argue that if the royalty is calculated from 10X's net revenue, 10X can reduce the royalty by "off-loading" its sales to an intermediary that takes a cut of the total revenue. (D.I. 570 at 3). I do not find that argument persuasive. Plaintiffs never sought damages based on the ultimate price to the end user, and the jury's verdict award was based on 10X's net revenue. (*Id.* at 7). Therefore, I would adopt 10X's proposed language of "a 15% royalty on the net

4

revenue 10X receives from the Permitted Historical Installed Base Sales." (D.I. 572, Ex. A at 7-8).

Second, the parties dispute whether royalties on post-verdict, pre-injunction sales must be placed in escrow. (*Id.* at 8). The parties agreed, "The determination of the on-going royalty (if any) for the sales governed by [] Section III (including the post-verdict, pre-injunction infringing sales) is SEVERED and STAYED." (*Id.*). 10X thus argues that it does not need to put in escrow a 15% royalty on any post-verdict, pre-injunction sales. (D.I. 570 at 8). I agree. The purpose of the injunction is to prevent future harm. It seems that royalties from sales that have already occurred are beyond the proper scope of the injunction. Therefore, I reject Plaintiffs' proposed language of: "In addition, within forty-five (45) days of the Effective Date 10X shall identify the aggregate number of units and selling price of each infringing product sold before the entry of the injunction and after the verdict that is not included in the supplemental damage award together with a payment in escrow of a 15% royalty of the price to the end user of all such sales." (D.I. 572, Ex. A at 8).

Third, the parties dispute the content of 10X's quarterly royalty report to Plaintiffs. (*Id.*). Plaintiffs seek an accounting on a per-product basis. (D.I. 570 at 3). 10X agrees to provide the aggregate sales but argues that it would suffer competitive harm by providing its per-product numbers. (*Id.* at 9).

I do not think Plaintiffs need a per-product accounting to adequately protect their rights. In addition to the quarterly accounting, the parties agreed to an audit process, which allows Plaintiffs to request an annual audit by an independent auditor for the purpose of verifying 10X's royalty statements and payments. Therefore, I would adopt 10X's proposed language granting

5

Plaintiffs the "right to a quarterly royalty report in which 10X shall identify the aggregate amount of Permitted Historical Installed Base Sales." (D.I. 572, Ex. A at 8).

### (c) Section IV—Future Instrument Sales

The parties agree that 10X should be required to install "firmware" on instruments sold after the effective date of the injunction to prevent use of those instruments in an infringing manner. (D.I. 572 at 2). The firmware will allegedly disable new instruments from operating old microfluidic chips. (*Id.* at 1). 10X's accused products were found to infringe based on their use of the old microfluidic chips. (*See* D.I. 570 at 6). Therefore, a new instrument with a new chip is a different system, which has not been found to infringe.

Plaintiffs argue that 10X should be required to "ensure that before [a new instrument] sale they have verifiably installed non user-modifiable firmware on all such instruments to preclude them from use with such infringing consumables or consumables not colorably different." (*Id.*, Ex. A at 9). In contrast, 10X proposes that the firmware "may be user-modifiable for upgrades provided by 10X but must not be user-modifiable in a way that would allow users to modify the firmware to permit such instruments to use in an infringing way consumables that have been found to infringe or consumables no more than colorably different." (*Id.*).

10X's proposal seems reasonable. Plaintiffs have not explained why 10X should be barred from allowing user-modifications for 10X upgrades. (D.I. 573). Instead, Plaintiffs arguments go towards the parties' dispute over prohibited activities in Sections I and II. (*Id.*). Therefore, I would adopt 10X's proposed firmware language.

6

**(d) Section V—Notice**

The parties dispute the scope of the notice requirement. Plaintiffs propose giving notice to each existing and new customer, vendor, sales representative (including third party resellers and distributors), employee, and all other persons in active concert or participation with them. (D.I. 572, Ex. A at 9-10). 10X limits the notice requirement to existing customers. (*Id.*).

I already held that 10X is not required to provide notice to customers to which it "intends in the future" to sell the accused products. (D.I. 568 at 11). Plaintiffs argue that there is a meaningful distinction between customers to which 10X "intends in the future" to sell products and actual new customers. (D.I. 570 at 3). I disagree. The point is that 10X will be enjoined from making infringing sales. Thus, there is no need for 10X to give notice to its new allegedly non-infringing customers.

I believe the remaining categories—vendors, sales representatives, employees, and persons acting in concert—are subject to the same analysis. 10X is only required to give notice to its existing vendors, etc.

Therefore, I would adopt Plaintiffs' proposed language: "10X shall provide a copy of this Permanent Injunction to each customer, vendor, sales representative (including third party resellers and distributors), employee and all other persons in active concert or participation with them as of the Effective Date." (D.I. 572, Ex. A at 9-10). I would not adopt Plaintiffs' additional language regarding new customers, etc.

By **August 14, 2019,** the parties shall submit, consistent with this order, a revised proposed final judgment and a revised proposed permanent injunction. The parties shall make any relevant calculations based on entry of final judgment on **August 15, 2019**.

IT IS SO ORDERED this 12 day of August 2019.

/s/ Richard G. Andrews
United States District Judge