# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BIO-RAD LABORATORIES, INC. and THE UNIVERSITY OF CHCAGO,<br><br>  Plaintiffs,<br><br>  v.<br><br>10X GENOMICS, INC.,<br><br>  Defendant. | C.A. No. 15-152-RGA |

# DEFENDANT'S OPENING BRIEF
# IN SUPPORT OF ITS MOTION TO STAY

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................ 1

II. FACTUAL BACKGROUND .............................................................................................. 4

III. ARGUMENT ........................................................................................................................ 7

    A. Execution Of Judgment Should Be Stayed Pending Resolution Of 10X's Forthcoming Motion For Relief From Judgment ...................................................... 7

        1. Discovery In Massachusetts Contradicts Key Positions Bio-Rad Took In The Present Case, And That Discovery Was Not Available In This Case For 10X To Use In Rebuttal At Trial ........................................................... 7

        2. A Stay Is Appropriate ............................................................................... 11

    B. Briefing On Ongoing Royalties Should Be Stayed Pending Further Discovery . 13

IV. CONCLUSION ................................................................................................................... 15

## TABLE OF AUTHORITIES

**Cases**

*Hologic, Inc. v. Minerva Surgical, Inc.*,
  No. 15-1031, 2020 WL 5095442 (D. Del. Aug. 28, 2020) ....................................................... 13

*Husqvarna AB v. Toro Co.*,
   No. 15-856-SLR, 2016 WL 5213904 (D. Del. Sep. 20, 2016) ............................................... 12

*Landis v. N. Am. Co.*,
  299 U.S. 248 (1936) ......................................................................................................... 11, 13

*Telcordia Techs., Inc. v. Cisco Sys., Inc.*,
  No. 04-00876-GMS (D. Del. Apr. 14, 2014) ........................................................................ 14

*Vectura Limited v. Glaxosmithkline LLC*,
  No. 16-00638-RGA (D. Del. Sep. 12, 2019) (J. Andrews) ..................................................... 14

**Rules**

Fed. R. Civ. Proc. 6(b)(1) ............................................................................................................. 13

Fed. R. Civ. Proc. 62(b) ............................................................................................................... 11

I.      **INTRODUCTION**

Principles of equity and efficiency warrant a modest stay of this matter. Since the completion of trial in the present case in November 2018, 10X has obtained discovery in another case showing that the judgment in the present case was based on fraud and misrepresentation. 10X requests a modest stay of execution of the judgment in this case to gain access to the existing discovery showing fraud and to permit the resolution of proceedings under Rule 60 seeking relief from aspects of the judgment—and particularly the damages award—that were procured by systematic false and misleading statements at trial. 10X also respectfully requests a stay of briefing on ongoing royalties during the pendency of its motions to gain access to the same existing discovery that is highly relevant to the Court's determination of such royalties.

This case involves patents that were first asserted by RainDance against 10X. Then Bio-Rad acquired RainDance and replaced RainDance as Plaintiff in the present case. Discovery from Bio-Rad was extremely limited. At trial, Bio-Rad sought a 15% royalty based on, in part, the value of the RainDance portfolio. The jury found for Bio-Rad, and the Court entered an injunction. 10X appealed from this Court's judgment to the Federal Circuit, which affirmed in part, reversed in part, and vacated in part. D.I. 613-1. 10X petitioned for rehearing *en banc*, but the Federal Circuit denied its petition. D.I. 612. The mandate then issued on November 12, 2020. D.I. 613. The damages award was left undisturbed based on the finding of infringement of a single patent with a worldwide damages award, even though the infringement finding was reversed as to two of the three asserted patents. By Federal Rule of Civil Procedure 62(a) and this Court's order, execution on judgment proceeds has been stayed for 30 days after entry of judgment. *See* D.I. 608 at 1. Per Bio-Rad's demand, 10X has agreed that absent action by this Court it will pay the judgment on December 15. Post-remand proceedings are likely to begin soon.

After trial in this case, Bio-Rad first filed another case against 10X in this Court (C.A. No.

1

19-1699-RGA), voluntarily dismissed it, and then refiled it in the District of Massachusetts (C.A. No. 1:19-cv-12533-WGY) ("Massachusetts Case"). The Massachusetts Case presented some of the same issues as the present case because the rights to the asserted patents were obtained through the same acquisition of RainDance and Bio-Rad's damages contentions rely on the 15% royalty rate from the present case. 10X thus sought discovery in the Massachusetts Case into Bio-Rad and its views of the RainDance portfolio and acquisition. While 10X is not yet permitted to provide the confidential details of the discovery, it has revealed the following:

- Bio-Rad knew and had specific and conclusive evidence that the 15% royalty rate it argued for at trial was not the reasonable rate even for the entire RainDance patent portfolio let alone the handful of patents from that portfolio that Bio-Rad asserted, including because it told the jury the opposite of its outside-of-litigation beliefs about comparable and non-comparable licenses;

- The Grant Thornton fair value analysis of certain assets acquired by Bio-Rad from RainDance was not, as Bio-Rad said at trial, merely a conservative accounting exercise and in fact reflected Bio-Rad's specific analysis and beliefs regarding the appropriate royalty for a license to the entire RainDance portfolio;

- Bio-Rad's assertions when attempting to bolster the value of the patents acquired from RainDance at trial in this case are the opposite of statements it made in the Massachusetts Case when attempting to defend against 10X's antitrust claims in that case;

- Bio-Rad's allegations that RainDance would be a perceived competitor based on RainDance's alleged plans to enter the market, despite having no competing product in the market with 10X, were inconsistent with RainDance's actual position and beliefs; and

- Contrary to Bio-Rad's allegations in support of its injunction demand that 10X irreparably harmed Bio-Rad, discovery in the Massachusetts Case showed that Bio-Rad failed because of its own shortcomings, lack of investment in its products, and the inferiority of its product, not because of 10X.

Before 10X will otherwise be forced to pay on the judgment in this case that was obtained through key testimony inconsistent with discovery that 10X did not have at trial, 10X asks merely for the opportunity to present the full set of facts to this Court under Rule 60. While some of the facts relevant to the Rule 60 proceedings are now public, Bio-Rad has not agreed that all such relevant

facts are not confidential and it has refused to allow 10X to use such discovery confidentially in the present case. Bio-Rad has been unwilling to agree to a cross-use provision, even one that would maintain the confidentiality protections of the information and would merely permit the use of confidential discovery in the present case. 10X's cross-use proposal did not require that Bio-Rad waive any other objection to the use of the discovery from the Massachusetts Case that could be raised in the District of Delaware, nor would its implementation cause any burden or prejudice to Bio-Rad. Bio-Rad nevertheless refused to agree to any cross-use. 10X remains willing to agree to a bilateral cross-use, as the parties have agreed to in multiple prior cases, including before this Court.

Because Bio-Rad has not been willing to reach an agreement on any use of documents from the Massachusetts Case in the present case, 10X is seeking the Court's assistance. Because, absent action by this Court, 10X will need to pay the judgment by December 15, 2020, 10X respectfully requests a stay of execution of the judgment to gain access to the relevant discovery in this case, to allow briefing under Rule 60, and to permit this Court to decide whether to grant 10X relief from the judgment.

10X is working expeditiously to obtain permission to use the relevant discovery in the present case. 10X has already moved in the District of Massachusetts to modify the protective order in that case to permit the use of the confidential materials from the Massachusetts Case in this Court. 10X also plans to move in this Court to compel production of the relevant information upon receiving guidance from the Court on the preferred procedures. *See* Ex. 1, Massachusetts Case, D.I. 197 (Dec 8, 2020, Motion to Modify Protective Order) ("Massachusetts Motion"); Ex. 2, Massachusetts Case, D.I. 198 (Dec. 9, 2020, Memorandum in Support) ("Massachusetts Memo."). If 10X obtains permission to use the relevant documents in this case, 10X will promptly file a Rule

60 motion. The stay 10X seeks simply preserves the status quo while the discovery dispute and the Rule 60 dispute are resolved.

The discovery that 10X seeks to use from the Massachusetts court or this Court is also relevant to the question of ongoing royalties that Bio-Rad has informed 10X it will be pursuing. Bio-Rad's beliefs regarding the appropriate royalty rate for the entire RainDance portfolio, Bio-Rad's beliefs about the comparability of other licenses, Bio-Rad's post-verdict licenses, and the absence of competition between Bio-Rad and 10X due to Bio-Rad's failings are all relevant to the post-verdict hypothetical negotiation between Bio-Rad and 10X that will be at issue. Bio-Rad has not agreed to the use of the relevant Massachusetts Case discovery in this case. Thus, 10X is seeking a stay to obtain permission to use the information that pertains directly to the upcoming briefing in this case.

A stay pending resolution of these motions will avoid payment of the fraudulently obtained judgment and will streamline outstanding briefing.

## II.   FACTUAL BACKGROUND

Plaintiffs asserted six microfluidics patents against 10X, three of which were ultimately presented to a jury. D.I. 559 at 2. As damages for the alleged infringement, Plaintiffs proposed a high 15% royalty rate allegedly for competitors based on allegedly comparable licenses. Ignoring over a dozen relevant licenses—including a license for the patents-in-suit with rates ranging from .25% to 3%—Plaintiffs' damages expert relied on three cherry-picked licenses: a license from Applera to Bio-Rad with a 15% rate on sales of PCR instruments; a license from Caliper to RainDance with a 2% rate for non-competitive uses like RainDance's and a hypothetical 15% competitive rate that RainDance never paid; and a license from AppliedBio to QuantaLife with a 10-15% rate for reagents for PCR technology. D.I. 559 at 28-33. Two of the three licenses were Bio-Rad licenses produced in litigation late, when Bio-Rad took over the case. Relevant to this

motion, at trial, Bio-Rad adduced a battery of testimony meant to validate its reliance on the high 15% rate for the handful of RainDance patents it asserted rather than the lower rates that the preponderance of licenses taught would have been correct. Of central importance to this theme, Bio-Rad told a story about how it bought RainDance knowing that it would terminate all of that company's products because all it wanted—and all it paid for—was RainDance's patent portfolio. Further, Bio-Rad put forward testimony that within the patent portfolio the most valuable patents, the ones it primarily paid for, were the asserted ones. Despite the extremely limited discovery that was allowed into Bio-Rad's actual information about the RainDance patents, Bio-Rad was confronted at trial with a key piece of evidence that the 15% rate was simply not correct—a fair value analysis performed by Grant Thornton that appeared to place the value of the entire RainDance portfolio much lower than the value Bio-Rad asked the jury to assign to just the handful of RainDance patents asserted in this case. Bio-Rad responded by dismissing that analysis as somehow inconsistent with the reasonable royalty both because it was a mere accounting exercise and because the actual royalty rate it supposedly implied was much higher than the rate it expressly stated. Without meaningful discovery into the licenses and the valuation process and with discovery from Bio-Rad severely curtailed following its acquisition of RainDance, 10X was unable to effectively impeach Bio-Rad's naked assertions and the jury was left free to accept them.

After the jury returned a verdict in favor of Plaintiffs and post-trial motions were resolved, the Court entered final judgment in the amount of $34,475,069 on August 15, 2019. D.I. 582. That judgment included the jury verdict award of $23,930,718 based on a 15% rate; $8,341,368 in supplemental damages through the date of the verdict; and $2,202,983 in interest. *Id.* The Court also issued an injunction. D.I. 578. But it severed and stayed the issue of what rate, if any, applies to ongoing royalties and whether it applies to consumables for instruments already sold; the Court

reserved resolution of ongoing royalties issues pending appeal. D.I. 506 at 2; D.I. 578 at 5. 10X filed a supersedeas bond, which "remain[s] in full force and effect." D.I. 605-1 at 1.

In parallel to the appeal proceedings, 10X and Bio-Rad have been litigating a related patent infringement and antitrust action in the District of Massachusetts. In the Massachusetts Case, Bio-Rad has accused 10X of infringing certain patents to which—like the patents asserted in this case—Bio-Rad obtained exclusive rights when it bought RainDance. In the same case, 10X asserts patent infringement claims against Bio-Rad and also asserts that Bio-Rad has violated antitrust law including by buying RainDance, and aggregating the RainDance patent portfolio with the patents Bio-Rad already owned or controlled in order to anticompetitively raise the price of both of the combined portfolios. Discovery in that case has progressed while this case was on appeal before the Federal Circuit and it is continuing today. In connection with Bio-Rad's claims for damages in that case, and in connection with 10X's antitrust claims, 10X took discovery from Bio-Rad, key Bio-Rad personnel, numerous former Bio-Rad or former RainDance personnel, and from Grant Thornton and the former Grant Thornton principal who was responsible for the Grant Thornton analysis that Bio-Rad had dismissed during trial of this case. The discovery 10X has taken in Massachusetts—discovery that was not available to 10X in this case—contradicts the core assertions Bio-Rad made at trial in this case to support its 15% royalty rate. Discovery in the Massachusetts Case has revealed that Bio-Rad's damages demand at trial in this case was a studied edifice of false and misleading claims that Bio-Rad's concealment of myriad essential facts deprived 10X of important defenses for itself.

Based on these discoveries, 10X intends to file a motion for relief from judgment pursuant to Federal Rules of Civil Procedure 60(b)(3) and 60(d) for fraud, misrepresentation, or misconduct by an opposing party. Because the evidence supporting the Rule 60 motion is presently subject to

a protective order in the District of Massachusetts, and because Bio-Rad has refused to agree that the information can be used in the present case, 10X has moved to modify the protective order in Massachusetts for permission to use the information in the present case. Exs. 1-2, Massachusetts Case, D.I. 197-98. 10X will also file a motion to compel production of the relevant information pending instructions from the Court about the Court's preferred form and schedule of briefing.

Gaining access to the documents 10X seeks is not burdensome. 10X already has the discovery. 10X merely needs permission to use it. Bio-Rad could at any time agree to the use of the discovery with a letter at zero cost to Bio-Rad. There is also no risk to Bio-Rad because 10X has proposed not that the discovery should be made public, but that it can be maintained under continuing confidentiality protections subject to further orders of the Court while being used in this proceeding.

Bio-Rad's refusal to agree to the use of existing discovery in the present case is contrary to Bio-Rad's own insistence on cross-use over multiple cases. Bio-Rad even raised the issue of cross-use with this Court in another proceeding Bio-Rad filed against 10X, and this Court asked "wouldn't that be a pretty easy thing to agree to." Ex. 3, Case No. 18-01679-RGA, June 7, 2019, Scheduling Conference Tr. at 10. But it is Bio-Rad that now refuses to permit 10X to present the relevant evidence to this Court by attempting to cloak it in confidentiality protections of another case to avoid its pervasive false statements in this case from coming to light. That is not proper.

### III.  ARGUMENT

#### A.  Execution Of Judgment Should Be Stayed Pending Resolution Of 10X's Forthcoming Motion For Relief From Judgment

##### 1.  Discovery In Massachusetts Contradicts Key Positions Bio-Rad Took In The Present Case, And That Discovery Was Not Available In This Case For 10X To Use In Rebuttal At Trial

Discovery in the Massachusetts Case revealed multiple examples of false and misleading

statements on key issues going to Bio-Rad's damages claims in this case. For example, at trial in this case, Ms. Tumolo, Bio-Rad's Executive Vice President, testified that "you can't practically do single cell without using droplets." Trial Tr. at 133:25-134:17. This was an attempted to bolster the value of the asserted patents, which Bio-Rad alleged covered droplets. It is now public that three Bio-Rad witnesses have testified to the opposite in Massachusetts.[1] Ex. 4, Lebofsky Dep., 9:19-21, 54:10-19 ("there are practical ways to do single-cell WTA 3' analysis without droplets"); *see also* Ex. 5, Trauzzi Dep., 99:8-100:6, 101:9-15 ("there have been practical ways to do single-cell without droplets"); Ex. 6, Chia Dep., 95:19-24 ("[T]here are practical ways that don't use droplets to do library prep for single-cells."). Ms. Tumolo also testified at trial in this case that the "whole [RainDance] acquisition we viewed as an intellectual property acquisition" and "the value of the IP was $87 million." Trial Tr. 138:3-12, 165:19-166:3, 179:17-180:17. This testimony was contradicted in the Massachusetts case. Bio-Rad's counsel also represented to this Court that when Ms. Tumolo was "looking at the company [RainDance]," she expected "we're going to disable the products or whatever you do, you know, to stop selling them" and told the CEO and likely the Board "the products aren't very good." Trial Tr. 49:4-25. But Ms. Tumolo also contradicted this claim in Massachusetts. In particular, her testimony in the Massachusetts Case was that Bio-Rad had not decided to "phase out" the RainDance products "prior to acquisition," contradicting the argument that she had decided to stop selling the RainDance products before the acquisition. Ex. 7, Tumolo Dep., 83:1-84:23.

Ms. Tumolo also submitted a declaration in this case to support Bio-Rad's injunction that

---

[1] While Bio-Rad permitted certain Massachusetts discovery to be filed publicly with 10X's Massachusetts Motion, including that cited in this motion, Bio-Rad continued to shield and withhold other relevant discovery as confidential. 10X is not seeking to have the confidential information made public. 10X seeks only the permission to use the information in this Court under continued confidentiality protections.

8

was fraught with inaccuracies. For example, Ms. Tumolo's declaration stated that "Bio-Rad has placed many single cell systems with hundreds of 'single cell' customers." ECF No. 516, ¶¶ 3-7. But Bio-Rad admitted in Massachusetts that "fewer than 100 distinct entities have purchased ddSEQ instruments," which are Bio-Rad's single cell instruments. Ex. 8 (Response to Request for Admission No. 2). Ms. Tumolo's declaration also asserted that 10X harmed Bio-Rad, such as through its early market entry. ECF No. 516, ¶¶ 3-7. But Bio-Rad's corporate witness in Massachusetts on lost sales was "not aware of lost sales" and testified that Bio-Rad did not "need 10X to stop selling its WTA 3' product in order to compete in the market." Ex. 4, Lebofsky Dep., 91:17-23, 93:4-7; Ex. 9 (Ex. 1 Lebofsky Dep.); Ex. 10 (Sep. 14, 2020, email). Multiple witnesses also testified in Massachusetts to Bio-Rad's failures to invest in research and development that would have been necessary to make competitive products. Mr. Lebofsky, Bio-Rad's Associate Director of Advanced Research, testified in Massachusetts that he "did not feel that [Bio-Rad was] staffing for success" when ten people were on projects requiring thirty in November 2017. Ex. 4, Lebofsky Dep., 105:24-108:1, 140:12-141:18, 145:3-147:24, 151:17-24. The former Bio-Rad vice president in charge of ddSEQ, Dr. Agresti, was frustrated about "not setting the ddSEQ project up to succeed" and that Ms. Tumolo "wasn't allocating enough resources." Ex. 11, Agresti Dep., 7:13-18, 8:24-9:6, 80:13-81:5, 87:6-88:4, 90:11-21, 94:7-23, 99:1-25. Another Bio-Rad witness testified in Massachusetts that Bio-Rad did not make "a massive investment into the roadmap for ddSEQ," but that 10X is "continually announcing and investing in new products[;] they are putting a massive amount of money into -- into R&D." Ex. 5, Trauzzi Dep., 18:24-19:4, 20:21-21:20. Bio-Rad's product has been unable to compete generally, not just against 10X's product: the "best guess" of Bio-Rad's Director of Marketing Strategy, Ms. Trauzzi, was that a third party's product, Becton Dickinson's Rhapsody, "has been more widely adopted than the [Bio-Rad] ddSEQ

platform." *Id.*, 59:2-5.

As another example, Ms. Tumolo offered testimony in this case to minimize the Grant Thornton analysis as taking "a conservative point of view because this is an accounting exercise." Trial Tr. 180:2-3. That is directly contrary to multiple sources in the Massachusetts Case confirming that the rates in the Grant Thornton analysis were accurate and conveyed Bio-Rad's views. *See, e.g.*, Ex. 12, DiPanfilo Dep., 9:6-11:23, 13:4-8, 18:12-19:11, 38:9-39:11 (Grant Thornton analysis "is part of our financials that are reported to the SEC" and IRS and that Bio-Rad would have attempted to provide complete, accurate, and truthful information); Ex. 13, Tr. of GT004182, 49:3-5 ("[W]e prefer the number to accurately reflect our thinking. And we're trying to explain that to you.").

The foregoing are only examples about which Bio-Rad has permitted certain limited evidence to become public. Bio-Rad cherry-picked the evidence it provided to 10X before trial in this case, and it continues to try to prevent 10X from using the information 10X has now obtained in other cases that shows the extent of Bio-Rad's false and misleading statements at trial in this Court. Thus, there are additional confidential facts that 10X seeks access to so that it can present the full scope of the misrepresentations to this Court. For example, an important dispute at trial in the present case was the reasonable royalty, and Bio-Rad offered argument and testimony that 15% was the reasonable royalty for a handful of RainDance-licensed patents. *E.g.*, Trial Tr., 611:18-612:14 (expert: "the right royalty rates [sic] is 15% for competitors"), 1499:17-21 (closing: arguing there was a 15% rate for competitors). Discovery in the Massachusetts Case showed that Bio-Rad had actually concluded that the royalty rate for the entire RainDance patent portfolio was less than the rate Bio-Rad claimed for just a handful of those same patents in this case. Ex. 2, Massachusetts Memo. at 11-15. Discovery in Massachusetts has also revealed Bio-Rad's outside-of-litigation

belief that the license it has argued to the jury is comparable, the Applera license, is not comparable, and that at least one license that Bio-Rad argued to the jury is not comparable, the Life Technologies license, is the real comparator. *Id.*, at 7. But Bio-Rad continues to assert information about its previous views on the rate is confidential and that 10X cannot use those facts even confidentially in this case. Bio-Rad adduced testimony at trial in this case that even though RainDance had no single cell or linked read products like 10X's, it was going to "bring[] them and showed they planned on doing it in competition." Trial Tr., 651:14-652:19. The evidence in the Massachusetts Case is again to the contrary, but the evidence itself is again subject to Bio-Rad's confidentiality claim and Bio-Rad will not permit its use in this case.

### 2. A Stay Is Appropriate

Federal Rule of Civil Procedure 62(b) authorizes the Court to stay execution of judgment where, as here, a bond is in effect. Rule 62(b) broadly states that "[a]t any time after judgment is entered, a party may obtain a stay by providing a bond or other security." The Comments to the 2018 Amendment reinforce that "[a] stay may be obtained under subdivision (b) at any time after judgment is entered." The comments go on to explain that the language of the rule was changed to permit "a party" to obtain a stay instead of "an appellant," and specifically that "a party may wish to secure a stay pending disposition of post-judgment proceedings after expiration of the automatic stay, not yet knowing whether it will want to appeal." 10X wishes to secure a stay pending the disposition of the post-judgment proceedings that will commence shortly before this Court.

This Court also has "the power to stay proceedings," which "is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). "[T]he decision of whether to grant a stay rests within the sound discretion of the court through the exercise of judgment, 'weigh[ing] competing interests and maintain[ing] an even balance.'"

11

*Husqvarna AB v. Toro Co.*, No. 15-856-SLR, 2016 WL 5213904, at *1 (D. Del. Sep. 20, 2016). In determining whether to grant a stay, courts in this district typically consider (1) "whether a stay will unduly prejudice or present a clear tactical disadvantage to the non-moving party, i.e., the balance of harms," (2) "whether a stay will simplify the issues in question," and (3) "whether a stay will promote judicial economy." *Id.*

*First*, the balance of harms favors a stay. Requiring 10X to satisfy a judgment procured by fraud and misrepresentation would cause gross inequity. Similarly, requiring 10X to pay on a judgment with no opportunity to be heard as to whether it was obtained by fraud based on the presently available evidence is also a significant harm. The stay is particularly warranted in this case because otherwise 10X is presently subject to a judgment based on these false statements with no access in the present case to much of the discovery that would permit 10X to show that falsity. By contrast, Bio-Rad suffers no undue prejudice or tactical disadvantage. Bio-Rad's interest in collecting any proper award is fully protected by the bond 10X posted, which "remain[s] in full force and effect." D.I. 605-1 at 1. The judgment provides for daily interest in the amount of $1,681 per day, which more than compensates Bio-Rad for any delay. D.I. 582. The injunction also remains in place as further protection of Bio-Rad against any alleged non-monetary harm. As 10X's forthcoming Rule 60 motion will show,[2] and as described briefly in the preceding section, relief from judgment is warranted, and there is no clear tactical disadvantage in permitting 10X to be heard before it pays on the judgment at issue. If a stay on execution remains in effect, Bio-Rad

---

[2] 10X has proceeded with diligence in filing for relief from judgment. 10X did not discover the underlying fraud, nor could it have, until well into discovery (which is still ongoing) in the District of Massachusetts Case. 10X then began the process of meeting and conferring with Bio-Rad, and after determining Bio-Rad would not agree to permit the evidence to be used in this case, moved in the District of Massachusetts and this Court to present the information here.

would be in no worse position than it is in now—and "a district court does not abuse its discretion by extending a stay to maintain the status quo." *Hologic, Inc. v. Minerva Surgical, Inc.*, No. 15-1031, 2020 WL 5095442, at *1 (D. Del. Aug. 28, 2020).

*Additionally*, a stay would simplify the issues and promote judicial economy. If judgment is executed and the Court determines relief from judgment is warranted, it would then have to direct the parties through the process of clawing back and redistributing the judgment. There will be additional efficiencies to staying judgment pending resolution of the Rule 60 proceedings because such proceedings can occur around the same time as the ongoing royalty briefing, which will likely involve some of the same discovery 10X seeks and some of the same issues. While there is no cost to staying execution, doing so offers the efficiency gain of streamlining the post-appeal proceedings.

The Court should thus grant a stay of execution of judgment pending resolution of 10X's forthcoming Rule 60 motion.

### B. Briefing On Ongoing Royalties Should Be Stayed Pending Further Discovery

The Court should stay briefing on ongoing royalties pending resolution of either 10X's forthcoming Motion to Compel or 10X's Massachusetts Motion to modify the protective order. For similar reasons to those described above, this Court has the power to manage its docket in the interest of efficiency and equity. *See Landis*, 299 U.S. at 254 (describing such inherent authority); *see also* Fed. R. Civ. Proc. 6(b)(1) (empowering court to extend time for good cause). Both those goals counsel in favor of a stay on briefing pending the resolution of either the motion to compel that is forthcoming in this case pending guidance from the Court on the preferred form and schedule of briefing, or proceedings to modify the protective order in the District of Massachusetts.

As this Court has recognized, post-remand damages determination involves a post-verdict hypothetical negotiation analysis. *Vectura Limited v. Glaxosmithkline LLC*, No. 16-00638-RGA,

D.I. 362 at 13 (D. Del. Sep. 12, 2019) (J. Andrews). This analysis includes assessment of changed economic circumstances and any "'other post-verdict' factor that would impact 'what a hypothetical negotiation would look like after the prior infringement verdict.'" *Id.* As described in the preceding section, discovery from Massachusetts related to the royalty rate, significance of the Grant Thornton analysis, and the value of the RainDance patents—whether it shows fraud or not—is relevant to the hypothetical negotiation that would occur between 10X and Bio-Rad. Bio-Rad has entered into a license with 1CellBio, a company making droplet products, after the verdict. Ex. 14 Massachusetts Case, D.I. 74-7. Such post-verdict licenses are relevant to determining ongoing royalties, and 10X should be permitted to rely on the non-public information about the 1CellBio license and its terms. *Telcordia Techs., Inc. v. Cisco Sys., Inc.*, No. 04-00876-GMS, D.I. 439 at 6-9 (D. Del. Apr. 14, 2014). The requested stay would permit the merits of the motion to compel or the Massachusetts Motion to be resolved before 10X needs to brief an issue to which the discovery is relevant.

Information about Bio-Rad's failed market position is also relevant to the hypothetical negotiation. While the hypothetical negotiation at trial was between RainDance and 10X, the post-verdict hypothetical negotiation would be between Bio-Rad and 10X. This is particularly relevant because at trial in the present case Bio-Rad's expert witnesses and counsel relied upon a license with a "15 percent" rate "when there's competition," and "when there was non-competition was 2 percent." Trial Tr. 625:5-20, 1168:18-1169:24, 1499:17-21, 1501:7-21. If 10X and Bio-Rad are not competitors in the post-verdict hypothetical negotiation, Bio-Rad should no longer obtain the supposed competitor licensing rate. Thus, the evidence from Massachusetts is even more relevant now, is available at no additional cost, and should be allowed. In addition to the reasons in Section

14

III(A)(I) for why 10X and Bio-Rad do not compete, other evidence from the Massachusetts case confirmed the same, and only some of it is public. For example, Bio-Rad's Director of Marketing Strategy, Ms. Trauzzi, testified in Massachusetts that "Bio-Rad to my knowledge has never had a significant presence in the single-cell NGS market" and has a market share "around 1 percent." Ex. 5, Trauzzi Dep., 84:8-15. Ms. Tumolo testified at trial in this case that Bio-Rad would "leapfrog" 10X's technology in 2019. D.I. 516, ¶¶ 3-7; Trial Tr., 134:18-135:15. But discovery in Massachusetts showed that no such new product was released; only a single new assay was released; and Bio-Rad was "falling short of what [they] were trying to achieve" with the project. Ex. 4, Lebofsky Dep., 147:10-13, 149:4-7; 149:15-150:15. 10X needs access to the full set of evidence from Massachusetts related to the market and competition to fairly defend against claims for an ongoing royalty, which have yet to be briefed.

Not only would it be more efficient to stay briefing until the relevant facts have been introduced into this record, but it would also permit an equitable result. Proceeding before a full airing of the facts risks forcing 10X to pay royalties based on inaccurate and fraudulent representations. This Court should therefore grant 10X's motion to stay briefing of ongoing royalties.

IV.  **CONCLUSION**

For the foregoing reasons, 10X respectfully requests that the Court stay execution of judgment pending resolution of motions for relief from judgment and that the Court stay briefing on ongoing royalties pending the resolution of the motion to compel or motion to modify the protective order.

| | |
|---|---|
| *Of Counsel*: | RICHARDS, LAYTON & FINGER, P.A. |
| ORRICK HERRINGTON & SUTCLIFFE LLP | */s/ Frederick L. Cottrell, III*<br>Frederick L. Cottrell, III (#2555)<br>Jason J. Rawnsley (#5379)<br>Alexandra M. Ewing (#6407)<br>920 North King Street<br>Wilmington, DE 19801<br>(302) 651-7550<br>cottrell@rlf.com<br>rawnsley@rlf.com<br>ewing@rlf.com |
| E. Joshua Rosenkranz (jrosenkranz@orrick.com)<br>Melanie L. Bostwick (mbostwick@orrick.com)<br>Elizabeth R. Moulton (emoulton@orrick.com)<br>51 West 52nd Street<br>New York, NY 10019-6142<br>(212) 506-5380 | |
| TENSEGRITY LAW GROUP LLP | *Attorneys for 10X Genomics, Inc.* |
| Matthew Powers (matthew.powers@tensegritylawgroup.com)<br>Azra Hadzimehmedovic (azra@tensegritylawgroup.com)<br>Robert Gerrity (robert.gerrity@tensegritylawgroup.com)<br>555 Twin Dolphin Drive<br>Suite 650<br>Redwood Shores, CA 94065<br>(650) 802-6000 | |

DATED: December 10, 2020